BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
MICAELA RUSTIA MOORE, ESQ.
Nevada Bar No. 9676
**FOX ROTHSCHILD LLP**
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
       mmoore@foxrothschild.com
*[Proposed] Counsel for Martifer Aurora Solar, LLC.*

Electronically filed January 23, 2014

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>MARTIFER AURORA SOLAR, LLC,<br>a Nevada limited liability company,<br><br><br><br><br><br><br><br><br>Debtor. | Case No.  BK-S-14-10355-abl<br><br>Chapter 11<br><br>**DECLARATION OF KLAUS BERNHART IN SUPPORT OF MOTION FOR INTERIM AND FINAL ORDER PURSUANT TO 11 U.S.C. §§ 361,362 AND 363 AND FED. R. BANKR. P. 4001(B) AND 4001(D): (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL AND PROVIDE ADEQUATE PROTECTION; (II) GRANTING RELATED RELIEF; AND (III) SCHEDULING FINAL HEARING**<br><br>Hearing Date: OST PENDING<br>Hearing Time: OST PENDING |

KLAUS BERNHART, being duly sworn, hereby deposes and declares under penalty of perjury:

1. I am over the age of 18, am mentally competent, and if called upon to testify as to the statements made herein, could and would do so.

2. I am the Chief Financial Officer of Martifer Solar USA, Inc. ("Martifer USA"). Martifer USA holds no less than 99% of the membership interests in Martifer Aurora Solar, LLC ("Aurora"). Martifer USA and Aurora are the debtors and debtors in possession (collectively, the "Debtors" or the "Companies"), in the above captioned chapter 11 cases (the "Chapter 11 Cases"). I am a Manager of Aurora. I am authorized to submit this declaration in support of the Debtors' motion for approval to use cash collateral (the "Cash Collateral Motion").[1]

3. In my capacity as Chief Financial Officer of Martifer USA and Manager of Aurora, and in conjunction with the efforts of the Companies' other respective officers, executives and senior management, I am involved in a management role on a day-to-day basis over all aspects of the Companies' affairs, including business operations, strategic planning, financial reporting, human resources, legal affairs and other management activities, as well as the Companies' efforts to address their current financial difficulties.

4. As a consequence, I review and work extensively with the books and records of the Companies, including their respective business plans, financial statements and projections, business analyses and reports, contracts and other legal documents, notes and correspondence and similar items. On a regular basis, I witness, participate in or have had reported to me discussions and negotiations with vendors, other creditors and stakeholders of the Companies, and have worked closely with personnel from all aspects of the Companies' business operations.

5. Based on all of the foregoing, I have developed an intimate familiarity with: (a) the Companies' books and records, which are maintained in the ordinary course of business under my supervision and control (and under the control of officers of the Companies' respective executive and senior management); (b) the Companies' respective business and financial histories, and their current business and financial situations; (c) the financial and operation details of the Companies' business operations; and (d) the solar panel and renewable energy industry, generally.

6. I have over 35 years of international experience in U.S. and European commercial and investment banking. I have originated, structured, lead, managed and syndicated in excess of

---

[1] Unless other defined, capitalized terms used herein shall have the meanings ascribed to them in the Cash Collateral Motion or the Omnibus Declaration.

$25 billion of global energy/renewable energy transactions. Over the course of 8 years, I served in several capacities at HSH Nordbank – including as the Senior Executive Vice President, the General Manager, the Regional Head of the Americas and the Global Head of Energy – where I positioned the bank as the top global financial institution in Renewable Energy with my success at the bank's New York branch. Prior to HSH Nordbank, over the course of two decades, I worked at various banks in Germany and France, beginning as an analyst out of college and promoted progressively to the executive vice president level. At Landesbank Schleswig-Holstein ("LBSH"), I developed a number of new business segments, such as aviation finance and structured finance. Additionally, I was responsible for running and growing LBSH Leasing GmbH as its Managing Director, prior to its sale to AGV Leasing, a leading player in the German leasing market. I attended Fachhochschule Munich, in Munich, Germany, with a professional certification called Bankkaufmann (i.e. banking).

