BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
MICAELA RUSTIA MOORE, ESQ.
Nevada Bar No. 9676
**FOX ROTHSCHILD LLP**
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
   mmoore@foxrothschild.com
*[Proposed] Counsel for Martifer Aurora Solar, LLC and Martifer Solar USA, Inc.*

Electronically filed January 24, 2014

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>MARTIFER SOLAR AURORA, LLC, a Nevada limited liability company,<br><br><br><br><br><br>Debtor. | Case No. BK-S-14-10355-abl<br><br>Chapter 11<br><br>**DECLARATION OF JAMES WONG IN SUPPORT OF MOTION FOR ORDER PURSUANT TO 11 U.S.C. § 364 AND FED. R. BANKR. P. 4001(c): (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) GRANTING RELATED RELIEF; AND (III) SCHEDULING FINAL HEARING**<br><br>Hearing Date: OST PENDING<br>Hearing Time: OST PENDING |

JAMES WONG, being duly sworn, hereby deposes and declares under penalty of perjury:

1. I am over the age of 18, am mentally competent, and if called upon to testify as to the statements made herein, could and would do so.

2. I am the Principal and founder of Armory Consulting Co. I have approximately 20 years of corporate restructuring and related advisory experience.

1

3. My experience includes a variety of industries such as real estate, transportation, retail, restaurants, gaming, construction, automotive, healthcare and not-for-profits. I have been retained as financial advisor for both debtors and creditors, as well as for expert witness assignments.

4. I began my career at Merrill Lynch, and was previously with KPMG and Grant Thornton's restructuring practices. I graduated from Stanford University with an M.S. in Business Management and from UCLA with a B.A., and am a Certified Insolvency and Restructuring Advisor.

5. I was engaged prior to the commencement of these chapter 11 cases as the financial advisor to Martifer Solar USA, Inc. ("Martifer USA") and Martifer Aurora Solar, LLC ("Aurora", and collectively with Martifer USA, "Debtors"). I submit this declaration in support of the Debtors' motion to approve post-petition financing (the "DIP Motion").[1]

6. In my capacity as financial advisor for Debtors, I have reviewed Debtors' books and records and consulted with Debtors' management regarding Debtors' financial condition, including Debtors' respective business plans, financial statements and projections, business analyses and reports, contracts and other legal documents, notes and correspondence and similar items

7. Based on all of the foregoing, I have developed a familiarity with: (a) the Debtors' books and records, which are maintained in the ordinary course of business under the control of officers of the Debtors' respective executive and senior management); (b) the Debtors' respective business and financial histories, and their current business and financial situations; (c) the financial and operation details of the Debtors' business operations; and (d) the solar panel and renewable energy industry, generally.

8. Except as otherwise stated herein, if called as a witness, I could and would competently testify to the matters set forth herein from my own personal knowledge.

9. With the added expenses associated with the Chapter 11 Cases, Debtors require additional financing in order maintain operations and remain current on expenses. Operationally,

---

[1] Unless other defined, capitalized terms used herein shall have the meanings ascribed to them in the DIP Motion.

2

1 Debtors require financing to ensure uninterrupted payment of expenses for the operation of their
2 businesses, including payroll and other general and administrative expenses, paying subcontractors
3 and all other operational needs.  Debtors also need to pay expenses associated with the Chapter 11
4 Cases, including professional fees and expenses and United States Trustee fees.

5     10.    As set forth in the Initial Cash Budget, Debtors will need to borrow approximately
6 two million dollars ($2,000,00) through the week ending April 14, 2014 in order to meet their
7 operating expenses, make interest-only adequate protection payments to the Pre-Petition Lender and
8 fund expenses for the administration of the Chapter 11 Cases.  The Initial Cash Budget revenues are
9 based on Debtor's internally-prepared projections-if actual revenues do not meet projections, then
10 Debtors will need to increase borrowings under the Postpetition Financing above the amounts set
11 forth in the Initial Cash Budget.  Therefore, in order to ensure that Debtors will have sufficient
12 liquidity to withstand fluctuations in the collection of receivables, and to fund the costs of
13 administering the Chapter 11 Cases, Debtors believe that they may require up to five million dollars
14 ($5,000,000) in postpetition financing.  With these funding requirements in mind, Debtors negotiated
15 the DIP Agreement with Lender, which provides for up to five million dollars ($5,000,000) in
16 Postpetition Financing borrowings.

