BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
MICAELA RUSTIA MOORE, ESQ.
Nevada Bar No. 9676
**FOX ROTHSCHILD LLP**
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
        mmoore@foxrothschild.com
*[Proposed] Counsel for Martifer Aurora Solar, LLC*
*and Martifer Solar USA, Inc.*

| Electronically filed February 4, 2014 |

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re | Case Nos. BK-S-14-10355-abl and  BK-S-14-10357-abl |
| MARTIFER AURORA SOLAR LLC., a Nevada limited liability company, | Jointly Administered under Case No. BK-S-14-10355-abl |
| | Chapter 11 |
| ☐ Affects Martifer Aurora Solar, LLC<br>☐ Affects Martifer Solar USA, Inc.<br>☒ Affects all Debtors | |
| | **DECLARATION OF KLAUS BERNHART IN SUPPORT OF SECOND MOTION FOR ORDER PURSUANT TO 11 U.S.C. § 364 AND FED. R. BANKR. P. 4001(c): (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) GRANTING RELATED RELIEF; AND (III) SCHEDULING FINAL HEARING** |
| Debtor. | Hearing Date: OST PENDING<br>Hearing Time: OST PENDING |

KLAUS BERNHART, being duly sworn, hereby deposes and declares under penalty of perjury:

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1.      I am over the age of 18, am mentally competent, and if called upon to testify as to the statements made herein, could and would do so.

2.      I am the Chief Financial Officer of Martifer Solar USA, Inc. ("Martifer Solar USA"). Martifer Solar USA holds no less than 99% of the membership interests in Martifer Aurora Solar, LLC ("Aurora", together with Martifer Solar USA, "Debtors" or the "Companies"), debtors and debtors in possession in the above captioned chapter 11 cases (the "Chapter 11 Cases").  I am a Manager of Aurora.  I am authorized to submit this declaration in support of the Debtors' second motion to approve post-petition financing (the "DIP Motion").[1]

3.      In my capacity as Chief Financial Officer of Martifer Solar USA and Manager of Aurora, and in conjunction with the efforts of the Companies' other respective officers, executives and senior management, I am involved in a management role on a day-to-day basis over all aspects of the Companies' affairs, including business operations, strategic planning, financial reporting, human resources, legal affairs and other management activities, as well as the Companies' efforts to address their current financial difficulties.

4.      As a consequence, I review and work extensively with the books and records of the Companies, including their respective business plans, financial statements and projections, business analyses and reports, contracts and other legal documents, notes and correspondence and similar items.  On a regular basis, I witness, participate in or have had reported to me discussions and negotiations with vendors, other creditors and stakeholders of the Companies, and have worked closely with personnel from all aspects of the Companies' business operations.

5.      Based on all of the foregoing, I have developed an intimate familiarity with: (a) the Companies' books and records, which are maintained in the ordinary course of business under my supervision and control (and under the control of officers of the Companies' respective executive and senior management); (b) the Companies' respective business and financial histories, and their current business and financial situations; (c) the financial and operation details of the Companies' business operations; and (d) the solar panel and renewable energy industry, generally.

---

[1]   Unless other defined, capitalized terms used herein shall have the meanings ascribed to them in the DIP Motion.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

6.      I have over 35 years of international experience in U.S. and European commercial and investment banking. I have originated structured, lead, managed and syndicated in excess of $25 billion of global energy/renewable energy transactions.  Over the course of 8 years, I served in several capacities at HSH Nordbank – including as the Senior Executive Vice President, the General Manager, the Regional Head of the Americas and the Global Head of Energy – where I positioned the bank as the top global financial institution in Renewable Energy with my success at the bank's New York branch. Prior to HSH Nordbank, over the course of two decades, I worked at various banks in Germany and France, beginning as an analyst out of college and promoted progressively to the executive vice president level. At Landesbank Schleswig-Holstein ("LBSH"), I developed a number of new business segments, such as aviation finance and structured finance. Additionally, I. was responsible for running and growing LBSH Leasing GmbH as its Managing Director, prior to its sale to AGV Leasing, a leading player in the German leasing market. I attended Fachhochschule Munich, in Munich, Germany, with a professional certification called Bankkaufmann (i.e. banking).

7.      Except as otherwise stated herein, if called as a witness, I could and would competently testify to the matters set forth herein from my own personal knowledge.

8.      Further background is set forth in my Omnibus Declaration filed on January 22, 2014 [Dkt #15] which is incorporated herein by this reference.

9.      With the added expenses associated with the Chapter 11 Cases, Debtors require additional financing in order maintain operations and remain current on expenses.  Operationally, Debtors require financing to ensure uninterrupted payment of expenses for the operation of their businesses, including payroll and other general and administrative expenses, paying subcontractors and all other operational needs.  In addition, the Debtors also need to pay expenses associated with the Chapter 11 Cases, including professional fees and expenses and United States Trustee fees.

10.      Although the Debtors have obtained interim Court approval for the use of cash collateral through the week of March 10, 2014, they do not have sufficient cash on hand to fund the expenses of operation during the crucial first few weeks of the Chapter 11 Cases.[2]  As set forth in the

---

[2] As set forth in the Initial Cash Budget (note 10), Aurora is not anticipated to incur any cash receipts or any cash disbursements during the period covered by the Initial Cash Budget, but professional fees and other costs of administration for its Chapter 11 Case will continue to accrue.

Initial Cash Budget,  Debtors will need to borrow approximately over $1 million through the week of March 10, 2014 in order to meet their operating expenses, make interest-only adequate protection payments to the Pre-Petition Lender and fund expenses for the administration of the Chapter 11 Cases.  The Initial Cash Budget revenues are based on Debtors' internally-prepared projections—if actual revenues do not meet projections, then Debtors will need to increase borrowings under the Postpetition Financing above the amounts set forth in the Initial Cash Budget.  Therefore, in order to ensure that Debtors will have sufficient liquidity to withstand fluctuations in the collection of receivables, and to fund the costs of administering the Chapter 11 Cases, I believe that Debtors may require up to five million dollars ($5,000,000) in postpetition financing.  With these funding requirements in mind, Debtors negotiated the Amended DIP Agreement with Lender, which provides for up to five million dollars ($5,000,000) in Postpetition Financing borrowings.[3]

11.    Debtors are seeking authorization to use Postpetition Financing pending a final hearing on the Motion in order to avoid immediate and irreparable harm to the estates.  In order to keep Debtors' business operational, Debtors must be able to pay their subcontractors for work performed, satisfy other ongoing working capital needs and expenses of operation, including, without limitation, employee payroll expenses, and fund the costs of administering Debtors' estates, including without limitation, fees assessed by the Office of the United States Trustee and the Clerk of Court and fees and expenses of estate professionals.  As indicated by the Initial Cash Budget, Debtors project that they will need to incur over $1,000,000 in Postpetition Financing borrowings through the first eight weeks after the Petition Date (ending with the week of March 10, 2014).  Most importantly, the Initial Cash Budget demonstrates that Debtors will not have sufficient liquidity to make key payments projected for the first few weeks of the Chapter 11 Cases without borrowings under the Postpetition Financing.  The Postpetition Financing is necessary from the very outset of the Chapter 11 Cases in order to fund operational shortfalls.

12.    Obtaining certainty regarding Debtors' ability to use Postpetition Financing is a key step for Debtors to stabilize operations as chapter 11 debtors in possession, which will then enable

---

[3] A true and correct copy of the Amended DIP Agreement is attached hereto as Exhibit "1".

