

_____
Honorable August B. Landis
United States Bankruptcy Judge



**Entered on Docket**
**February 18, 2014**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

| | |
|---|---|
| In re: | ) Case Nos. BK-S-14-10355-abl and |
| | ) BK-S-14-1 0357 -abl |
| MARTIFER AURORA SOLAR, LLC, | ) |
| | ) Jointly Administered under |
| | ) Case No. BK-S-14-10355-abl |
| ☐ Affects Martifer Aurora Solar, LLC | ) |
| | ) Chapter 11 |
| | ) |
| ☐ Affects Martifer Solar USA, Inc. | ) Hearing Date: January 28, 2014 |
| | ) |
| ■ Affects all Debtors | ) Hearing Time: 9:30 a.m. |
| | ) |

**AMENDED INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 361, 362 AND 363 AND FED. R. BANKR. P. 4001(b) AND 4001(d): (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL AND PROVIDE ADEQUATE PROTECTION; (II) GRANTING RELATED RELIEF; AND (III) SCHEDULING FINAL HEARING**

The Court, having reviewed and considered the Motion (the "Motion") filed by Martifer Solar USA, Inc. ("Martifer USA") and Martifer Aurora Solar, LLC ("Aurora", together with Martifer USA, "Debtors" or the "Companies"), for entry of an interim order (the "Interim Order") and final order (the "Final Order") pursuant to sections 361, 362 and 363 of title 11 of the United States Code,§§ 101 et. seq. (the "Bankruptcy Code"), Rules 4001(b) and 400l(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001(b) and 4001(c) of the Local Rules for the U.S. Bankruptcy Court, District of Nevada ("Local Rules"): (i) authorizing and approving, among other things, (a) Debtors to use the cash collateral of Cathay Bank (the

"Pre-Petition Lender"), (b) Debtors to provide adequate protection to the Pre-Petition Lender, (c) the form and manner of service of the Motion; and (ii) scheduling interim and final hearings with respect to the relief requested therein; and it appearing that the relief requested is in the best interests of Debtors' estates, their creditors and all other parties in interest; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having reviewed and considered all other pleadings and evidence submitted by the parties in connection with the Motion; and due and proper notice of the Motion having been provided; and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual grounds set forth in the Motion establish just cause for the relief granted herein; and the Court having considered the oral arguments of counsel at the hearings held on January 28, 2014; and the Court having made findings of fact and conclusions of law on the record, which (to the extent not expressly set forth below) are incorporated herein pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable to these proceedings by Bankruptcy Rule 7052; and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that:

**I. Background, Jurisdiction and Notice.**

A. On January 21, 2014, Debtors commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Each of the Debtors is continuing to operate its business as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee, examiner, or statutory committee has been appointed in this case.

B. This Court has jurisdiction over this matter pursuant to 28U.S.C. §§ 157(b) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2

C. Debtors have complied with the requirements of Bankruptcy Rules 4001(b) and 4011 (d), and Local Rules 4001(b), 4001(c) and 9006, requiring, among other things, that the Interim Hearing be held on less than twenty-one (21) days notice by serving the Motion and providing notice of the Interim Hearing by facsimile or overnight mail to: (i) the U.S. Trustee; (ii) all parties listed on the List of Creditors Holding the 20 Largest Unsecured Claims; (iii) the U.S. Parent (defined below); (iv) the Pre-Petition Lender; (v) the Internal Revenue Service; and (vi) all other parties requesting notice pursuant to Bankruptcy Rule 2002.  Given the nature of the relief sought in the Motion, the Court concludes that the foregoing notice was sufficient and adequate under the circumstances and complies with Bankruptcy Rule 4001 in all respects.

