MICHAEL GERARD FLETCHER, ESQ.
California Bar No. 070849
REED S. WADDELL, ESQ.
California Bar No. 106644
**FRANDZEL ROBINS BLOOM & CSATO, L.C.**
6500 Wilshire Boulevard, 17th Floor
Los Angeles, California 90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577
E-Mail: mfletcher@frandzel.com
      rwaddell@frandzel.com
and
NATALIE M. COX, ESQ.
Nevada Bar No. 007662
RANDOLPH L. HOWARD, ESQ.
Nevada Bar No. 006688
**KOLESAR & LEATHAM**
400 South Rampart Boulevard
Suite 400
Las Vegas, Nevada 89145
Telephone: (702) 362-7800
Facsimile: (702) 362-9472
E-Mail: ncox@klnevada.com
      rhoward@klnevada.com

Attorneys for Secured Creditor
**CATHAY BANK**

RECEIVED AND FILED

MAR 10   2 23 PM '14

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>MARTIFER AURORA SOLAR, LLC, a Nevada limited liability company.<br><br>    Debtor.<br><br>☐ Affects Martifer Aurora Solar, LLC<br>☐ Affects Martifer Solar USA, Inc.<br>☒ Affects All Debtors | Case Nos. BK-S-14-10355-abl and BK-S-14-10357-abl<br><br>Jointly Administered Under Case No. BK-S-14-10355-abl<br><br>Chapter 11<br><br>**CATHAY BANK'S MOTION FOR AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE IN THESE BANKRUPTCY CASES PURSUANT TO 11 U.S.C. § 1104(a) OR, ALTERNATIVELY, CONVERTING OR DISMISSING THESE BANKRUPTCY CASES TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE PURSUANT TO 11 U.S.C. § 1112(b)**<br><br>Hearing Date:   To Be Determined<br>Hearing Time:   To Be Determined |

1407472.1 | 023000-0918

MOTION FOR ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE IN THESE BANKRUPTCY CASES OR, ALTERNATIVELY, DISMISSING OR CONVERTING THESE BANKRUPTCY CASES

# TABLE OF CONTENTS

**Page**

I.  RELEVANT FACTUAL BACKGROUND ................................................................. 1
    A.  The Bank's Extension of Credit to the Borrowers ........................................... 1
    B.  The Borrowers' Defaults Under the Loan Documents .................................... 2
    C.  The Bank's Efforts to Work With the Borrowers To Resolve the Defaults .... 3
    D.  The Borrowers Divert the Bank's Collateral to the CB&T Account .............. 4
    E.  The AEF Settlement Agreement ....................................................................... 6
    F.  Kiser and Bernhart's Employment Agreements .............................................. 7
    G.  The Debtors' Pre-Petition Financial Performance ........................................... 7
    H.  The Debtors' Bankruptcy Cases and the Bank's Claim ................................... 8
    I.  The Debtors' Financial Projections and Post-Petition Operations ................... 8

II.  ARGUMENT ............................................................................................................. 9
    A.  Legal Standard for Appointment of a Trustee ................................................. 9
    B.  Cause Exists to Appoint a Trustee Because the Debtors' Management
        Cannot Be Trusted .......................................................................................... 9
    C.  Cause Also Exists to Appoint a Trustee to Determine Whether the Debtors
        Should Continue to Operate Their Business ................................................. 10
    D.  Alternatively, the Court Should Convert or Dismiss These Cases ............... 11

III.  CONCLUSION ........................................................................................................ 11

Frandzel Robins Bloom & Csato, L.C.
6500 Wilshire Boulevard, 17th Floor
Los Angeles, California 90048-4920
(323) 852-1000

1407472.1 | 023000-0918                                              i
MOTION FOR ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE IN THESE BANKRUPTCY
CASES OR, ALTERNATIVELY, DISMISSING OR CONVERTING THESE BANKRUPTCY CASES

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*In re Bibo, Inc.*,
    76 F.3d 256 (9th Cir. 1996) .................................................................................................. 9

