BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
MICAELA RUSTIA MOORE, ESQ.
Nevada Bar No. 9676
FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
Telephone: (702) 262-6899
Facsimile:  (702) 597-5503
Email:  baxelrod@foxrothschild.com
        mmoore@foxrothschild.com
*Counsel for Martifer Aurora Solar, LLC
and Martifer Solar USA, Inc.*

Electronically Filed on April 24, 2014

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re,<br><br>MARTIFER AURORA SOLAR, LLC, a Nevada limited liability company,<br><br>☐ Affects Martifer Aurora Solar, LLC<br>☒ Affects Martifer Solar USA, Inc.<br>☐ Affects all Debtors | Case Nos. BK-S-14-10355-abl and BK-S-14-10357-abl<br><br>Jointly Administered under Case No. BK-S-14-10355-abl<br><br>Chapter 11<br><br>**DECLARATION OF MICHAEL TUCKER IN SUPPORT OF MOTION FOR AN ORDER AUTHORIZING PAYMENT OF CRITICAL VENDOR CLAIM**<br><br>Hearing Date:  OST PENDING<br>Hearing Time:  OST PENDING |

I, Michael Tucker, being duly sworn, deposes and declares under the penalty of perjury:

1.      I am over the age of 18, am mentally competent, have personal knowledge of the facts in this matter, except where stated as based upon information and belief, and if called upon to testify, could and would do so.

2.      I am a Senior Managing Director of FTI Consulting, Inc. ("FTI"), engaged and authorized to assist the Debtors in their restructuring efforts.  In addition, I have been engaged and authorized to serve as the Debtors' Chief Restructuring Officer ("CRO").

ACTIVE 25492667v1 04/24/2014

1

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

3.      I submit this Declaration in support of Martifer Solar USA, Inc.'s ("Debtor") Motion for an Order Authorizing Payment of Critical Vendor Claim (the "Motion").

4.      CBS Broadcasting, Inc. ("CBS") and Alternative Energy Financing, LLC ("AEF") entered into a series of agreements (the "Service Agreements"), providing that AEF would install and service solar photovoltaic systems in phases (the "Solar Projects") on CBS's property (the "CBS Property"). Under the Service Agreements, CBS assigned to AEF its rights to certain rebates (the "Rebates") from the Los Angeles Department of Water and Power (the "LADWP") upon completion of the Solar Projects, and agreed to pay AEF certain fees (the "Supplier Fees") for ten years after completion of the Solar Projects, based on the Solar Projects' production of energy. In addition, AEF expected to receive from the United States Treasury Department (the "Treasury") certain federal grants provided by section 1603 of the American Recovery and Reinvestment Tax Act of 2009 (the "Grants") upon completion of the Solar Projects.

5.      Disputes arose between AEF and the Debtor, which were resolved in a settlement agreement dated January 2, 2014 (the "Settlement Agreement"). Under the Settlement Agreement, AEF assigned to the Debtor all of AEF's rights under certain of the Service Agreements (the "Assigned Service Agreements"), and all of AEF's rights to the Grants. The Debtor stepped into AEF's shoes under the Assigned Service Agreements, and became entitled to AEF's benefits (including the Supplier Fees, the Rebates, and the Grants), and responsible for AEF's obligations, thereunder.

6.      Debtor assumed the agreement with AEF by order of the Court on March 27, 2014[Docket No. 529].

7.      In order to move forward on the Assigned Service Agreements for the Solar Projects, the Debtor needs to obtain a final certification which requires the Critical Vendor to: (1) perform a site visit to observe the final inverter platform installations for Phase IV of the Solar Projects; and (2) prepare a written Structural Observation review letter for submittal to the City of Los Angeles building department, as required by CBC Section 1710, in order for the Debtor to start generating power at CBS. The anticipated monthly revenue will be between $10,000 - $15,000.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

8.      Pursuant to the Proposal and Agreement for Services,[1] Critical Vendor will provide Structural Engineering Services to observe the final inverter platform installation for the CBS Studio Phase IV solar project located in Los Angeles, CA. This proposal is limited to the specific architecture-engineering services as defined by the following Scope of Services:

      a.   Perform one site visit to observe the final inverter platform installations for the CBS Studio Phase IV solar project. The specific facilities where inverters are located are Studios 9, 10, 12 and atop the Norvet Building adjacent to Studios 21-23.

      b.   Prepare a written Structural Observation review letter for submittal to the building department as required by CBC Section 1710.

9.      The certification in question is for the inverter platforms on Phase IV of the Solar Projects.  The City of Los Angeles requires that all steel platforms installed in the city of Los Angeles be fabricated and installed by an approved welder.   This is extremely costly and, prepetition, Debtor was unable to find someone who would manufacture the platform on schedule.  Therefore, Debtor resorted to using an un-licensed fabricator, which is not uncommon as it was approved by the City of Los Angeles.  The approval is contingent on the engineer of record's approval of the design.   Since the engineer of record is the Critical Vendor, the Critical Vendor is necessary to observe the site and sign-off on the design.

10.     Since the design is the Critical Vendor's and Debtor obtained a one-time approval from the City of Los Angeles, there is no other person, within reason, that can sign-off on the design.  The City of Los Angeles provided Debtor with an exception and switching engineers at this point would be unduly burdensome and costly.

11.     The Critical Vendor, despite the protections of administrative priority status, has refused to provide services postpetition to Debtor if it does not pay all of its Critical Vendor Claim of $1,783.24.

---

[1] A true and correct copy of the Proposal and Agreement for Services is attached to the Tucker Declaration as Exhibit "1."

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

12.    Debtor has room in its cash collateral budget and DIP financing to make the requested payment.

13.    If Debtor is not allowed to pay the prepetition claim of $1,783.24, it may cost Debtor at least $31,000 (which is the approximate amount paid prepetition to the Critical Vendor) to hire a new engineer with a new design and related installation since such engineer may not be willing to assume liability of another engineer's design.

14.    The Critical Vendor provides Debtor with services that are essential to Debtor's continuing operations and its ability to commence to generate power at the CBS Project which monthly revenue should be anywhere between $10,000-$15,000 per month. Hiring a new structural engineer to perform the final certification would cost the estate more in time and would be significantly expensive than making the Critical Vendor payment.

