BRETT A. AXELROD (NV BAR NO. 5859)
MICAELA RUSTIA MOORE (NV BAR NO. 9676)
**FOX ROTHSCHILD LLP**
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
        mmoore@foxrothschild.com
*Counsel for Martifer Solar USA, Inc.*
*and Martifer Aurora Solar, LLC*

Electronically Filed April 24, 2014

### UNITED STATES BANKRUPTCY COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>MARTIFER AURORA SOLAR, LLC, a<br>Nevada limited liability company,<br><br>☐ Affects Martifer Aurora Solar, LLC<br>☒ Affects Martifer Solar USA, Inc.<br>☐ Affects all Debtors | Case Nos. BK-S-14-10355-abl and<br>BK-S-14-10357-abl<br><br>Jointly Administered under<br>Case No. BK-S-14-10355-abl<br><br>Chapter 11<br><br>**DECLARATION OF MICHAEL TUCKER<br>IN SUPPORT OF DEBTOR'S MOTION<br>FOR APPROVAL OF SETTLEMENT<br>AGREEMENT, PURSUANT TO FED. R.<br>BANKR. P. 9019, BETWEEN MARTIFER<br>SOLAR USA, INC., CHATSMOUTH, LLC<br>AND SOLAR OPTIMUM, INC.**<br><br>Hearing Date:    OST PENDING<br>Hearing Time:    OST PENDING |

I, Michael Tucker, being duly sworn, deposes and declares under the penalty of perjury:

1.     I am over the age of 18, am mentally competent, have personal knowledge of the facts in this matter, except where stated as based upon information and belief, and if called upon to testify, could and would do so.

2.     I am a Senior Managing Director of FTI Consulting, Inc. ("FTI"), engaged and authorized to assist the Debtors in their restructuring efforts.  In addition, I have been engaged and authorized to serve as the Debtors' Chief Restructuring Officer ("CRO").

3.     I submit this Declaration in support of the motion (the "Motion") for Approval of

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

Settlement Agreement, Pursuant to Fed. R. Bankr. P. 9019, Between Martifer USA ("Martifer USA"), Chatsmouth, LLC ("Chatsmouth"), and Solar Optimum, Inc. ("Optimum"), for entry of an order, pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), approving the settlement agreement (the "Settlement Agreement").  A true and correct copy of the Settlement Agreement is attached as Exhibit 1.[1]

4.    The Settlement Agreement resolves the disputes concerning (a) the obligations, if any, due by Martifer USA and/or Chatsmouth to each other under the provisions of the Engineering, Procurement and Construction Agreement (the "EPC Agreement") and the Operation and Maintenance Agreement (the "Maintenance Agreement"); and (b) the obligations, if any, due by Martifer USA and/or Optimum to the other under the provisions of the Subcontractor Agreement between them (the "Subcontract").

5.    The Motion requests that the Court enter an order (i) approving the Settlement Agreement; (ii) authorizing Debtor to take all actions contemplated by the Settlement Agreement according to the terms and provisions thereof; and (iii) granting such further relief as the Court deems just and proper.

6.    Martifer USA, Chatsmouth, and Optimum (the "Settling Parties") have reached an arms length and negotiated settlement of all disputes between them in connection with the EPC Agreement, the Subcontract, and the Maintenance Agreement on terms and conditions that are reasonable, fair and equitable.

7.    As set forth in the Settlement Agreement:

a.  Chatsmouth is the owner of a commercial property located at 9640 Owensmouth Avenue, Chatsworth, California 91311 (the "Property").  Ex. 1 at 1.

b.  Martifer USA is a general contractor that designs, constructs and installs photovoltaic systems.  Id.

---

[1] All capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

c.  Optimum is a contractor that designs, constructs and installs photovoltaic systems and that also performs such work as a subcontractor. Id.

d.  On or about June 6, 2013, Chatsmouth and Martifer entered into the EPC Agreement for the design, acquisition of components and construction of a 615.67 kilowatt photovoltaic power plant at the Property (the "Project"). Id. A true and correct copy of the EPC Agreement is attached as Ex. A to Ex. 1.

e.  On or about October 16, 2013, Martifer USA entered into the Subcontract with Optimum for racking, panelization and installation services and material as more fully described in the Subcontract (the "Optimum Services"). Ex. 1 at 1. A true and correct copy of the Subcontract is attached as Ex. B to Ex. 1.

f.  The total contract price for the Project under the terms of the EPC Agreement was $1,483,434.64, of which $1,149,766.35 had been paid by Chatsmouth to Martifer USA prior to the Petition Date, leaving a balance (without accounting for adjustments, if any) of $333,668.29. Ex. 1 at 1.

g.  The total original contract price for the Optimum Services under the terms of the Subcontract was $322,518.00 and change orders totaling an additional $63,278.04 were requested and approved of which $54,000 had been paid by Martifer USA to Optimum prior to the Petition Date, leaving a balance (without accounting for adjustments, if any) of $331,796.04. Id.

h.  Chatsworth and Martifer USA also entered into the Maintenance Agreement. Id.

i.  The EPC Agreement provides that a progress payment is due at such time as Chatsmouth and Martifer USA acknowledge by a jointly executed notice of substantial completion that substantial completion of the Project has occurred. Id. at 2. The EPC Agreement further provides that the balance of sums due will thereafter be paid on final completion of the project. Id.

j.  On or about January 17, 2014, Martifer USA sent Chatsmouth a proposed notice of substantial completion. Chatsmouth disputed that the Project was substantially completed and, on or about January 24, 2014, within the time permitted under the

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

EPC Agreement, Chatsmouth rejected the notice of substantial completion.  Disputes remain between Chatsmouth and Martifer USA regarding certain items of work on the Project.  As part of the Settlement Agreement, Optimum will complete the remaining items. Those disputes are among the matters intended to be resolved by the Settlement Agreement. For its part, Martifer USA denies that any of its work was defective.  Id.

k.  On or about January 24, 2014, Optimum recorded a mechanic's lien (the "Mechanic's Lien") against the Property to secure payment to Optimum of the sum of $329,196.04 that it claims to be owed. Optimum had previously served a 20-day preliminary notice.  The EPC Agreement provides that "Client's [Chatsmouth's] title to all Equipment shall be free and clear of all liens, claims, charges, security interests, and encumbrances whatsoever, upon payment. .. to Contractor."  The EPC Agreement defines "Equipment"  to, *inter alia,* "include all material, equipment and components" of the Project.  Id.

l.  Martifer USA cannot presently fulfill its obligation to deliver the Project to Chatsmouth free and clear of liens in that Martifer USA cannot pay Optimum because all or substantially all of the Optimum Services were performed prior to the filing of the Chapter 11.  Id.

8.  The Settlement Agreement provides that Optimum shall complete installation (collectively "Completion") of the agreed upon outstanding items.  Id. at 3.

9.  On the later of Completion or ten days after the Approval Order has become final, Chatsmouth shall deliver a wire transfer in the sum of $331,796.04 to Optimum's bank account pursuant to wire transfer instructions provided by Optimum (the "Optimum Payment") and deliver a check to Martifer USA in the sum of $1,872.25.  Id.

10.  Optimum shall accept said payment in full satisfaction of its rights, claims, demands, causes of action of any kind or nature arising under or related to the Subcontract and/or the Optimum Services and/or the performance of any work or service or the procurement or delivery of any materials, supplies, equipment and components to the Project or Property. Id. at 3-4.

11.     The Settlement Agreement provides the Optimum shall waive and release any and all pre-petition claims of any kind or nature against Martifer USA. Id.

12.     The Settlement Agreement provides that on receipt of the Optimum Payment, Optimum shall duly execute and record a release of its Mechanic's Lien at the offices of the Los Angeles County Recorder by 5:00p.m. on or before the second business day following receipt of payment and if a lawsuit on the Mechanic's Lien has been filed, Optimum shall concurrently deliver a dismissal of such lawsuit with prejudice to Chatsmouth.  Id. at 3.

13.     Chatsmouth's delivery of the Optimum Payment shall constitute full satisfaction of all of Chatsmouth's obligations and liabilities under the ECP Agreement. Id.

14.     The Settlement Agreement provides for full satisfaction of Chatsmouth's, rights, claims, demands, causes of action of any kind or nature arising under or related to the ECP Agreement and/or the performance of any work or service or the procurement or delivery of any materials, supplies, equipment and components to the Project or Property, including without limitation the "Equipment" as defined in the ECP Agreement. Id.

15.     In consideration of the foregoing, Chatsmouth shall accept the Project in its present condition as satisfying Martifer USA's obligations to deliver substantial completion and final completion of the Project under the ECP Agreement. Id.

16.     The Settlement Agreement provides that Chatsmouth shall waive and release any and all pre-petition claims of any kind or nature against Martifer USA, including express or implied warranty claims against Martifer USA, with respect to the Equipment, including without limitation any claim that materials used in the Project did not meet contract specifications or breach of warranty, but does not waive any such claim as to any subcontractor or material provider related to the Project.  Id.

17.     Paragraph 6 of the Settlement Agreement provides that the Maintenance Agreement will be terminated by the mutual consent of Chatsmouth and Martifer USA and that the Maintenance Agreement will be rejected pursuant to 11 U.S.C. §365(a).  Id. at 3-4.

///

///

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

1    18.    I verify under penalty of perjury that the foregoing statement is true and correct to

2  the best of my information, knowledge and belief.

3    Executed this 24th day of April 2014.

4

5    _____/s/Michael Tucker_____

6    Michael Tucker

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
(702) 262-6899
(702) 597-5503 (fax)

# EXHIBIT 1

## SETTLEMENT AND RELEASE AGREEMENT

This Settlement and Release Agreement ("Agreement") is made this ___ day of April, 2014 by and among Chatsmouth, LLC, a California limited liability company, ("Chatsmouth"), Martifer Solar USA, Inc., a California corporation ("Martifer"), and Solar Optimum, Inc., a California corporation ("Optimum").  The term "Parties" refers to Chatsmouth, Martifer and Optimum collectively and the term "Party" refers to each and any of the Parties.  This Agreement is made with reference to the following facts:

A.      Chatsmouth is the owner of a commercial property located at 9640 Owensmouth Avenue, Chatsworth, California 91311 ("Property").

B.      Martifer is a general contractor that designs, constructs and installs photovoltaic systems.

C.      Optimum is a contractor that designs, constructs and installs photovoltaic systems and that also performs such work as a subcontractor.

D.      On or about June 6, 2013, Chatsmouth and Martifer entered into an agreement entitled "Engineering, Procurement and Construction Agreement" ("EPC Agreement") for the design, acquisition of components and construction of a 615.67 kilowatt photovoltaic power plant at the Property (the "Project").  A copy of the EPC Agreement is attached as Exhibit A hereto.

E.      On or about October 16, 2013, Martifer entered into an agreement with Optimum, entitled "Subcontractor Agreement" ("Subcontract"), for racking, panelization and installation services and material as more fully described in the Subcontract ("Optimum Services"). A copy of the Subcontract is attached as Exhibit B hereto.

F.      The total contract price for the Project under the terms of the EPC Agreement was $1,483,434.64 of which $1,149,766.35 had been paid by Chatsmouth to Martifer prior to January 21, 2014, leaving a balance (without accounting for adjustments, if any) of $333,668.29.

G.      The total original contract price for the Optimum Services under the terms of the Subcontract was $322,518.00 and change orders totaling an additional $63,278.04 were requested and approved of which $54,000  had been paid by Martifer to Optimum prior to January 21, 2014, leaving a balance (without accounting for adjustments, if any) of $331,796.04.

H.      Chatsworth and Martifer also entered into an Operation and Maintenance Agreement dated as of June 6, 2013 ("Maintenance Agreement").

I.      On or about January 21, 2014, Martifer filed a voluntary petition in the United States Bankruptcy Court for the District of Nevada, Case No. 14-10357-abl  for reorganization under Chapter 11 of the United States Bankruptcy Code, which is subject to joint administration with the lead case in a related chapter 11 bankruptcy, *Martifer Aurora Solar, LLC*, Case No. 14-10355-abl (the "Chapter 11").

J.      Martifer filed the Chapter 11 as debtor-in-possession and has remained the debtor-in-possession since the filing.

K.      The EPC Agreement provides that a progress payment is due at such time as Chatsmouth and Martifer acknowledge by a jointly executed "Notice of Substantial Completion" that substantial completion of the Project has occurred. The EPC Agreement further provides that the balance of sums due will thereafter be paid on "Final Completion" of the Project.

L.      On or about January 17, 2014, Martifer sent Chatsmouth a proposed Notice of Substantial Completion.  Chatsmouth disputed that the Project was substantially completed and, on or about January 24, 2014, within the time permitted under the EPC Agreement, Chatsmouth rejected the Notice of Substantial Completion. Disputes remain between Chatsmouth and Martifer regarding certain items of work on the Project.  Those disputes are among the matters intended to be resolved by this Agreement.  On its part, Martifer denies that any of its work was defective.

M.      On or about January 24, 2014, Optimum recorded a mechanic's lien ("Mechanic's Lien") against the Property to secure payment to Optimum of the sum of $329,196.04 that it claims to be owed.  Optimum had previously served a California 20-day Preliminary Notice.

N.      The EPC Agreement provides that "Client's [Chatsmouth's] title to all Equipment shall be free and clear of all liens, claims, charges, security interests, and encumbrances whatsoever, upon payment…to Contractor."   The EPC Agreement defines "Equipment" to, *inter alia*, "include all material, equipment and components" of the Project.

O.      On account of the filing of the Chapter 11, Martifer cannot presently fulfill its obligation to deliver the Project to Chatsmouth free and clear of liens in that Martifer cannot pay Solar Optimum because all or substantially all of the Optimum Services were performed prior to the filing of the Chapter 11.

P.      On the terms set forth below, the Parties desire to resolve all disputes between them concerning: (1) the obligations, if any, due by Martifer and/or Chatsmouth to the other under the provisions of EPC Agreement and the Maintenance Agreement; and (2) the obligations, if any, due by Martifer and/or Solar Optimum to the other under the provisions of the Subcontract.

**AGREEMENT**

NOW, THEREFORE, in consideration of the above recitals, the covenants and agreements herein contained and other good and valuable consideration, the Parties agree as follows:

1.      **Incorporation of Recitals.**  The foregoing recitals are incorporated herein and made a part hereof by this reference.

2.      **Contingent on Court Approval.**  This Agreement is expressly conditioned on entry of an order by the United States Bankruptcy Court for the District of Nevada in the Chapter 11 that approves this Agreement and provides that the Agreement shall be binding on any successor or assign of Martifer, including, without limitation, a subsequently appointed chapter 11 trustee, a chapter 7 trustee in the event the Chapter 11 is converted to a chapter 7 proceeding, or a creditor's committee that is

assigned any right, interest or claim of Martifer ("Approval Order").  Except with respect to each of the Parties' obligation to reasonably cooperate in seeking approval of this Agreement, this Agreement and each of its provisions shall be of no force or effect until an Approval Order has been entered and has become final.