7. Except as otherwise stated herein, if called as a witness, I could and would competently testify to the matters set forth herein from my own personal knowledge.

8. On January 21, 2014 (the "Petition Date"), the Debtors initiated their Chapter 11 Cases by concurrently filing voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

9. The Debtors intend to operate their businesses and manage their properties as debtors-in-possession under section 1107(a) and 1108 of the Bankruptcy Code.

10. I am advised by counsel that this Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in this United States Bankruptcy Court for the District of Nevada pursuant to 28 U.S.C. §§ 1408 and 1409.

11. Additional background is set forth in my Omnibus Declaration in Support of First Day Motions (the "Omnibus Declaration"), which is incorporated herein by this reference.

12. The Pre-Petition Lender holds a lien on all of Debtors' personal property and the proceeds thereof as of the Petition Date pursuant to the CSA. As a result, the Pre-Petition Lender asserts an interest in all cash held by Debtors as of the Petition Date. Now that Debtors have commenced their Chapter 11 Cases, Debtors require the consent of the Pre-Petition Lender or approval of the Court to use the Pre-Petition Lender's cash collateral.

13. Pending approval of DIP Financing, Debtors do not have any other source of cash to fund operations that is not the Pre-Petition Lender's cash collateral. Moreover, although Debtors are negotiating for DIP Financing in order to provide additional post-petition liquidity, Debtors still primarily need to rely on the use of cash collateral to maintain their operations and remain current on expenses. As set forth in the Initial Cash Budget, Debtors project that they will need to use more than $3.8 million in case (exclusive of projected DIP Financing borrowings) during the first thirteen (13) weeks following the Petition Date in order to meet their operating expenses and make adequate protection payments to the Pre-Petition Lender. In addition, Debtors estimate that they will incur approximately $750,000 in expenses associated with the Chapter 11 Cases during this same period (which are contemplated to be funded with DIP Financing). Thus, Debtors have an urgent and immediate need to use cash collateral. With this necessity in mind, Debtors have attempted to negotiate a Cash Collateral Agreement with the Pre-Petition Lender, but have not yet reached agreement on the terms thereof.

14. Debtors are seeking authorization to use cash collateral pending a final hearing on the Motion in order to avoid immediate and irreparable harm to the estate. In order to keep Debtors' business operational, Debtors must be able to pay their subcontractors, satisfy other ongoing working capital needs and expenses of operation, including, without limitation, employee payroll expenses, and fund the costs of administering Debtors' estates, including without limitation, fees assessed by the Office of the United States Trustee and the Clerk of Court and fees and expenses of estate professionals. Ensuring uninterrupted payment to subcontractors is particularly crucial because they have the ability to assert mechanics' liens against the Debtors' projects, which in turn could severely and adversely impact Debtors' collection of revenue.

15. As indicated by the Initial Cash Budget, Debtors project that they will need to use more than $800,000 in cash during the first five (5) weeks after the Petition Date (exclusive of projected DIP Financing borrowings) in order to fund its ongoing operational expenses and make the first adequate protection payment to the Pre-Petition Lender. Accordingly, timely approval of the proposed use of cash collateral is critical to preserving the going concern value of Debtors' estates from the outset of the Chapter 11 Cases.

ACTIVE 24564361v1 01/24/2014          4

16. In addition, Debtors are requesting that the Court set a final hearing on the proposed use of cash collateral. Debtors request that the Court set the final hearing within thirty (30) days of the Petition Date, subject to availability on the Court's calendar. Obtaining certainty regarding Debtors' ability to use cash collateral is a key step for Debtors to stabilize operations as chapter 11 debtors in possession, which will then enable Debtors and their professionals to focus complete attention on the implementation of Debtors' plan of reorganization.

I verify under penalty of perjury that the foregoing statement is true and correct to the best of my information, knowledge and belief.

Executed this 23rd day of January 2014.

*/s/Klaus Bernhart*
KLAUS BERNHART

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)