17     11.    Debtors are seeking authorization to use Postpetition Financing pending a final
18 hearing on the Motion in order to avoid immediate and irreparable harm to the estates.  In order to
19 keep Debtors' business operational, Debtors must be able to pay their subcontractors for work
20 performed, satisfy other ongoing working capital needs and expenses of operation, including,
21 without limitation, employee payroll expenses, and fund the costs of administering Debtors' estates,
22 including without limitation, fees assessed by the Office of the United States Trustee and the Clerk
23 of Court and fees and expenses of estate professionals.  As indicated by the Initial Cash Budget,
24 Debtors project that they will need to incur nearly one million dollars ($1,000,000) in Postpetition
25 Financing borrowings through the first four full weeks after the Petition Date (ending on February
26 10, 2014).  Accordingly, timely approval of the proposed DIP Financing is critical to preserving the
27 going concern vale of Debtors' estates from the outset of the Chapter 11 Cases.
28

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

12. Debtors' particular financial circumstances make it exceedingly unlikely that it could obtain credit without offering the protections of a superpriority claim and a lien on available collateral. As of the Petition Date, all of Debtors' personal property (other than Avoidance Actions) was encumbered by liens in favor of the Pre-Petition Lender. Accordingly, there are no unencumbered assets (other than Avoidance Actions) nor any readily available funds that could be used to secure or repay post-petition financing on an unsecured administrative expense claim basis. In addition, Debtors' chief source of revenue to service or repay postpetition financing is the proceeds of accounts receivable, which proceeds (in addition to being part of the Cathay Collateral) are subject to fluctuations in terms of timing and collectability.

13. Under these circumstances, the price of "new money" postpetition financing would have been prohibitive for Debtors. Even if a previously uninvolved party could get comfortable with the level of risk attendant to financing the Chapter 11 Cases, it undoubtedly would demand a hefty cost premium as part of any financing proposal in order to compensate for such risk. While an existing lender often will be a viable option for postpetition financing, the Pre-Petition Lender was not interested in increasing its credit exposure beyond the current scope of borrowings (and certainly not on an unsecured administrative claim basis). Therefore, Debtors had few options when it came to locating a cost-effective source of funding for the Chapter 11 Cases.

14. Nonetheless, Debtors made an extensive effort to locate potential sources of post-petition financing. I personally participated in many discussions with potential financing sources. Debtors contacted over twenty (20) potential sources of post-petition financing, and five (5) parties signed Non-Disclosure Agreements. Despite extensive efforts, as of the Petition Date, Debtors had not received any offers (much less a firm commitment) from other sources of potential post-petition financing other than Lender. Debtors canvassed the market and were not able to find any other readily available funding source willing to provide credit to Debtors on an unsecured administrative expense claim basis, much less on terms as favorable as the Postpetition Financing.

15. The interest rate and other terms of the Postpetition Financing are favorable in today's market. I assisted Debtors in canvassing the market, and we have not yet been able to find any other

readily available funding source willing to provide credit to Debtors on an unsecured administrative expense claim basis, much less on terms as favorable as the Postpetition Financing.

16. I believe that the terms of the DIP Agreement are very favorable under the circumstances. Lender negotiated for a junior lien on all assets. Thus, this is not a case where an over-reaching (and/or oversecured) pre-petition lender seeks to enhance its collateral package at the expense of unsecured creditors. Instead, Lender simply requested reasonable protections to secure repayment of the Postpetition Financing.

17. Similarly, the interest rate of nine percent (9.0%) is reflective of the competitive rates available in the market for financing secured by a junior lien on assets that may not be readily convertible to cash.

18. Furthermore, the DIP Agreement provides for a reasonable Carve-Out, which covers fees and expenses of professionals employed by a statutory committee (if appointed) as well as professionals employed by Debtors. The Events of Default and conditions to borrowing are customary in postpetition financings, and Lender's ability to exercise remedies upon the occurrence of an Event of Default expressly allows for a hearing before the Bankruptcy Court on shortened notice to resolve any dispute. I do not believe that via the DIP Agreement Lender seeks to control or restrict Debtors' ability to prosecute the Chapter 11 Cases with limitations or prohibitions on Debtors' ability to use cash collateral or propose a plan.

I verify under penalty of perjury that the foregoing statement is true and correct to the best of my information, knowledge and belief.

Executed this 24th day of January 2014.


JAMES WONG