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

4

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Debtors and their professionals to focus complete attention on the development and implementation of a plan of reorganization. Accordingly, I believe that timely approval of the proposed Postpetition Financing is critical to preserving the going concern vale of Debtors' estates from the outset of the Chapter 11 Cases.

13.     Debtors' particular financial circumstances make it difficult to obtain credit without offering the protections of at least a superpriority claim. As of the Petition Date, all of Debtors' personal property (other than Avoidance Actions) were encumbered by liens in favor of the Pre-Petition Lender. Accordingly, there are no unencumbered assets (other than Avoidance Actions) nor any readily available funds that could be used to secure or repay post-petition financing on an unsecured administrative expense claim basis. In addition, Debtors' chief source of revenue to service or repay postpetition financing is the proceeds of accounts receivable, which proceeds (in addition to being part of the Cathay Collateral) are subject to fluctuations in terms of timing.

14.     Under these circumstances, the price of "new money" emergency postpetition financing almost certainly would have been prohibitive for Debtors. Even if a previously uninvolved party could get comfortable with the level of risk attendant to financing the Chapter 11 Cases, it undoubtedly would demand a hefty cost premium as part of any financing proposal in order to compensate for such risk. While an existing lender often will be a viable option for postpetition financing, the Pre-Petition Lender was not interested in increasing its credit exposure beyond the current scope of borrowings (and certainly not on an unsecured administrative claim basis). Therefore, Debtors had few options when it came to locating a cost-effective source of funding for the Chapter 11 Cases.

15.     Nonetheless, Debtors made an extensive effort to locate potential sources of post-petition financing. I personally participated in many discussions with potential financing sources. Debtors contacted over twenty (20) potential sources of post-petition financing, and five (5) parties signed Non-Disclosure Agreements. Despite extensive efforts, as of the Petition Date, Debtors had not received any offers (much less a firm commitment) from other sources of potential post-petition financing other than Lender. Debtors canvassed the market and were not able to find any other

readily available funding source willing to provide credit to Debtors on an unsecured administrative expense claim basis, much less on terms as favorable as the Postpetition Financing.

16.    Fortunately, Lender is willing to provide the Postpetition Financing on eminently reasonable terms under the circumstances.    Although Lender was not willing to provide the Postpetition Financing on an unsecured administrative claim basis, Lender has agreed to forego any security for the Postpetition Financing and has only required the protection of the DIP Superpriority Claim (which will be junior to the Prepetition Lender's Superpriority Claim and also subject to the Carve-Out).    And Lender has agreed to negotiate in good faith with Debtors to reach agreement on the terms of Debtors' Reorganization Plan, which would provide, inter alia, for the full amount of Obligations outstanding on the effective date of Debtors' Reorganization Plan to be converted to equity in the reorganized Martifer Solar USA on terms acceptable to the Lender.    In my business judgment, the Postpetition Financing to be provided by the Lender is most favorable under the current circumstances and addresses the Debtors' working capital needs.    I do not believe that Debtors could obtain proposals for postpetition financing on terms and conditions more favorable to the Debtors' estates than those proposed herein

17.    I believe that entering into the Postpetition Financing represents a reasonable exercise of business judgment.    As demonstrated by the Initial Cash Budget, Debtors have an immediate need for the Postpetition Financing in order to fund operations and the expenses of the Chapter 11 Cases. Debtors and Lender negotiated the terms of the proposed Postpetition Financing at arms' length in good faith, and Lender was represented by independent counsel.

18.    The Amended DIP Agreement provides for an Event of Default to occur if, as of February 23, 2014,   the Pre-Petition Lender shall not have been stayed or enjoined, or shall not have refrained, from the prosecution of claims against the Lender, Martifer Solar, S.A. and their affiliates (other than Debtors).    Lender is a guarantor of the Debtors' obligations to the Pre-Petition Lender, and I understand that Lender is willing to make the substantial financial contribution to Debtors' reorganization in the form of the Postpetition Financing so long as it is not required to simultaneously defend itself from efforts by the Pre-Petition Lender to enforce the guaranty.    The February 23 trigger for this Event of Default provides time for Lender to attempt to negotiate a

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

standstill with the Prepetition Lender, or for Debtors to seek injunctive relief if a consensual standstill cannot be negotiated. Moreover, Debtors will have the ability to borrow nearly $700,000 under the Amended DIP Agreement before the February 23 trigger for this Event of Default is reached.

19.     Without the Postpetition Financing, Debtors would not be able to fund operations and proceed with a chapter 11 plan. Instead, Debtors would be faced with the potential for administrative insolvency followed by a liquidation. Given the choice between these two alternatives, I believe that Debtors prudently negotiated the Amended DIP Agreement with Lender to ensure that Debtors would have the necessary funding to bring the Chapter 11 Cases to a successful conclusion.

20.     Debtors have requested that the Court conduct an expedited interim hearing on the Motion and, after the entry of the Interim Order, allow Debtors to enter the Amended DIP Agreement, borrow funds in accordance therewith. Debtors have an urgent and immediate need for cash to fund chapter 11 administration expenses and operations, as set forth in the Initial Cash Budget. I do not believe that Debtors could obtain financing at the present time on terms more favorable than presented in the Amended DIP Agreement. I believe that the terms of the proposed Postpetition Financing are fair, reasonable and in the best interests of the Debtors' estates.

I verify under penalty of perjury that the foregoing statement is true and correct to the best of my information, knowledge and belief.

Executed this 4th day of February 2014.

_____

KLAUS BERNHART

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

# EXHIBIT 1

**THIS FIRST AMENDED AND RE-STATED DEBTOR-IN-POSSESSION
CREDIT AGREEMENT**

Dated as of __, 2014, is entered into by and between MARTIFER SOLAR USA, INC. ("Martifer Solar USA") and MARTIFER AURORA SOLAR, LLC (collectively with Martifer Solar USA, "Borrowers"); and MARTIFER SOLAR, Inc. ("Lender").

## RECITALS

WHEREAS, on January 21, 2014, Borrowers filed voluntary petitions with the Bankruptcy Court[1] initiating the Chapter 11 Cases in which Borrowers continue in the possession of their respective assets and in the management of their respective businesses pursuant to Bankruptcy Code sections 1107 and 1108;

WHEREAS, an immediate and on-going need exists for Borrowers to obtain funding in order to continue the operation of their respective businesses as debtors-in-possession under chapter 11 of the Bankruptcy Code and, accordingly, Borrowers have requested that Lender agree to extend post-petition financing to Borrowers;

WHEREAS, Lender is willing to make Loans to Borrowers upon the terms and conditions set forth herein;

WHEREAS, all Exhibits hereto, or expressly identified in this Agreement, are incorporated herein by reference, and taken together, shall constitute but a single agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, Borrowers and Lender agree as follows:

---

[1] Capitalized terms not defined where they first appear are defined in Section 1.1 hereof.



1

## ARTICLE I

## DEFINITIONS

1.1    <u>Defined Terms</u>.

Capitalized terms used in this Agreement shall have the following respective meanings, and all Section references in the following definitions shall refer to Sections of this Agreement:

"Agreement" shall mean this First Amended and Re-Stated Debtor-in-Possession Credit Agreement, as the same may from time to time be amended, modified or supplemented.

"Avoidance Actions" shall mean causes of action under chapter 5 of the Bankruptcy Code and the proceeds thereof.