**II. Findings Regarding the Use of Cash Collateral Based on the Record at the Interim Hearing.**

D. On November 15, 2012, the Pre-Petition Lender originated a working-line of credit for the benefit of Debtors, allowing them to draw up to a maximum principal amount of $12 million (the "Cathay Loan").  The Cathay Loan is evidenced in part by a Promissory Note dated November 15, 2012 (the "Cathay Note").  The Cathay Loan is generally secured by (i) Martifer USA's personal property described in that certain Commercial Security Agreement dated November 15, 2012, executed by Martifer USA in favor of the Pre-Petition Lender ("CSA 1"), and (ii) Aurora's personal property described in that certain Commercial Security Agreement dated November 15, 2012, executed by Aurora in favor of the Pre-Petition Lender ("CSA 2" and together with CSA 1, individually and collectively referred to as the "CSA").  The collateral for the Cathay Loan pursuant to the CSA is referred to herein as the "Cathay Collateral".

E. Martifer Solar, Inc. (the "US Parent"), the direct parent of Martifer USA, executed a Commercial Guaranty dated November 15, 2012 in favor of the Pre-Petition Lender, guaranteeing the indebtedness of Debtors owing to the Pre-Petition Lender as described therein ("Guaranty 1"); likewise, Martifer Solar, S.A. ("S.A.", and, together with the US Parent, the "Guarantors"), executed a Commercial Guaranty dated November 15, 2012 in favor of the

Pre-Petition Lender guaranteeing Debtors' indebtedness to the Pre-Petition Lender as described therein ("Guaranty 2" and together with Guaranty 1, individually and collectively referred to as the "Guaranty". The Cathay Note, the CSA, the Guaranty, and all related Cathay Loan documents are collectively, the "Loan Documents.")

F. The Pre-Petition Lender has asserted that the Debtors and the Guarantors have defaulted in their obligations to the Pre-Petition Lender under the Loan Documents, as more particularly described in the default and demand letter delivered to Martifer USA on or about August 19, 2013 (all such asserted defaults are collectively, the "Existing Defaults"). As a result of the Existing Defaults, the Pre-Petition Lender has asserted that the outstanding indebtedness under the Cathay Loan Documents has become immediately due and payable to the Pre-Petition Lender.

G. The Loan Documents further provided a Loan maturity date of November 30, 2013. The Pre-Petition Lender has asserted that the failure to pay the outstanding Loan balance by such date constituted Debtors' and Guarantors' further defaults under the Loan Documents.

H. On January 21, 2014 (the "Petition Date"), Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court").

I. As of the Petition Date, the outstanding balance of the Loan is approximately $6.4 million.

J. During the Chapter 11 Cases, Debtors need to use cash collateral (as defined in Bankruptcy Code section 363) in which the Pre-Petition Lender asserts an interest (the "Pre-Petition Lender's Cash Collateral").

K. Debtors have an immediate and critical need to use the Pre-Petition Lender's Cash Collateral. Debtors' ability to use the Pre-Petition Lender's Cash Collateral is critical to their ability to continue as a going concern during the course of the Chapter 11 Cases.

4

L. An initial 13-week Cash Budget through the week ended April 14, 2014 (the "Initial Cash Budget") is attached to the Motion as Exhibit "2." Debtors' ability to use cash collateral under the terms of this Interim Order in accordance with the Initial Cash Budget is vital to the preservation and maintenance of the going concern value of Debtors' estates and to Debtors' successful reorganization. Consequently, without the ability to use cash collateral to the extent authorized pursuant to this Interim Order, Debtors and the estates would suffer immediate and irreparable harm.

M. The terms of this Interim Order are fair and reasonable under the circumstances. The Debtors' proposed use of cash collateral pursuant to the terms of this Interim Order reflects Debtors' sound exercise of prudent business judgment consistent with its fiduciary duties.

N. The adequate protection to be provided pursuant to this Interim Order, including, without limitation, the Replacement Liens (as hereinafter defined) and the Pre-Petition Lender's Superpriority Claim, is consistent and in compliance with the Bankruptcy Code, including sections 361, 362 and 363 thereof. Adequate protection is also provided by an equity cushion that is at least 20%.

O. Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(d), and, to the extent it applies, Bankruptcy Rule 6003, as the Court finds that entry of this Interim Order is necessary to avoid immediate and irreparable harm to Debtors and the estates. Entry of this Interim Order is in the best interest of Debtors, creditors, and the estates.

P. Based on the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor:

**III. Disposition.**

1. The Motion is granted on an interim basis on the terms and conditions set forth in this Interim Order. This Interim Order shall become effective immediately upon its entry.