*In re PRS Ins. Group, Inc.*,
    274 B.R. 381 (Bankr. D. Del. 2001) ...................................................................................... 9

*In re Sharon Steel Corp.*,
    871 F.2d 1217 (3rd Cir. 1989) ............................................................................................... 9

*In re V. Savino Oil & Heating Co.*,
    99 B.R. 518 (Bankr. E.D.N.Y. 1989) ..................................................................................... 8

*Wolf v. Weinstein*,
    372 U.S. 633 (1963) ............................................................................................................... 9

**FEDERAL STATUTES**

11 U.S.C. § 102(3) ....................................................................................................................... 8

11 U.S.C. §§ 361, 362 and 363 .................................................................................................... 7

11 U.S.C. § 1104(a) ..................................................................................................... 1, 8, 10, 11

11 U.S.C. § 1104(a)(1) ................................................................................................................. 9

11 U.S.C. § 1104(a)(2) ................................................................................................................. 8

11 U.S.C. § 1112(b) ....................................................................................................... 1, 10, 11

**RULES**

Fed. R. Bankr. P. 4001(b) and 4001(d): (I) .................................................................................. 7

Cathay Bank ("Bank" or "Lender") files this motion for an order directing the appointment of a chapter 11 trustee in the bankruptcy cases of Martifer Aurora Solar, LLC ("Martifer Aurora"), and Martifer Solar USA, Inc. ("Martifer USA," and with Martifer Aurora, "Debtors," "Borrowers," or "Grantors"), pursuant to 11 U.S.C. § 1104(a) or, alternatively, dismissing or converting these bankruptcy cases to cases under chapter 7 of the Bankruptcy Code pursuant to 11 U.S.C. § 1112(b).[1]

## I. RELEVANT FACTUAL BACKGROUND

### A. The Bank's Extension of Credit to the Borrowers

On or about November 15, 2012, the Bank agreed to make a loan to the Borrowers in the original principal sum of $12,000,000.00 ("Loan"). In connection with the Loan, the Borrowers executed and delivered to the Bank a Business Loan Agreement (Asset Based) dated November 15, 2012 ("BLA"). Among other things, the BLA (at page 7) requires the Borrowers, at all times while the Loan is outstanding, to maintain their "primary operating checking account with Lender with specific authorization to Lender to debit said checking account for payments and fees due under loans and/or advances, as they become due and payable." [Declaration of Eileen Lewis in Support of Bank's Demand for Adequate Protection filed January 27, 2014 (ECF No. 60[2]) ("Lewis Adequate Protection Decl.") ¶ 6, Ex. 1.]

In connection with the Loan, the Borrowers also executed and delivered to the Bank a Promissory Note dated as of November 15, 2012, in the original principal sum of $12,000,000.00 ("Note"). The Note provides, among other things, that the Borrowers will (1) make regular monthly payments of all accrued unpaid interest as of each payment date, beginning December 31, 2012, with all subsequent interest payments to be due on the last day of each month after that; and (2) pay all outstanding principal plus all accrued unpaid interest due under the Loan on November 30, 2013. [*Id.* ¶¶ 7-8, Ex. 2.]

---

[1] Pursuant to Local Bankruptcy Rule 9014.2, the Bank hereby indicates its consent to entry of a final order on the Motion by the Court.

[2] Unless otherwise noted, all docket citations are to the docket in Martifer Aurora's bankruptcy case.

1407472.1 | 023000-0918

1

MOTION FOR ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE IN THESE BANKRUPTCY CASES OR, ALTERNATIVELY, DISMISSING OR CONVERTING THESE BANKRUPTCY CASES

To secure repayment of amounts due under the Loan, Martifer USA executed and delivered to the Bank a Commercial Security Agreement dated November 15, 2012 ("CSA-1"), whereby Martifer USA granted the Bank a security interest in all of Martifer USA's tangible and intangible assets, including but not limited to its accounts; contract rights; instruments; deposit accounts; letter of credit rights; payment intangibles and general intangibles; inventory, machinery, furniture, fixtures, and equipment; and all proceeds, products, or profits of any such assets (collectively, "CSA-1 Collateral"). The Bank perfected its security interest in the CSA-1 Collateral by filing a UCC Financing Statement with the California Secretary of State on November 27, 2012 ("CSA-1 FS") [Id. ¶¶ 9-10, Exs. 3-4.]