15.    As set forth above, Debtor has determined, in the exercise of its sound business judgment, that payment of Critical Vendor Claim is essential (i) for performing under its assumed contracts, (ii) to ensure that the value of the business as a going concern is preserved through the pendency of these Chapter 11 Cases, and (iii) to Debtor's ability to rehabilitate for the benefit of all stakeholders.

I declare under penalty of perjury that the foregoing statement is true and correct to the best of my information, knowledge and belief.

Executed this 24th day of April 2014.

_____/s/Michael Tucker_____
Michael Tucker

ACTIVE 25492667v1 04/24/2014

4

1

**EXHIBIT 1**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)



INTERACTIVE
R E S O U R C E S
Architects & Engineers

## PROPOSAL AND AGREEMENT FOR SERVICES

**PROJECT AND CLIENT INFORMATION**

| | |
|---|---|
| PROJECT NAME: | CBS Studio Phase IV Inverter Platform Final Structural Observation |
| PROJECT ADDRESS (If Known) | 4024 Radford Ave, Los Angeles, CA |
| ARCHITECT/ENGINEER PROPOSAL NUMBER: | P2014-020 |
| CLIENT CONTACT PERSON: | Daniel Ithurburn |
| CLIENT ORGANIZATION: | Martifer Solar USA |
| CLIENT ADDRESS: | 2040 Armacost Ave Los Angeles, CA  90025 |
| DATE | February 3, 2014 |

### PROPOSAL

**INTERACTIVE RESOURCES, INC.** (Architect/Engineer) proposes to provide professional services for the subject projects as follows:

**1.   PROJECT DESCRIPTION AND PROGRAM**

This proposal is provided with the following understandings:

**1.1.  Project Description**

Provide Structural Engineering Services to observe the final inverter platform installation for the CBS Studio Phase IV solar project located in Los Angeles, CA.  This proposal is limited to the specific architecture-engineering services as defined by the Scope of Services below.

**1.2.  Information Provided by Client**

Martifer shall coordinate the date of the site visit with CBS Studios and other parties involved to make sure access to the specific inverter locations can be made and will not be in conflict with ongoing Studio activities.

**2.   SCOPE OF SERVICES**

Based on the above understanding of the project, IR proposes to provide the following services:

### 2.1. <u>Services by IR</u>

2.1.1 Basic Services - Interactive Resources will:

1. Perform one site visit to observe the final inverter platform installations for the CBS Studio Phase IV solar project. The specific facilities where inverters are located are Studios 9, 10, 12 and atop the Norvet Building adjacent to Studios 21-23.
2. Prepare a written Structural Observation review letter for submittal to the building department as required by CBC Section 1710.

2.1.2 Contingent Services – Interactive Resources will, if requested:

1. None identified at this time.

### 2.2. <u>Deliverables</u>

**1.** Two copies wet-signed of the final structural observation letter for submittal to the Building Department.

### 2.3. <u>Exclusions</u>

1. None identified at this time.

## 3. COMPENSATION

### 3.1. <u>Compensation for Basic Services</u>

Compensation for Basic Services will be on Time and Expense basis with a Not-to-Exceed limit of $1,530 excluding reimbursables. Reimbursables for this project are estimated to approximately $1,000 and will depend on the amount of advance time allowed for making the necessary travel arrangements and the availability of flights. Structural Fees and Expenses will be billed as shown in the attached <u>Exhibit A</u>. Hourly rates shall be as shown on the attached Rate Schedule.

### 3.2. <u>Compensation for Contingent Services</u>

Compensation for Contingent services will be on a Time and Expense basis per the attached rate schedule.

## 4. EXECUTION

A copy of this Proposal, signed and returned to Architect/Engineer along with a retainer in the amount of $2,500 and the attached <u>Standard Conditions of Service</u> will constitute our engagement agreement. In addition to this amount, there remains an outstanding balance of $1,783.24

Page **3** of **3**

withheld as retainers on prior projects that we require be paid prior to our beginning this project. Our work on these projects as specified by our Scope of Services is long since complete.

Section 5536.22 and 6749 of the California Business and Professions Code requires architects and engineers to use a written contract when providing professional services to a client. In order to be in compliance with the law, it is imperative that this agreement be executed prior to any services being provided.

February 3, 2014

| Name | Date | Client Signature | Date |
|------|------|------------------|------|



CELEBRATING *40* YEARS

# INTERACTIVE RESOURCES

ARCHITECTS & ENGINEERS *1973–2013*

## STANDARD CONDITIONS OF SERVICE

**PROJECT INFORMATION**

| | |
|---|---|
| Proposal Title: | CBS Studio Phase IV Inverter Platform |
| | Final Structural Observation |
| Proposal No: | P2014-020 |
| Date Sent: | February 3, 2014 |
| Client: | Daniel Ithurburn |
| | Martifer Solar USA |
| | 2040 Armacost Ave |
| | Los Angeles, CA 90025 |
| | |
| | Phone: 310.820.7080 x247 |
| | Email: dithurburn@martifersolarusa.com |

## ARTICLE 1 ARCHITECT/ENGINEER'S RESPONSIBILITIES

**1.1 INTERACTIVE RESOURCES, INC. (**Architect/Engineer) shall provide professional services defined by:

[X] Cover letter from Architect/Engineer
[ ] Supplementary Written Agreement
[ ] Other:

Services beyond those specifically described in the instrument indicated in **1.1**, including phased services, shall be compensated on a time and expense basis unless a fixed sum or maximum sum is agreed to in writing by both parties, transmitted via letter, fax or email. When verbal Client instructions for additional services are confirmed in writing (fax or email) by Architect/Engineer, such confirmation shall be deemed accepted by Client upon transmission to client, or if by mail, upon delivery to client's address by the U.S. Postal Service. All additional services shall be subject to these Standard Conditions.

**1.2** The Architect/Engineer shall perform its services consistent with the professional skill and care ordinarily provided by architects or engineers practicing in the same or similar locality under the same or similar circumstances. The Architect/Engineer shall perform its services as expeditiously as is consistent with such professional skill and care and the orderly progress of the Project.