3.    **Agreement to Seek Approval.**  Debtor shall, within fourteen (14) days of the execution of this Agreement by all Parties, cause its counsel to file and serve a motion in the Chapter 11 to obtain the Approval Order on the terms set forth herein. The parties shall reasonably cooperate with Martifer's counsel in the preparation of the motion.

4.    **Completion of Work and Payment and Satisfaction of Optimum/Payment to Martifer**.  Upon entry of an Approval Order, Optimum shall complete installation by: (a) tying-in wires to correct excess slack; (b) roof coating limited to those specific areas set forth in Exhibit C attached hereto; and (c) installing rubber pads underneath racks in missing areas (collectively "Completion").  On the later of Completion or ten days after the Approval Order has become final, Chatsmouth shall deliver a wire transfer in the sum of $331,796.04 to Optimum's bank account pursuant to wire transfer instructions provided by Optimum (the "Optimum Payment") and deliver a check to Martifer at the place for notice below in the sum of $1,872.25.  Optimum shall accept said payment in full satisfaction of its rights, claims, demands, causes of action of any kind or nature arising under or related to the Subcontract and/or the Optimum Services and/or the performance of any work or service or the procurement or delivery of any materials, supplies, equipment and components to the Project or Property.  On receipt of the Optimum Payment, Optimum shall duly execute and record a release of its Mechanic's Lien at the offices of the Los Angeles County Recorder by 5:00 p.m. on or before the second business day following receipt of payment and if a lawsuit on the Mechanic's Lien has been filed, Optimum shall concurrently deliver a dismissal of such lawsuit with prejudice to Chatsmouth.

5.    **Satisfaction of ECP Agreement Obligations.**  Chatsmouth's delivery of the Optimum Payment shall constitute full satisfaction of all of Chatsmouth's obligations and liabilities under the ECP Agreement, and full satisfaction of Martifer's rights, claims, demands, causes of action of any kind or nature arising under or related to the ECP Agreement and/or the performance of any work or service or the procurement or delivery of any materials, supplies, equipment and components to the Project or Property, including without limitation the "Equipment" as defined in the ECP Agreement. In consideration of the foregoing provisions of this paragraph, upon entry of the Approval Order (i) Chatsmouth shall accept the Project in its present condition as satisfying Martifer's obligations to deliver substantial completion and final completion of the Project under the ECP Agreement; and (ii) Chatsmouth shall waive any and all pre-petition claims of any kind or nature against Martifer, including express or implied warranty claims against Martifer, with respect to the Equipment, including without limitation any claim that materials used in the Project did not meet contract specifications or breach of warranty, but does not waive any such claim as to any subcontractor or material provider related to the Project.

6.    **Termination of Maintenance Agreement.**  The Maintenance Agreement is hereby terminated by the mutual consent of Chatsmouth and Martifer.  The Approval

Order shall provide that the Maintenance Agreement is rejected pursuant to 11 U.S.C. § 365(a).

7. **Release by Optimum.** Upon entry of the Approval Order, with the exception of the rights and obligations set forth in this Settlement Agreement, and subject to satisfaction of the conditions herein, Optimum, for itself and for its current and former employees, officers, directors, shareholders, representatives, agents, servants, counsel, attorneys, affiliates, parent companies, sister companies, subsidiaries, investors, predecessors, successors and assigns, does hereby knowingly, voluntarily, absolutely and irrevocably discharge and release Chatsmouth and Martifer, and their respective current and former employees, associates, officers, directors, partners, shareholders, representatives, members, managers, agents, servants, counsel, attorneys, experts, consultants, administrators, affiliates, parent companies, sister companies, subsidiaries, investors, predecessors, successors and assigns ("Released Persons"), from any and all claims (including pre-petition claims), acts, demands, damages, debts, liabilities, accountings, reckonings, obligations, costs, expenses, claims for relief, rights of action, causes of action, and choses in action, in law or in equity, of every nature and kind (known, unknown, suspected, unsuspected, fixed, contingent, or otherwise) it ever had or now has against the Released Persons, arising from, related to or connected with the ECP Agreement, the Subcontract, the Project and/or work performed at or materials supplied to the Property or for the benefit of the Property or the Project, including without limitation the claim asserted in Optimum's Mechanic's Lien against the Property.

8. **Martifer and Chatsmouth Releases.** Upon entry of the Approval Order, with the exception of the rights and obligations set forth in this Agreement, and subject to satisfaction of the conditions herein, Martifer and Chatsmouth, and each of them, for themselves and, as the case may be, for their respective current and former employees, officers, directors, shareholders, representatives, members, managers, agents, servants, counsel, attorneys, affiliates, parent companies, sister companies, subsidiaries, co-venturers, investors, predecessors, successors and assigns, do hereby knowingly, voluntarily, absolutely and irrevocably discharge and release each other, and their respective current and former employees, officers, directors, shareholders, managers, members, representatives, agents, servants, counsel, attorneys, experts, consultants, affiliates, parent companies, sister companies, subsidiaries, investors, predecessors, successors and assigns, of and from any and all claims (including pre-petition claims), acts, demands, damages, debts, liabilities, accountings, reckonings, obligations, costs, expenses, claims for relief, rights of action, causes of action, and choses in action, in law or in equity, of every nature and kind (known, unknown, suspected, unsuspected, fixed, contingent, or otherwise) it ever had or now has against the Released Persons, arising from, related to or connected with the ECP Agreement, the Project and/or work performed at or materials supplied to the Property or for the benefit of the Property or the Project. Neither the release set forth in this paragraph nor any other provision of this Agreement shall, however, constitute a release or waiver of claims by Chatsmouth against Optimum.

9. **Scope of Settlement.** This Settlement Agreement is intended as a full settlement and compromise of each, every and all claims, acts, demands, damages, debts, liabilities, accountings, reckonings, obligations, costs, expenses, claims for relief,

rights of action, causes of action and choses in action, in law or in equity, of every nature and kind (known, unknown, suspected, unsuspected, fixed, contingent, or otherwise), which the Parties have ever had, now have, or may in the future have, arising from payment obligations under the EPC Agreement and/or the Subcontract Agreement; and payment obligations on account of work performed at or materials supplied to the Property or for the benefit of the Property or the Project. With respect to such payment obligations the Parties, being aware of and advised concerning the legal effect of the provisions of California Civil Code section 1542, expressly, knowingly, and intentionally waive any and all rights which they have or may have under the provisions of said Section 1542, which provides:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

The Parties also waive the provisions of any federal statute or rule having effect similar to California Civil Code section 1542 with respect to such payment obligations.

9.1     In entering into this Settlement Agreement, the Parties have had full opportunity to seek the advice of their attorneys. The terms of this Settlement Agreement have been completely read by the Parties, and all Parties agree that such terms are fully understood and voluntarily accepted by the Parties. All Parties represent that they are entering into this Settlement Agreement of their own volition.

9.2     Except for Martifur's bankruptcy, each  party represents and warrants that there has been no assignment, encumbrance, hypothecation or other transfer of any interest in any of the claims, acts, demands, damages, debts, liabilities, accountings, reckonings, obligations, costs, expenses, claims for relief, rights of action, causes of action and choses of action released in this Settlement Agreement by such party.

10. **Extension of Time re Mechanic's Lien**. Optimum and Chatsmouth agree, pursuant to California Civil Code section 8460 to extend credit with respect to the time for Optimum to commence a lawsuit to enforce its Mechanic's Lien from April 24, 2014 to September 30, 2014 and Optimum may record notice of such credit and extension of time with the Los Angeles County Recorder's Office.

11.     **Interpretation.** In construing the Settlement Agreement or determining the rights of any person or entity hereunder, no party shall be deemed to have drafted or created this Settlement Agreement and therefore if any provision of this Settlement Agreement should be deemed to be uncertain or ambiguous, it shall not be construed against any Party. This Settlement Agreement is a complete and final integration of all understandings or any existing or asserted prior or contemporaneous agreements between the Parties, and supersedes any such existing or alleged understandings or prior or contemporaneous agreements.   The provisions of this Settlement Agreement shall not be subject to amendment or modification, except by a subsequently entered into agreement signed by all the Parties.

12.     **Governing Law.** This Settlement Agreement is made and entered into under the laws of the State of California and shall be interpreted, applied and enforced under those laws except as otherwise required by the U.S. Bankruptcy Code.

13.    **Execution in Counterparts.**  This Settlement Agreement may be executed in two or more counterparts, which, taken together, shall constitute the whole of the agreement between the Parties.  Additionally, signatures exchanged by facsimile or e-mail shall have the same force and effect as original signatures.

14.    **Execution.**  Each person executing this Settlement Agreement on behalf of any corporation, partnership or entity warrants and represents that he or she is fully authorized and empowered to do so, and that this Agreement shall be binding on the party on whose behalf he or she is executing the Agreement.

15.    **Invalidity.**  If any term, provision, covenant or condition of this Settlement Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

16.    **Notice.**  Any notice required or permitted to be given under or in furtherance of the provisions of this Agreement shall be given in writing and sent as follows:

If to Solar Optimum, Inc.:    Arno Aghamalian, president
Solar Optimum, Inc.
1010 North Central Avenue, Suite 390
Glendale, California 91202

If to Martifer Solar U.S.A., Inc.:    Michael Tucker, Chief Restructuring Officer
Martifer Solar USA, Inc.
2040 Armacost Avenue, 2nd Floor
Los Angeles, California 90025

If to Chatsmouth, LLC:    Madhukar Kapadia, Managing Member
9640 Owensmouth Avenue
Chatsworth, California 91311

IN WITNESS whereof the Parties execute this Agreement effective the date first written above at Los Angeles, California

SOLAR OPTIMUM, INC.

By:_____
Arno Aghamalian, its president

MARTIFER SOLAR U.S.A., INC.

By:_____
Michael Tucker, Chief Restructuring Officer

CHATSMOUTH, LLC

By:_____
Madhukar Kapadia, Managing Member

X:\30487\006\00179264.DOC                    - 6 -

13.    **Execution in Counterparts.** This Settlement Agreement may be executed in two or more counterparts, which, taken together, shall constitute the whole of the agreement between the Parties. Additionally, signatures exchanged by facsimile or e-mail shall have the same force and effect as original signatures.

14.    **Execution.** Each person executing this Settlement Agreement on behalf of any corporation, partnership or entity warrants and represents that he or she is fully authorized and empowered to do so, and that this Agreement shall be binding on the party on whose behalf he or she is executing the Agreement.

15.    **Invalidity.** If any term, provision, covenant or condition of this Settlement Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

16.    **Notice.** Any notice required or permitted to be given under or in furtherance of the provisions of this Agreement shall be given in writing and sent as follows:

If to Solar Optimum, Inc.:          Arno Aghamalian, president
                                    Solar Optimum, Inc.
                                    1010 North Central Avenue, Suite 390
                                    Glendale, California 91202

If to Martifer Solar U.S.A., Inc.:  Michael Tucker, Chief Restructuring Officer
                                    Martifer Solar USA, Inc.
                                    2040 Armacost Avenue, 2nd Floor
                                    Los Angeles, California 90025

If to Chatsmouth, LLC:              Madhukar Kapadia, Managing Member
                                    9640 Owensmouth Avenue
                                    Chatsworth, California 91311

IN WITNESS whereof the Parties execute this Agreement effective the date first written above at Los Angeles, California

SOLAR OPTIMUM, INC.

By:_____
      Arno Aghamalian, its president

MARTIFER SOLAR U.S.A., INC.

By:_____
      Michael Tucker, Chief Restructuring Officer

CHATSMOUTH, LLC

By:_____
      Madhukar Kapadia, Managing Member

X:\30487\006\00179264.DOC                    - 6 -

13.     **Execution in Counterparts.** This Settlement Agreement may be executed in two or more counterparts, which, taken together, shall constitute the whole of the agreement between the Parties. Additionally, signatures exchanged by facsimile or e-mail shall have the same force and effect as original signatures.

14.     **Execution.** Each person executing this Settlement Agreement on behalf of any corporation, partnership or entity warrants and represents that he or she is fully authorized and empowered to do so, and that this Agreement shall be binding on the party on whose behalf he or she is executing the Agreement.

15.     **Invalidity.** If any term, provision, covenant or condition of this Settlement Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

16.     **Notice.** Any notice required or permitted to be given under or in furtherance of the provisions of this Agreement shall be given in writing and sent as follows:

If to Solar Optimum, Inc.:

Arno Aghamalian, president
Solar Optimum, Inc.
1010 North Central Avenue, Suite 390
Glendale, California 91202

If to Martifer Solar U.S.A., Inc.:

Michael Tucker, Chief Restructuring Officer
Martifer Solar USA, Inc.
2040 Armacost Avenue, 2nd Floor
Los Angeles, California 90025

If to Chatsmouth, LLC:

Madhukar Kapadia, Managing Member
9640 Owensmouth Avenue
Chatsworth, California 91311

IN WITNESS whereof the Parties execute this Agreement effective the date first written above at Los Angeles, California

SOLAR OPTIMUM, INC.

By:_____
    Arno Aghamalian, its president

MARTIFER SOLAR U.S.A., INC.

By:_____
    Michael Tucker, Chief Restructuring Officer

CHATSMOUTH, LLC

By _____
    Madhukar Kapadia, Managing Member

X:\30487\006\00179264.DOC                                          - 6 -



# CHATSMOUTH

## ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT

Dated as of June 6, 2013

Between

Chatsmouth, LLC

and

Martifer Solar USA, Inc.