"Bankruptcy Code" shall mean 11 U.S.C. §§ 101, *et seq.*, as the same may from time to time be amended and in effect and applicable to the Chapter 11 Case.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Nevada.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure, as the same may from time to time be amended and in effect and applicable to the Chapter 11 Case.

"Borrowers" shall mean Martifer Solar USA, Inc. and Martifer Aurora Solar, LLC, as set forth in the preamble.

"Borrowers' Reorganization Plan" shall mean a Reorganization Plan proposed by Borrowers, which shall provide, *inter alia,* for the full amount of Obligations outstanding on the effective date of Borrowers' Reorganization Plan to be converted to equity in Reorganized Martifer Solar USA on terms acceptable to the Lender.

"Borrowing Date" shall mean the date set forth in a Loan request upon which Borrowers seek to withdraw Loan proceeds from the DIP Account.



"Business Day" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in Nevada are authorized or required by law to close.

"Carve-Out" shall mean (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930, and (ii) an amount not exceeding Two Million Dollars ($2,000,000) in the aggregate, which amount may be used after the occurrence and during the continuation of an Event of Default, to pay the fees and expenses of professionals retained by Borrowers and any Committee and allowed (or allowable) by the Bankruptcy Court (as to which allowed or allowable fees and expenses Lender waives any right to seek disgorgement).

"Cash Budget" shall mean collectively Borrowers' operating budget, which shall: (a) be in form and substance reasonably acceptable to Lender; (b) cover a rolling 13-week period; and (c) include, on a line item basis (i) budgeted cash receipts (including as a result of the receipt of proceeds from the Loans); (ii) anticipated disbursements (including payments required under the terms hereof); and (iii) projected weekly cash balance; provided that the Cash Budget for the first eight (8) weeks including and after the Petition Date shall be the Initial Cash Budget.

"Cash Collateral" shall have the meaning set forth in Bankruptcy Code section 363(a).

"Chapter 11 Cases" shall mean the cases commenced by Borrowers upon filing their voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

"Commitment Effective Date" shall mean the date that the Interim Order is entered.

"Commitment Termination Date" shall mean the earliest of (a) the Maturity Date, (b) the date on which any Reorganization Plan confirmed in the Chapter 11 Cases becomes effective, or (c) the date on which an existing Event of Default (defined below) is no longer subject to cure.

3



"Committee" shall mean the official committee of unsecured creditors or any other committee appointed in the Chapter 11 Cases under Bankruptcy Code section 1102.

"DIP Account" shall mean an account at a financial institution mutually agreed by Borrowers and Lender as to which (i) withdrawals shall require joint authorization from Martifer Solar USA and the Lender Designee pursuant to Section 2.3 hereof; provided that for avoidance of doubt, Lender shall not seek to withdraw or otherwise exercise remedies as to any funds deposited in the DIP Account unless and until an Event of Default has occurred.

"DIP Superpriority Claim" shall have the meaning ascribed thereto in Section 2.10 hereof.

"Disclosure Statement" shall mean a disclosure statement filed in the Chapter 11 Case, as may be amended from time to time.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Emergency Advances" shall mean the expenses set forth on Schedule 1 to this Agreement and any other emergency expense that is agreed in writing by Lender and Borrowers, which shall be funded by Lender in accordance with Section 2.3(g) hereof and otherwise treated as Loans.

"Event of Default" shall have the meaning ascribed thereto in Section 7.1 hereof.

"Final Order" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2), which order shall be in form and substance reasonably satisfactory to Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied (unless Lender waives such requirement), together with all extensions, modifications



and amendments thereto, and which, among other matters but not by way of limitation, approves

this Agreement, and authorizes Borrowers to obtain credit pursuant to the terms hereof.

"Initial Advance Amount" shall mean (x) $2,160,000.00, less (y) any Emergency

Advances previously made.

"Initial Cash Budget" shall mean the Cash Budget for the 8-week period commencing on

the Petition Date and ending on March 10, 2014, a copy of which is attached hereto as **Exhibit**

**"A."**

"Interim Order" shall mean the order of the Bankruptcy Court entered in the Chapter 11

Cases after an interim hearing under Bankruptcy Rule 4001(c)(2), which order shall be in form

and substance reasonably satisfactory to Lender, together with all extensions, modifications and

amendments thereto, and which, among other matters but not by way of limitation, approves this

Agreement on an interim basis, and authorizes Borrowers to obtain credit pursuant to the terms

hereof pending a final hearing.

"Lender" shall mean Martifer Solar, Inc., as set forth in the preamble, or its permitted

assignee.

"Lender Designee" shall mean Pedro Gomes-Pereira or such other or additional

designee(s) Lender may designate in writing.

"Lien" shall mean (a) any mortgage, pledge, statutory deemed trust, hypothecation,

assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security

interest or any preference, priority or other security agreement or preferential arrangement of any

kind or nature whatsoever (including, without limitation, any conditional sale or other title

retention agreement and any financing lease having substantially the same economic effect as

any of the foregoing and the filing of any financing statement under the UCC (other than the



filing of any such financing statement which states therein that such filing is a precautionary filing only and is filed in connection with "true leases" only) or comparable law of any jurisdiction), (b) any arrangement or agreement which prohibits any loan party from creating any mortgage, pledge, hypothecation, deposit arrangement, encumbrance, lien, charge or other security interest, or from entering into any agreement or arrangement described in clause (a) of this definition or (c) the sale, assignment, pledge or transfer for security of any accounts, general intangibles or chattel paper of any loan party with or without recourse.

"Loan" and "Loans" shall have the meaning ascribed thereto in Section 2.1 hereof.

"Loan Documents" shall mean this Agreement, the Notes and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of, Lender and including all other, powers of attorney, consents, assignments, contracts, subordination agreements, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of Borrowers in connection with this Agreement or the transactions contemplated hereby. Any reference in this Agreement or any other Loan Document to a Loan Document shall include all exhibits thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such Agreement as the same may be in effect at any and all times such reference becomes operative.

"Loan Rejection Notice" shall have the meaning ascribed thereto in Section 2.3(e) hereof.

"Martifer Solar USA" shall mean Martifer Solar USA, Inc., as set forth in the preamble.

"Maturity Date" shall mean, absent an uncured Event of Default, fifteen (15) months from the Petition Date, unless otherwise agreed in writing by Borrowers and Lender (for which no Bankruptcy Court approval, other than approval of this Agreement, will be required).

"Maximum Commitment Amount" shall mean five million dollars ($5,000,000).



"Note" and "Notes" shall have the meaning ascribed thereto in Section 2.2 hereof.

"Obligations" shall mean the aggregate principal amount of all outstanding Loans, together with all accrued and unpaid interest thereon and all of the obligations of Borrowers to Lender under the Loan Documents (including, without limitation, any extensions, modifications, substitutions, amendments or renewals of any or all of the foregoing obligations), whether direct or indirect, absolute or contingent, and whether for principal, interest, premium, fees, costs or expenses (including without limitation all fees and disbursements of counsel for Lender that are required to be paid by Borrowers pursuant to the Loan Documents).

"Petition Date" shall mean January 21, 2014.

"Pre-Petition Credit Agreement" shall mean the Promissory Note dated November 15, 2012 and the Commercial Security Agreements dated November 15, 2012 executed in favor of the Pre-Petition Lender.

"Pre-Petition Lender" shall mean Cathay Bank.