2. From the Petition Date through the Termination Date (as hereinafter defined), Debtors

shall be permitted to use the Pre-Petition Lender's Cash Collateral according to the terms of this Interim Order.  Debtors shall have no right to use the Pre-Petition Lender's Cash Collateral after the occurrence and during the continuance of any Event of Default (as hereinafter defined), except as provided herein with respect to the Carve-Out (as hereinafter defined).

3. The Pre-Petition Lender's Cash Collateral may be used to pursue any action or joinder in any action, counter-claim, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek any order, determination or similar relief (including conducting formal or informal discovery in connection therewith) (a) challenging the legality, validity, amount, priority, perfection or enforceability (as the case may be) of any claim of the Pre-Petition Lender against Debtors or any lien of the Pre-Petition Lender against Debtors' property (collectively, the "Pre-Petition Lender's Claims"); (b) invalidating, setting aside, avoiding or subordinating, in whole or in part, any of the Pre-Petition Lender's Claims; (c) seeking authority to use any of the Pre-Petition Lender's Cash Collateral without the Pre-Petition Lender's consent, other than as provided herein; or (d) challenging the legality, validity, amount, priority, perfection or enforceability (as the case may be) of any claim of the Pre-Petition Lender against Debtors under the Loan Documents.

4. All use of the Pre-Petition Lender's Cash Collateral shall be subject to compliance with, in addition to this Interim Order, the Initial Cash Budget, as modified at the hearing and attached hereto as Exhibit A (the "Interim Cash Budget"); provided, however, that compliance with the Interim Cash Budget shall be deemed satisfied if the actual aggregate expenditures for the period comprising weeks two through eight (the "Interim Period") do not exceed the aggregate budgeted amount for such Interim Period as set forth in the Interim Cash Budget.

5. As adequate protection under Bankruptcy Code sections 361, 362, 363 and 552 for any diminution in the value (as it existed on the Petition Date) of Pre-Petition Lender's interest in the Cathay Collateral (any such diminution to be determined by agreement or order of the Bankruptcy Court after notice and a hearing) caused by the imposition of the automatic stay

and/or Debtors' use of the Pre-Petition Lender's Cash Collateral and other Cathay Collateral (a "Value Diminution"), the Pre-Petition Lender shall receive:

(a) monthly, on or before the first day of each month and continuing through the Termination Date, adequate protection payments made by Debtors to the Pre-Petition Lender in an amount equal to the default contractual rate of interest applicable from time to time to amounts outstanding under the Cathay Loan (the "Adequate Protection Payments"), and the automatic stay hereby is vacated and modified to the extent necessary to permit Debtors to make such Adequate Protection Payments and the Pre-Petition Lender to apply them against the Pre-Petition Lender's Claims;

(b) replacement liens to secure the amount of any Value Diminution (the "Replacement Liens"),[1] which Replacement Liens shall: (i) be subject and junior only to the Carve-Out (defined below), and any Prior Liens,[2] (ii) attach to the Cathay Collateral as of the Petition Date and any other assets of Debtors that are subject to a valid and perfected lien as of the Petition Date, any other previously unencumbered assets of Debtors, and any proceeds of the foregoing, and (iii) be in addition to the Pre-Petition Lender's Claims and liens; and

(c) to the extent permitted by Bankruptcy Code section 507(b), a superpriority claim (the "Pre-Petition Lender's Superpriority lien") against Debtors' estates, subject and junior only to the Carve-Out.

6. All claims and liens of the Pre-Petition Lender, including, without limitation, the Replacement Liens and the Pre-Petition Lender's Superpriority Claims, shall be subject to

---

[1] Replacement Liens does not include causes of action under chapter 5 of the Bankruptcy Code and the proceeds thereof ("Avoidance Actions").