To further secure repayment of amounts due under the Loan, Martifer Aurora executed and delivered to the Bank a second Commercial Security Agreement dated November 15, 2012 ("CSA-2"), whereby Martifer Aurora granted the Bank a security interest in all of Martifer Aurora's tangible and intangible assets, including but not limited to its accounts; contract rights; instruments; deposit accounts; letter of credit rights; payment intangibles and general intangibles; inventory, machinery, furniture, fixtures, and equipment; and all proceeds, products, or profits of any such assets (collectively, "CSA-2 Collateral," and with the CSA-1 Collateral, "Collateral"). The Bank perfected its security interest in the CSA-2 Collateral by filing a second UCC Financing Statement with the Office of the California Secretary of State on November 27, 2012 ("CSA-2 FS"). [Id. ¶¶ 11-12, Exs. 5-6.]

CSA-1 and CSA-2 (in each case at page 3) each contain the following provisions:

> **Transactions Involving Collateral.** Except for Inventory sold or accounts collected in the ordinary course of Grantor's business…Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement.

The BLA, the Note, CSA-1, CSA-1 FS, CSA-2, and CSA-2 FS are collectively referred to herein as the "Loan Documents."

///

### B. The Borrowers' Defaults Under the Loan Documents

In or about early August 2013, the Bank discovered that the Borrowers were in default of their obligations under the Loan Documents because the Loan balance exceeded the maximum outstanding balance permitted under the Loan Documents. Specifically, the BLA (at page 1) states that "the aggregate amount of [advances under the Loan outstanding at any time shall not] exceed the Borrowing Base." The BLA (at page 8) defines "Borrowing Base" as "the lesser of (1) $12,000,000 or (2) 75.000% of the aggregate amount of Eligible Accounts" and (also at page 8) defines "Eligible Accounts" as accounts receivable meeting certain specified conditions. [*Id.* ¶ 14, Ex. 1.]

The BLA (at page 1) states that "If at any time the aggregate principal amount of the outstanding Advances shall exceed the applicable Borrowing Base, Borrower, immediately upon written or oral notice from Lender, shall pay to Lender an amount equal to the difference between the outstanding principal balance of the Advances and the Borrowing Base." In accordance with this provision, the Bank notified the Borrowers that the outstanding advances under the Loan exceeded the Borrowing Base and gave the Borrowers the opportunity to pay down the Loan and bring the Loan back within the limits provided for in the Loan Documents. [*Id.* ¶ 15, Ex. 1.]

The Borrowers did not do so. As a result, on August 15, 2013, the Bank sent a default demand letter ("Default Letter") to the Borrowers whereby the Bank declared the Loan in default and demanded payment in full of all amounts outstanding under the Loan. The Bank personally delivered a copy of the Default Letter to the Borrowers at a meeting between the Bank and the Borrowers on August 19, 2013. [*Id.* ¶ 16, Ex. 7.]

### C. The Bank's Efforts to Work With the Borrowers To Resolve the Defaults

Beginning in late August 2013, and repeatedly thereafter, the Bank clearly and unequivocally informed the Borrowers that the Bank did not consent to use of the Collateral (including collections of accounts receivable) except on a day-to-day and case-by-case basis. Over the next several months in the context of workout negotiations, but still on a day-to-day basis, the Bank for the most part approved Martifer USA's daily requests to use cash for its operating needs. [Declaration of Eileen Lewis filed herewith ("Lewis Decl.") ¶ 3, Ex. 1.]