**1.3** The Architect/Engineer shall identify a representative authorized to act on behalf of the Architect/Engineer with respect to the Project.

**1.4** Except with the Client's knowledge and consent, the Architect/Engineer shall not engage in any activity, or accept any employment, interest or contribution that would reasonable appear to compromise the Architect's or Engineer's professional judgment with respect to this Project.

**1.5** The Architect/Engineer shall maintain insurance for the duration of this Agreement as described in Exhibit B. If any of Client's insurance requirements exceed the types and limits in Exhibit B, the Client shall reimburse the Architect/Engineer for any additional cost.

**1.6** By accepting a copy of these Standard Conditions and pursuing a business relationship with Architect/Engineer, Inc., the Client implicitly accepts these Standard Conditions and agrees to be bound by their provisions.

## ARTICLE 2 CLIENT'S RESPONSIBILITIES

**2.1** Unless otherwise provided for under this Agreement, the Client shall provide information in a timely manner regarding requirements for and limitations on the Project, including a written program which shall set forth the Client's objectives, schedule, constraints and criteria, including space requirements and relationships, flexibility, expandability, special equipment, systems and site requirements. Within 15 days after receipt of a written request from the Architect/Engineer, the Client shall furnish the requested information as necessary and relevant for the Architect/Engineer to evaluate, give notice of or enforce lien rights.

**2.2** The Client shall identify a representative authorized to act on the Client's behalf with respect to the Project. The Client shall render decisions and approve the Architect/Engineer's submittals in a timely manner in order to avoid unreasonable delay in the orderly and sequential progress of the Architect/Engineer's services.

**2.3** The Client shall coordinate the services of its own consultants with those services provided by the Architect/Engineer. Upon the Architect/Engineer's request, the Client shall furnish copies of the scope of consulting services in the contracts between the Client and the Client's consultants. The Client shall furnish the services of consultants other than those designated in this Agreement, or authorize the Architect/Engineer to furnish them as an Additional Service, when the Architect/Engineer requests such services and demonstrates that they are reasonably required by the scope of the Project. The Client shall require that its consultants maintain professional liability insurance as appropriate to the services provided.

**2.4** The Client shall furnish all legal, insurance and accounting services, including auditing services that may be reasonably necessary at any time for the Project to meet the Client's needs and interests.

**2.5** The Client shall provide prompt written notice to the Architect/Engineer if the Client becomes aware of any fault or defect in the Project, including errors, omissions or inconsistencies in the Architect/Engineer's Instruments of Service.

## ARTICLE 3 COPYRIGHTS AND LICENSES

**3.1** The Architect/Engineer and the Client warrant that in transmitting Instruments of Service, or any other information, the transmitting party is the copyright Client of such information or has permission from the copyright Client to transmit such information for its use on the Project. If the Client and Architect/Engineer intend to transmit Instruments of Service or any other information or documentation in digital form, they shall endeavor to establish necessary protocols governing such transmissions.

**3.2** The Architect/Engineer and the Architect/Engineer's consultants shall be deemed the authors and Clients of their respective Instruments of Service, including the Drawings and Specifications, and shall retain all common law, statutory and other reserved rights, including copyrights. Submission or distribution of Instruments of Service to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the reserved rights of the Architect/Engineer and the Architect/Engineer's consultants.

**3.3** Upon execution of this Agreement, the Architect/Engineer grants to the Client a nonexclusive license to use the Architect/Engineer's Instruments of Service solely and exclusively for the Project, provided that the Client substantially performs its obligations, including prompt payment of all sums when due, under this Agreement. The Architect/Engineer shall obtain similar nonexclusive licenses from the Architect/Engineer's consultants consistent with this Agreement. The license granted under this section permits the Client to authorize the Contractor, Subcontractors, Sub-subcontractors, and material or equipment suppliers, as well as the Client's consultants and separate contractors, to reproduce applicable portions of the Instruments of Service solely and exclusively for use in performing services for the Project. If the Architect/Engineer rightfully terminates this Agreement for cause as provided in Sections 5.3 and 5.4, the license granted in this Section 3.3 shall terminate.

**3.3.1** In the event the Client uses the Instruments of Service without retaining the author of the Instruments of Service, the Client releases the Architect/Engineer and Architect/Engineer's consultant(s) from all claims and causes of action arising from such uses. The Client, to the extent permitted by law, further agrees to indemnify and hold harmless the Architect/Engineer and its consultants from all costs and expenses, including the cost of defense, related to claims and causes of action asserted by any third person or entity to the extent such costs and expenses arise from the Client's use of the Instruments of Service under this Section 3.3.1.

**3.4** Except for the licenses granted in this Article 3, no other license or right shall be deemed granted or implied under this Agreement. The Client shall not assign, delegate, sublicense, pledge or otherwise transfer any license granted herein to another party without the prior written agreement of the Architect/Engineer. Any unauthorized use of the Instruments of Service shall be at the Client's sole risk and without liability to the Architect/Engineer and the Architect/Engineer's consultants.

## ARTICLE 4 CLAIMS AND DISPUTES

### 4.1 GENERAL

**4.1.1** The Client and Architect/Engineer shall commence all claims and causes of action, whether in contract, tort, or otherwise, against the other arising out of or related to this Agreement in accordance with the requirements of the method of binding dispute resolution selected in this Agreement within the period specified by applicable law, but in any case not more than 10 years after the date of Substantial Completion of the Work. The Client and Architect/Engineer waive all claims and causes of action not commenced in accordance with this Section 4.1.1.

**4.1.2** To the extent damages are covered by property insurance, the Client and Architect/Engineer waive all rights against each other and against the contractors, consultants, agents and employees of the other for damages, except such rights as they may have to the proceeds of such insurance as set forth in AIA Document A201-2007, General Conditions of the Contract for Construction, if applicable. The Client or the Architect/Engineer, as appropriate, shall require of the contractors, consultants, agents and employees of any of them similar waivers in favor of the other parties enumerated herein.