ACTIVE 20807152v2 06/06/2013 1:57 PM

EXHIBIT A

# MARTIFER
SOLAR

## TABLE OF CONTENTS

1.  DEFINITIONS .................................................................................................................1

2.  CONTRACTOR'S OBLIGATIONS ...............................................................................4

    2.1  The Work.................................................................................................................4
    2.2  Exclusions...............................................................................................................5
    2.3  Changes and Extra Work........................................................................................6
    2.4  Protective Measures................................................................................................6
    2.5  Unanticipated Conditions.......................................................................................6
    2.6  Labor.......................................................................................................................7
    2.7  Insurance.................................................................................................................7
    2.8  Performance of the Work........................................................................................7
    2.9  Hazardous Materials...............................................................................................8
    2.10 Suspension of the Work..........................................................................................8
    2.11 Title; Risk of Loss..................................................................................................9
    2.12 Workmanship Warranty..........................................................................................9
    2.13 Taxes.....................................................................................................................10
    2.14 Liens......................................................................................................................10
    2.15 Compliance with Applicable Laws.......................................................................10
    2.16 Subcontractors and Suppliers...............................................................................10

3.  PRICE AND PAYMENT ...............................................................................................11

    3.1  Contract Price........................................................................................................11
    3.2  Payment and Payment Method..............................................................................11

4.  COMMENCEMENT & COMPLETION.......................................................................12

    4.1  Commencement and Substantial Completion .......................................................12
    4.2  Final Completion...................................................................................................13
    4.3  Inspection..............................................................................................................13

5.  REPRESENTATIONS & WARRANTIES ....................................................................13

    5.1  Representations and Warranties of Contractor......................................................13
    5.2  Representations and Warranties of Client .............................................................14

6.  BREACH & TERMINATION........................................................................................14

    6.1  Termination by Client ...........................................................................................14
    6.2  Termination by Contractor ....................................................................................15
    6.3  Indemnity..............................................................................................................15

7.  MISCELLANEOUS .......................................................................................................16

    7.1  Representatives .....................................................................................................16

6/6/2013

ACTIVE 20807152v2

CONFIDENTIAL

EXHIBIT A

**MARTIFER**
SOLAR

| | | | |
|---|---|---|---|
| 7.2 | Ownership of Plans, Data, Reports and Material | | 16 |
| 7.3 | Governing Law | | 17 |
| 7.4 | Force Majeure | | 17 |
| 7.5 | Dispute Resolution | | 17 |
| 7.6 | Notices and Demands | | 18 |
| 7.8 | Time of Essence | | 19 |
| 7.9 | Validity | | 19 |
| 7.10 | Survival | | 19 |
| 7.11 | Binding Effect | | 19 |
| 7.12 | Execution Time Limit | | 19 |
| 7.13 | No Oral Modifications | | 19 |
| 7.14 | Headings | | 19 |
| 7.15 | Counterparts | | 19 |
| 7.16 | Announcements and Publications | | 20 |
| 7.17 | Complete Agreement | | 20 |
| 7.18 | No Agency | | 20 |
| 7.19 | Priority of Documents | | 20 |
| 7.20 | Assignment | | 20 |
| 7.21 | Underground Utilities | | 20 |
| 7.22 | Goodwill and Publicity | | 20 |
| 7.23 | No Waiver | | 21 |
| 7.24 | Estoppel | | 21 |

<u>EXHIBITS</u>

| | | |
|---|---|---|
| Exhibit A | - | Construction Schedule |
| Exhibit B | - | Performance Tests |
| Exhibit C | - | Scope of Work |
| Exhibit D | - | Change Request |
| Exhibit E | - | Payment Schedule |
| Exhibit F | - | Substantial Completion Commissioning Plan for System |
| Exhibit G | - | Insurance |
| Exhibit H | - | Warranty |
| Exhibit I | - | Site Layout |
| Exhibit J | - | Substantial Completion Notice |
| Exhibit K | - | Final Completion Certificate |

EXHIBIT A

# MARTIFER
## SOLAR

### ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT

This ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT, is made and entered into as of June 6, 2013 ("Agreement"), and is entered into by and between CHATSMOUTH, LLC, a California Limited liability company, ("Client") and MARTIFER SOLAR USA, INC., a California Corporation ("Contractor").

### RECITALS

**WHEREAS**, Client is developing an approximately 615.67 kW DC solar photovoltaic power plant (the "System") to be located 9640 Owensmouth Avenue, Chatsworth, CA 91311 (the "Site");

**WHEREAS**, Contractor designs, constructs and installs photovoltaic systems and as such is able to engineer and construct the System and all the necessary ancillary systems;

**WHEREAS**, Client desires to engage Contractor to supply and install the System at the Site;

**WHEREAS**, Madhukar B. Kapadia ("Kapadia"), an individual, owns, directly or indirectly, 49% of the interests in the Client and, having a financial interest in the Client, has agreed to guarantee all of Client's obligations under this Agreement and has concurrently executed herewith a separate Guaranty Agreement (the "Guaranty Agreement") to such effect; and

**WHEREAS**, but for Guarantor's concurrent execution of the Guaranty Agreement and the representations of Guarantor thereunder, Contractor would not enter into this Agreement; and,

**WHEREAS**, Contractor desires to provide such supply and installation services, all in accordance with the terms and conditions set forth in this Agreement.

**NOW THEREFORE**, in consideration of the mutual promises set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### AGREEMENT:

1. **DEFINITIONS**

Unless otherwise required by the context in which any term appears: (a) capitalized terms used in this Agreement shall have the respective meanings set forth in this Section 1; (b) the singular shall include the plural and vice versa; (c) the word "including" shall mean "including, without limitation", (d) references to "Sections", "Schedules" and "Exhibits" shall be to sections, schedules and exhibits hereof; (e) the words "herein", "hereof" and "hereunder" shall refer to this Agreement as a whole and not to any particular section or subsection hereof; and (f) references to this Agreement shall include a reference to all schedules and exhibits hereto, as the same may be amended, modified, supplemented or replaced from time to time.

"Affiliate" of a specified Person means any Person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, such specified Person. As used in this definition of Affiliate, the term "control" of a specified Person including, with correlative meanings, the terms, "controlled by" and "under common control with," means (a) the ownership, directly or indirectly, of 50% or more of the equity interest in a Person or (b) the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" shall have the meaning set forth in the preamble.

"Applicable Law" shall mean, with respect to any Governmental Authority, any constitutional provision, law, statute, rule, regulation, ordinance, treaty, order, decree, judgment, decision, certificate, injunction, registration, license, permit, authorization, guideline, governmental approval, consent or requirement of such Governmental Authority, as construed from time to time by any Governmental Authority.

"Applicable Permits" shall mean each and every national, autonomic, regional and local license, authorization, certification, filing, recording, permit or other approval with or of any Governmental Authority, including, without limitation, each and every environmental, construction or operating permit and any agreement, consent or approval from or with any other Person that is required by any Applicable Law or that is otherwise necessary for the performance of the Work or operation of the System.

"Business Day" means Mondays to Fridays, except such days on which banks are permitted or required to close in California.

Page 1

CONFIDENTIAL

ACTIVE 20807152v2

EXHIBIT A

# MARTIFER
## SOLAR

"**Change Order**" shall mean a written document signed by Client and Contractor authorizing an addition, deletion or revision to the Work or an adjustment of the Contract Price or Construction Schedule issued after execution of this Agreement.

"**Client's Representative**" shall mean the individual designated by Client in accordance with Section 7.1(a).

"**Commercial Operation**" shall mean, with respect to a particular Site, the condition existing when the System at such Site are (i) mechanically complete and materially operating at or about the capacity listed in the Scope of Work; and (ii) energy is delivered through the System's metering device to such Site's electrical system under an Interconnection Agreement.

"**Commercial Operation Date**" shall mean, with respect to a particular Site, the date on which the System at such Site has achieved Commercial Operation.

"**Construction Schedule**" shall mean the schedule for performance of the Work as set forth on Exhibit A.

"**Contract Documents**" shall mean this Agreement, the exhibits and schedules hereto, and drawings, specifications, plans, calculations, models and designs that have been prepared by Contractor or any Subcontractor exclusively for the Work.

"**Contract Price**" shall mean the amount for performing the Work that is payable to Contractor as set forth in Section 3.1(a), as the same may be modified from time to time in accordance with the terms hereof.

"**Contractor**" shall have the meaning set forth in the preamble.

"**Contractor Acquired Permits**" shall mean all applicable building, electrical and fire permits as required by the city permitting department or other applicable authority, but do not include any permits or approvals required to satisfy zoning requirements.

"**Contractor Representative**" shall mean the individual designated by the Contractor in accordance with Section 7.1(b).

"**Day**" means calendar day unless it is specified that it means a "business day".

"**Disclosing Party**" shall have the meaning set forth in Section 7.7.

"**Dispute**" shall have the meaning set forth in Section 7.5(a).

"**Dollar**" and "**$**" shall mean the lawful currency of the United States of America.

"**Effective Date**" shall mean the date first set forth above and further described in Section 4.1(a).

"**Equipment**" shall mean (a) all materials, supplies, apparatus, machinery, equipment, parts, tools, components, instruments, appliances, spare parts and appurtenances thereto that are required for prudent design, construction or operation of the Systems in accordance with Industry Standards and (b) all materials, supplies, apparatus, machinery, equipment, parts, tools, components, instruments, appliances, spare parts and appurtenances thereto described in, required by, reasonably inferable from or incidental to the Work or the Contract Documents.

"**Final Completion**" shall mean satisfaction or waiver of all of the conditions for completion of the System set forth in Section 4.2.

"**Force Majeure Event**" shall mean, when used in connection with the performance of a Party's obligations under this Agreement, any act or event (to the extent not caused by such Party or its agents or employees) which is unforeseeable, or being foreseeable, unavoidable and outside the control of the Party which invokes it, and which renders said Party unable to comply totally or partially with its obligations under this Agreement. In particular, any of the following shall be considered a Force Majeure Event:

(a)  war (whether or not war is declared), hostilities, revolution, rebellion, insurrection against any Governmental Authority, riot, terrorism, acts of a public enemy or other civil disturbance;

(b)  acts of God, including but not limited to, storms, floods, lightning, earthquakes, hailstorms, ice storms, tornados, typhoons, hurricanes, landslides, other weather issues, volcanic eruptions, fires, winds in excess of ninety (90) miles per hour, and objects striking the earth from space (such as meteorites), sabotage or destruction by a third party (other than any contractor retained by or on behalf of the Party) of facilities and equipment relating to the performance by the affected Party of its obligations under this Agreement;

(c)  Regional or national strikes, walkouts, lockouts or similar industrial or labor actions or disputes; and

6/6/2013
Version 1
ACTIVE 20807152v2

CONFIDENTIAL

EXHIBIT A

# MARTIFER
SOLAR

(d)    Acts of any Governmental Authority that materially restricts or limits Contractor's access to the Site or its activities at the Site; provided that no act by the Government of the United States of America shall constitute a Force Majeure Event in respect of any obligation of Client hereunder.

"**Guarantor**" shall mean Madhukar B. Kapadia, an individual, and a member of Client that has agreed to personally guarantee Client's obligations under this Agreement.

"**Governmental Authority**" shall mean any national, autonomic, regional, province, town, city, or municipal government, whether domestic or foreign, or other administrative, regulatory or judicial body of any of the foregoing.

"**Hazardous Material**" shall mean oil or petroleum and petroleum products, asbestos and any asbestos containing materials, radon, polychlorinated biphenyl's ("PCBs"), urea formaldehyde insulation, lead paints and coatings, and all of those chemicals, substances, materials, controlled substances, objects, conditions and waste or combinations thereof which are now or become in the future listed, defined or regulated in any manner by any federal, state or Applicable Law.

"**Indemnified Party**" shall have the meaning set forth in Section 6.3(d).

"**Indemnifying Party**" shall have the meaning set forth in Section 6.3(d).

"**Industry Standards**" shall mean those standards of care and diligence normally practiced by a majority of solar engineering, construction and installation firms in performing services of a similar nature in jurisdictions in which the Work will be performed and in accordance with good engineering design practices, Applicable Permits, and other standards established for such Work.

"**Interconnection Agreement**" shall mean the interconnection agreement in a form approved by the Utility and providing for connection of the System to the Utility's electrical distribution system.

"**Parties**" means each of Client and Contractor.

"**Party**" means either Client or Contractor.

"**Performance Tests**" means, the tests of the System, as more particularly described in Exhibit B.

"**Person**" shall mean any individual, corporation, partnership, company, joint venture, association, trust, unincorporated organization or Governmental Authority.

"**Projected Substantial Completion Date**" means the date on which Contractor reasonably believes it will achieve Substantial Completion.

"**Receiving Party**" shall have the meaning set forth in Section 7.7.

"**Representatives**" shall mean the Contractor Representative and the Client Representative and each may individually be referred to as a "Representative".

"**Retention**" shall have the meaning set forth in Section 3.2(b).

"**Retention Cap**" shall have the meaning set forth in Section 3.2(b).

"**Site**" shall have the meaning set forth in the first recital, and is more fully described in Exhibit I hereto.

"**Subcontractor**" shall mean any Person, other than Contractor and Suppliers, retained by Contractor to perform any portion of the Work (including any Subcontractor of any tier) in furtherance of Contractor's obligations under this Agreement.

"**Substantial Completion**" shall mean satisfaction or waiver of all of the conditions set forth in Section 4.1(c).

"**Substantial Completion Date**" shall mean the actual date on which the Substantial Completion of the System, as defined in Section 4.1(c), has occurred.

"**Substantial Completion Notice**" shall mean the written notice, attached hereto as Exhibit J, provided by Contractor notifying Client of the achievement of Substantial Completion.

"**Suppliers**" shall mean those Equipment suppliers with which Contractor contracts to build the System.

"**System**" shall have the meaning ascribed in the Recitals to this Agreement.

"**Technical Dispute**" shall have the meaning set forth in Section 7.5(b).

6/6/2013
Version 1
ACTIVE 20807152v2

CONFIDENTIAL

EXHIBIT A

# MARTIFER
## SOLAR

"**Utility**" shall mean the local electric distribution owner and operator providing electric distribution and interconnection services to the System.

"**Warranty**" shall mean the warranty of Contractor set forth on Exhibit H.

"**Work**" shall mean all obligations, duties, and responsibilities assigned to or undertaken by Contractor and described in Exhibit C with respect to the System.

2. ## CONTRACTOR'S OBLIGATIONS

2.1 ### The Work

(a)     Contractor shall perform the Work in accordance with the description thereof in Exhibit C. Contractor shall perform all Work in accordance with Industry Standards, Applicable Law and Applicable Permits.

(b)     Contractor shall perform engineering and design services, using qualified architects, engineers and other professionals selected and paid for by Contractor, in each case as are necessary to prepare all Contract Documents and submit the Contract Documents to Client for its review and approval, provided that approval by the Client shall not excuse the Contractor from performance of any of its duties under this Agreement.

(c)     Contractor shall obtain, and shall file on a timely basis any documents reasonably required to obtain, the Contractor Acquired Permits. Client shall pay for all taxes, fees and costs required of Contractor in order to obtain such Contractor Acquired Permits. Client shall file any documents required to obtain any necessary Applicable Permits and obtain all such Applicable Permits except the Contractor Acquired Permits. Client, at its expense, shall file any documents required to obtain all Applicable Permits other than Contractor Acquired Permits on a timely basis. Client shall pay for all taxes, fees and costs required of Client in order to obtain the Applicable Permits for which Client is responsible under this Section 2.2(c). In particular, Client represents and warrants to Contractor that Client has obtained, or will timely obtain, all permits, licenses and other authorizations which may be required to commence and complete the construction of the System other than Contractor Acquired Permits.

(d)     Contractor, at its expense, shall purchase, transport, deliver, inspect to the extent it deems necessary, and construct and install all Equipment reasonably necessary or useful in order to complete the System. Contractor shall use its reasonable best efforts to maintain standard manufacturer's and supplier's warranties for the Equipment and to cause such warranties to be pass-through or freely assignable to Client, to the extent such warranties are freely assignable. With respect to the System, Contractor shall assign to Client all of Contractor's right, title and interest in each component of the System upon delivery thereof to the Site. In addition, upon Substantial Completion of the System, Contractor shall assign to Client all related manufacturer's and/or supplier's warranties, to the extent that such warranties are freely assignable. To the extent that any the validity or effect of any manufacturer or supplier warranty is diminished, reduced or eliminated though no material fault of Contractor, including, without limitation, if such diminishment, reduction, or elimination is caused by the filing of a petition for bankruptcy relief by such manufacturer or supplier, Contractor shall have no liability to warrant, replace, or repair, or remedy any failed component provided by such supplier or manufacturer and shall have no other liability to Client as a result of the same.