"Pre-Petition Lender's Collateral" shall mean "Collateral" as defined in the Pre-Petition Credit Agreement to the extent such Collateral is owned by Borrowers.

"Pre-Petition Lender's Superpriority Claim" shall have the meaning ascribed thereto in Section 2.12(b)(iii) hereof.

"Prior Liens" shall mean any and all valid and duly perfected Liens encumbering the Pre-Petition Lender's Collateral in existence and senior to the interests of the Pre-Petition Lender as of the Petition Date.

"Reorganization Plan" shall mean a plan of reorganization or liquidation filed in the Chapter 11 Cases, as may amended from time to time.

7



"Replacement Liens" shall have the meaning ascribed thereto in Section 2.12(b)(ii) hereof.

"Value Diminution" means any diminution in the value as of the Petition Date of the Pre-Petition Lender's interest in the Pre-Petition Lender's Collateral caused by the imposition of the automatic stay, Borrowers' borrowing under this Agreement and/or Borrowers' use of Cash Collateral and other Pre-Petition Lender's Collateral (any such diminution to be determined by agreement or order of the Bankruptcy Court after notice and a hearing).

1.2     <u>Other Definitional Provisions.</u>

(a)     Unless otherwise specified therein, all terms defined in this Agreement shall have their respective defined meanings when used in the Notes or other documents made or delivered pursuant hereto.

(b)     As used herein, in the Notes or other documents made or delivered pursuant hereto, accounting terms relating to Borrowers and accounting terms partly defined in Section 1.1 hereof, to the extent not defined herein, shall have the respective meanings given to them under normal and customary use.

(c)     The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole, including all Exhibits, as the same may from time to time be amended, restated, modified or supplemented, and not to any particular section, subsection or clause contained in this Agreement or any such Exhibit. The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(d)     Unless the context otherwise requires, each reference herein to any agreement, document or instrument (including the Loan Documents) shall be deemed a reference to such



agreement, document or instrument as amended, restated, supplemented or otherwise modified from time to time.

(e)    The term "includes" and "including" shall not be construed to imply any limitation.

(f)    In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding." Periods of days referred to in this Agreement shall be counted in calendar days unless Business Days are expressly prescribed. Any period determined hereunder by reference to a month or months or a year or years shall end on the day in the relevant calendar month in the relevant year, if applicable, immediately preceding the date numerically corresponding to the first day of such period, provided that if such period commences on the last day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month during which such period is to end), such period shall, unless otherwise expressly required by the other provisions of this Agreement, end on the last day of the calendar month.

1.3    Payment Terms; References to Money.

Except as expressly set forth herein to the contrary, (a) all payments made by Borrowers shall be made in Dollars in respect of principal and interest on the Loans, and (b) to the extent not otherwise indicated, all amounts of money referenced herein shall mean and be references to amounts of money denominated in Dollars.



## ARTICLE II

## AMOUNT AND TERMS OF LOANS

2.1     Loans.

Subject to the terms and conditions hereof (including without limitation the conditions precedent set forth in ARTICLE IV hereof), Lender agrees to make Loans (each, a "Loan" and collectively, the "Loans") to Borrowers from time to time until the Commitment Termination Date in an aggregate principal amount at any one time outstanding not to exceed the Maximum Commitment Amount, in all instances subject to the Cash Budget; provided that:

(a) compliance with the Cash Budget shall be deemed satisfied if the actual aggregate expenditures for every four-week period (i.e. post-petition weeks one through four, five through eight, etc.) do not exceed by more than twenty percent (20%) the aggregate budgeted amount for such four-week period as set forth in the Cash Budget;

(b) to the extent that the full amount of any of the expenses budgeted for a particular four-week period under the Cash Budget is not disbursed during such four-week period, the unused balance shall be added to the amount of budgeted expenses for ensuing four-week periods and the Cash Budget shall be deemed to be amended (and approved) to reflect the same, such that Borrowers may use such unused budgeted amounts in subsequent four-week periods in addition to originally budgeted amounts for such four-week periods; and

(c) Lender shall not be permitted or required to make any Loan if after giving effect thereto, the sum of the outstanding aggregate principal amount of Loans at any one time would exceed the Maximum Commitment Amount.



Until the Commitment Termination Date, Borrowers may from time to time borrow, prepay the Loans in whole or in part, and re-borrow under this Section 2, all in accordance with the terms and conditions hereof and in accordance with the applicable Cash Budget. Loans in an aggregate principal amount at any one time outstanding not to exceed the Maximum Commitment Amount may be borrowed, repaid and re-borrowed in accordance with this Section 2, at all times subject to and in accordance with the Cash Budget, on and after the Commitment Effective Date until the Commitment Termination Date. Lender agrees that the Initial Cash Budget is in form and substance acceptable to Lender, and that it may be used, among other purposes, for purposes of the motion seeking entry of the Interim Order and Final Order.

Each Loan shall be denominated in Dollars.

2.2    Notes.

Each Loan made by Lender shall be evidenced by a promissory note (each a "Note" and collectively, the "Notes") of Borrowers made to the order of Lender, with appropriate insertions as to date and principal amount, payable to the order of Lender. Each Note shall (i) be dated as of the date it is executed, (ii) be stated to mature on the Maturity Date or such earlier date the Loans shall be due and payable in full, whether by acceleration or otherwise, pursuant to the terms of this Agreement, and (iii) provide for the payment of interest. A copy of the form of the Note is attached hereto as **Exhibit B**.

2.3    Procedure for Loans and Payments.

(a)    Borrowers may obtain Loans until the Commitment Termination Date on any Business Day; provided that (i) from January 27, 2014 through the week beginning February 10, 2014, the Loans shall be limited on a weekly basis to the amounts set forth on Schedule 2 attached to this Agreement; (ii) from the Petition Date through the term of the Initial Cash



11

Budget, the sum of the outstanding aggregate principal amount of Loans shall be limited to the Initial Advance Amount, and (iii) except as set forth on Schedule 1 or Schedule 2, each borrowing of a Loan shall be in an amount equal to but not less than $10,000 or a whole multiple of $10,000 in excess thereof.

(b)     Within five (5) Business Days after the execution of this Agreement, Lender shall have deposited into the DIP Account funds in the Initial Advance Amount.

(c)     On or before April 14, 2014, Lender shall deposit into the DIP Account additional funds in an amount equal to (x) the Maximum Commitment Amount, less (y) the sum of the Initial Advance Amount and any Emergency Advances.

(d)     Borrowers shall give Lender not less than three (3) Business Days' notice of the Borrowing Date applicable to any Loan request, which request shall be transmitted by facsimile and electronic mail to Lender at:

> Pedro Gomes-Periera
> 2040 Armacost Ave., Second Floor
> Los Angeles, California 90025
> Phone: (310) 820-7080 x238
> Facsimile: (310) 820-7090
> E-mail:  pedro.gomes.pereira@martifer.com

> with a copy to Lender's counsel at:

> Samuel A. Schwartz, Esq.
> 6623 Las Vegas Blvd. South, Suite 300
> Las Vegas, Nevada 89119
> Phone:  (702) 385-5544
> Facsimile: (702) 385-2741
> E-mail:  sam@schwartzlawyers.com

(e)     Within two (2) Business Day of receiving a Loan request from Borrowers, Lender shall provide to Borrowers via facsimile and email (with a copy to Borrowers' counsel, Brett A. Axelrod, Esq.) written notice ("Loan Rejection Notice") of any Event of Default or failure to

satisfy a condition precedent set forth in Section 4.1 or 4.2 hereof that Lender contends is applicable to such Loan request.