[2] "Prior Liens" shall consist of any and all valid and duly perfected liens, mortgages or other security interests in the any assets of Debtors in existence and senior to the interests of Pre-Petition Lender as of the Petition Date.

carve-out (the "Carve-Out") from its liens and claims, including, without limitation, the Replacement Liens, the Pre-Petition Lender's Claims, and the Pre-Petition Lender's Superpriority Claim, for (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930, and (ii) only to the extent the amounts are not available under the Cash Budget, an amount not exceeding two million dollars ($2,000,000) in the aggregate, which amount may be used after the occurrence and during the continuation of an Event of Default (defined below), to pay the fees and expenses of professionals retained by Debtors and any statutory committee and allowed by the Bankruptcy Court; provided, however, that (iii) Debtors shall be permitted to pay compensation and reimbursement of expenses allowed, authorized by the Bankruptcy Court and payable under Bankruptcy Code sections 330 and 331 in accordance with the Interim Cash Budget; (iv) the Carve-Out shall not be reduced by the amount of any compensation and reimbursement of expenses paid or incurred (to the extent ultimately allowed by the Bankruptcy Court) prior to the occurrence of an Event of Default in respect of which the Carve-Out is invoked; and provided, further, that nothing herein shall be construed to impair the ability of the Pre-Petition Lender to object to the reasonableness of any of the fees, expenses, reimbursement or compensation sought by the professionals retained by Debtors or any statutory committee.

7. The Debtors shall be authorized to use the Pre-Petition Lender's Cash Collateral through the earliest of (a) March 10, 2014, or (b) the occurrence of an Event of Default (as hereinafter defined) that is no longer subject to cure (each, a "Termination Date"). Notwithstanding the occurrence of a Termination Date, upon Debtors' receipt of sufficient funds, Debtors shall be entitled to continue to use the Pre-Petition Lender's Cash Collateral to pay (i) amounts that fall within the scope of the Carve-Out, and (ii) all expenses set forth in and in accordance with the Interim Cash Budget for the period through the Termination Date.

8. Upon written notice from the Pre-Petition Lender, any of the following shall be an event of default (each an "Event of Default") (for purpose of items (i) through (vii) by way of a

final order, the effectiveness of which has not been stayed): (i) appointment of a chapter 11 trustee with respect to either of the Chapter 11 Cases; (ii) appointment of an examiner with expanded powers with respect to either of the Chapter 11 Cases; (iii) conversion of either of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (iv) dismissal of either of the Chapter 11 Cases; (v) the Bankruptcy Court terminating either of the Debtors' authority to operate its business; (vi) reversal, vacatur or stay of the effectiveness of this Interim Order; (vii) any use of Cash Collateral to make a payment that is not in compliance with the Interim Cash Budget; or (viii) breach by Debtors of any other provision of this Interim Order, and such breach remains uncured for a period of ten (10) days after written notice of such breach is actually received by Debtors.

9. The Pre-Petition Lender shall not be required to file or serve financing statements, notices of lien or similar instruments that otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect the Replacement Liens; and the failure by Debtors to execute any documentation relating to the Replacement Liens shall in no way affect the validity, perfection or priority of such Replacement Liens.

10. Notwithstanding an Event of Default, any amounts that have been disbursed m accordance with the Interim Cash Budget and/or the Carve-Out shall not be subject to disgorgement in favor of the Pre-Petition Lender absent a finding of mistaken payment, bad faith or fraud.

11. To the extent applicable, this Interim Order is not subject to the 14-day stay provision of Bankruptcy Rule 4001(a)(3).

12. Debtors shall cause a copy of this Interim Order to be served within three (3) business days of its entry, by electronic mail, U.S. Mail or the Court's ECF noticing of the Interim Hearing to: (a) Pre-Petition Lender: Cathay Bank, (b) the Office of the United States Trustee for the District of Nevada, Attn: J. Michal Bloom; (c) counsel for any statutory committee appointed in

this case, and if no such committee was appointed, then to the parties listed on the List of Creditors Holding the 20 Largest Unsecured Claims; and (d) all other secured creditors, and all other parties requesting notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties").