In addition, while consent was not required, on several occasions the Bank obtained Martifer USA's consent to apply portions of the collateral collections and proceeds held in its account with the Bank ("Cathay Account") to reduce the outstanding Loan balance. Specifically, with Martifer USA's consent, the Bank applied collateral collections and proceeds in the Cathay Account to reduce the Loan principal balance on a weekly basis from October 2, 2013, through November 27, 2013, by a total of $1,700,000. [*Id.* ¶ 4.]

### D. The Borrowers Divert the Bank's Collateral to the CB&T Account

The Borrowers further defaulted under the Loan Documents by failing to pay the outstanding Loan balance in full on or before the November 30, 2013, maturity date. On December 4, 2013, as workout negotiations reached an impasse and the Bank became increasingly concerned about the Loan, the Bank applied $300,000 of collateral collections and proceeds in the Cathay Account to reduce the outstanding Loan balance.[2] On December 11, 2013, the Bank again applied $100,000 of collateral collections and proceeds in the Cathay Account to reduce the outstanding Loan balance.[3] On December 13, 2013, Martifer USA requested that the Bank consent to payment of a $70,206.70 rebate application deposit to Oncor Electric Delivery Co., LLC ("Oncor"), in connection with a joint project between SoCore Installation Services, LLC and Martifer USA for Oncor. The Bank never consented to the payment. [*Id.* ¶ 5.]

Within days, the Bank noticed that deposits to the Cathay Account dropped off precipitously.[4] As a result, on January 10, 2014, James Crossland (a consulting expert engaged by the Bank's counsel) conducted an onsite audit of the Borrowers' books and records. Mr. Crossland's audit revealed that after the Bank declined to approve the payment to Oncor, Martifer

---

[2] Martifer USA had only consented to the Bank applying $50,000.00 to reduce the Loan balance on December 4, 2013.

[3] As with the December 4, 2013, application of funds, Martifer USA had only consented to the Bank applying $50,000.00 to reduce the Loan balance on December 11, 2013.

[4] Between December 17, 2013, and January 16, 2014, deposits to the Cathay Account substantially decreased when compared to prior account activity with the largest individual deposits to the Cathay Account during that time ranging from $1,170.44 to a maximum of $5,000.00.

USA began directing all deposits to an account with California Bank & Trust ("CB&T Account"). The audit also revealed that on December 17, 2013, Martifer USA unilaterally made the payment to Oncor without the Bank's consent. [Declaration of James Crossland filed herewith ("Crossland Decl.") ¶¶ 8-10, Ex. 2.]

Specifically, Mr. Crossland's audit showed that between December 17, 2013, and January 8, 2014, 14 deposits totaling $1,445,162.27 were made into the CB&T Account, including six separate deposits ranging from $100,000-$710,000 each. Furthermore, between December 23, 2013 and January 7, 2014, 10 withdrawals in excess of $100,000 each (i.e., between $10,008 and $332,520) were made from the CB&T Account for a total of $803,437.87. [Id. ¶ 11, Ex. 2.]

The Borrowers' clandestine diversion of the Bank's collateral to the CB&T Account was in direct violation of the BLA, which (as noted) requires the Borrowers to maintain their primary operating checking account with the Bank (with the Bank authorized to debit the account for amounts due under the Loan) at all times while the Loan is outstanding. The Bank knew the CB&T Account existed since September 2013. At that time, Avi Muhtar (the Debtors' General Counsel) told the Bank that the CB&T Account was "an old account that...hasn't been actively used by Martifer for quite some time and isn't being actively used [and] remained open because there was a concern that the company's clients would continue to mistakenly use this old account notwithstanding notice that had been provided to them of the change of our account." [Lewis Decl. ¶ 7, Ex. 2.]