**4.1.3** The Architect/Engineer and Client waive consequential damages for claims, disputes or other matters in question arising out of or relating to this Agreement. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination of this Agreement, except as specifically provided in Section 5.7.

**4.1.4 Attorney's Fees and Other Costs of Litigation or Dispute Resolution:** If any action at law or in equity, including action for declaratory relief and arbitration, is brought to enforce, interpret, rescind or reform this Agreement, the prevailing party shall be entitled to actual costs incurred, up to a reasonable amount, in prosecuting or defending the action, including, but not limited to, attorney's fees, Architect/Engineer fees or witness fees, which latter fees shall include payment to reimburse the party and/or its employees for time spent in preparation for and participation in defending or prosecuting any said action which shall be governed by the laws of the State of California and shall take place in the State of California. The attorneys' fee shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred in good faith.

### 4.2 MEDIATION

**4.2.1** Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to mediation as a condition precedent to binding dispute resolution. If such matter relates to or is the subject of a lien arising out of the Architect/Engineer's services, the Architect/Engineer may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the matter by mediation or by binding dispute resolution.

**4.2.2** The mediator shall be mutually agreed upon , or in the absence of agreement within 10 days of notice by either party, the Alternative Adjudication at One Kaiser Plaza, Suite 505, Oakland, CA 94612 by default prior to initiation of any lawsuit or other litigation unless the parties mutually agree otherwise.

**4.2.3** The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in Contra Costa County, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

**4.2.4** If the parties do not resolve a dispute through mediation pursuant to this Section 4.2, the method of binding dispute resolution shall be the following: Litigation in a court of competent jurisdiction of the State of California. Venue for any such legal action concerning this contract shall be the County of Contra Costa.

## 4.3 CONSOLIDATION OR JOINDER

**4.3.1** Either party, at its sole discretion, may consolidate an arbitration conducted under this Agreement with any other arbitration to which it is a party provided that (1) the arbitration agreement governing the other arbitration permits consolidation; (2) the arbitrations to be consolidated substantially involve common questions of law or fact; and (3) the arbitrations employ materially similar procedural rules and methods for selecting arbitrator(s).

**4.3.2** Either party, at its sole discretion, may include by joinder persons or entities substantially involved in a common question of law or fact whose presence is required if complete relief is to be accorded in arbitration, provided that the party sought to be joined consents in writing to such joinder. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent.

**4.3.3** The Client and Architect/Engineer grant to any person or entity made a party to an arbitration conducted under this Section 4.3, whether by joinder or consolidation, the same rights of joinder and consolidation as the Client and Architect/Engineer under this Agreement.

## ARTICLE 5 TERMINATION OR SUSPENSION

**5.1** If the Client fails to make payments to the Architect/Engineer in accordance with this Agreement, such failure shall be considered substantial nonperformance and cause for termination or, at the Architect/Engineer's option, cause for suspension of performance of services under this Agreement. If the Architect/Engineer elects to suspend services, the Architect/Engineer shall give seven days' written notice to the Client before suspending services. In the event of a suspension of services, the Architect/Engineer shall have no liability to the Client for delay or damage caused the Client because of such suspension of services. Before resuming services, the Architect/Engineer shall be paid all sums due prior to suspension and any expenses incurred in the interruption and resumption of the Architect/Engineer's services. The Architect/Engineer's fees for the remaining services and the time schedules shall be equitably adjusted.

**5.2** If the Client suspends the Project, the Architect/Engineer shall be compensated for services performed prior to notice of such suspension. When the Project is resumed, the Architect/Engineer shall be compensated for expenses incurred in the interruption and resumption of the Architect/Engineer's services. The Architect/Engineer's fees for the remaining services and the time schedules shall be equitably adjusted.

**5.3** If the Client suspends the Project for more than 90 cumulative days for reasons other than the fault of the Architect/Engineer, the Architect/Engineer may terminate this Agreement by giving not less than seven days' written notice.

**5.4** Either party may terminate this Agreement upon not less than seven days' written notice should the other party fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination.

**5.5** The Client may terminate this Agreement upon not less than seven days' written notice to the Architect/Engineer for the Client's convenience and without cause.

**5.6** In the event of termination not the fault of the Architect/Engineer, the Architect/Engineer shall be compensated for services performed prior to termination, together with Reimbursable Expenses then due and all Termination Expenses as defined in Section 5.7.

**5.7** Termination Expenses are in addition to compensation for the Architect/Engineer's services and include expenses directly attributable to termination for which the Architect/Engineer is not otherwise compensated, plus an amount for the Architect/Engineer's anticipated profit on the value of the services not performed by the Architect/Engineer.

**5.8** The Client's rights to use the Architect/Engineer's Instruments of Service in the event of a termination of this Agreement are set forth in Article 3 and Section 6.1.

## ARTICLE 6 COMPENSATION FOR USE OF ARCHITECT/ENGINEER'S INSTRUMENTS OF SERVICE

**6.1** If the Client terminates the Architect/Engineer for its convenience under Section 5.5, or the Architect/Engineer terminates this Agreement under Section 5.3, the Client shall pay a licensing fee as compensation for the Client's continued use of the Architect/Engineer's Instruments of Service solely for purposes of the Project as follows:

## 6.2 PAYMENTS TO THE ARCHITECT/ENGINEER

**6.2.1** An initial payment may be made upon execution of this Agreement and is the minimum payment under this Agreement. It shall be credited to the Client's account in the final invoice.

**6.2.2** Unless otherwise agreed and incorporated into this agreement, payments for services are computed on an hourly basis in accordance with the standard rate schedule (**Exhibit A**) dated February 3, 2014, attached. Individual rates are subject to change as personnel changes occur and as employees receive salary modifications.

**6.2.3 Invoices:** Interactive Resource's monthly billing period terminates with the last Friday of the month. This usually covers four weeks but includes a fifth week four times a year.  Invoices are prepared at the end of each billing period for services performed during the period and are usually mailed during the second week of the following billing period.