(e)     Contractor shall construct the System, and perform the Performance Tests for the System. Client shall provide such electricity and consumables as may be required to carry out the Performance Tests. The Contractor's technical personnel (or, when applicable the installer and/or manufacturer's personnel, with Contractor's supervision) shall operate the System during the Performance Tests, although Client (and Client's personnel) shall be entitled to be present during any Performance Test. Any third party entrusted with the supervision, oversight or quality control of Contractor shall be entitled to observe the Performance Tests. Contractor shall provide Client with at least seven (7) days written notice of the commencement of each Performance Test at Substantial Completion in order to permit Client's Representative to coordinate attendance and observation of the Performance Tests.

(i)     If the results of the Performance Test can be obtained at the Site immediately following the performance of the Performance Test and the Performance Test has been completed successfully, Client's Representative and Contractor's Representative shall execute the relevant certificate including the results achieved in the Performance Test. If the results of the Performance Test

6/6/2013
Version 1
ACTIVE 20807152v2

CONFIDENTIAL

EXHIBIT A

# MARTIFER
## SOLAR

cannot be obtained at the Site immediately following the performance of the Performance Test, Contractor shall promptly submit the relevant certificate containing the results of such Performance Test to Client's Representative as soon as practicable. Client's Representative shall promptly review such certificate and the results set forth therein and shall determine whether the Performance Test has been successfully completed within five (5) business days following receipt of such certificate.

(ii)    If the System fails to satisfy any Performance Test, Client's Representative and Contractor's Representative shall execute the relevant certificate including the results achieved in the relevant Performance Test. Contractor shall repeat the Performance Test one or several times before Substantial Completion of the System. Contractor shall take all corrective actions so that the System may successfully complete the Performance Tests, without prejudice to Client's rights and remedies in accordance with this Agreement.

(iii)    If any Dispute regarding the Performance Tests arises, Contractor or Client may submit the Dispute to an independent expert in accordance with Section 7.5(b). The determination by the independent expert contemplated in Section 7.5(b) shall be binding on Client and Contractor and, therefore, the relevant Performance Test shall be deemed approved or disapproved, as applicable, for all the purposes contemplated in this Agreement.

(f)    After Final Completion, Contractor shall remove debris, Equipment and surplus materials from the Site and leave the Site in "broom clean" condition.

(g)    Client shall be solely responsible for soliciting and obtaining any subsidies, rebates or other incentives that may be available from any Governmental Authority pursuant to or in connection with the purchase or operation of the System or otherwise, and Contractor makes no representation or warranty to Client as to the availability of any of such subsidies, rebates or incentives. Contractor shall provide Client reasonable assistance in obtaining such subsidies, rebates or incentives; however, in the event that Client fails to qualify for any such subsidies, rebates or incentives, Client is still liable to Contractor for the entire contract price. IN NO CASE SHALL CONTRACTOR HAVE ANY LIABILITY TO CLIENT FOR ANY INABILITY OR FAILURE BY CLIENT OR ANY OF ITS INVESTORS TO OBTAIN ANY OR ALL OF THE BENEFIT OF ANY INVESTMENT TAX CREDIT OR DEPRECIATION.

(h)    Contractor shall provide Client's personnel with up to one (1) day of on-site operation and maintenance training in respect of the System. Client's personnel shall have the qualifications necessary to perform their activities and will be hired by Client.

(j)    Contractor shall deliver Client an owner's manual, operator's manual and as-built drawings for the System no later than thirty (30) days after Substantial Completion occurs. For the avoidance of doubt, the as-built drawings shall be included in the punch list items contemplated in Section 4.1(c)(v).

(k)    Scheduling of training will be coordinated between Contractor and Client; provided that the operation and maintenance manuals and such training will be provided within the thirty (30) days following the Substantial Completion Date.

**2.2   Exclusions**

Contractor shall not be obligated to, and shall not, perform any work or activity beyond the scope of the Work, as defined in this Agreement. In particular, the following shall not be included in the Work and therefore shall be performed by Client:

(a)    Client shall provide the Site for the Work and continuous and suitable access thereto so that Contractor may gain access to the Site to perform the Work as soon as any necessary work permits, licenses and authorizations are obtained;

(b)    Client shall select its own personnel so that such personnel is present at the Performance Tests prior to the date of Substantial Completion and entry into commercial operation;

(c)    Client shall be responsible for hiring any third party entrusted with the supervision, oversight or quality control of Contractor;

Page 5

CONFIDENTIAL

EXHIBIT A

**MARTIFER**
SOLAR

(d) Client shall obtain every necessary Applicable Permit, except for the Contractor Acquired Permits; provided, however, that Client shall pay for all fees related to any permits, licenses or authorizations and costs incurred (except for the costs of Contractor's personnel and the costs of any third parties subcontracted by Contractor to prosecute the Contractor Acquired Permits) in order to obtain any Applicable Permits, including the Contractor Acquired Permits;

(e) Client shall be solely responsible for securing and paying for all asset management services relating to the System and Contractor shall not be liable for the provision of any such services; and

(f) Contractor shall not be responsible for any environmental liabilities relating to the Site, except for such pollution, toxic emissions, and other Hazardous Materials as are caused by Contractor; provided, however, that Contractor shall be required to comply with all applicable environmental laws and regulations during construction of the System without prejudice to the provisions of Section 2.16.

**2.3    Changes and Extra Work**

(a) Without invalidating this Agreement, Client may initiate a change in the Work on the System by advising Contractor in writing of the change believed to be necessary. As soon as practicable after notice, Contractor shall prepare and forward to Client in writing the price for the extra or changed Work in accordance with Exhibit C and any required adjustment to the Construction Schedule or any other term or condition of this Agreement. Except for minor modifications in the Work not involving extra cost and not inconsistent with the purposes of the Work, and except in an emergency endangering life or property, all authorized extra Work or changes, and the agreed to price, shall be confirmed through a Change Order to this Agreement. No change or extra Work shall be effective without a Change Order accepted in writing by Contractor. The price provided by Contractor for a proposed change in the Work shall include all costs associated with performing the extra Work or changes, including the impact on the Work, inefficiencies created by the extra Work or changes, and overhead associated with the extra Work or changes. If Contractor reasonably determines that the proposed change of Work is unfeasible or otherwise impracticable, Contractor may, in its sole discretion, decline to undertake such change in Work.

(b) All extra Work and changes shall be performed in accordance with the provisions and conditions of this Agreement, except as provided in the Change Order.

(c) If Contractor's price or time adjustment is not accepted, Contractor shall provide Client Representative with the details of and backup for its price or time estimate. If the Parties fail to agree on a price, and except to the extent the Contractor declines to undertake such change of work pursuant to Section 2.4(a), Client Representative may authorize the extra or changed Work to be performed on a time and material basis in accordance with the rates specified in Exhibit E.

(d) Contractor may propose Change Orders to Client if those Change Orders improve the System or are otherwise advisable for the Work. Client will not be required to accept such a proposal.

(e) Any changes to the System or the Work required by any Governmental Authority as a condition to issue an Applicable Permit shall entitle Contractor to request a Change Order in accordance with this Section 2.4.

**2.4    Protective Measures**

(a) Contractor shall be responsible for all injury or damage to individuals or property that may occur as a result of its fault or negligence or that of its Subcontractors in connection with the performance of the Work. Contractor shall be responsible for the proper care and protection of all Equipment and materials furnished by Contractor and the Work performed until Final Completion of the Work.

(b) Contractor shall take all reasonably necessary precautions for the safety of its employees on the relevant part of the Site where the System is located and reasonably act to prevent accidents or injury to individuals on, about, or adjacent to the premises where the Work is being performed.

(c) Contractor shall keep the relevant part of the Site where the System is located and surrounding areas free from accumulation of waste materials or rubbish caused by the Work, and upon Final Completion, shall remove from the relevant part of the Site where the System is located all waste materials, rubbish, tools, Equipment, machinery and surplus materials.

**2.5    Unanticipated Conditions**

6/6/2013
Version 1
ACTIVE 20807152v2

CONFIDENTIAL

EXHIBIT A

**MARTIFER**
SOLAR

If Contractor discovers or becomes aware of existing site conditions or other considerations which would preclude Contractor from installing the proposed system, (such conditions include, but are not limited to the ability of the structure to support the System, current structural loading capacity of the proposed installation location, toxic or other hazardous materials, flooding considerations, the presence of rare or endangered species, permitting and/or zoning requirements, and liens or other legal considerations), then Contractor will notify Client of such conditions and the costs associated with correcting such conditions. Contractor shall request a Change Order in accordance with Section 2.4. In no case shall Contractor be under any obligation to install the System if the Parties cannot come to mutually agreeable terms to resolve the unanticipated conditions.

**2.6    Labor**

Contractor shall use reasonable efforts to minimize the risk of labor-related delays or disruption of the progress of the Work. Contractor shall promptly take any and all reasonable steps that may be available in connection with the resolution of violations of collective bargaining agreements or labor jurisdictional disputes. Contractor shall advise Client promptly in writing of any actual or threatened labor dispute of which Contractor has knowledge that might materially affect the performance of the Work by Contractor or by any of its Subcontractors. Notwithstanding the foregoing, the settlement of strikes, walkouts, lockouts or other labor disputes shall be at the discretion of the Party having the difficulty.

**2.7    Insurance**

(a)    Contractor, at its expense, shall procure or cause to be procured and maintain or cause to be maintained in full force and effect at all times commencing no later than commencement of the work at the Site and until Final Completion, insurance coverages as specified in Part I of Exhibit G, which are agreed by the Parties to be sufficient for construction of the System. All insurance coverage shall be in accordance with the terms of this Section 2.8 and Part I of Exhibit G.

(b)    Client, at Client's expense, shall procure or cause to be procured and maintain or cause to be maintained in full force and effect at all times during the period commencing no later than commencement of the work at the Site and until Final Completion, all insurance coverages specified in Part II of Exhibit G. All insurance coverages shall be in accordance with this Section 2.8 and Part II of Exhibit G. Subject to the prior agreement of the Parties, Client may elect to include such insurance coverages, at Client's cost and responsibility, under Contractor's insurance policies under Section 2.8(a) above.

(c)    The insurance policy limits set forth herein shall in no way be construed as limits on the Parties' liability under this Agreement, subject to the provisions of Section 6.3(e).

(d)    The beneficiaries of the insurance policies shall be Client, Contractor and the Subcontractors that may be affected by the risks insured. The insurance policies shall permit Client to assign its rights thereunder to third parties at no cost.

(e)    Each Party shall provide the other Party with executed copies of the insurance policies and with evidence that the premiums have been paid not later than thirty (30) days following the Effective Date.

**2.8    Performance of the Work**

(a)    Contractor agrees to use, and agrees that it shall require each of its Subcontractors to use, only personnel who to Contractor's knowledge are qualified and properly trained and who possess every license, permit, registration, certificate or other approval required by Applicable Law or any Governmental Authority to enable such Persons to perform their Work involving any part of Contractor's obligations under this Agreement.

(b)    Contractor agrees that all materials and Equipment to be supplied or used by Contractor or its Subcontractors in the performance of its obligations under this Agreement shall be in good condition and fit for the use(s) for which they are employed by Contractor or its Subcontractors. Such materials and Equipment shall at all times be maintained, inspected and operated as required by Applicable Law. Contractor further agrees that all licenses, permits, registrations and certificates or other approvals required by Applicable Law or any Governmental Authority will be procured and maintained for such materials and Equipment at all times during the use of the same by Contractor or its Subcontractors in the performance of any of Contractor's obligations under this Agreement.

6/6/2013
Version 1
ACTIVE 20807152v2

CONFIDENTIAL

EXHIBIT A

**ARTIFER**
OLAR

2.9    **Hazardous Materials**

(a)    Subject to Section 2.16(a), Contractor hereby specifically agrees to indemnify, defend and hold Client, its present and future direct or indirect parents, subsidiaries, Affiliates, divisions, and their respective directors, officers, employees, shareholders, agents, representatives, successors and assigns harmless from and against any and all losses, liabilities, claims, demands, damages, causes of action, fines, penalties, costs and expenses (including, but not limited to, all reasonable consulting, engineering, attorneys' or other professional fees), that they may incur or suffer by reason of:

(i)    Any unauthorized release of a Hazardous Material by Contractor;

(ii)    Any enforcement or compliance proceeding commenced by or in the name of any Governmental Authority because of an alleged, threatened or actual violation of any Applicable Law by Contractor; and

(iii)    Any action reasonably necessary to abate, remediate or prevent a violation or threatened violation of any Applicable Law by Contractor.

(b)    Client hereby specifically agrees to indemnify, defend and hold Contractor, its present and future direct or indirect parents, subsidiaries, affiliates, divisions, and their respective directors, officers, employees, shareholders, agents, representatives, successors and assigns harmless from and against any and all losses, liabilities, claims, demands, damages, causes of action, fines, penalties, costs and expenses (including, but not limited to, all reasonable consulting, engineering, attorneys' or other professional fees), that they may incur or suffer by reason of:

(i)    Any unauthorized release of a Hazardous Material by Client;

(ii)    Any enforcement or compliance proceeding commenced by or in the name of any Governmental Authority because of an alleged, threatened or actual violation of any Applicable Law by Client; and

(iii)    Any action reasonably necessary to abate, remediate or prevent a violation or threatened violation of any Applicable Law by Client.

2.10    **Suspension of the Work**

(a)    Contractor may, in its sole discretion, suspend the Work temporarily if Client fails to make any payment within ten (10) days after the date on which such payment is required to be made hereunder. To the extent Contractor elects to suspend the Work pursuant to this provision, Contractor shall be entitled to (i) an automatic extension of the deadlines of this Agreement for the same period of the suspension, and (ii) the reimbursement of the additional costs and expenses, if any, incurred and substantiated by Contractor in protecting, securing or insuring the Work, and in resumption of the Work. If a suspension of the Work continues for more than two (2) months, Contractor shall be entitled to terminate this Agreement and Client shall remain liable for all costs, expenses, and work provided or performed prior to such cancellation. Contractor shall not be liable for any adverse consequences resulting from a suspension elected pursuant to this provision.

(b)    In the event that the Work is totally or partially suspended by reason of an order from a Governmental Authority, the Party that has caused the issuance of such order (whether by reason of an act, omission or default) shall bear all the damages, costs and expenses caused by the suspension, subject to the limitations provided under Section 6.3(e) of this Agreement. If the suspension is not due to an act, omission or default of any of the Parties, then the deadlines of this Agreement shall be automatically extended for the same period of the suspension, or for such other period that Contractor deems reasonable in view of the circumstances, and Client shall assume any costs arising under the effects of the suspension on the obligations of the Parties under this Agreement. Notwithstanding the occurrence or continuation of any Force Majeure Event, the provisions of this Section 2.11(b) shall apply.

(c)    After the resumption of the performance of the Work, Contractor shall, after due notice to Client, examine the Work affected by the suspension. Contractor shall make good any defect, deterioration or loss of the construction or the Work affected that may have occurred during the suspension period. Costs properly incurred by Contractor (including mobilization costs, insurance fees and others) shall be added to the

6/6/2013
Version 1
ACTIVE 20807152v2

CONFIDENTIAL

EXHIBIT A

# MARTIFER
## SOLAR

Contract Price, so long as the suspension did not arise due to any act, omission or default on the part of Contractor.