(f)    Unless Lender provides a timely Loan Rejection Notice as set forth in Section 2.3(e) hereof, then the Lender Designee shall authorize the withdrawal of Loan proceeds from the DIP Account in the amount requested by Borrowers prior to 4:00 p.m. prevailing Pacific Time on the Borrowing Date,.

(g)    Notwithstanding anything to the contrary in Section 4.1, 4.2 or otherwise herein, Lender shall fund any and all Emergency Advances as provided on Schedule 1 without any condition precedent.

(h)    The Loans shall be paid in full on the Commitment Termination Date, pursuant and subject to the terms herein, including, without limitation, section 2.14 hereof.

2.4    <u>Lender Expenses</u>.

Borrowers shall reimburse Lender for all reasonable out-of-pocket costs and expenses incurred in connection with this Agreement and the Chapter 11 Cases, including, without limitation, related due diligence and preparation, negotiation, execution, delivery, administration and enforcement of the Loan Documents and ongoing expenses related to the Loans, including attorney and advisor fees and expenses.

2.5    <u>Interest Rates and Payment Dates</u>.

(a)    Each Loan shall bear interest at a rate *per annum* of nine percent (9.0%).

(b)    Notwithstanding the foregoing, in the event an Event of Default has occurred and is continuing, the Loans shall bear interest at a rate *per annum* equal to the rate set forth above plus three percent (3.0%) from the date of occurrence of such Event of Default until the date such Event of Default is cured or waived.



2.6     Computation of Interest.

(a)     Interest shall accrue and compound monthly. All computations of interest and fees payable hereunder shall be made on the basis of a year of 365 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or fees are payable.

(b)     Any payment of interest hereunder shall be subject to any applicable withholding taxes, and any amount withheld under this Section shall be treated as having been paid by Borrowers to Lender for all purposes.

2.7     Prepayments.

(a)     Borrowers may, at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty, upon irrevocable written notice to Lender by 11:00 a.m. prevailing Pacific Time on such date of prepayment, in each case specifying the date and amount of prepayment. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with any amounts payable, accrued interest to such date on the amount prepaid and any outstanding fees and expenses then due and owing.

(b)     Repayment of the Obligations, including any prepayment of Obligations, shall be applied in the following order of priority:

(i)     first, to the payment of all costs and expenses that are due and payable to Lender on such date under and in respect of this Agreement, including but not limited to reasonable attorneys' fees and costs incurred by counsel to Lender; and

(ii)     second, to the payment of the outstanding principal amount of all of the Loans that are due and payable to Lender on such date, together with all accrued and unpaid interest thereon.



2.8    Use of Proceeds.

(a)    Borrowers shall utilize the proceeds of the Loan in accordance with the Cash Budget solely for (i) funding the operations of Borrowers' respective businesses and properties, (ii) making adequate protection payments to the Pre-Petition Lender, (iii) paying expenses incurred for the administration of the Chapter 11 Case, including paying reasonable compensation of professional fees and expenses, (iv) paying of any contractual obligations, and (v) repaying the Loans; provided that Borrowers shall be permitted to pay compensation and reimbursement of expenses allowed, allowable or authorized by the Bankruptcy Court and payable under Bankruptcy Code sections 330 and 331 in accordance with the Cash Budget. The Carve-Out shall not be reduced by the amount of any compensation and reimbursement of expenses paid or incurred (to the extent ultimately allowed or allowable by the Bankruptcy Court) prior to the occurrence of an Event of Default in respect of which the Carve-Out is invoked, and Lender waives any right to seek disgorgement thereof; provided, however, that nothing herein shall be construed to impair the ability of Lender to object to the reasonableness of any of the fees, expenses, reimbursement or compensation sought by the professionals retained by Borrowers or any Committee.

(b)    Under no circumstances shall any proceeds of any Loan be used to pursue any action or joinder in any action, counter-claim, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek any order, determination or similar relief (i) challenging the legality, validity, priority, perfection or enforceability (as the case may be) of any of the Obligations, the DIP Superpriority Claim or any other claim of Lender against Borrowers or the estates, other than the calculation of the amount thereof; (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, any of the



15

foregoing; and (iii) otherwise seeking monetary relief against Lender other than for a breach of this Agreement.

2.9     Separate Loans Not To Exceed Commitment.

All Loans to Borrowers and all of the other Obligations of Borrowers arising under this Agreement and the other Loan Documents shall constitute separate loans to Borrowers, evidenced by a separate promissory note executed by Borrowers; provided, however, that the total outstanding principal balance of all Loans by Borrowers shall not exceed the Maximum Commitment Amount.

2.10    DIP Superpriority Claim.

Pursuant to Bankruptcy Code section 364(c)(1), the Obligations of Borrowers hereunder and under the Loan Documents shall at all times constitute allowed administrative expense claims (the "DIP Superpriority Claim") in the Chapter 11 Cases having priority over all claims against Borrowers now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kinds and over any and all administrative expenses or other claims arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114, subject and junior in all instances and respects in all instances and respects only to (a) the Pre-Petition Lender's Superpriority Claims, and (b) the Carve-Out.

2.11    [RESERVED].


2.12    [RESERVED].



2.13    Adequate Protection for Pre-Petition Lender.

(a)    [RESERVED]

(b)    So long as no uncured Event of Default has occurred and Borrowers is in compliance with the Cash Budget, Lender consents to Borrowers' use of Cash Collateral of the Pre-Petition Lender and consents to Borrower, in its sole discretion and subject to Bankruptcy Court approval, providing and granting to the Pre-Petition Lender the following as adequate protection under Bankruptcy Code sections 361, 362 and 363 for any Value Diminution:

(i)    replacement liens to secure the amount of any Value Diminution (the Replacement Liens"), which Replacement Liens shall: (x) be subject and junior only to the Carve-Out and any Prior Liens; and (y) attach to (1) the Pre-Petition Lender's Collateral as of the Petition Date, any other assets of Borrowers that are subject to a valid and perfected lien as of the Petition Date, any other previously unencumbered assets of Borrowers (which for avoidance of doubt excludes Avoidance Actions), and (3) any proceeds of the foregoing; and

(iii)    a superpriority claim (the "Pre-Petition Lender's Superpriority Claim") against Borrowers' estate to the extent permitted by Bankruptcy Code section 507(b), subject and junior only to the Carve-Out.

2.14    Debt to Equity Conversion.

(a)    Lender shall negotiate in good faith with Borrowers to reach agreement on the terms of Borrowers' Reorganization Plan.



# ARTICLE III

## REPRESENTATIONS AND WARRANTIES

To induce Lender to make the Loans, Borrowers make the following representations and warranties to Lender, each and all of which shall survive the execution and delivery of this Agreement.

3.1     Corporate Existence; Compliance with Law.

Each of Borrowers (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation; (b) is duly qualified as a foreign corporation and is in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification; (c) subject to the entry of the Interim Order by the Bankruptcy Court with respect to the Interim Advance Amount and entry of the Final Order by the Bankruptcy Court with respect to any further Loans in addition to the Initial Advance Amount, has and shall have the requisite corporate power and authority and the legal right to effect the transactions contemplated hereby and by the other Loan Documents to which it is a party; and (d) subject to the entry of the Interim Order by the Bankruptcy Court with respect to the Initial Advance Amount and entry of the Final Order by the Bankruptcy Court with respect to any further Loans in addition to the Initial Advance Amount, and in all instances subject to the requirements of the Bankruptcy Code, has and shall have the requisite corporate power and authority and the legal right to, without limitation, own, pledge, mortgage or otherwise encumber and operate its properties, lease the property it operates under lease, and conduct its business as now, heretofore and proposed to be conducted.