13. Final Hearing. A hearing to consider entry of an order granting the relief set forth in this Interim Order on a final basis (the "Final Order") shall be held on March 10, 2014, at 9:30 a.m. (the "Final Hearing") in Courtroom 1; with any objections (the "Objections") to entry of a Final Order due to be timely filed electronically with the Court and served on the Notice Parties and Debtors' counsel: Fox Rothschild, LLP, 3800 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada 89169, Attn: Brett A. Axelrod, Esq. (collectively, the "Objection Notice Parties") (with a courtesy copy delivered directly to the Chambers of the Honorable August B. Landis) no later than February 24, 2014.  Replies to timely-filed Objections, if any, shall be filed with the Bankruptcy Court electronically and served no later than March 3, 2014 (with a courtesy copy delivered directly to the Chambers of the Honorable August B. Landis) by the Objection Notice Parties and the objecting party.

14. These are interim findings of fact and conclusions of law and all parties' rights are reserved with respect to challenge of these findings for purposes of the hearing on the Final Order.

**IT IS SO ORDERED**

Notice and copies sent through:

CM/ECF ELECTRONIC NOTICING AND/OR BNC

and sent via FIRST CLASS MAIL BY THE COURT AND/OR BNC to:

LAWRENCE M JOHNSON
GLICKFIELD FIELDS & JACOBSON LLP
9720 WILSHIRE BLVD., STE. 700
BEVERLY HILLS, CA 90212

###

**EXHIBIT A**

**Martifer Solar USA, Inc.**
**13 Week Cash Flow Projections**

Unaudited — Draft- Subject to Modification

| Week # | Totals | 13 (4/14/14) | 12 (4/7/14) | 11 (3/31/14) | 10 (3/24/14) | 9 (3/17/14) | 8 (3/10/14) | 7 (3/3/14) | 6 (2/24/14) | 5 (2/17/14) | 4 (2/10/14) | 3 (2/3/14) | 2 (1/27/14) | 1 (1/21/14) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Receipts (Legacy) | $ 2,897,564 | $ - | $ - | $ 1,647,404 | $ - | $ - | $ - | $ - | $ 910,741 | $ 283,151 | $ 47,547 | $ - | $ 8,721 | $ - |
| Cash Receipts (New Busi.) | 675,000 | 60,000 | - | 615,000 | - | - | - | - | - | - | - | - | - | - |
| **Total Cash Receipts** | 3,572,564 | 60,000 | - | 2,262,404 | - | - | - | - | 910,741 | 283,151 | 47,547 | - | 8,721 | - |
| Direct Materials + Subs (Legacy) | 1,977,743 | - | - | 741,669 | - | - | - | - | 1,009,886 | - | 133,151 | 38,038 | 55,000 | - |
| Direct Materials + Subs (New Busi.) | 1,154,350 | 5,000 | 15,000 | 630,000 | 25,000 | 5,000 | 10,000 | - | 114,350 | - | - | - | 350,000 | - |
| **Total Dir. Mat. Disbursements** | 3,132,093 | 5,000 | 15,000 | 1,371,669 | 25,000 | 5,000 | 10,000 | - | 1,124,236 | - | 133,151 | 38,038 | 405,000 | - |
| Payroll | 1,128,234 | 161,176 | - | 161,176 | - | 161,176 | - | 161,176 | - | 161,176 | - | 161,176 | - | 161,176 |
| Commissions | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Insurance | 130,500 | - | - | - | 43,500 | - | - | - | 43,500 | - | - | - | 43,500 | - |
| Expense Reimbursements | 108,000 | - | - | - | 36,000 | - | - | - | 36,000 | - | - | - | 36,000 | - |
| Fuel | 11,100 | - | - | 3,700 | - | - | - | 3,700 | - | - | - | 3,700 | - | - |
| Rent | 66,150 | - | - | - | 22,050 | - | - | - | 22,050 | - | - | - | 22,050 | - |
| Utilities | 36,000 | - | - | - | 12,000 | - | - | - | 12,000 | - | - | - | 12,000 | - |
| Other Expenses | 36,000 | - | - | 12,000 | - | - | - | 12,000 | - | - | - | 12,000 | - | - |
| IT Services | 30,900 | - | - | - | 10,300 | - | - | - | 10,300 | - | - | - | 10,300 | - |
| Outside Services | 114,000 | - | - | 38,000 | - | - | - | 38,000 | - | - | - | 38,000 | - | - |
| Vehicle Leases | 24,750 | - | - | 8,250 | - | - | - | 8,250 | - | - | - | 8,250 | - | - |
| Contingency | 215,000 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 132,500 | 7,500 | 7,500 | - |
| **Total Operating Disbursements** | 1,900,634 | 168,676 | 7,500 | 230,626 | 131,350 | 168,676 | 7,500 | 230,626 | 131,350 | 168,676 | 132,500 | 230,626 | 131,350 | 161,176 |
| **Net Operating Cash Flows** | (1,460,164) | (113,676) | (22,500) | 660,109 | (156,350) | (173,676) | (17,500) | (230,626) | (344,845) | 114,475 | (218,104) | (268,664) | (527,629) | (161,176) |
| Debtor's Legal Fees (Ch.11) | 370,000 | 370,000 | - | - | - | - | - | - | - | - | - | - | - | - |
| Debtor's FA Fees (Ch. 11) | 75,000 | 75,000 | - | - | - | - | - | - | - | - | - | - | - | - |
| Debtor's IB Fees (Ch. 11) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debtor's Legal Fees (Other) | 245,000 | 245,000 | - | - | - | - | - | - | - | - | - | - | - | - |
| Committee's Fees | 50,000 | 50,000 | - | - | - | - | - | - | - | - | - | - | - | - |
| Chapter 11 UST Fees | 6,500 | 6,500 | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Professional Fees** | 746,500 | 746,500 | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Expense- Secured Debt | 173,305 | - | - | - | 57,768 | - | - | - | 57,768 | - | - | - | 57,768 | - |
| **Net Cash Flow Before DIP Draws** | (2,379,969) | (860,176) | (22,500) | 660,109 | (214,118) | (173,676) | (17,500) | (230,626) | (402,613) | 114,475 | (218,104) | (268,664) | (585,398) | (161,176) |
| Beginning Cash | 505,700 | 901,434 | 923,934 | 263,825 | 262,943 | 256,619 | 264,119 | 264,746 | 383,009 | 268,534 | 211,638 | 220,302 | 505,700 | 505,700 |
| DIP Facility Draws | 2,075,526 | 160,000 | - | - | 215,000 | 180,000 | 10,000 | 230,000 | 284,350 | - | 275,000 | 260,000 | 300,000 | 161,176 |
| **Net Ending Cash** | $ 201,257 | $ 201,257 | $ 901,434 | $ 923,934 | $ 263,825 | $ 262,943 | $ 256,619 | $ 264,119 | $ 264,746 | $ 383,009 | $ 268,534 | $ 211,638 | $ 220,302 | $ 505,700 |