The Bank accepted Mr. Muhtar's explanation and relied on his representations with regard to the CB&T Account in continuing to negotiate with the Debtors regarding a possible Loan workout. [Id. ¶ 8.][5] During Mr. Crossland's January 10, 2014, onsite audit, Mr. Muhtar admitted

---

[5] The explanation was consistent with Mr. Crossland's findings during an earlier onsite audit of the Debtors' books and records on December 13, 2013. During that audit, the Debtors provided Mr. Crossland copies of bank account statements for the CB&T Account dated September 30, 2013, October 31, 2013, and November 29, 2013. Those statements show that the CB&T Account was relatively dormant from September 1-November 29, 2013 (i.e., zero deposits, a single debit in the amount of $115.53 on September 18, 2013, and a balance ranging from $3,490.59 to $3,606.12). [Crossland Decl. ¶ 6 Ex. 2.]

that the CB&T Account was being used by Martifer USA for its day-to-day operations, including payroll and deposits of receivables collected. Mr. Muhtar also told Mr. Crossland, without further elaboration, that the decision to start using the CB&T Account as Martifer USA's operating account was "a management decision." [Crossland Decl. ¶ 7.]

E.     **The AEF Settlement Agreement**

A primary topic of discussion during workout negotiations was Martifer USA's relationship with Alternative Energy Financing LLC ("AEF") and CBS Broadcasting, Inc. ("CBS"). Beginning in November 2011 AEF entered into contracts with CBS for installation of solar power systems at CBS' real property in Los Angeles, California ("CBS Project"), and entered into separate contracts with Martifer USA for the construction of various phases of the CBS Project. [Lewis Decl. ¶ 9.]

On December 26, 2013, Studios Solar, LLC ("Solar"); Studios Solar 2, LLC ("Solar 2"); Studios Solar 3, LLC ("Solar 3"); Studios Solar 4, LLC ("Solar 4"); and Studios Solar 5, LLC ("Solar 5") were each formed under Delaware law. [Request for Judicial Notice filed herewith Exs. 1-5.]

On January 2, 2014, without the Bank's knowledge or consent, Martifer USA, AEF, and various other parties entered into a Settlement Agreement with Mutual Releases ("AEF Settlement Agreement"). In the AEF Settlement Agreement, the parties agreed (at paragraphs 3 and 4) that AEF owed Martifer USA no less than $7,900,000 and that Martifer USA did not owe AEF any amount. AEF also agreed (also at paragraph 10) to assign to Martifer USA all rebates and grants received from the CBS Project. AEF further agreed (at paragraph 10) to transfer all its interest in the CBS Project to Martifer USA, who in turn transferred (1) Phase 2 of the CBS Project to Solar 2; (2) Phase 3 of the CBS Project to Solar 3; (3) Phase 4 of the CBS Project to Solar 4; and (4) Phase 5 of the CBS Project to Solar 5. The transfer was documented by an Asset Purchase Agreement ("APA") dated as of January 2, 2014, signed by Martifer USA's Chief Financial

---

a single debit in the amount of $115.53 on September 18, 2013, and a balance ranging from $3,490.59 to $3,606.12). [Crossland Decl. ¶ 6 Ex. 2.]

Officer Klaus Bernhart, and attached to the AEF Settlement Agreement as Exhibit B.[6] [Crossland Decl. ¶ 37; Declaration of Chris Frye filed February 25, 2014 (ECF No. 236) ¶ 9.]

In exchange, Martifer USA agreed (at paragraphs 6 and 18 respectively) among other things to make payments to AEF totaling $300,000, and to give AEF a general release, including a release of AEF's $7,900,000 debt to Martifer USA described above. To secure Martifer USA's payment obligations to AEF, Martifer USA (at paragraph 6.d) granted AEF a security interest in certain grants to be received from the United States Treasury related to the CBS Project. [*Id.* ¶ 38.] Martifer USA thereby further violated its obligations the Loan Documents which (as noted) forbid the Debtors from granting a security interest in their assets without the Bank's consent.

The Debtors did not disclose the AEF Settlement Agreement in any of their numerous initial pleadings and declarations filed with the Court, and the Bank did not know Martifer USA had entered into the AEF Settlement Agreement until Martifer USA filed its Periodic Report and schedules on February 20, 2014. [Lewis Decl. ¶ 10.]