**6.2.4 Payment Due:** Payment is due when the invoice is received by the client and is past due on the first day of the billing period following preparation. A past due service charge equal to 18% annually, calculated by a periodic rate which is based on the number of days in the billing cycle, on all past due accounts of 30 days after invoice date. Payment shall first be applied against service charges and then against principal.  If the Client objects to any portion of an invoice, the Client shall so notify Architect/Engineer in writing within 5 calendar days of receipt of the invoice.  The Client shall identify the specific cause of the disagreement and shall pay when due that portion of the invoice not in dispute.

**6.2.5 Expenses:** Reimbursable expenses are in addition to hourly fees and are not included in any contract maximum specified in the letter component of the agreement unless specifically noted in the letter. Reimbursable expenses include such items as postage, reproduction, CAD drawing plotting, printing, photographic film and processing, contract typing of specifications, special materials or equipment, storage of investigative samples or forensic evidence, meals when traveling out of the Bay Area for the project, and travel at the IRS standard mileage rate. Lodging, meals and incidentals, for overnight travel, will be reimbursed either at cost or the Per Diem rates found on the General Services Administration web site (www.gsa.gov). A surcharge of 10% is added to cover processing and billing.

**6.2.6 Taxes or Fees:** Any taxes or fees, enacted by local, state or federal government subsequent to the date of this contract, and based on gross receipts or revenues will be added to amounts due under this agreement, in accordance with any such fees or  taxes.

**6.2.7 Consultants:** The cost of consultants will be invoiced at a markup of 10 percent to cover administrative costs and overhead items such as insurance.

**6.2.8 Collection Costs:** If the Client fails to make payments when due and Architect/Engineer incurs any costs in order to collect overdue sums from the Client, the Client agrees that all such collection costs incurred shall immediately become due and payable to Architect/Engineer. Collection costs shall include, without limitation, legal fees, collection agency fees, and expenses, court costs, collection bonds and reasonable Architect/Engineer staff costs at standard billing rates for Architect/Engineer' time spent in efforts to collect. This obligation of the Client to pay Architect/Engineer' collection costs shall survive the term of this Agreement or any earlier termination by either party.

**6.2.9 Set-offs, Backcharges, Discounts:** Payment of invoices shall not be subject to any discount or set-offs by the Client, unless agreed to in writing by Architect/Engineer. Payment to Architect/Engineer for services rendered and expenses incurred shall be due and payable regardless of any subsequent suspension or termination of this Agreement by either party.

**6.2.10 Satisfaction with Services:** Payment of any invoice by the Client to Architect/Engineer shall be taken to mean that the Client is satisfied with Architect/Engineer' services to the date of payment and is not aware of any deficiencies in those services .

**6.2.11 Disputed Invoice:** If the Client objects to any portion of an invoice, the Client shall so notify Architect/Engineer in writing within five calendar days of receipt of the invoice. The Client shall identify in writing the specific cause of the disagreement and the amount in dispute, and shall pay that portion of the invoice not in dispute in accordance with the other payment terms of this Agreement. Any dispute over invoiced amounts due that cannot be resolved within ten (10) calendar days after presentation of invoice by direct negotiation between the parties shall be resolved within thirty (30) days in accordance with the Dispute Resolution provision of this Agreement. Late payment charges as described herein shall be paid by the Client on all disputed invoice amounts that are subsequently resolved in Architect/Engineer' favor and shall be calculated on the unpaid balance from the due date of the invoice.

**6.2.12** The Client shall not withhold amounts from the Architect/Engineer's compensation to impose a penalty or liquidated damages on the Architect/Engineer, or to offset sums requested by or paid to contractors for the cost of changes in the Work unless the Architect/Engineer agrees or has been found liable for the amounts in a binding dispute resolution proceeding.

**6.2.13** Records of Reimbursable Expenses and services performed on the basis of hourly rates shall be available to the Client at mutually convenient times.

**6.2.14 Time Period:** If the services covered by this Agreement have not been completed within 12 months of the date hereof, through no fault of Architect/Engineer, the amounts of compensation, rates and multiples set forth herein shall be equitably adjusted.

## ARTICLE 7 MISCELLANEOUS PROVISIONS

**7.1** This Agreement shall be governed by California law, except that if the parties have selected arbitration as the method of binding dispute resolution, the Federal Arbitration Act shall govern Section 4.3.

**7.2** Terms in this Agreement shall have the same meaning as those in AIA Document A201-2007, General Conditions of the Contract for Construction.

**7.3** The Client and Architect/Engineer, respectively, bind themselves, their agents, successors, assigns and legal representatives to this Agreement. Neither the Client nor the Architect/Engineer shall assign this Agreement without the written consent of the other, except that the Client may assign this Agreement to a lender providing financing for the Project if the lender agrees to assume the Client's rights and obligations under this Agreement.

**7.4** If the Client requests the Architect/Engineer to execute certificates, the proposed language of such certificates shall be submitted to the Architect/Engineer for review at least 14 days prior to the requested dates of execution. If the Client requests the Architect/Engineer to execute consents reasonably required to facilitate assignment to a lender, the Architect/Engineer shall execute all such consents that are consistent with this Agreement, provided the proposed consent is submitted to the Architect/Engineer for review at least 14 days prior to execution. The Architect/Engineer shall not be required to execute certificates or consents that would require knowledge, services or responsibilities beyond the scope of this Agreement.

**7.5** Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Client or Architect/Engineer.

**7.6** Unless otherwise required in this Agreement, the Architect/Engineer shall have no responsibility for the discovery, presence, handling, removal or disposal of, or exposure of persons to, hazardous materials or toxic substances in any form at the Project site.

**7.7** The Architect/Engineer shall have the right to include photographic or artistic representations of the design of the Project among the Architect/Engineer's promotional and professional materials. The Architect/Engineer shall be given reasonable access to the completed Project to make such representations. However, the Architect/Engineer's materials shall not include the Client's confidential or proprietary information if the Client has previously advised the Architect/Engineer in writing of the specific information considered by the Client to be confidential or proprietary. The Client shall provide professional credit for the Architect/Engineer in the Client's promotional materials for the Project.

**7.8** If the Architect/Engineer or Client receives information specifically designated by the other party as "confidential" or "business proprietary," the receiving party shall keep such information strictly confidential and shall not disclose it to any other person except to (1) its employees, (2) those who need to know the content of such information in order to perform services or construction solely and exclusively for the Project, or (3) its consultants and contractors whose contracts include similar restrictions on the use of confidential information.