**2.11    Title; Risk of Loss**

(a)    From the Effective Date and until the date of Substantial Completion, and subject to Sections 2.12(b) and 2.12(c), Contractor assumes risk of loss and full responsibility for the cost of replacing or repairing any damage to the System and all materials, Equipment, supplies and maintenance equipment (including temporary materials, equipment and supplies) that are purchased by Contractor for permanent installation in or for use during construction of the System subject to Section 2.12(c).

(b)    Client shall bear the risk of loss and full responsibility in respect of the System from and after the date of Substantial Completion of the System, and if any component of the System is lost or damaged for whatever reason, then Contractor shall restore or rebuild any such loss or damage and complete the Work in accordance with this Agreement at the sole cost and expense of Client.

(c)    Notwithstanding anything herein to the contrary, Client shall bear the risk of loss and full responsibility for the cost of replacing or repairing any damage to the System and all materials, Equipment, supplies and maintenance equipment (including temporary materials, equipment and supplies) that are purchased by Contractor or Client for permanent installation in or for use during construction of the System to the extent caused by the negligent, grossly negligent or willful acts of Client or its agents, employees or representatives.

(d)    Title to all materials, Equipment, supplies and maintenance equipment (including temporary materials, equipment and supplies) that are purchased by Contractor or Client for permanent installation in or for use during construction of the System shall pass to the Client upon the earliest to occur of (a) delivery of goods to the Site or (b) payment for such property by the Client.

**2.12    Workmanship Warranty**

(a)    Contractor shall guarantee the workmanship for the system for Ten (10) years following the Final Completion date. This warranty only applies to labor provided by Contractor or its subcontractors. Contractor's warranty hereunder shall be the warranty, as set forth in Exhibit H, and, except as set forth in such Exhibit, Contractor does not make (and hereby expressly disclaims) any other warranties of any kind whatsoever. If labor shall prove defective within the time period set forth in this paragraph, Contractor will make repairs at its own cost and expense. Contractor expressly disclaims and does not warrant the components, parts, items or equipment of, or which compose or comprise, the System and shall not be responsible to repair, replace, or remedy any failure in the System resulting from failed equipment or components. Contractor shall not be liable for any defect or deficiency to the extent that the same results from the specific written direction of Client relating to the Work and/or the Systems; provided that any such defect or deficiency is not the result of Contractor's failure to properly implement the Work in accordance with this Agreement. The warranty will not include damage, malfunction, or degradation of electrical output cause by failure to properly operate or maintain the System in accordance with printed instructions provided with the system. The warranty will not include damage, malfunction, or degradation of electrical output caused by any repair or replacement using a part or service not provided or authorized in writing by the Contractor. The warranty will not include damage, malfunction, or degradation of electrical output resulting from Client or third party abuse, accident, alteration, improper use, negligence or vandalism, or from earthquake, fire, flood, or other acts of God. The scope of such warranty will not include the warranty statements provided under the warranties referenced in Section 2.13(b) below.

(b)    Contractor will provide Client with copies of pass-through warranties provided by photovoltaic module and inverter Suppliers for the benefit of Client.

(c)    Without limitation of any of the foregoing, Contractor expressly acknowledges that should the roof of the Site where the System is to be installed be damaged as a result of actions taken by Contractor, its agents, or subcontractors during the course of construction, Contractor shall liable for the repair and remedy of such damage. Thereafter, for a period terminating two years after the completion of construction of the System, Contractor shall remedy and repair any roof leaks reasonably determined to be caused by the attachment points of the System.

Page 9

**MARTIFER**
SOLAR

**2.13**    Taxes

In addition to the Contract Price, Client assumes exclusive liability for and shall pay before delinquency all federal, state or local sales, use, value added, excise and other taxes, charges or contributions imposed on, or with respect to, or measured by the matters contemplated by this Agreement other than income taxes; provided, however, that Contractor assumes exclusive liability for sales tax on materials. Provided that the conditions of indemnification set forth in Section 6.3 are satisfied, Client shall hold harmless, indemnify and defend Contractor, together with any and all its officers, directors, agents and employees from any liability, penalty, interest and expense by reason of Client's failure to pay such taxes, charges or contributions. Contractor and Client shall cooperate with each other to minimize the tax liability of both Parties to the extent legally permissible.

**2.14**    Liens

(a)    Contractor warrants good title, free and clear of all liens, claims, charges, security interests, and encumbrances whatsoever, to all Equipment and other items furnished by it or any of its Subcontractors that become part of the System to the extent payment therefor has been received by Contractor.

(b)    Client's title to all Equipment shall be free and clear of all liens, claims, charges, security interests, and encumbrances whatsoever, upon the payment therefor to the Contractor.

**2.15**    Compliance with Applicable Laws

(a)    Contractor specifically agrees that it shall at all times fully comply with Applicable Laws and that it shall perform the Work in accordance with the Applicable Laws. Notwithstanding the foregoing, Contractor shall not be responsible for any environmental liabilities relating to the relevant part of the Site where the System is located, except for such pollution, toxic emissions and other Hazardous Materials as are caused by Contractor during construction of the System; provided, however, that Contractor shall be required to comply with all applicable environmental laws and regulations during construction of the System. If any Hazardous Materials are found in the Site (other than hazardous materials introduced by Contractor), the removal shall be at the cost of Client.

(b)    Client specifically agrees that in the performance of its obligations under this Agreement it shall at all times fully comply with Applicable Laws. Client further specifically agrees that at all times during its performance of this Agreement it shall have and keep in effect all Client Acquired Permits.

**2.16**    Subcontractors and Suppliers

(a)    Contractor shall at all times be responsible for the acts and omissions of Subcontractors. Contractor shall be responsible for performance of all the Work, whether performed by Contractor or its Subcontractors. Client shall not undertake any obligation to pay or to be responsible for the payment of any sums to any Subcontractor.

(b)    Subject to meeting the warranty requirements described in Section 2.13(b), Client accepts that the System may be built with photovoltaic modules provided by one of the following pre-approved Suppliers, the selection of which shall be left to the sole discretion of Contractor:

- Jinko
- ET Solar
- Talesun
- SunPower
- Hanwha Solarone
- Trina Solar
- TopSun
- Renesola
- REC
- CSUN
- Tianwei
- Schuco

6/6/2013
Version 1
ACTIVE 20807152v2

CONFIDENTIAL

EXHIBIT A

**MARTIFER**
SOLAR

- Kyocera
- SolarWorld
- Canadian Solar
- Mitsubishi

(c)   Subject to meeting the warranty requirements described in Section 2.13(b), Client agrees that the System may be built with the following inverter equipment, the selection of which shall be left to the sole discretion of Contractor:

Supplier: Solectria

Model Number: SGI-500

(d)   Contractor may, in its sole reasonable discretion and so long as the equipment selected does not have a material adverse impact on the System, vary the equipment described in Section 2.17(b) to equipment provided by one of the following pre-approved Suppliers:

- Solectica
- Advanced Energy
- SMA
- Xantrex
- Fronius
- Ingeteam
- Solectria
- PowerOne (ABB)
- Power Electronics

## 3.   PRICE AND PAYMENT

### 3.1   Contract Price

(a)   As full compensation for the Work and all of Contractor's obligations hereunder Client shall pay to Contractor One Million Four Hundred Eighty Three Thousand, Four Hundred and Thirty Four Dollars and Sixty Four cents ($1,483,434.64).  The Contract Price (or portion thereof, as applicable) shall only be changed (i) by Change Orders approved prior to Substantial Completion in accordance with Section 2.4 or Section 7.5 or (ii) for price adjustments made prior to Substantial Completion to the extent that the cost of materials required for the System increases following execution of this Agreement, but only in the event of an unanticipated delay in the Work with respect to the System, which delay is beyond the reasonable control of the Contractor and lasts for at least thirty (30) days.  The Contract Price shall be paid in accordance with Section 3.2.

(b)   Except as otherwise set forth herein, the Contract Price is firm and fixed and not subject to any variation or price adjustments (downward or upward) in this Agreement and includes all expenses to be incurred by Contractor including, but not limited to, design, engineering, Equipment and materials, erection, commissioning and Performance Tests, inclusive of cost of travel and lodging expenses and the Contractor Acquired Permits, related to Contractor's performance of its obligations under this Agreement. The Contract Price does not include any fees or expenses related to any Applicable Permits (except as otherwise provided in Section 2.3(d)), which fees and expenses shall be paid by Client.

### 3.2   Payment and Payment Method

(a)   Client shall pay to Contractor the Contract Price in accordance with Exhibit E.

(b)   Retention: With the exception of the first milestone payment, which shall be payable in full upon Client's execution of this Agreement, Client shall pay ninety five percent (90%) of each subsequent payment when such payment is due. The aggregate of the remaining ten percent (10%) of each milestone payment of the Contract Price (the "Retention") shall be due and payable no later than fifteen (15) days after Final Completion; provided, however, that at no time shall the total Retention retained exceed $118,674.77 in the aggregate ("Retention Cap"). While the Retention Cap is reached, Client shall pay 100% of each newly invoiced payment when due.

6/6/2013
Version 1
ACTIVE 20807152v2

CONFIDENTIAL

EXHIBIT A

# MARTIFER
## SOLAR

(c) Invoices shall be sent by facsimile or email with confirmation of receipt, and Client must receive the invoice and, if applicable, the attached documentation, on the same date of delivery by Contractor.

(d) If Contractor does not receive payment of all sums due from Client on the date due, Client shall pay to Contractor an additional sum of one percent (1%) of the amounts due as a late charge. Such late charge will be immediately due and payable as of the first day following the date due. The Parties agree that this late charge represents a fair and reasonable estimate of the cost Contractor will incur by reason of Client's late payment and shall not be construed as a penalty. Accepting any late charge shall not waive Client's default with respect to the overdue amount or prevent Contractor from exercising any other rights or remedies available to Contractor. In addition to the late charge, Client shall pay interest at the rate of twelve percent (12%) per annum, or the highest rate allowable by law, whichever is less, on amounts not paid within five (5) business days after the date such sums become due.

(e) Client shall be responsible and liable for any and all fees incurred by Contractor in connection with, or arising from, Contractor's receipt of any payment from Client hereunder, provided that the fee incurred by Contractor exceeds 2.5% of the payment amount; in such case, Client shall be liable for payment of that portion of the fee that exceeds 2.5% of the payment amount.

## 4. COMMENCEMENT & COMPLETION

### 4.1 Commencement and Substantial Completion

(a) Contractor shall perform the Work in accordance with Exhibit A.

(b) The Projected Substantial Completion Date is set forth on Exhibit A. Contractor may claim, or be entitled by right to, a justified extension of the Substantial Completion Date if it is or will be delayed in completing the Work for one or more of the following causes:

    (i) Change Orders agreed pursuant to this Agreement;

    (ii) Breach of this Agreement or of a statutory duty owed to Contractor by Client;

    (iii) Suspension of the Work pursuant to Section 2.11; or

    (iv) A Force Majeure Event.

(c) The following are conditions precedent to Substantial Completion:

    (i) The System is mechanically, electrically, and structurally constructed in accordance with this Agreement, the Work and Industry Standards, except for non-critical punch list items;

    (ii) The grid connection for the System are mechanically, electrically and functionally complete and capable of interconnection with the local utility;

    (iii) Commissioning according to procedures set forth in Exhibit F is completed successfully and the corresponding certificates are duly signed by Client's Representative, the Contractor's Representative; and

    (iv) Client and Contractor shall have agreed on the punch list items.

When Contractor reasonably believes it has achieved Substantial Completion, Contractor shall give Client written notice, attached hereto as Exhibit J, certifying that all of the conditions of Substantial Completion have been satisfied. Client (i) may visit the Site and review the applicable data and documentation in order to confirm that such System has achieved Substantial Completion and (ii) if the Client is satisfied that such System has achieved Substantial Completion, deliver to Contractor a written confirmation to such effect; such written confirmation shall not be unreasonably withheld. Failure of Client to provide written notice of rejection of the Substantial Completion Notice within ten (10) business days shall constitute acceptance of the Substantial Completion Notice. Any dispute between Client and Contractor with respect to the achievement of Substantial Completion as contemplated by this Section 4.1(c) shall be resolved in accordance with Section 7.5(b). Contractor in any event shall not be obligated to commence any Performance Test and shall not be obligated to turn on any System unless and until either (i) Client shall

6/6/2013
Version 1
ACTIVE 20807152v2

CONFIDENTIAL

EXHIBIT A

# MARTIFER
## SOLAR

have paid the Contract Price for the System as provided in Section 3.2 or (ii) this Agreement has been terminated in accordance with Section 6.

(d)    All punch list items shall be completed no later than sixty (60) Days after Substantial Completion, provided however that Contractor's completion of such punch list items shall not be delayed as a result of actions or events beyond Contractor's control. Failure of Contractor to fulfill this obligation shall entitle Client to complete the pending works on its own and charge the Contractor for the duly justified costs, subject to proof.

(e)    Substantial Completion shall not be withheld for failure to obtain any Applicable Permits, other than Applicable Permits required for the initial operation of the Systems and other than Contractor Acquired Permits.

### 4.2    Final Completion

Final Completion of the System shall be deemed to have occurred only if:

(a)    All punch list items contemplated in Section 4.1(c)(v) have been completed or waived;

(b)    Commissioning according to procedures set forth in Exhibit F is completed successfully and the corresponding certificates are duly signed by Client's Representative, the Contractor's Representative;

(c)    All manuals, drawings and other documents expressly required to be delivered by Contractor hereunder have been delivered to Client;

(d)    All final Lien waivers have been obtained.

Upon Final Completion, Contractor shall submit to Client a written final completion certificate, attached hereto as Exhibit K, certifying that all of the foregoing conditions have been satisfied. Client shall, within ten (10) business days after the receipt by Client of such written certificate, execute and return an acknowledgment of such certificate if Contractor has achieved Final Completion; such acknowledgment shall not be unreasonably withheld. Execution of the acknowledgment or failure of Client to provide written notice of Contractor's failure to achieve Final Completion within ten (10) business days shall constitute acceptance of the Contractor's final completion certificate.

### 4.3    Inspection

All Work performed by Contractor and all Equipment shall be subject to inspection by Client, but such right of inspection of the Work or Equipment shall not relieve Contractor of responsibility for the proper performance of the Work or Equipment to the extent provided under this Agreement. Contractor shall provide to Client or Client's designee access to Contractor's facility or facilities where the Work is being performed upon reasonable prior notice (at least forty-eight (48) hours), during business hours, and subject to compliance with Contractor's safety rules and policies. Client shall ensure that the inspections and Performance Tests do not affect the normal performance of this Agreement.

## 5.    REPRESENTATIONS & WARRANTIES

### 5.1    Representations and Warranties of Contractor

Contractor represents and warrants to Client that:

(a)    Contractor is a corporation, duly organized, validly existing, and in good standing under the laws of the State of California, and has full power to engage in the business it presently conducts and contemplates conducting, and is and will be duly licensed or qualified and in good standing under the laws of the State of California and in each other jurisdiction wherein the nature of the business transacted by it makes such licensing or qualification necessary and where the failure to be licensed or qualified would have a material adverse effect on its ability to perform its obligations hereunder.