3.2    Corporate Power, Authorization, Enforceable Obligations.

Upon entry by the Bankruptcy Court of the Interim Order with respect to the Initial Advance Amount and the Final Order with respect to any Loans in addition to the Initial Advance Amount, each of Borrowers has and shall have the corporate power and authority, and the legal right, to make, deliver and perform its obligations under the Loan Documents to which it is a party and to authorize the execution, delivery and performance of the Loan Documents to which it is a party. Subject to the requirements of the Bankruptcy Code, each of Borrowers has the appropriate power and authority to borrow hereunder and has taken all necessary corporate action to authorize the borrowings on the terms and conditions set forth in this Agreement and in the Notes. Subject to the entry of the Interim Order with respect to the Initial Advance Amount and the Final Order with respect to any Loans in addition to the Initial Advance Amount, this Agreement has been, and each other Loan Document to which each of Borrowers is a party will be, duly executed and delivered on behalf thereof. Subject to the requirements of the Bankruptcy Code, this Agreement constitutes, and each other Loan Document to which each of Borrowers is a party when executed and delivered will constitute, a legal, valid and binding obligation of each of Borrowers, enforceable against each of Borrowers in accordance with its terms (whether enforcement is sought by proceedings in equity or at law).

3.3    Effectiveness of Interim Order and Final Order.

Borrowers shall not seek to borrow under this Agreement during any period in which the Interim Order has not been entered with respect to the Initial Advance Amount, and in which the Final Order is not in full force and effect or has been reversed or stayed with respect to any Loans in addition to the Initial Advance Amount.



3.4    <u>Purpose of Loans</u>.

Borrowers shall not use the proceeds of any Loan hereunder other than in accordance with this Agreement.

3.5    <u>Insurance</u>.

Borrowers will maintain with financially sound and reputable insurers insurance with respect to its assets, properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas.  Such insurance shall be in such minimum amounts that Borrowers will not be deemed a co-insurer under applicable insurance laws, regulations and policies and otherwise shall be in such amounts, contain such terms, be in such forms and be for such periods as were in place prior to the Petition Date or as otherwise may be reasonably satisfactory to Lender.   In addition, Debtor shall cause Lender to be listed in all such insurance policies as a loss payee.

**ARTICLE IV**

**CONDITIONS PRECEDENT**

4.1    <u>All Borrowings (other than Emergency Advances)</u>.

At any time, Lender's obligations to make the Loans in an amount not to exceed the applicable Maximum Commitment Amount, are conditioned on satisfaction (or written waiver) of the following in Lender's reasonable discretion:

(a)    The Interim Order shall have been entered with respect to the Initial Advance Amount, and the Final Order shall be in full force and effect and shall not have been reversed, modified, amended or stayed (or application therefor made) with respect to any Loans in addition to the Initial Advance Amount, except for modifications and amendments that are reasonably acceptable to Lender.



4.2    All Borrowings (other than Emergency Advances) in Excess of the Initial Advance Amount.

At any time, Lender's obligations to make Loans in an amount in excess of the Initial Advance Amount not to exceed the applicable Maximum Commitment Amount, or to take, fulfill, or perform any other action hereunder, are conditioned on satisfaction (or written waiver) of the following in Lender's reasonable discretion:

(a) Representations and warranties in this Agreement shall be true and correct in all material respects as of the date each Loan is made as if made on such date (except if such representation or warranty specifically relates only to a prior date, in which case it shall be true and correct in all material respects as of such earlier date);

(b)    No administrative claim that is senior to or pari passu with the DIP Superpriority Claim shall exist, except the Carve-Out and the Pre-Petition Lender's Superpriority Claim; and

(c)    Lender shall have received this Agreement, the Notes and all other Loan Documents, and each other agreement, document and instrument relating to the loan and other credit transactions contemplated by this Agreement, each duly executed where appropriate and in form and substance reasonably satisfactory to Lender.

(d)    Except to the extent the parties may agree to later dates, Borrowers shall:

(i)    On or before the 120 days after the Petition Date, file a Reorganization Plan and Disclosure Statement, reasonably acceptable to the Lender;

(ii)    On or before 160 days after the Petition Date, obtain an order approving the Disclosure Statement; and



(iii)    On or before 200 days after the Petition Date, obtain an order approving the Reorganization Plan.

## ARTICLE V

## NEGATIVE COVENANTS

From the date hereof and for so long as any Note remains outstanding and unpaid or any Obligation is owing to Lender hereunder, Borrowers hereby agree not to (and will not apply, unless in connection with an amendment to this Agreement that is reasonably likely to be approved by Lender, to the Bankruptcy Court for authority to):

(a)    sell any material asset or obtain approval to sell any asset outside the ordinary course of business, in each case without the prior written consent of Lender (with the exception of assets currently held for sale); or

(b)    propose, file, solicit votes for, support, or prosecute, a Reorganization Plan or related disclosure statement other than Borrowers' Reorganization Plan, unless such other Reorganization Plan is reasonably acceptable to Lender or provides for payment in full of the Obligations on the effective date thereof.

## ARTICLE VI

## TERMINATION

6.1    <u>Termination</u>.

Except as expressly set forth herein, the financing arrangements contemplated hereby shall be in effect until the Commitment Termination Date, and on the Commitment Termination Date, any obligation to provide Loans hereunder shall terminate and the aggregate principal amount of all outstanding Loans, together with all accrued and unpaid interest thereon, and all of



22

the Obligations shall be due in full or upon such other terms to which Borrowers and Lender may agree.

6.2     Survival of Obligations Upon Termination of Financing Arrangements.

Except as otherwise expressly provided for in the Loan Documents, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the obligations, duties and liabilities of Borrowers or the rights of Lender relating to any unpaid portion of the Loans or any other Obligations, due or not due, liquidated, contingent or unliquidated or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is required after the Commitment Termination Date. Except as otherwise expressly provided herein or in any other Loan Document, all undertakings, agreements, covenants, warranties and representations of or binding upon Borrowers, and all rights of Lender, all as contained in the Loan Documents, shall not terminate or expire, but rather shall survive any such termination or cancellation and shall continue in full force and effect until the Commitment Termination Date.