**Notes:**

[1] All dates represent the beginning Monday, except for Week 1, the beginning of which is the Petition Date

[2] Martifer restructured its sales team in December 2013 with a mandate that all new contracts generate positive cash flows. "Legacy" business represents those contracts in place prior to this restructuring

[3] While all new business has been calculated as cash flow positive, contracts typically require initial cash outlays up to several months prior to recognition of cash receipts, as is common industry practice

[4] Week 1 payroll is assumed to be paid through the DIP Facility (i.e. Martifer Solar, Inc. as DIP Lender) in advance of finalization of the DIP Facility loan agreement

[5] Assumes amounts due to critical vendors of approximately $125,000 are paid by Week 4 pursuant to Section 105 or other provisions of the Bankruptcy Code

[6] Investment Banking fees of $300,000 contemplates a potential exit financing transaction. Should this transaction not materialize within this budget period, such corresponding fees will not be paid

[7] Professionals' monthly invoices are assumed to be paid at 80% of fees and 100% of expenses (for January 2014 through March 2014 invoices). The 20% holdbacks are assumed to be paid upon Plan Confirmation.

[8] Assumes default interest rate at 11% per annum based on a principal balance of $6.3 million

[9] Beginning cash balance per the Debtor cash balance as of 1/21/14.

[10] DIP Facility draws relate to a pending Debtor in Position facility. All related interest is accrued. Draws on the DIP Facility are projected for any week in which the cash balance is projected to drop below $200,000