**F.    Kiser and Bernhart's Employment Agreements**

Effective as of March 10, 2013, Martifer USA entered into an Executive Employment Agreement with Mr. Kiser and a separate Executive Employment Agreement with Mr. Bernhart. Pursuant to the employment agreements, the term of each executive's employment terminates on March 10, 2014. On that date, Mr. Kiser is entitled to a $75,000 restructuring bonus and Mr. Bernhart is entitled to a $50,000 restructuring bonus, in each case for their services during the prior year. [Crossland Decl. ¶ 52, Exs. 15 and 16.]

**G.    The Debtors' Pre-Petition Financial Performance**

In 2012, the Debtors incurred a $7,917,323 operating loss. Interest expense, write-offs and

---

[6] At paragraph 6.5 of the APA, Martifer USA represented to AEF that "[t]here are no bankruptcy...proceedings...being contemplated by" Martifer USA or any of Martifer USA's affiliates. This representation was false. In fact, on December 10, 2013, Martifer USA's Board of Directors (including Roland Kiser, Martifer USA's Chief Executive Officer) authorized and directed Martifer USA to file a Chapter 11 petition. [Martifer USA ECF No. 1.] On January 3, 2014, just one day after Mr. Bernhart executed the APA, Mr. Kiser and Mr. Bernhart (in their capacities as Martifer Aurora's managers) authorized and directed Martifer Aurora to file a Chapter 11 bankruptcy petition by unanimous written consent. [ECF No. 1.]

provisions led to a $9,649,849 loss before provision for income taxes. In 2013, after Martifer USA hired Mr. Kiser and Mr. Bernhart to restructure the Debtors, the Debtors incurred a $15,948,154 operating loss and a $17,783,320 loss before provision for income taxes. [*Id.* ¶ 16, Ex. 3.]

### H.  The Debtors' Bankruptcy Cases and the Bank's Claim

The Debtors commenced these bankruptcy cases on January 21, 2014 ("Petition Date"), the day before a hearing on the Bank's Ex Parte Application for appointment of a receiver over the Debtors in Los Angeles County Superior Court. [ECF No. 1; Martifer USA ECF No. 1; Omnibus Declaration of Klaus Bernhart in Support of First Day Motions filed January 22, 2014 (ECF No. 15).] As of the Petition Date, the Bank's claim against the Debtors totaled $6,337,886.39, plus accrued fees and costs. [Lewis Adequate Protection Decl. ¶ 31.] Martifer USA's Schedule B shows that Martifer USA holds 100 percent of Solar, valued at $8,127,356, and that Solar owns Solar 2, Solar 3, Solar 4, and Solar 5. [Martifer USA ECF No. 102.]

### I.  The Debtors' Financial Projections and Post-Petition Operations

On February 18, 2014, the Court entered its Amended Interim Order Pursuant to 11 U.S.C. §§ 361, 362 and 363 and Fed. R. Bankr. P. 4001(b) and 4001(d): (I) Authorizing Debtors to Use Cash Collateral and Provide Adequate Protection; (II) Granting Related Relief and (III) Scheduling Final Hearing ("Interim Cash Collateral Order"). [ECF No. 187.]

Martifer USA's 13-Week Cash Flow Projections ("Budget"), attached to the Interim Cash Collateral Order as Exhibit A and first filed with the Court on January 23, 2014, projected that the Debtors would collect $1,250,160 in receivables during the six weeks from the Petition Date through February 28, 2014. These receivables include monies associated with the CBS Project, which the Budget represented would be received by the Debtors directly even though Martifer USA does not hold title to the CBS Project Assets. [Crossland Decl. ¶ 45.]

During these six weeks, the Debtors collected only $9,232 in receivables, lost $1,166,770 on an operating basis (i.e., before paying professional fees or making interest payments to the Bank), and borrowed $2,542,731 from Martifer USA's parent Martifer Solar, Inc. Going forward the Debtors are not projected to generate any further revenue until the week of March 31, 2014.