**7.9 Enforcement:** Failure of Architect/Engineer or Client to act to enforce any of the provisions of this Agreement at any time shall not act as a waiver nor limit the right of Architect/Engineer or Client to act to enforce those provisions at any other time.

**7.10 Cost Estimates:** Construction cost estimates prepared by Architect/Engineer represent our best judgment as design professionals familiar with the construction industry. Sources of information for estimates may include data derived from construction contractors, material suppliers, publications, and our own experience and records of other projects. Until bid documents are completed, estimates are based only on preliminary or partially developed design concepts. It is recognized furthermore that neither Architect/Engineer nor the client has control over the cost of labor, materials, or equipment, over a bidder's method of determining bid prices, over competitive bidding, market, or negotiating conditions. Accordingly, Architect/Engineer cannot and does not warrant or represent that bids or negotiated prices will not vary from the project budget, if any, provided by the client, or from any cost estimate or evaluation prepared by Architect/Engineer.

**7.11 Construction Administration and Hold Harmless:** If directed to do so by the client, Architect/Engineer shall provide construction administration services to be compensated on an hourly basis, unless other payment arrangements are stipulated as a part of this Agreement. These services may include:

**7.11.1** Architect/Engineer shall visit the site at intervals appropriate to the stage of construction or as otherwise agreed by Architect/Engineer in writing to become generally familiar with the progress and quality of the Work and to determine in general if the Work is proceeding in accordance with the Contract Documents. However, Architect/Engineer shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. On the basis of such on-site observations as an architect, Architect/Engineer shall keep the Client informed of the progress and quality of the Work, and shall endeavor to guard the Client against defects and deficiencies in the Work of the Contractor.

**7.11.2** Architect/Engineer shall review and take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for conformance with the design concept of the Work and with the information given in the Contract Documents. Such action shall be taken with reasonable promptness so as to cause no delay. Architect/Engineer' approval of a specific item shall not indicate approval of an assembly of which the item is a component.

**7.11.3** Architect/Engineer shall prepare Change Orders for the Client's approval and execution in accordance with the Contract Documents, and shall have authority to order minor changes in the Work not involving an adjustment in the Contract Sum or an extension of the Contract Time which are not inconsistent with the intent of the Contract Documents.

**7.11.4** If the client does not direct Architect/Engineer to provide Construction Administration Services, the client agrees to defend, indemnify and hold Architect/Engineer harmless from any claims arising during or following the construction process, unless such claim is the result of prior negligent acts by Architect/Engineer.

**7.11.5 Non Responsibility for Construction Procedures:** Architect/Engineer shall not have control or charge of and shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, for the acts or omissions of the Contractor, Subcontractors or any other persons performing any of the Work, or for the failure of any of them to carry out the Work in accordance with the Contract Documents.

**7.12 Limitation of Liability:** The Client and Architect/Engineer have discussed their risks, rewards and benefits of the project and Interactive Resource's total fee for services. The risks have been allocated such that the Client agrees that, to the fullest extent permitted by law, Interactive Resource's total liability to Client for any and all injuries, claims, losses, expenses, damages, or claim expenses arising out of this agreement from any cause or causes, shall not exceed the total amount of $50,000 or the amount of fees paid to Architect/Engineer, whichever is less. Such causes include, but are not limited to design professional's negligence, errors, omissions, strict liability, breach of contract or breach of warranty.

**7.13 Witness Fees, Indemnity and Hold Harmless from Third Party Claims:** When Architect/Engineer performs consulting services involving expert witness testimony, investigation, or repair of construction defects for a project which is, or is expected to be, at the time of this Agreement, the subject of litigation, it is not unlikely that Architect/Engineer could be named as a party, subpoenaed as a percipient witness or subpoenaed to produce documents at some future date, merely because of the firm's participation. In recognition of this exposure, the client agrees to indemnify, defend and hold Architect/Engineer harmless from any claims, expenses, judgments, or other costs, including defense costs, and including the time of Architect/Engineer personnel, at normal professional billing rates, required to defend and indemnify Architect/Engineer against any claim brought against Architect/Engineer by a party other than the client for any activity relating to the services performed under this contract. Client agrees to reimburse Architect/Engineer for the cost of any testimony as a percipient witness at the scheduled rate in Exhibit B for expert testimony less the statutory compensation paid by the party requesting the testimony and to compensate Architect/Engineer at the rates scheduled in Exhibit B for any time spent in the process of document production less that statutory compensation paid by the party requesting the documents. This indemnity and hold harmless agreement will not be effective for any claims, losses or expenses arising out of the sole negligence or willful misconduct of Architect/Engineer.

**7.14 Asbestos and Other Hazardous Substances:** Client acknowledges that Architect/Engineer' scope of services for this project does not include any work related in any way to asbestos, mold, pollution and/or hazardous waste. Should Architect/Engineer knowingly encounter, or any party knowingly encounter such materials on the job site, or should it in any other way become known that such materials are present or may be present on the job site or any adjacent or nearby areas which may affect Architect/Engineer' services, Architect/Engineer may, at its option, terminate its services on the project until such time as client retains a qualified contractor to abate and/or remove the asbestos, pollution and/or hazardous waste materials and warrant that the job site is free from any hazard which may result from the existence of such materials. Client agrees to bring no claims against Architect/Engineer, its principals, employees, agents and/or consultants for any delay arising out of or connected with the enforcement of this provision.

**7.14.1 American With Disabilities Act:** The Americans with Disabilities Act (ADA) is a Federal law now in effect which affects virtually every type of building except private residences, private clubs, and churches. In some cases, even these facilities are included. The ADA is unique in that it is not enforced by local building officials or subject to plan check. It is enforced by the U. S. Attorney General or through civil action. To avoid any misunderstanding about how our services may or may not involve ADA compliance for your facilities, we are providing the following:

**7.14.2 New Buildings:** When Architect/Engineer is providing design of a new building we will use ordinary skill and care to include in the design our interpretation of ADA compliance requirements.