(b)    Contractor has (either directly or through its Subcontractors) all the required authority, ability, skills, experience and capacity necessary to perform and shall diligently perform the Work in a timely and professional manner, utilizing sound engineering principles, project management procedures, construction procedures and supervisory procedures, all in accordance with Industry Standards. Contractor has (either directly or through its Subcontractors) the experience and skills necessary to determine, and Contractor has reasonably determined, that Contractor can perform the Work for the Contract Price.

6/6/2013
Version 1
ACTIVE 20807152\2

CONFIDENTIAL

EXHIBIT A

**MARTIFER**
SOLAR

(c)    The execution, delivery and performance by Contractor of this Agreement will not (i) violate or conflict with any covenant, agreement or understanding to which it is a party or by which it or any of its properties or assets is bound or affected, or its organizational documents or (ii) subject the System or any component part thereof to any lien other than as contemplated or permitted by this Agreement.

(d)    There are no actions, suits, proceedings, patent or license infringements or investigations pending or, to Contractor's knowledge, threatened against it before any court or arbitrator that individually or in the aggregate could result in any materially adverse effect on the business, properties or assets or the condition, financial or otherwise, of Contractor or in any impairment of its ability to perform its obligations under this Agreement.

(e)    All goods, services, equipment, parts, and materials furnished in connection with the Work related to the System are new, unused and undamaged at the time of delivery to the relevant Site.

(f)    The individual executing this Agreement on behalf of Contractor is duly authorized to execute and deliver this Agreement on behalf of Contractor and this Agreement is binding upon Contractor in accordance with its terms.

**5.2**    **Representations and Warranties of Client**

Client represents and warrants to Contractor that:

(a)    Client is a Limited liability company duly formed and validly existing under the laws of the State of California and has full legal capacity and standing to pursue its corporate purpose (including the capacity to dispose of and encumber all of its assets) and full power to engage in the business it presently conducts and contemplates conducting, and is and will be duly licensed or qualified and in good standing under the laws of each jurisdiction wherein the nature of the business transacted by it makes such licensing or qualification necessary and where the failure to be licensed or qualified would have a material adverse effect on its ability to perform its obligations hereunder.

(b)    The execution, delivery and performance by Client of this Agreement will not (i) violate or conflict with any covenant, agreement or understanding to which it is a party or by which it or any of its properties or assets is bound or affected, or its organizational documents or (ii) subject the System or any component part thereof or the Site or any portion thereof to any lien other than as contemplated or permitted by this Agreement.

(c)    There are no actions, suits, proceedings, patent or license infringements or investigations pending or, to Client's knowledge, threatened against it before any court or arbitrator that individually or in the aggregate could result in any materially adverse effect on the business, properties or assets or the condition, financial or otherwise, of Client or in any impairment of its ability to perform its obligations under this Agreement.

(d)    Client has, and will have, available all the funds that are necessary from time to time to pay Contractor the Contract Price.

(e)    The individual executing this Agreement on behalf of Client is duly authorized to execute and deliver this Agreement on behalf of Client and this Agreement is binding upon Client in accordance with its terms.

**6.**    **BREACH & TERMINATION**

**6.1**    **Termination by Client**

(a)    Contractor agrees that Client shall be entitled to terminate this Agreement upon the occurrence of any of the following circumstances:

     (i)    Contractor abandons the entire Work without just cause for more than thirty (30) days or fails to commence the Work without just cause for within thirty (30) days after the Effective Date, or

     (ii)    Contractor violates in any material respect any of the provisions of this Agreement, which violation remains uncured for thirty (30) days following Contractor's receipt of written notice thereof from Client.

6/6/2013
Version I
ACTIVE 20807152v2

CONFIDENTIAL

EXHIBIT A

**MARTIFER**
SOLAR

(b) Upon the occurrence of any of the foregoing, Client may instruct Contractor to discontinue all or any part of the Work, and Contractor shall thereupon discontinue the Work of such parts thereof. Client shall thereupon have the right to continue and complete the Work or any part thereof, by contract or otherwise. Upon the occurrence of any of the circumstances contemplated in Sections 6.1(a)(i), 6.1(a)(ii) and 6.1(a)(iii), Contractor shall be liable to Client, unless otherwise contemplated herein, for any and all damage and excess cost incurred by Client in completing the Work. Likewise, Client shall be liable to Contractor for all costs and expenses incurred by Contractor in reasonably and adequately performing under this Agreement prior to Client's termination of this Agreement.

(c) The remedies in this Section 6.1 shall be inclusive and additional to any other remedies that may be available under Applicable Law, and no action by Client shall constitute a waiver of any such right or remedy.

**6.2    Termination by Contractor**

Without limiting the provisions of Section 7.5, Client agrees that if: (a) Client or Guarantor shall become bankrupt or insolvent, without the written authorization of Contractor; (b) Client violates in any material respect any of the provisions of this Agreement, which violation remains uncured for thirty (30) days following Client's receipt of written notice thereof from Contractor; (c) Guarantor breaches or fails to perform under the Guaranty Agreement; (d) any of the representations provided by Guarantor in the Guaranty Agreement are found to be materially false; or, (e) the force of effect of the Guaranty Agreement is materially and adversely affected; then Client shall be in breach and Contractor shall have all rights and remedies that may be available under Applicable Law against Client with respect thereto, including without limitation the right to suspend performance of the Work, to terminate this Agreement, and/or to require Client to immediately post payment bonds.

**6.3    Indemnity**

(a) Subject to Section 2.8, Contractor shall fully indemnify, save harmless and defend Client from and against costs, claims, and expenses incurred by Client in connection with or arising from any claim by a third party for physical damage to or physical destruction of property, or death of or bodily injury to any person, but only to the extent caused by (a) the negligence, gross negligence or willful misconduct of Contractor or its agents or employees or others under Contractor's control or (b) a breach by Contractor of its obligations hereunder.

(b) Subject to Section 2.8, Client shall fully indemnify, save harmless and defend Contractor from and against any and all costs, claims, and expenses incurred by Contractor in connection with or arising from any claim by a third party for physical damage to or physical destruction of property, or death of or bodily injury to any person, but only to the extent caused by (a) the negligence, gross negligence or willful misconduct of Client or its agents or employees or others under Client's control or (b) a breach by Client of its obligations hereunder.

(c) Each Party shall indemnify, defend and hold the other Party, and its present and future direct and indirect parents, subsidiaries and Affiliates and their directors, officers, shareholders, employees, agents and representatives harmless from and against any and all claims, actions, suits, proceedings, losses, liabilities, penalties, damages, costs or expenses (including attorneys' fees and disbursements) of any kind whatsoever arising from (a) actual or alleged infringement or misappropriation by such Party (or in the case of Contractor, any Subcontractor) of any patent, copyright, trade secret, trademark, service mark, trade name, or other intellectual property right in connection with the System, including without limitation, any deliverable, (b) such Party's (and in the case of Contractor, any Subcontractor's) violation of any third-party license to use intellectual property in connection with the Work, including, without limitation, any deliverable.

(d) If any claim is brought against a Party (the "Indemnifying Party"), then the other Party (the "Indemnified Party") shall be entitled to participate in, and, unless in the opinion of counsel for the Indemnifying Party a conflict of interest between the Parties may exist with respect to such claim, assume the defense of such claim, with counsel reasonably acceptable to the Indemnifying Party. If the Indemnifying Party does not assume the defense of the Indemnified Party, or if a conflict precludes the Indemnified Party from assuming the defense, then the Indemnifying Party shall reimburse the Indemnified Party on a monthly basis for the Indemnified Party's defense through separate counsel of the Indemnified Party's choice. Even

Page 15

**MARTIFER**
SOLAR

if the Indemnifying Party assumes the defense of the Indemnified Party with acceptable counsel, the Indemnified Party, at its sole option, may participate in the defense, at its own expense, with counsel of its own choice without relieving the Indemnifying Party of any of its obligations hereunder.

(e)    IN NO CIRCUMSTANCES SHALL THE CONTRACTOR OR CLIENT OR ANY OF THEIR RESPECTIVE OFFICERS, MEMBERS OR EMPLOYEES BE LIABLE FOR PUNITIVE, CONSEQUENTIAL OR EXEMPLARY DAMAGES OF ANY NATURE INCLUDING, BUT NOT LIMITED TO, DAMAGES FOR LOST PROFITS OR REVENUES OR THE LOSS OR USE OF SUCH PROFITS OR REVENUE, LOSS BY REASON OF PLANT SHUTDOWN OR INABILITY TO OPERATE AT RATED CAPACITY, INCREASED OPERATING EXPENSES OF PLANT OR EQUIPMENT, INCREASED COSTS OF PURCHASING OR PROVIDING EQUIPMENT, MATERIALS, LABOR, SERVICES, COSTS OF REPLACEMENT POWER OR CAPITAL, DEBT SERVICE FEES OR PENALTIES, INVENTORY OR USE CHARGES, DAMAGES TO REPUTATION, DAMAGES FOR LOST OPPORTUNITIES, OR CLAIMS OF ANY OF THE PROJECT COMPANIES' CUSTOMERS, MEMBERS OR AFFILIATES, REGARDLESS OF WHETHER SAID CLAIM IS BASED UPON CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR OTHER THEORY OF LAW. IN ADDITION, WHETHER AN ACTION OR CLAIM IS BASED ON WARRANTY, CONTRACT, TORT OR OTHERWISE, UNDER NO CIRCUMSTANCE SHALL THE INDEMNIFYING PARTY'S TOTAL LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT EXCEED $1,000,000, MINUS THE AGGREGATE AMOUNT OF ANY PENALTIES PAID BY THE INDEMNIFYING PARTY UNDER THIS AGREEMENT.    THE LIMITATIONS IN THIS SECTION 6.3(e) SHALL NOT APPLY IN THE CASE OF (A) THE GROSS NEGLIGENCE, FRAUD OR WILLFUL MISCONDUCT OF CONTRACTOR OR CLIENT OR (B) ANY INDEMNITY CLAIMS AGAINST CONTRACTOR OR CLIENT RESULTING FROM A CLAIM BY A THIRD PARTY FOR INJURY TO PERSON OR PROPERTY.

7.    **MISCELLANEOUS**

7.1    **Representatives**

(a)    Client Representative.  Client designates, and Contractor agrees to accept, Rishi Kapadia as Client Representative for all matters relating to Contractor's performance of the Work (except for the execution of the certificates approving any Performance Test contemplated in Section 2.2(e)).  The actions taken by Client Representative regarding such performance shall be deemed the acts of Client and shall be fully binding for Client.  Client may, upon written notice to Contractor, pursuant to Section 7.6 hereof, change the designated Client Representative.

(b)    Contractor Representative.  Contractor designates, and Client agrees to accept, David Sanders as Contractor Representative for all matters relating to Contractor's performance under this Agreement.  The actions taken by Contractor Representative shall be deemed the acts of Contractor.  Contractor may, upon written notice to Client, pursuant to Section 7.6 hereof, change the designated Contractor Representative.

(c)    Power of Representatives.  The Parties shall vest their Representatives with sufficient powers to enable them to assume the obligations and exercise the rights of Contractor or Client, as applicable, under this Agreement.

(d)    Notices to Representative.  Notwithstanding Sections 7.1(a) and 7.1(b), all amendments, Change Orders, notices and other communications between Contractor and Client contemplated herein shall be delivered in writing and otherwise in accordance with Section 7.6.

7.2    **Ownership of Plans, Data, Reports and Material**

(a)    Subject to Sections 7.2(c) and 7.7, Contract Documents developed by Contractor under this Agreement shall immediately become the property of Client when prepared and shall be delivered to Client upon completion of the Work; provided that nothing in the foregoing shall impair, alter or otherwise affect Contractor's proprietary rights in its patents, products or other intellectual property or prejudice the rights of Contractor derived from Section 7.2.

(b)    Any additional inventions or intellectual property created during construction shall be owned by Contractor.

Page 16

6/6/2013
Version 1
ACTIVE 20807152v2

CONFIDENTIAL

EXHIBIT A

**MARTIFER**
SOLAR

(c)    Contractor further agrees to grant and hereby grants to Client an irrevocable, non-exclusive, royalty-free license under all patents, copyrights and other proprietary information of Contractor related to the Work now or hereafter owned or controlled by Contractor to the extent reasonably necessary for the operation, maintenance or repair of the System or any subsystem or component thereof designed, specified, or constructed by Contractor under this Agreement.  No other license in such patents and proprietary information is granted pursuant to this Agreement.

**7.3    Governing Law**

The formation, interpretation and performance of this Agreement shall be governed by and construed in accordance with the laws of the State of California.

**7.4    Force Majeure**

Contractor shall promptly notify Client in writing of any delay or anticipated delay in Contractor's performance of this Agreement due to a Force Majeure Event, and the reason for and anticipated length of the delay.  If reasonably feasible, Contractor shall deliver such notice within three business days of Contractor's becoming aware of such delay.  Contractor shall be excused for any delays or defaults in the performance of its obligations under this Agreement that are the result of a Force Majeure Event.  Contractor shall be entitled to a reasonable extension of time for delays due to a Force Majeure Event; provided that any Force Majeure Event that prevents performance, or is reasonably expected to prevent performance, for more than ninety (90) days shall entitle the Contractor and Client to terminate this Agreement; provided, further, that any Work done or materials furnished by Contracts in restoring or rebuilding the System will be paid for by Client as extra Work pursuant to Section 2.4.  Any modification to the Construction Schedule pursuant to this Section 7.4 shall be documented by a written Change Order to this Agreement.

**7.5    Dispute Resolution**

(a)    Good faith negotiations.  In the event that any question, dispute, difference or claim arises out of or in connection with this Agreement, including any question regarding its existence, validity, performance or termination (a "Dispute"), which either Party has notified to the other, senior management personnel from both Contractor and Client shall meet and diligently attempt in good faith to resolve the Dispute for a period of thirty (30) days following one Party's written request to the other Party for such a meeting.  If, however, either Party refuses or fails to so meet, or the Dispute is not resolved by negotiation, the provisions of Sections 7.5(b) and 7.5(c) shall apply.

(b)    Technical Dispute. Technical Disputes shall be resolved by an independent expert. For the purposes of this Agreement, a "Technical Dispute" shall mean a Dispute regarding whether the System conforms to the technical specifications, whether the relevant part of the Site where the System is located meets the required site characteristics, whether the Performance Tests contemplated by the System commissioning plan (Exhibit F) have been satisfied, and any other Disputes of a technical or engineering nature.  All Technical Disputes shall be resolved on an accelerated basis by one of the following institutions unless otherwise agreed in writing by Contractor and Client; to the extent that Contractor and Client cannot agree to the selection of an expert, Contractor and Client shall each select an independent expert and those two experts shall jointly select a single third party expert to resolve the dispute:

(i)    Sandia National Laboratories;

(ii)    National Renewable Energy Laboratories; and

(iii)    Black and Veatch, LLP.