## ARTICLE VII

## EVENTS OF DEFAULT; RIGHTS AND REMEDIES

7.1     Events of Default.

Notwithstanding the provisions of Bankruptcy Code section 362 (but subject to Section 7.2 hereof) and without application or motion to the Bankruptcy Court or any notice to Borrowers, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder (for purpose of items (i) through (vi) by way of a final order, the effectiveness of which has not been stayed): (i) appointment of a chapter 11 trustee with respect to either of the Chapter 11 Cases; (ii) appointment of an examiner



with expanded powers with respect to either of the Chapter 11 Cases; (iii) conversion of either of the Chapter 11 Cases to one under chapter 7 of the Bankruptcy Code; (iv) dismissal of either of the Chapter 11 Case; (v) approval of a motion granting a party a superpriority claim which is senior or pari passu with the DIP Superpriority Claim (other than the Carve-Out and the Pre-Petition Lender's Superpriority Claim); (vi) granting of relief from the automatic stay to permit the Pre-Petition Lender to exercise rights or remedies regarding the Pre-Petition Lender's Collateral; (vii) use of Loan advances to make a payment that is not in compliance with the Cash Budget or this Agreement; (viii) failure of the Final Order to have been entered by the Bankruptcy Court by the date that is forty-five (45) days (or such longer period as Lender and Borrowers agree) after the date on which the motion for entry of the Final Order is filed; (ix) Borrowers' breach of any other provision of the Final Order and such breach remains uncured for a period of ten (10) days after notice is provided to Borrowers of such breach; (x) Borrowers' failure to comply with section 4.2(d); (xi) the commencement of any lawsuit seeking monetary relief against Lender on behalf of Borrowers or the estates, other than for a breach of this Agreement and (xii) as of February 23, 2014, the Pre-Petition Lender shall not have been stayed or enjoined, or shall not have refrained in writing, from the prosecution of claims against the Lender, Martifer Solar, S.A. and their affiliates (other than Borrowers.

7.2    Remedies.

Upon the occurrence and during the continuance of an Event of Default and following three (3) Business Days' prior notice thereof to Borrowers (with a copy to counsel for any Committee, and to the United States Trustee for the District of Nevada), and without further order of or application to the Bankruptcy Court: (i) Lender's obligations to provide Loans shall cease immediately, (ii) the Obligations shall be immediately due and payable, and (iii) Lender



shall have the right to declare the Loans or any portion thereof then outstanding to be forthwith due and payable, whereupon the principal of such Loans together with accrued interest thereon and any unpaid accrued fees and all other liabilities of Borrowers accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by Borrowers, anything contained herein or in any other Loan Document to the contrary notwithstanding.

## ARTICLE VIII

## MISCELLANEOUS

### 8.1    Amendments and Waivers.

Neither this Agreement, any Note nor any other Loan Document, nor any terms hereof or thereof, may be amended, restated, supplemented or modified except in writing signed by Borrowers and Lender.

### 8.2    No Waiver; Cumulative Remedies.

No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

### 8.3    Survival of Representations and Warranties.

All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall



survive the execution and delivery of this Agreement and the Notes and the making of the Loans hereunder but shall expire on the Commitment Termination Date.

8.4    Successors and Assigns; Participations and Assignments.

(a)    This Agreement shall be binding upon and inure to the benefit of Borrowers and Lender and their respective successors and assigns, including any trustee or examiner appointed in the Chapter 11 Cases or in any converted Chapter 7 case.

(b)    Lender may, in accordance with applicable law, sell, transfer or assign its rights under this Agreement and any Obligations of Borrowers hereunder; provided that any assignment shall be subject to this Agreement.

8.5    Counterparts.

This Agreement may be executed by Borrowers and Lender on any number of separate counterparts (including by telecopy), and all said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Agreement signed by all the parties shall be lodged with Borrowers and Lender.

8.6    Severability.

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.7    Governing Law.

THIS AGREEMENT AND THE NOTES AND THE RIGHTS AND OBLIGATIONS OF BORROWERS AND LENDER UNDER THIS AGREEMENT, THE NOTES AND THE



LOAN DOCUMENTS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEVADA APPLICABLE TO AGREEMENTS MADE AND PERFORMED IN SUCH STATE, EXCEPT AS GOVERNED BY THE BANKRUPTCY CODE.

Borrowers and Lender hereby irrevocably and unconditionally: (a) submit for themselves and their property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the jurisdiction of the Bankruptcy Court; (b) consent that any such action or proceeding may be brought in the Bankruptcy Court and waive any objection that they may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agree not to plead or claim the same; (c) agree that nothing contained herein shall affect the right to effect service of process in any other manner permitted by law or limit the right to sue in any other jurisdiction; and (d) waive, to the maximum extent not prohibited by law, any right they may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

8.8     Recitals/Further Assurances.

The Recitals hereto are incorporated into the body of this Agreement and made an integral party hereof, as if set forth herein. The parties agree to execute such other documents as may be necessary or appropriate to carry out the intent of this Agreement.

IN WITNESS WHEREOF, Borrowers and Lender have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.



Martifer Solar USA, Inc., Borrower          Martifer Aurora Solar, LLC, Borrower

By: _____          By: _____
Name:                                                    Name:
Title:                                                    Title:

Martifer Solar, Inc., Lender

By: _____
Name:
Title:

## SCHEDULE 1

## EMERGENCY ADVANCES

### 1/23/14 – 2/23/14

| | |
|---|---|
| Payroll (previously advanced for 1/23/14) | $161,176 |
| Payroll (for week beginning 2/3/14 | 161,176 |
| Payroll (for week beginning 2/17/14) | 161,176 |
| Insurance | 43,500.00 |
| Expense Reimbursements | 36,000.00 |
| Rent | 22,050.00 |
| Utilities | 12,000.00 |
| IT Services | 10,300.00 |
| **TOTAL** | **$607,378** |