1407472.1 | 023000-0918

8

MOTION FOR ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE IN THESE BANKRUPTCY CASES OR, ALTERNATIVELY, DISMISSING OR CONVERTING THESE BANKRUPTCY CASES

With respect to those collections the Debtors' Financial Advisor James Wong has admitted that the Debtors now do not expect to collect at least $1,343,307 of the $1,647,404 in "Legacy" receivables or any portion of the $615,000 in "New Business" revenue at any time during the period covered by the Budget. [*Id.*]

## II.  ARGUMENT

**A.  Legal Standard for Appointment of a Trustee**

11 U.S.C. § 1104(a) provides that the Court

> shall order the appointment of a trustee—(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause...or (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate[.]

11 U.S.C. § 1104(a) "represents a potentially important protection that courts should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession." *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989). The words "including" and "or similar cause" in 11 U.S.C. § 1104(a), taken together with 11 U.S.C. § 102(3) (which states that the word "including" is not limiting), indicate that the grounds for appointing a trustee "are not...limited to the derelictions specifically enumerated" therein. *Id.* The court has even greater flexibility under 11 U.S.C. § 1104(a)(2), which calls for an examination of the "totality of circumstances" to determine if they are "signal[ing] the need for a trustee." *In re Sharon Steel Corp.*, 871 F.2d 1217, 1228 (3rd Cir. 1989).

**B.  Cause Exists to Appoint a Trustee Because the Debtors' Management Cannot Be Trusted**

Cause exists to appoint a trustee because, among other things, there is strong evidence of fraud and dishonesty on the part of the Debtors' management prior to the Petition Date. Fraud and dishonesty are two of the four enumerated examples of cause under 11 U.S.C. § 1104(a)(1). This is sensible, because whether a debtor can remain in possession hinges "upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." *Wolf v. Weinstein*, 372 U.S. 633, 651 (1963). In this regard, courts have consistently held that "[d]iversion of funds and misuse of corporate assets constitute fraud or dishonesty

1407472.1 | 023000-0918

9

MOTION FOR ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE IN THESE BANKRUPTCY CASES OR, ALTERNATIVELY, DISMISSING OR CONVERTING THESE BANKRUPTCY CASES

sufficient to warrant appointment of a trustee" under 11 U.S.C. § 1104(a)(1). *In re PRS Ins. Group, Inc.*, 274 B.R. 381, 385 (Bankr. D. Del. 2001). *See also In re Bibo, Inc.*, 76 F.3d 256 (9th Cir. 1996).

As detailed above, the Debtors beginning on or about December 17, 2013, secretly diverted at least $1,445,162.27 in account collections to the CB&T Account for the sole purpose of fraudulently converting the Bank's collateral. The Debtors' conduct was particularly egregious in light of Mr. Muhtar's representation to the Bank (upon which the Bank relied in continuing to engage in workout negotiations with the Debtors) in September 2013 that the CB&T Account was not being actively used and would not be used going forward.

The Debtors also attempted to defraud the Bank by entering into the AEF Settlement Agreement and APA. (The APA itself, as noted, fraudulently represented to AEF that Martifer USA was not contemplating filing a bankruptcy petition, less than one month after Martifer USA's Board of Directors authorized and directed Martifer USA to file a chapter 11 petition.) Without the Bank's knowledge or consent, the Debtors orchestrated a transaction whereby (1) Martifer USA's $7,900,000 receivable owing from AEF (which was the Bank's collateral) was released in exchange for ownership of the CBS Project; (2) Solar 2, Solar 3, Solar 4, and Solar 5 took ultimate title to the CBS Project rather than Martifer USA; and (3) Martifer USA, in further violation of the Loan Documents, granted AEF a security interest in interest in certain grants to be received from the United States Treasury related to the CBS Project. This transaction evidences an intent to hide Martifer USA's most valuable asset from the Bank's security interest. The Debtors did not disclose the AEF transaction at the outset of this case, including in connection with their motion to use cash collateral.