**7.14.3 Alterations and Additions to Existing Buildings:** When Architect/Engineer is providing design of alterations to existing facilities, we are not providing a survey of ADA compliance or compliance design for the entire facility unless a specific written provision for an ADA survey or compliance design appears in our agreement. To the extent that the alteration work may require ADA compliance or that it may trigger ADA compliance in areas not altered, we will use ordinary skill and care to include in our design services our interpretation of ADA compliance requirements. Our fee, however, shall not include ADA required design outside the area to be altered unless specifically provided for in writing in our agreement. We do not provide legal opinions about the applicability of ADA, and such opinions, when required to advance the design process, are the responsibility of the Client.

**7.14.4 Services Not Involving Building Design or Alterations:** When Architect/Engineer is providing services where the ultimate instrument of service is other than construction drawings and specifications for new buildings or alterations to existing buildings, we are not providing a survey of ADA compliance or making recommendations for compliance unless a specific written provision for an ADA survey appears in our agreement.

**7.14.5 ADA Surveys:** Other than as described above, Architect/Engineer can provide ADA surveys and cost estimate as specific project tasks when requested by clients. Such requests shall be specifically confirmed in writing as to scope and objectives as a part of the agreement. In making ADA surveys, Architect/Engineer will use ordinary care and skill to interpret the ADA. Legal opinions about the applicability of the ADA or what is *"readily achievable"* shall be the responsibility of the Client and his or her legal counsel.

**7.15 Building Diagnostics – Exploratory Demolition:** Whenever, as a component of services under this agreement, Architect/Engineer directs, coordinates or facilitates exploratory demolition and subsequent patching of finishes, such work shall be accomplished by others, either licensed independent contractors retained by Client, or Client's designated employees.  Unless

otherwise stipulated and agreed to by Architect/Engineer in writing, patching shall be considered temporary and cosmetic in nature. Architect/Engineer shall have no responsibility for the integrity of any patch or the weather-resistive performance of any patched building component.

All exploratory demolition is limited in scope. Client recognizes and agrees that Architect/Engineer has no responsibility for taking any action, including reporting, estimating repair costs or designing repairs for conditions not observed as a result of exploratory demolition. The only way to detect all damage and defects in a building is to totally dismantle the entire building.

**7.16 Plan Check Response:**  Recently many jurisdictions have retained private plan checking companies.  This can result in plan check comment lists three to six pages in length.  Interpretation of the California Building Code (CBC) can be a subjective process.  While we are very familiar with most structural requirements of the CBC, it is possible that a plan checker could have different interpretations of specific requirements.  Also, we will provide a level of detail in the construction documents that is sufficient, based upon our experience, to construct the project in accordance with the construction documents.  It is possible that the plan checker will require additional detail.  For this reason, we limit our proposal to include two hours of plan check response time.  If it is clear that the response will require greater effort on our part, we will discuss the issue with you, and require your authorization to proceed prior to completing our response.  Response time in excess of this amount will be charged at our current rate.

**7.17 Risks/Rewards of Geotechnical Consultants:** The structural calculations and other design documents for the above project have been, or will be, prepared using assumed soils and foundation design criteria.  Use of assumed soils conditions and foundation design criteria may create significant risks.  These risks include, but are not limited to, settlement, landslide, liquefaction, soil expansion, and uneconomical foundation design.  These risks can be reduced by procuring the services of a qualified geotechnical consultant.  Costs of geotechnical investigation services are normally borne by the Client; therefore any savings realized by not obtaining a geotechnical report will benefit the Client.

The Client, by signing and returning a copy of this letter, acknowledges the following:

- o  The Client has evaluated the risks and rewards of directing the design professionals to use assumed geotechnical design criteria, without the benefit of a current geotechnical report.

- o  The Client directs the design professionals to use assumed geotechnical design criteria.

- o  The Client alone stands to benefit from the rewards of the decision not to obtain a current geotechnical report.

- o  The Client assumes all risks associated with the decision to not obtain a current geotechnical report.

## ARTICLE 8 Licensed Architects and Engineers

To comply with Business and Professions Code Section 5536.22 and 6749, architectural and engineering services, when performed under this agreement, shall be performed or supervised by one or more of the following licensed architect or licensed engineer:

Thomas K. Butt, FAIA  (CA-7389; AR-1428; NV-1436)
Charles L. Beavers, AIA (CA-9601; AZ-27705; NV-3416; HI-AR9038)
Jamie L. Brown, AIA (CA-33030)
John E. Clinton, SE, AIA (CA-2052 and 8505; NV-003529; WA-18939; AZ-12594), PE (CO-22121; HI-5741; OR-09834; NJ-24GEO4618600; CT-26119; WI-39590)
Edward J. Anisman, AIA (CA-14225)
George Y. Namkung, AIA (CA-24511)
Andrew M. Butt, AIA (CA-29669)
Kimberly J. Butt, AIA (CA-30301)
Allan K. Whitecar, Jr., CE, (CA-29823) SE (CA-2692)
Paul M. Westermann, PE (CA-35655; CO-PE.0046797; CT-PEN.28550; FL-P.E.-70886; GA-PE036425; MD-37063; MN-51012; NC-038487; NJ-24GE05024800; NM-21299; NY-092846; OH-76126; PA-PE077278; Puerto Rico-24723; TX-109403), SE (CA-3097; AZ-49374; DC-PE905235; HI-14663; MA-48174; OR-PE-87355; RI-9475; VT-69827; WA-50817)

## ARTICLE 9 SPECIAL TERMS AND CONDITIONS

Special terms and conditions that modify this Agreement are as follows:

**ARTICLE 10 SCOPE OF THE AGREEMENT**

**10.1** This Agreement represents the entire and integrated agreement between the Client and the Architect/Engineer and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Client and Architect/Engineer.