(c)    Submission to Jurisdiction. Each Party hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Superior Court of the State of California sitting in the county of Los Angeles and of the United States District Court of the Central District of California, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the Parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such California State or, to the extent permitted by law, in such Federal court.

6/6/2013
Version 1
ACTIVE 20807152v2

EXHIBIT A

CONFIDENTIAL

**MARTIFER**
SOLAR

(d)    Waiver of Venue. Each Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in Section 7.5(c). Each of the Parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(e)    Service of Process. Each Party hereby irrevocably consents and agrees to the service of any and all legal process, summons, notices and documents out of any of the aforementioned courts in any such suit, action or proceeding, which service may be made by mailing copies thereof by registered or certified mail, postage prepaid, at the address set forth in Section 7.6 or at such other address as such Party has later specified in writing (the Parties agree that such service will become effective five (5) Business Days after such mailing). Each Party hereby agrees that service upon it, or any of its agents, in each case in accordance with this Section 7.5(e), shall constitute valid and effective personal service upon such Party, and each Party hereby agrees that the failure of any of its agents to give any notice of such service to any such Party shall not impair or affect in any way the validity of such service on such Party or any judgment rendered in any action or proceeding based thereon. Nothing herein shall affect the right of any Party to service of process in any other manner permitted by Applicable Law or to commence legal proceedings or to proceed against any other Party in any jurisdiction other than that specified above.

(f)    Waiver of Immunity. To the extent that any Party has or hereafter may acquire any immunity from jurisdiction of any of the above-named courts or from any legal process therein, with respect to itself or its property, such Party hereby irrevocably waives, to the extent permitted by Applicable Law, such immunity, and each Party hereby irrevocably waives, to the extent permitted by Applicable Law, and agrees not to assert, by way of motion, as a defense, or otherwise, in any legal action or proceeding brought hereunder in any of the above-named courts, (i) that it or any of its property is immune from the above described legal process or (ii) that such action or proceeding is brought in an inconvenient forum, that venue for the action or proceeding is improper or that this Agreement or any other transaction or document related to this Agreement may not be enforced in or by such courts.

(g)    Waiver of Jury Trial. EACH PARTY HEREBY IRREVOCABLY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION IN ANY COURT IN ANY JURISDICTION BASED UPON OR ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER TRANSACTION OR DOCUMENT RELATED TO THIS AGREEMENT.

**7.6    Notices and Demands**

Any notice, request, demand or other communication required or permitted under this Agreement, shall be deemed to be properly given by the sender and received by the addressee if made in writing and (a) if personally delivered; (b) three (3) days after deposit in the mail if mailed by certified or registered air mail, post prepaid, with a return receipt requested; or (c) if sent by facsimile with confirmation. Mailed notices and facsimile notices shall be addressed as follows to:

Client:

CHATSMOUTH, LLC
11062 Winnetka Avenue
Chatsworth, CA 91311
Attention: Rishi Kapadia
Phone: 818.230.7609
Facsimile: 818.368.0816
Email: rishi@trkdt.com

Contractor:

MARTIFER SOLAR USA, INC.
2040 Armacost Avenue
Second Floor
Los Angeles, CA 90025
Attention: Legal Department
Phone: 310.820.7080
Facsimile: 310.820.7090
Email: legal@martifersolarusa.com

**7.7    Nondisclosure**

Whichever Party receives confidential information (the "Receiving Party") from the other Party (the "Disclosing Party") shall not use for any purpose other than performing the Work under this Agreement or divulge, disclose, produce, publish, or permit access to, without the prior written consent of the Disclosing Party, any such information of the Disclosing Party. Confidential information includes, without limitation, this Agreement and exhibits hereto, all information or materials prepared in connection with the Work performed under this or any related subsequent

Page 18

6/6/2013
Version 1
ACTIVE 20807152v2

CONFIDENTIAL

# MARTIFER
## SOLAR

Agreement, designs, drawings, specifications, techniques, models, data, documentation, source code, object code, diagrams, flow charts, research, development, processes, procedures, know-how, manufacturing, development or marketing techniques and materials, development or marketing timetables, strategies and development plans, customer, supplier or personnel names and other information related to customers, suppliers or personnel, pricing policies and financial information, and other information of a similar nature, whether or not reduced to writing or other tangible form, and any other trade secrets. Confidential information does not include (a) information known to the Receiving Party prior to obtaining the same from the Disclosing Party; (b) information in the public domain at the time of disclosure by the Receiving Party; or (c) information obtained by the Receiving Party from a third party who did not receive same, directly or indirectly, from the Disclosing Party. The Receiving Party shall use the higher of the standard of care that the Receiving Party uses to preserve its own confidential information or a reasonable standard of care to prevent unauthorized use or disclosure of such confidential information. Notwithstanding anything herein to the contrary, the Receiving Party has the right to disclose Confidential Information without the prior written consent of the Disclosing Party: (i) as required by any court or other Governmental Authority, or by any stock exchange upon which the shares of any Party are listed, (ii) as otherwise required by law, (iii) as advisable or required in connection with any government or regulatory filings, including without limitation, filings with any regulating authorities covering the relevant financial markets, (iv) to its attorneys, accountants, financial advisors or other agents, in each case bound by confidentiality obligations, (v) to banks, investors and other financing sources and their advisors, in each case bound by confidentiality obligations; or (vi) in connection with an actual or prospective merger or acquisition or similar transaction where the party receiving the Confidential Information is bound by confidentiality obligations. If a Receiving Party believes that it will be compelled by a court or other Governmental Authority to disclose confidential information of the Disclosing Party, it shall give the Disclosing Party prompt written notice, and in all cases not less than five (5) business days notice in advance of disclosure, so that the Disclosing Party may determine whether to take steps to oppose such disclosure.

**7.8**    **Time of Essence**

Time is expressly agreed to be of the essence of this Agreement and each, every and all of the terms, conditions and provisions herein.

**7.9**    **Validity**

The provisions contained in each section, subsection and clause of this Agreement shall be enforceable independently of each of the others and their validity shall not be affected if any of the others are invalid. If any of those provisions is void but would be valid if some part of the provision were deleted, the provision in question shall apply with such modification as may be necessary to make it valid. The Parties shall, if necessary, negotiate in good faith and make any necessary amendments to ensure the enforceable terms of this Agreement reflect the true intent of the Parties as of the date of execution of this Agreement.

**7.10**    **Survival**

Any provisions in this Agreement that, by their terms, are intended to survive termination, including, without limitation, representations and warranties, provisions pertaining to indemnification, confidentiality, and dispute resolution, shall survive the expiration or earlier termination of this Agreement.

**7.11**    **Binding Effect**

This Agreement shall be binding on the Parties hereto and on their respective permitted successors, heirs and assigns.

**7.12**    **Execution Time Limit**

This contract is valid for execution until June 11, 2013 at 5:00 p.m. prevailing Pacific Time.

**7.13**    **No Oral Modifications**

No oral or written amendment or modification of this Agreement by any officer, agent or employee of Contractor or Client, either before or after execution of this Agreement, shall be of any force or effect unless such amendment or modification is in writing and is signed by any officer of the Party (or of the managing member or managing partner of the Party on behalf of the Party) to be bound thereby.

**7.14**    **Headings**

6/6/2013
Version 1
ACTIVE 20807152v2

CONFIDENTIAL

EXHIBIT A

**MARTIFER**
SOLAR

The headings in this Agreement are for convenience of reference only and the words contained therein shall in no way be held to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this Agreement.

**7.15** **Counterparts**

This Agreement may be executed in counterparts which, taken together, shall constitute a single instrument.

**7.16** **Announcements and Publications**

Contractor shall coordinate with Client with respect to, and provide advance copies to Client for review of, the text of any proposed announcements or publications that include any non-public information concerning the Work prior to the dissemination thereof to the public or to any Person other than Subcontractors or advisors of Contractor, in each case, who agree to keep such information confidential. If Client delivers written notice to Contractor rejecting any such proposed announcement or publication within two (2) business days after receiving such advance copies, the Contractor shall not make such public announcement or publication; provided, however, that Contractor may disseminate or release such information in response to requirements of Governmental Authority.

**7.17** **Complete Agreement**

This Agreement constitutes the complete and entire Agreement between the Parties and supersedes any previous communications, representations or Agreements, whether oral or written, with respect to the subject matter hereof. There are no additions to, or deletions from, or changes in, any of the provisions hereof, and no understandings, representations or Agreements concerning any of the same, which are not expressed herein, unless stated below. THE PARTIES HEREBY AGREE THAT NO TRADE USAGE, PRIOR COURSE OF DEALING OR COURSE OF PERFORMANCE UNDER THIS AGREEMENT SHALL BE A PART OF THIS AGREEMENT OR SHALL BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT.

**7.18** **No Agency**

This Agreement is not intended, and shall not be construed, to create any association, joint venture, agency relationship or partnership between the Parties or to impose any such obligation or liability upon either Party. Neither Party shall have any right, power or authority to enter into any agreement or undertaking for, or act as or be an agent or representative of, or otherwise bind, the other Party.

**7.19** **Priority of Documents**

In the event of conflicting provisions between any of the Contract Documents, the provisions shall govern in the following priority: first, duly executed amendments to this Agreement (to the extent not superseded by a subsequent amendment), second, this Agreement and third, the other Contract Documents.

**7.20** **Assignment**

(a)   Except as set forth in Section 7.19(b), no Party shall be entitled to assign this Agreement or any of its rights or obligations under this Agreement, nor shall it enter into any transaction as a result of which it may transfer, assign, charge or dispose by any title of any of those rights and obligations, without the prior written consent of the other Party, which may be withheld in its sole and absolute discretion.

(b)   Notwithstanding the foregoing, (i) Client shall be entitled to assign its right, title and interest in and to this Agreement (and, in particular, any rights arising in relation to any insurance policy and any other right to collect any amount from Contractor) to any lenders by way of security for the performance of obligations to such lenders without the consent of the Contractor; and (ii) Contractor shall be entitled to assign its right, obligation, title and interest in and to this Agreement to any of its affiliates or in connection with a merger or acquisition of Contractor.

**7.21** **Underground Utilities**

Contractor is not responsible for damage to any underground utility including but not limited to electric, sewer, gas, or cable lines.

**7.22** **Goodwill and Publicity**

Page 20

# MARTIFER
## SOLAR

Neither Party shall use the name, trade name, service mark, or trademark of the other Party in any promotional or advertising material without the prior written consent of such other Party. The Parties shall coordinate and cooperate with each other when making public announcements related to the execution and existence of this Agreement and the installation and operation of the System, and each Party shall have the right to promptly review, comment upon, and approve any publicity materials, press releases, or other public statements by the other Party that refer to, or that describe any aspect of, this Agreement or the System; provided that no such publicity releases or other public statements (except for filings or other statements or releases as may be required by, or cannot be proscribed by Applicable Law), shall be made by either Party without the prior written consent of the other Party. At no time shall a Party acquire any rights whatsoever to any trademark, trade name, service mark, logo or other intellectual property right belonging to the other Party without an express written agreement with respect thereto.

7.23    **No Waiver**

No provision of this Agreement shall be considered waived by either Party except when such waiver is made in writing. The failure of either Party to insist, on one or more occasions, upon strict performance of any of the provisions of this Agreement or to take advantage of its rights hereunder or the delay or failure in exercising totally or partially any right or remedy under this Agreement, shall not be construed as a waiver of any such provisions or the relinquishment of any such rights or any other rights for the future, but the same shall continue and remain in full force and effect.

7.24    **Estoppel**

Either Party hereto, without charge, at any time and from time to time, within five (5) business days after receipt of a written request by the other party hereto, shall deliver a written instrument, duly executed, certifying to such requesting party, or any other person, firm or corporation specified by such requesting party:

(a)     That this Agreement is unmodified and in full force and effect, or if there has been any modification, that the same is in full force and effect as so modified, and identifying any such modification, and that Contractor affirms its obligation to complete the Facility consistent with the specifications in this Agreement; and

(b)     Whether or not to the knowledge of any such party there are then existing any offsets or defenses in favor of such party against enforcement of any of the terms, covenants and conditions of this Agreement and, if so, specifying the same and also whether or not to the knowledge of such party the other party has observed and performed all of the terms, covenants and conditions on its part to be observed and performed, and if not, specifying the same.

**[Signature Page Follows]**

6/6/2013
Version 1
ACTIVE 20807152v2

CONFIDENTIAL

EXHIBIT A

# MARTIFER
SOLAR

IN WITNESS WHEREOF, the Parties have executed this Engineering, Procurement and Construction Agreement as of the date set forth above.

**CLIENT:**

_Madhukar Kapadia_ ___6 / 6 / 2013___
Signature                                Date

Madhukar Kapadia, an individual in his capacity as Managing Member of Chatsmouth, LLC

**CONTRACTOR:**

_____  ___6/6/13___
Signature                                Date

**Roland Kiser**

**CEO**

Martifer Solar USA, Inc.

6/6/2013
Version 1
ACTIVE 20807152v2

Page 22

CONFIDENTIAL

EXHIBIT A

**MARTIFER**
SOLAR

**EXHIBIT C**
**SCOPE OF WORK**

1. Development Services

Martifer Solar USA will coordinate with LADWP for all development services required for the project, including:

- **Feasibility Screens:**
  - Utility feasibility screens

- **Interconnection:**
  - Interconnection application and agreements

- **Preliminary Engineering and Design:**
  - Site layout, array configuration, single line diagram, metering requirements, interconnection point verification, cost estimation and production calculations

The following services are believed to be not applicable to this project, are being handled by other parties, or are otherwise not included in the Development Services.