**SCHEDULE 2**

**LOAN AVAILABILITY FROM JANUARY 27, 2014**
**THROUGH THE WEEK BEGINNING FEBRUARY 10, 2014**

Week of January 27, 2014:    $190,038

Week of February 3, 2014:    $261,164

Week of February 10, 2014:  $85,604



**EXHIBIT "A"**

**INITIAL CASH BUDGET**



**Martifer Solar USA, Inc.**
**8 Week Cash Flow Projections**

Draft: Subject to Modification

Unaudited

Printed: Feb. 3, 2014

| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Week Beginning Date | 1/21/14 | 1/27/14 | 2/3/14 | 2/10/14 | 2/17/14 | 2/24/14 | 3/3/14 | 3/10/14 | [1] |
| Cash Receipts (Legacy) | $ - | $ 8,721 | $ - | $ 47,547 | $ 283,151 | $ 910,741 | $ - | $ - | [2] |
| Cash Receipts (New Busi.) | - | - | - | - | - | - | - | $ - | [3] |
| **Total Cash Receipts** | - | 8,721 | - | 47,547 | 283,151 | 910,741 | - | - | |
| Direct Materials + Subs (Legacy) | - | 55,000 | 38,038 | 133,151 | - | 1,009,886 | 161,176 | - | [2] |
| Direct Materials + Subs (New Busi.) | - | 350,000 | - | - | - | 114,350 | - | 10,000 | [3] |
| **Total Dir. Mat. Disbursements** | - | 405,000 | 38,038 | 133,151 | - | 1,124,236 | - | 10,000 | |
| Payroll | 161,176 | - | 161,176 | - | 161,176 | - | 161,176 | - | [4] |
| Commissions | - | - | - | - | - | - | - | - | |
| Insurance | - | 43,500 | - | - | - | 43,500 | - | - | |
| Expense Reimbursements | - | 36,000 | - | - | - | 36,000 | - | - | |
| Fuel | - | - | 3,700 | - | - | - | 3,700 | - | |
| Rent | - | 22,050 | - | - | - | 22,050 | - | - | |
| Utilities | - | 12,000 | - | - | - | 12,000 | - | - | |
| Other Expenses | - | - | 12,000 | - | - | - | 12,000 | - | |
| IT Services | - | 10,300 | - | - | - | 10,300 | - | - | |
| Outside Services | - | - | 38,000 | - | - | 38,000 | 38,000 | - | |
| Vehicle Leases | - | - | 8,250 | - | - | - | 8,250 | - | |
| Contingency | | | | | | | | | [5] |
| **Total Operating Disbursements** | 161,176 | 123,850 | 223,126 | - | 161,176 | 123,850 | 223,126 | - | |
| **Net Operating Cash Flows** | (161,176) | (520,129) | (261,164) | (85,604) | 121,975 | (337,345) | (223,126) | (10,000) | |
| Debtor's Legal Fees (Ch.11) | - | - | - | - | - | - | - | - | |
| Debtor's FA Fees (Ch. 11) | - | - | - | - | - | - | - | - | |
| Debtor's IB Fees (Ch. 11) | - | - | - | - | - | - | - | - | |
| Debtor's Legal Fees (Other) | - | - | - | - | - | - | - | - | |
| Committee's Fees | - | - | - | - | - | - | - | - | |
| Chapter 11 UST Fees | - | - | - | - | - | - | - | - | |
| **Total Professional Fees** | - | - | - | - | - | - | - | - | [6] |
| Interest Expense-Secured Debt | - | 26,258 | - | - | - | 26,258 | - | - | [7] |
| **Net Cash Flow Before DIP Draws** | (161,176) | (546,388) | (261,164) | (85,604) | 121,975 | (363,603) | (223,126) | (10,000) | |
| Beginning Cash | 505,700 | 505,700 | 451,852 | 150,000 | 150,000 | 271,975 | 1,369,740 | 1,146,613 | [8] |
| DIP Facility Draws | 161,176 | 161,176 | - | 150,000 | 150,000 | 1,461,368 | 1,146,613 | - | [9] |
| **Net Ending Cash** | $ 505,700 | $ (40,688) | $ 150,000 | $ 150,000 | $ 271,975 | $ 1,369,740 | $ 1,146,613 | $ 1,136,613 | [10] |

**Notes:**
[1] All dates represent the beginning Monday, except for Week 1, the beginning of which is the Petition Date.
[2] Martifer restructured its sales team in December 2013 with a mandate that all new contracts generate positive cash flows. "Legacy" business represents those contracts in place prior to this restructuring.
[3] While all new business has been calculated as cash flow positive, contracts typically require initial cash outlays up to several months prior to recognition of cash receipts, as is common industry practice.
[4] Week 1 payroll is assumed to be paid through the DIP Facility (i.e. Martifer Solar, Inc. as DIP Lender) in advance of finalization of the DIP Facility loan agreement.
[5] Contingency expenses totaling $215,000, which included reserves for critical vendors, have been removed.
[6] Assumes initial interim professional fees and expenses are paid after this period.
[7] Interest expense is calculated at the contract interest rate of 1.75% plus WSJ prime rate, currently at 3.25%, for a total of 5.00% per annum.
[8] Beginning cash balance per the Debtor cash balance as of 1/21/14.
[9] DIP Facility draws relate to a pending Debtor in Position facility. All related interest is accrued.
[10] Martifer Aurora Solar, LLC is not anticipated to incur any cash receipts or any cash disbursements during this period.

**EXHIBIT "B"**

**FORM OF NOTE**



## PROMISSORY NOTE

$_____                                                    _____, 2014

FOR VALUE RECEIVED, the undersigned, MARTIFER SOLAR USA, INC., a California corporation ("Maker"), having a notice address of _____, Attention: _____, promises to pay to the order of MARTIFER SOLAR, INC., a Delaware Corporation ("Holder"), having a notice address of _____, the principal sum of_____ U.S. DOLLARS ($_____).

DIP Agreement.  This Promissory Note (the "Note") is entered into in accordance with, and Holder is entitled to the benefits of, that certain First Amended and Re-Stated Debtor-in-Possession Credit Agreement (the "DIP Agreement") between Maker, Holder and Martifer Aurora, LLC dated January 23, 2014. The terms of the DIP Agreement are incorporated into the terms of this Note, as if expressly set forth herein.

Payments Terms.  Interest on this Note shall accrue monthly, at a rate of nine percent (9.0%) *per annum*.  Notwithstanding the foregoing, in the event an Event of Default (as defined herein) has occurred and is continuing, the Note shall bear interest at a rate *per annum* equal to the rate set forth above plus three percent (3.0%) from the date of occurrence of such Event of Default until the date such Event of Default is cured or waived.  All computations of interest and fees payable hereunder shall be made on the basis of a year of 365 days.  Absent an Event of Default, all sums due under this Note, including accrued interest, shall be due and payable on April 21, 2015.

All payments of this Note are payable in lawful money of the United States of America to Holder hereof at the office of Holder set forth above, or at such other place as Holder hereof may designate in writing.  Maker may, without premium or penalty, prepay this Note in full or in part at any time.

Default.  Each of the following events shall constitute an event of default ("Event of Default") under this Note:

        (a)      Maker fails to pay any sums within five (5) days when due hereunder;

        (b)      Maker fails to perform any obligation or breaches any term of this Note, if such failure or breach is not cured within ten (10) days after written notice from Holder; or

        (c)      Any default or Event of Default occurring under the DIP Agreement.

Upon the occurrence of an Event of Default, Holder at its option, shall have the right to declare the entire amount of this Note to be, and this Note shall thereupon become, immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived, and Maker will immediately pay to Holder, or its order, the entire outstanding amount of this Note.

Miscellaneous.

Time is of the essence of each and every provision hereof.  All rights and remedies of Holder hereunder and under the DIP Agreement are cumulative and concurrent and the exercise of one remedy shall not be deemed a waiver or release of any other right or remedy.  Failure or delay in exercising the



default remedies herein or in the DIP Agreement or acceptance of partial payments shall not constitute a waiver of the right to exercise any remedies available to Holder hereunder or under the DIP Agreement with respect to any subsequent or uncured Event of Default. The subsequent acceptance of any sum in payment of any indebtedness evidenced hereby or any other payment hereunder by Maker to Holder shall not be construed to be a waiver or release of any preceding breach by Maker of any provision, covenant or condition of this Note other than the failure of Maker to pay the particular sum so accepted, regardless of Holder's knowledge of such preceding breach at the time of acceptance of such payment. No payment by Maker or receipt by Holder of a lesser amount than the amount herein provided shall be deemed to be other than on account of the earliest sums due and payable hereunder, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Holder may accept any such check or payment without prejudice to Holder's right to recover the balance of such sum or pursue any other remedy provided in this Note or the Loan Documents.

A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances.

If any lawsuit or arbitration is commenced which arises out of or relates to this Note or the DIP Agreement, the prevailing party shall be entitled to recover from each other party such sums as the court or arbitrator may adjudge to be reasonable attorneys' fees in the action or arbitration, in addition to costs and expenses otherwise allowed by law.

This Note is entered into in the State of California and shall be construed according to the laws of that State, without reference to principles of conflicts of laws.

No waiver or amendment of any of the terms hereof shall be effective unless in writing signed by Holder.

This Note inures to and binds the heirs, legal representatives, successors and assigns of Maker and Holder; provided, however, that Maker may not assign this Note, or assign or delegate any of its rights or obligations, without the prior written consent of Holder in each instance, in Holder's sole discretion.

IN WITNESS WHEREOF, this Note has been executed as of the date first hereinabove written.

MARTIFER SOLAR USA, INC., a
California corporation

By: _____

Its: _____



35