The actions of the Debtors' management in these cases demonstrates that they cannot be trusted to fulfill their fiduciary duties to the Bank and other creditors, warranting appointment of a chapter 11 trustee.

C.  **Cause Also Exists to Appoint a Trustee to Determine Whether the Debtors Should Continue to Operate Their Business**

There is also cause to appoint a trustee because a disinterested fiduciary is needed to

1  evaluate whether the Debtors should continue to operate their business or should instead shift the
2  focus of these bankruptcy cases to an orderly liquidation. The Debtors have been hemorrhaging
3  red ink since at least 2012, with their operating loss nearly doublings in 2013 as compared to
4  2012, after the Debtors' current management was installed; and they have continued to do so after
5  the Petition Date.

6        Mr. Kiser and Mr. Bernhart have a personal stake in the Debtors' survival (including the
7  possibility of receiving substantial restructuring bonuses as provided for in their employment
8  agreements). The Bank and other creditors, however, should not be forced to bear the risk of the
9  Debtors' (and the Debtors' parent's) long-shot gamble. Instead, a chapter 11 trustee should be
10 appointed to make an impartial decision as to whether the potential rewards of the Debtors'
11 continued operations outweighs the costs.

12 **D.    Alternatively, the Court Should Convert or Dismiss These Cases**

13       11 U.S.C. § 1112(b) provides generally that the court shall convert a chapter 11 case to a
14 case under chapter 7 or dismiss the case, "whichever is in the best interests of creditors and the
15 estate, for cause unless the court determines that the appointment under section 1104(a) of a
16 trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)
17 defines cause to include, among other things, "substantial or continuing loss to or diminution of
18 the estate and the absence of a reasonable likelihood of rehabilitation."

19       In light of the Debtors' multi-million losses during just the first six weeks of these cases,
20 and the faint prospects for any improvement in the Debtors' financial condition going forward, the
21 Bank believes that an orderly liquidation of the Debtors' assets best serves the interests of creditors
22 in these cases. Appointing a chapter 11 trustee would add additional administrative expenses to
23 these cases. Accordingly, the Bank respectfully requests that the Court consider, as an alternative
24 to ordering the appointment of a chapter 11 trustee, simply dismissing or converting these cases to
25 permit a prompt and orderly liquidation of the Debtors' assets to proceed.

26                              **III.    CONCLUSION**

27       For the foregoing reasons, the Bank respectfully requests that the Court enter an order
28 directing the appointment of a chapter 11 trustee pursuant to 11 U.S.C. § 1104(a) or, alternatively,

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920

1  converting or dismissing these bankruptcy cases to cases under chapter 7 of the Bankruptcy Code
2  pursuant to 11 U.S.C. § 1112(b).

3  DATED: March 3, 2014

**FRANDZEL ROBINS BLOOM & CSATO, L.C.**
MICHAEL GERARD FLETCHER, ESQ.
REED S. WADDELL, ESQ.

By: /s/ *[signature]*
MICHAEL GERARD FLETCHER
(CA State Bar No. 070849)
mfletcher@frandzel.com
REED S. WADDELL (CA State Bar No. 106644)
rwaddell@frandzel.com
**FRANDZEL ROBINS BLOOM & CSATO, L.C.**
6500 Wilshire Boulevard, Seventeenth Floor
Los Angeles, California 90048-4920
and
NATALIE M. COX, ESQ.
Nevada Bar No. 007662
RANDOLPH L. HOWARD, ESQ.
Nevada Bar No. 006688
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Attorneys for Creditor
CATHAY BANK

Attorneys for Secured Creditor CATHAY BANK

1407472.1 | 023000-0918

12

MOTION FOR ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE IN THESE BANKRUPTCY CASES OR, ALTERNATIVELY, DISMISSING OR CONVERTING THESE BANKRUPTCY CASES