**10.2** This Agreement is comprised of the following documents listed below:

**10.2.1** Instrument describing scope of services

**10.2.2** Exhibit A Rate Schedule

**§ 10.2.3** Exhibit B Insurance Coverage (upon request)



# RATE SCHEDULE
## February 3, 2014
## EXHIBIT A

| Title: | Per Hour |
|---|---|
| President (Sr. Project Manager) | $200.00 |
| Managing Principal (Sr. Project Manager) | 200.00 |
| Associate Principal (Sr. Project Manager) | 160.00 – 185.00 |
| Senior Project Manager | 145.00 – 155.00 |
| Project Manager | 140.00 |
| Senior Designer/Drafter | 115.00 – 140.00 |
| Designer/Drafter I | 80.00 |
| Technical Support | 90.00 – 140.00 |

Rates are subject to change as employees receive salary modifications.

(Rate revised May 26, 2012)

Document1

| ACORD™ | CERTIFICATE OF LIABILITY INSURANCE | | | | DATE (MM/DD/YY)<br>10/18/2013 |
|---|---|---|---|---|---|

| PRODUCER<br><br>Dealey, Renton & Associates<br>P. O. Box 12675<br>Oakland, CA  94604-2675<br>510 465-3090 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|

| | INSURERS AFFORDING COVERAGE |
|---|---|
| INSURED<br><br>Interactive Resources, Inc.<br>117 Park Place<br>Point Richmond, CA  94801 | INSURER A:  Travelers Property Casualty Co |
| | INSURER B:  Hudson Insurance Company |
| | INSURER C: |
| | INSURER D: |
| | INSURER E: |

**COVERAGES**

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY<br>X  COMMERCIAL GENERAL LIABILITY<br>  CLAIMS MADE  X  OCCUR<br><br><br><br>GEN'L AGGREGATE LIMIT APPLIES PER:<br>  POLICY  X  PRO-JECT    LOC | 6806049L850<br>GENERAL LIAB EXCLUDES CLAIMS ARISING OUT OF THE PERFORMANCE OF PROFESSIONAL SERVICES. | 11/05/13 | 11/05/14 | EACH OCCURRENCE | $1,000,000 |
| | | | | | FIRE DAMAGE (Any one fire) | $300,000 |
| | | | | | MED EXP (Any one person) | $5,000 |
| | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| A | AUTOMOBILE LIABILITY<br>X  ANY AUTO<br>  ALL OWNED AUTOS<br>  SCHEDULED AUTOS<br>X  HIRED AUTOS<br>X  NON-OWNED AUTOS | BA6050L885 | 11/05/13 | 11/05/14 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | BODILY INJURY (Per person) | $ |
| | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | GARAGE LIABILITY<br>  ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | OTHER THAN        EA ACC | $ |
| | | | | | AUTO ONLY:          AGG | $ |
| A | EXCESS LIABILITY<br>X  OCCUR    CLAIMS MADE<br><br>  DEDUCTIBLE<br>  RETENTION      $ | CUP3465T288 | 11/05/13 | 11/05/14 | EACH OCCURRENCE | $1,000,000 |
| | | | | | AGGREGATE | $1,000,000 |
| | | | | | | $ |
| | | | | | | $ |
| | | | | | | $ |
| A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | UB3771T06A | 09/01/13 | 09/01/14 | X  WC STATU-TORY LIMITS    OTH-ER | |
| | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| B | OTHER  Professional Liability | AEE7221905 | 10/19/13 | 10/19/14 | $1,000,000 per claim<br>$2,000,000 annl aggr. | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISIONS

**FOR PROPOSAL PURPOSES ONLY!!**

| CERTIFICATE HOLDER | ADDITIONAL INSURED; INSURER LETTER: ____ | CANCELLATION |
|---|---|---|
| | **==SPECIMEN CERTIFICATE==** | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL **30**___ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.<br><br>AUTHORIZED REPRESENTATIVE<br>*Angela Berg* |

| ACORD 25-S (7/97)1    of 1 | #S775813/M775812 | BMA | © ACORD CORPORATION 1988 |
|---|---|---|---|



Interactive Resources, Inc.
117 Park Place
Pt. Richmond, CA 94801
(510) 236-7435

Martifer Solar USA                                              Statement date: 2/3/2014
Tim Lutey
2040 Armacost Ave
Los Angeles, CA 90025

| | Invoice Number | Invoice Date | Receipt | Receipt Date | Receipt Method | Amount |
|---|---|---|---|---|---|---|
| **Martifer Solar USA** | | | | | | |
| **2012-080-01 Martifer - Westfield Mall** | | | | | | |
| | 031372 | 4/9/2013 | | | | 4,995.00 |
| | | | 7-12-13 | 7/15/2013 | Check | -4,495.50 |
| | | | | | **Invoice Total** | 499.50 |
| | 031374 | 4/9/2013 | | | | 3,705.00 |
| | | | 7-12-13 | 7/15/2013 | Check | -3,334.50 |
| | | | | | **Invoice Total** | 370.50 |
| | 061352 | 7/9/2013 | | | | 13.24 |
| | | | | | **Project Outstanding** | 883.24 |
| **2013-001-01 Panorama Mall Solar-Macerich** | | | | | | |
| | 0113-27 | 2/11/2013 | | | | 3,640.00 |
| | | | 6142 | 8/14/2013 | Check | -3,276.00 |
| | | | | | **Invoice Total** | 364.00 |
| | 021372 | 3/11/2013 | | | | 1,680.00 |
| | | | 6142 | 8/14/2013 | Check | -1,512.00 |
| | | | | | **Invoice Total** | 168.00 |
| | 031380 | 4/12/2013 | | | | 280.00 |
| | | | 6142 | 8/14/2013 | Check | -252.00 |
| | | | | | **Invoice Total** | 28.00 |
| | 051365 | 6/10/2013 | | | | 3,400.00 |
| | | | 6142 | 8/14/2013 | Check | -3,060.00 |
| | | | | | **Invoice Total** | 340.00 |
| | | | | | **Project Outstanding** | 900.00 |
| | | | | | **Client Outstanding** | 1,783.24 |

| Martifer Solar USA | | | | | | | Prepayment |
|---|---|---|---|---|---|---|---|
| **Outstanding** | **Current** | **31-60 Days** | **61-90 Days** | **91-120 Days** | **121+ Days** | | |
| 1,783.24 | 0.00 | 0.00 | 0.00 | 0.00 | 1,783.24 | | 0.00 |