- Re-Zoning

- Land entitlement and parcel ownership verification

- Utility easements

- Site acquisition

- Roof lease

1.2    Engineering, Procurement and Construction (EPC) Services

- **Permits:** Permits for construction and commissioning of the solar array, including
  - Electrical
  - Building
  - Fire

- **System Layout and Design**
  - Racking layout (tilt, azimuth, row spacing)
  - Module layout, string sizing and color-coded string identification
  - Hourly production calculation using PVSyst
  - Combiner box placement
  - Re-combiner box placement (if applicable)
  - Inverter placement

ACTIVE 20807152v2 06/06/2013 1:57 PM

EXHIBIT A

# MARTIFER
## SOLAR

- AC switchgear placement at interconnection point

- Data acquisition system design

- Equipment pad details

- All trenching run specifications including length, width, depth, encasement and compaction requirements, conduit size, wire size and trench paths

- **Electrical Engineering**

  - Wet-stamped electrical plan-set meeting all applicable AHJ and code requirements

  - Electrical design optimization minimizing wire losses

  - Single-line diagram detailing all electrical characteristics of the system, including but not limited to:

    - Module strings, arrays and sub-arrays

    - Wiring

    - Combiner boxes

    - Re-combiners (if applicable)

    - Inverters

    - Transformers

    - AC electrical equipment (meter, disconnects, switches)

    - Data acquisition system (DAS)

    - Utility-required equipment (as specified)

- **Structural Engineering**

  - Structural engineering of racking, ballasts, and support structures for modules, inverters and other equipment, and any additional structural necessary to meet permitting and AHJ requirements

  - Wind and structural load analysis on existing roof framing

  - Wet-stamped structural drawings meeting all applicable AHJ and code requirements

- **Civil Engineering**

  - Civil engineering of foundations, trenching and other civil site work to meet permitting and AHJ requirements

  - Wet-stamped civil drawings meeting all applicable AHJ and code requirements

- **Underground Surveys (USA)**

  - Survey and identification of all underground utilities

- **Shading Analysis**

ACTIVE 20807152v2 06/06/2013 1:57 PM

EXHIBIT A

# MARTIFER
## SOLAR

- o   On-site shading analysis indicating areas which will be shaded at any time during the year

**Roofing Materials and Installation**

- **Roof Repairs**
  - o   Install an overlay cap sheet layer on areas not recently repaired by others
  - o   Install new insulation in damaged areas prone to ponding to match existing roof level and thickness

- **Anchor Installation**
  - o   Remove and discard existing cap-sheet
  - o   Install new insulation to match existing thickness
  - o   Apply primer directly to the ply substrate
  - o   Install anchors and ensure screws are aligned with existing roof framing
  - o   Install pipe flashing and solder to fit snug
  - o   Seal flashing with mastic, one ply of smooth APP, and reinstall new cap-sheet APP

**Mechanical and Electrical Materials and Installation**

- **Modules and Panelization**
  - o   Solar modules
  - o   Balance of Systems Components
    - ▪   String connectors (MC4 connectors or equivalent)
    - ▪   String fuses
    - ▪   DC disconnects
    - ▪   Raceways (including but not limited to conduit, wire trays, fittings, wire management systems)
    - ▪   Grounding hardware (lugs, wire)

- **Racking**
  - o   Solar racking
  - o   Ballast blocks
  - o   Seismic attachments
  - o   Roof protection pads (slip sheets)

- **AC and DC Electrical**

ACTIVE 20807152v2 06/06/2013 1:57 PM

EXHIBIT A

# MARTIFER
## SOLAR

- o  Inverters

- o  Data acquisition system

- o  Weather station

- o  DC Multiple disconnect safety switch (if applicable)

- o  AC switchgear

- o  Transformers

- o  Pull and junction boxes

- o  Combiner boxes

- o  AC disconnects

- o  DC wiring, wire management, and grounding from combiner boxes to inverter

- o  AC wiring, wire management, and grounding from inverter to interconnection point

- o  Raceways and raceway supports (including but not limited to conduit, wire trays, fittings, wire management systems)

- o  Aluminum and copper wire

- o  Grounding hardware (lugs, wire)

- o  Testing at the inverters

- o  Testing at the combiner boxes

- o  Testing at the AC switchgear

1.3    Civil Materials and Installation

- **Equipment Pads**

  - o  Poured concrete foundations and/or structural supports for equipment, including inverters, disconnects and switchgear

- **Trenching**

  - o  Excavation and backfill

  - o  All trenching to be done in accordance with applicable AHJ requirements, including minimum depth under roadways and non-roadways, and level of compaction

- **Conduit and Raceways**

  - o  Laying of conduit and raceways

ACTIVE 20807152v2 06/06/2013 1:57 PM

# MARTIFER
## SOLAR

- o   All conduit and raceways to be installed in accordance with applicable AHJ requirements, including minimum depth under roadways and non-roadways, level of compaction, concrete encasement, and spacing

**1.4**    Notes

- **Operations and Maintenance**
  - o   5-year fixed O&M services agreement with negotiable extension terms after expiration
  - o   A separate contract will be prepared for O&M services at the price indicated in the Exhibit

- **Production Calculations**
  - o   PVSyst modeling for 1st year and years 2-25 system production

- **Equipment Selection**

| Type | Brand* | Quantity |
|------|--------|----------|
| Solar Modules | Talesun | 2,123 |
| Racking | S:Flex | 1 Set |
| Inverters | Solectria | 1 |
| Switchgear | Eaton | 1 |
| Combiner Boxes | Teal | 8 |
| DAS | Also Energy | 1 Set |

*Martifer Solar USA to make final selection of equipment prior to construction start. All equipment will be Tier 1 and of similar quality.

EXHIBIT A

# MARTIFER
## SOLAR

I.    <u>Assumptions and clarifications</u>

We note the following Assumptions considered in this offer. These items pertain particularly to portions of the project where it will be necessary to work in conjunction with our client and its agents to gather additional information and maximize the benefits of the project. If awarded this contract, we will move quickly to coordinate the necessary resources and individuals to address each item to our client's satisfaction and present our recommendations.

Unless otherwise noted, the current price presented reflects the following assumptions and exclusions. If any of these items are required, Martifer Solar USA would be pleased to supply the required services at our client's request.

While inclusion of these items may affect the project's total financial returns, we do not expect this to materially affect the viability and lifetime benefit this project will deliver. We can discuss the potential impact of these items and the best course of action at our client's convenience.

1) **Access:** Site access through locked gate on northwest entrance of property will be provided by host each morning by 7am or host shall provide key to Martifer for duration of project.

2) **Bonding:** No bonding has been considered in this bid, including but not limited to performance, payment, warranty and bid bonding.

3) **Construction period finance:** Construction period finance has not been considered.

4) **Construction schedule:** Pricing assumes time is of the essence and that the Client/project is moving directly to LOI, contract, permitting and construction. New construction and/or forward pricing, unless otherwise indicated, must be approved by management. (The danger of the possibility of fluctuation in commodity prices can lead to increases in the price of steel, modules and other materials/components, and hedging may be required). Projects with an accelerated or truncated schedule may require additional fees to expedite engineering, permitting, construction and commissioning. Price is valid for 30 days.

5) **Construction schedule:** Work outside of normal business hours is not considered in this bid (it is assumed that the Client will provide access to the site and the surrounding area during normal business hours for completion of the installation).

6) **Cost of easements:** No costs of easements to the utility have been included.

7) **Data acquisition system:** Invoicing capabilities are not considered in this bid.

8) **Electrical service:** It is assumed that the electrical equipment present at the site can handle the proposed solar system without requiring any upgrades or modification and is code compliant. This includes, but is not limited to, items such as the utility transformer and upstream utility lines either contracted, built or under control of the interconnecting utility or Client.

9) **Insurance:** Any insurance requirements not already satisfied by Martifer Solar USA's current policies are not considered (current limits can be provided upon request) is assumed that only the following insurance will be required for this project: General Liability, Umbrella Liability, Auto Liability, Workers Compensation and Employers Liability.

10) **Interconnection allowance:** Interconnection allowance of $20,000 is included. Interconnection costs shall be received from LADWP and will be the sole responsibility of Client to cover all interconnection costs.

11) **Inverter Shelter:** Inverter shelters have not been included.

12) **Methane seals:** No methane seals allotted for in electrical conduit runs or equipment.

13) **Monitoring:** No string level monitoring or diagnostics.

14) **Permits:** Permit expeditor(s) are not considered in this bid.

15) **Reports, studies, and surveys:** This bid does not consider costs of reports, studies, or surveys including but not limited to the following: Environmental Impact Report (EIR), geotechnical report, soils report.

16) **Security:** Security measures such as locking / security bolts or anti-theft screws, motion sensors, cameras, fencing, lighting or security clearance etc. are not considered.

ACTIVE 20807152v2 06/06/2013 1:57 PM

EXHIBIT A

# MARTIFER
## SOLAR

17) **Site conditions:** Martifer Solar USA assumes no liability or responsibility for existing site conditions that would preclude us from installing the proposed solar system. Such conditions include but are not limited to toxic or other hazardous materials, flooding considerations, the presence of rare or endangered species, FAA regulations, and liens or other legal considerations.

18) **Staging:** This bid assumes that the back area of the warehouse can be utilized for storage / staging area and that all materials can be stored at site for at least ten (10) business days prior to use.

19) **System size:** Final system size and configuration will be determined upon thorough engineering and site analysis. System size proposed is an estimate based on the information provided by the client.

20) **Tree Trimming or Removal:** The client will be responsible for ensuring that existing trees are removed or trimmed prior to system commissioning to avoid shading of the PV array throughout the lifetime of the asset.

21) **Zoning:** Zoning, conditional use, site control, HOA guideline compliance, and any entitlement issues are not included.

EXHIBIT A

# MARTIFER
SOLAR

**EXHIBIT D**
**CONTRACT CHANGE REQUEST**

| | | |
|---|---|---|
| **DATE:** | **PROJECT NAME:** | **CHANGE ORDER #** |
| **PROJECT MANAGER:** | | **CONTRACT DATE:** |
| **REASON FOR CHANGE:** | | |

| Description | Cost |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total Cost of Changes:** | |

*Attach Additional Sheets if Necessary*

| CHANGE ORDER EFFECT ON COMPLETION DATES (Please check appropriate box) | |
|---|---|
| ☐ | This Change Order shall **NOT** affect the Dates of Substantial or Final Completion. |
| ☐ | This Change Order **WILL** affect Completion Dates. The Revised Dates are below. |
| | Substantial Completion: |
| | Final Completion: |

| REVISED CONTRACT AMOUNT | |
|---|---|
| ORIGINAL CONTRACT SUM | |
| COST OF PREVIOUS CHANGE ORDERS (IF ANY) | |
| PREVIOUSLY REVISED TOTAL | |
| COST OF CURRENT CHANGE ORDER | |
| REVISED CONTRACT SUM | |

| MARTIFER SOLAR USA, INC. APPROVALS | | | |
|---|---|---|---|
| CEO | | VP of Engineering | |
| CFO | | Regional VP of Operations | |

*NOTE: This change order will only be effective upon execution by Martifer Solar CEO or CFO.*

| CLIENT APPROVAL | |
|---|---|
| SIGNATURE | |
| PRINTED NAME | |
| TITLE | |
| DATE | |

Rev. 4.10.12

ACTIVE 20807152v2 06/06/2013 1:57 PM

EXHIBIT A



## EXHIBIT E

## PAYMENT SCHEDULE

| Milestone | Distribution to Martifer |
|---|---|
| Upon Execution of the Agreement | 20% |
| Receipt of Permits | 10% |
| Mobilization | 10% |
| Module Delivery to Site | 10% |
| Racking Delivery to Site | 10% |
| Panel Installation | 15% |
| Inverter Delivery to Site | 10% |
| Substantial Completion | 15% |
| Final Completion/CPS Sign-off | Retention |

### Schedule of Payments

Client shall pay Martifer the Contract price pursuant to the following milestones.

1.0  Upon Execution of the Agreement:
    1.1  Client shall have provided confirmation of site control.
    1.2  Engineering will only commence after receipt of all documents.
    1.3  Payment Amount: 20% Payment due immediately upon execution of the Agreement.

2.0  Receipt of Permits:
    2.1  Martifer shall complete the Engineering permit packet and obtain the Building Permit.
    2.2  Payment Amount: 10% Payment due 15 days from date of invoice.

3.0  Mobilization:
    3.1  A site survey will be carried out. Payment of the mobilization shall be paid upon deployment of roofers and / or mechanical installers to site.
    3.2  Payment Amount: 10% Payment due 15 days from date of invoice.

4.0  Module Delivery to the site:
    4.1  Payment shall be made upon receipt by Client of signed bills of lading for all modules delivered to the site.
    4.2  Payment Amount: 10% Payment due 15 days from date of invoice.

5.0  Racking delivered to site:
    5.1  Payment shall be made upon receipt by Client of signed bills of lading for all racking delivered to site.
    5.2  Payment Amount: 10% Payment due in 15 days from date of invoice.

6.0  Panelization Installation:
    6.1  All modules shall be physically mounted and attached to the racking
    6.2  Payment Amount: 15% Payment due in 15 days from date of invoice.

7.0  Inverter Delivery to the site:
    7.1  Payment shall be made upon receipt by Client of signed bills of lading for all inverters delivered to site.
    7.2  Payment Amount: 10% Payment due 15 days from date of invoice.

8.0  Substantial Completion:
    8.1  Payment shall be made up on Client acceptance of Substantial Completion.
    8.2  Payment Due: 15% Payment due in 15 days from date of invoice.

9.0  Final Completion:
    9.1  Completion of punch list items.
    9.2  Payment Amount: Retention Payment due 15 days from date of invoice.

# MARTIFER
## SOLAR

**EXHIBIT F**

**Substantial Completion Commissioning Plan for System**

| System | | |
|---|---|---|
| | Overall Site Condition | Inspect general condition of the Site.  Verify cleanliness of Site, structure, and tiles.  Confirm 'Danger' signage is erected and check security and safety features are in place. |
| | Installed Equipment | Verify that all equipment on construction drawings is installed per design documents and manufacturer's specifications. |
| | PV Mounting | Verify that all modules are properly placed, spaced and aligned.  Check for cracks and other defects in each module.  Verify that condition frames and clamps are in place.  Evaluate the potential degree of soiling that may occur, assess any shading issues, and review any clearance concerns and obstacles for the modules. |
| | Array Wiring | Check the grounding integrity, all wiring connections, and the wire condition. |

| Electrical | | |
|---|---|---|
| | Combiner Box and Terminal Boxes | Check for loose wires and conduit, door seals, fuses and all wiring connections.  Verify that the correct signage and labeling is in place. |
| | Inverter | Follow manufacturer start up and commissioning procedures. |
| | AC/DC Disconnect | Inspect each disconnect and ensure the proper positioning.  Also, check that the appropriate safety signage is in place. |

| Monitoring | | |
|---|---|---|
| | Data Acquisition System ("DAS") | Inspect the DAS logger and the phone line.  Verify that operational data is collected. |
| | Power Meter | Calibrate the DAS meter against utility grade monitor. |
| | Weather Station | Check functionality of meteorological sensors. |

| Testing | |
|---|---|
| | Test Open Circuit Voltage (All Strings) |
| | Test DC Amperage (All Strings) |

ACTIVE 20807152v2 06/06/2013 1:57 PM

EXHIBIT A

# MARTIFER
## SOLAR

**EXHIBIT G**

---

**INSURANCE**

**Part I:   Contractor shall secure and maintain the following insurance coverages:**

Commercial General Liability

Limits of Liability:

$2,000,000. General Aggregate

$2,000,000. Products/Completed Operations Aggregate

$1,000,000. Personal & Advertising Injury Limit

$1,000,000. Per Occurrence

Endorsements issued in favor to Client:

- Additional Insured
- Coverage afforded Client shall be Primary and non-contributing to any other insurance maintained by Client
- Thirty (30) days notice of cancellation, except ten (10) days for non-payment of premium.

Automobile Liability:

Limits of Liability:

$1,000,000. per accident

Workers' Compensation:

Limits of Liability:

Statutory

Employers' Liability:

Limits of Liability:

$1,000,000. per occurrence

Umbrella/Excess Liability:

$5,000,000. Aggregate

Excess over Primary Limits of Liability required for Commercial General Liability, Automobile Liability and Employers' Liability.

Professional Liability:

Limits of Liability:

$1,000,000. each claim

$2,000,000. aggregate

**Part II:  Client Insurance Requirements**

Upon substantial completion of the project Client shall procure and maintain comprehensive insurances appropriate for owners risks arising out of their ownership and operation of the System.

---

ACTIVE 20807152v2 06/06/2013 1:57 PM

EXHIBIT A