1  CARLYON LAW GROUP, PLLC
2  CANDACE C. CARLYON, ESQ.
   Nevada Bar No. 2666
3  ADAM P. BOWLER, ESQ.
   Nevada Bar No. 8383
4  3333 E. Serene Avenue, Suite 110
   Las Vegas, NV 89074
5  Telephone No. (702) 685-4444
6  Facsimile No.  (702) 471-7435
   Email: ccarlyon@ccarlyon.com
7
   *Counsel for Roland Kiser and Klaus Bernhart*
8
                **UNITED STATES BANKRUPTCY COURT**
9
                     **DISTRICT OF NEVADA**
10

| 11 | In re: | Case No.:  BK-S-14-10355-abl and BK-S-14-10357-abl |
| 12 | MARTIFER AURORA SOLAR, LLC a Nevada limited liability company, | Jointly administered under **Case No.:  BK-S-14-10355-abl** |
| 13 | _____Affects Martifer Aurora Solar, LLC | Chapter 11 |
| 14 | _____Affects Martifer Solar USA, Inc. <br> _X__Affects all Debtors | **MOTION FOR RELIEF FROM STAY TO PURSUE ALTERNATIVE DISPUTE RESOLUTION** |
| 15 | Debtors. | DATE:  June 4, 2014 |
| 16 | | TIME:  1:30 p.m. |

19

20      Roland Kiser ("Kiser" or "Mr. Kiser") and Klaus Bernhart ("Bernhart" or "Mr.

21  Bernhart" and, collectively with Mr. Kiser, "Movants") hereby move this Honorable Court

22  for an order granting relief from stay to permit the Officers to pursue resolution of their

23  disputes with the Debtors through mediation and, if unsuccessful, via binding arbitration,

24  pursuant to the agreement of the parties (the "Motion").  Movants do not seek to collect

25  amounts due absent further order of this Court; however, it is submitted that all other issues

26

27

28

1

relative to their claims should be determined via the alternative dispute resolution provisions of their agreements, the Federal Arbitration Act, and the legal authorities discussed below.

This Motion is made and based upon 11 U.S.C. section 362(d)(1), the Points and Authorities and Exhibits attached hereto, the Declaration of Roland Kiser filed herewith, the pleadings, papers and records on file or subsequently filed in the above-captioned case, and any evidence and oral argument which the Court may entertain at the time of the hearing of the Motion.

DATED this 7th day of May, 2004.

CARLYON LAW GROUP, PLLC


CANDACE CARLYON, ESQ.
Nevada Bar No. 2666
ADAM P. BOWLER, ESQ.
Nevada Bar No. 8383
3333 E. Serene Avenue, Suite 110
Las Vegas, Nevada 89074

*Counsel for Roland Kiser and Klaus Bernhart*

**POINTS AND AUTHORITIES**

**I.**

**BACKGROUND**

1.     On January 21, 2014, Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

2.     Debtors have continued and are operating and managing their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

3.      Pursuant to the Court's January 29, 2014 Order [Doc. No. 72[1]], the chapter 11 cases of the Debtors were administratively consolidated with the bankruptcy case of Martifer Aurora Solar, LLC ("Aurora"), case no. BK-14-10355-abl being designated as the lead case.

4.      On February 4, 2014, this Court entered an Order Designating Responsible Persons [Debtor Doc. No. 88; Aurora Doc. No. 90], appointing Mr. Kiser, Chief Executive Officer, and Mr. Bernhart, Chief Financial Officer, as the natural persons responsible for the duties and obligations of the Debtors in these Chapter 11 Cases.

5.      In November of 2012, Debtor engaged Mr. Kiser as its CFO.  A copy of a letter dated November 4, 2012 regarding Mr. Kiser employment as CFO is attached hereto as **"Exhibit 1"**, and authenticated by the Kiser Declaration.    Mr. Kiser was subsequently promoted to CEO.  A copy of a Mr. Kiser's "Executive Employment Agreement" regarding his position a CEO is attached hereto as **"Exhibit 2"**, and authenticated by the Kiser Declaration. Mr. Kiser has over 20 years of senior executive experience in the energy and financing sectors, including serving as the General Manager and Chief Operating Officer of HSH Nordbank where he spearheaded the startup of U.S. operations and facilitated the growth of HSH Nordbank's energy business to become a $6 billion leader in renewable energy financing, funding more than 4.5 GW (gigawatts) of wind and solar projects.  Mr. Kiser has also formerly served as the Chief Operating Officer of UBS Americas and the President and CEO of Kenyon Energy. See Doc. 15 at p. 17-18.

6.      Debtor entered into a "Consulting Agreement" with Mr. Bernhart in 2012, a copy of which is attached as is attached hereto as **"Exhibit 3"**, and authenticated by the Kiser

---

[1] Pursuant to LR 1015(h) and unless otherwise noted, docket references are to the Aurora docket.

Declaration.  Debtor engaged Mr. Bernhart as CFO of Debtor and as manager of Aurora.  A copy of a Mr. Bernhart's "Executive Employment Agreement" regarding his position as CFO is attached hereto as **"Exhibit 4"**[2], and authenticated by the Kiser Declaration.  Mr. Bernhart has over 35 years of international experience in U.S. and European commercial and investment banking. He has originated, structured, led, managed and syndicated in excess of $25 billion of global energy/renewable energy transactions. His experience includes serving as the Senior Executive Vice President, the General Manager, the Regional Head of the Americas and the Global Head of Energy at HSH Nordbank – where he positioned the bank as the top global financial institution in Renewable Energy.  Doc. No. 25 at pps. 2-3.

      7.    The Employment Agreements, drafted by the employer, each contain provisions providing for the arbitration of any disputes.  Each agreement provides:

> 12.    Mediation and Arbitration
>
> Executive and the Company agree that any and all disputes regarding this Agreement or Executive's employment with the Company will first be addressed in mediation before a mutually agreeable mediator, paid for by the company.  If the matter cannot be resolved in mediation, then the dispute will be resolved in binding arbitration administered by JAMS pursuant to its Employment Arbitration Rules then in effect.  The arbitration shall take place before an experienced JAMS employment arbitrator licensed to practice law in Los Angeles County mutually selected by the parties.  The arbitrator may not modify or change this Agreement in any way.  All out-of-pocket costs of the arbitration, including the fees of the arbitrator, the costs of any record or transcript of the arbitration, administrative fees, and other fees and costs shall be paid for by the Company. Each party shall initially be responsible for its own attorneys' fees, except that the arbitrator may award such fees and costs, exclusive of the arbitrator's fees, to the prevailing Party as set forth in Paragraph 13(b).  All procedural and substantive rights that the Executive and the Company would have in a court of law, will be extended to the parties in arbitration, including full discovery and all forms of relief.  The parties express acknowledge that they are waiving any right they may have to a jury trial for any and all claims covered by this Agreement.

---

[2]  Movants' employment agreements, including the indemnity agreements, are collectively referred to herein as the "Employment Agreements."

8.     Attached hereto as **"Exhibit 5"** is a copy of "Action by Unanimous Written Consent of the Board of Directors of Martifer Solar USA, INC., a California corporation", approving Mr. Kiser's "Executive Employment Agreement" and Mr. Bernhart's "Executive Employment Agreement" and authorizing Pedro Gomez Pereria to sign the same.

9.     The Employment Agreements also provide:

13(b)  Attorneys' Fees. In any action undertaken to enforce the terms of this Agreement, including arbitral proceedings, the prevailing party shall be reimbursed by the non-prevailing party's such prevailing party's reasonable attorneys' fees and expenses, including the costs of enforcing an arbitral award or a judgment.

10.     Mr. Bernhart and Mr. Kiser completed a restructuring assessment in January of 2013, and have implemented numerous measures to improve the financial viability of the Debtors.  See Doc. #15 at 18-20.

11.     The Employment Agreements each provide that:

This Employment Agreement is effective as of March 10, 2013 (the "Commencement Date"), and shall continue for a period of one year, until March 10, 2014, after which time continued employment shall be on an at-will basis, unless:
(a)     Executive's employment is terminated by either party in accordance with the provisions of Section 6 of this Agreement; or
(b)     Executive's term of employment is extended by a subsequent agreement duly executed by each of the parties to the Agreement, in which case such employment shall be subject to the terms and conditions contained in the subsequent written agreement.
(c)     In the event that Executive's employment with the company is not extended pursuant to a subsequent agreement, Company shall pay to Executive in a single lump sum payment on or before April 1, 2014, an amount equal to four (4) months' salary.

12.     The Employment Agreements also provide, at Section 4(b), for the payment of a restructuring bonus to Mr. Kiser of $75,000 and to Mr. Bernhart of $50,000, both of which were payable on March 10, 2014.

13.    The Employment Agreements also included Indemnity Agreements, true and correct copies of which are attached hereto as composite **"Exhibit 6"**.

14.    Pursuant to the Indemnity Agreements, Debtor, Martifer Solar USA, Inc., also agreed to be responsible for any and all costs and expenses, including attorneys' fees, incurred in connection with any "Claim"-defined to include any proceeding (*i.e.* this case).

15.    The Employment Agreements provided for Movants to have full authority to act as CEO and CFO of the Debtor, including, respectively, (as CEO) responsibility for all day to day operations and (as CFO) responsibility for the company's financial matters, including without limitation, internal and external reporting, controls, purchasing and payroll, banking activities, budget management, and supervision of the Company's finance team. The Employment Agreements also specify that Mr. Kiser reports Pedro Gomes Pereira on matters relating to strategy and direction of the Company, and that Mr. Bernhart reports to Mr. Kiser.

16.    In contravention of these provisions, on March 6, 2014, the Debtor engaged FTI Consulting to perform the services of a CEO and CFO, under the designation "Chief Restructuring Officer." See Amended Declaration of Michael Tucker... filed on March 18, 2014, at ¶¶5-9. In connection therewith, the Debtors requested, and by order entered on March 21, 2014, the Court approved, the designation of Michael Tucker as the responsible person for the Debtors, replacing Mr. Kiser and Mr. Bernhart as such designees. See Docket No. 498.

17.    On March 27, 2014, Debtors filed the Notice of Resignation of Klaus Bernhart and Roland Kiser [Doc 528].

18.    On April 15, 2014, Movants made a demand upon Debtors for payment for services rendered post-petition but not paid. Attached hereto as **"Exhibit 7"** is a copy of the April 15, 2014 correspondence.

19.     As reflected in Exhibit 7, Movants requested that, absent payment of the post-petition amounts due, Debtors agree to arbitration Movants' claims pursuant to the provisions of the Employment Agreements.

20.     Movants seek relief from stay to submit to mediation and arbitration if unsuccessful in their claims under their Employment Agreements.

## II.

## LEGAL AUTHORITY

### A.    *Standard for Granting Relief From Stay*

Pursuant to 11 U.S.C. Section 362(d)(1) the court shall grant relief from the stay for cause, including the lack of adequate protection of an interest in property.  The burden is on the Debtor in opposing such a request.  11 U.S.C. Section 362(g).

### B.     *The Arbitration Clause Should Be Enforced In This Non-Core Proceeding*

The Federal Arbitration Act ("FAA") provides, in pertinent part, that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA establishes a federal policy favoring arbitration. *See Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987).

In re Elec. Mach. Enterprises, Inc., 479 F.3d 791, 795 (11th Cir. 2007).  "[T]he Arbitration Act requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums."  Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 217 (1985).  Simply put, in core matters, there is a strong presumption in favor of enforcing arbitration agreements.  See, e.g., In re Jotan, Inc., 232 B.R. 503, 507 (Bankr. M.D. Fla. 1999).  In non-core matters, many jurisdictions hold that arbitration clauses must be enforced.

> In general, bankruptcy courts do not have the discretion to decline to enforce an arbitration agreement relating to a non-core proceeding. *See Crysen/Montenay Energy Co. v. Shell Oil Co. (In re Crysen/Montenay Energy Co.)*, 226 F.3d 160, 166 (2d Cir.2000). However, even if a proceeding is determined to be a core proceeding, the bankruptcy court must still analyze whether enforcing a valid arbitration agreement would inherently conflict with the underlying purposes of the Bankruptcy Code.

In re Elec. Mach. Enterprises, Inc., 479 F.3d 791, 796 (11th Cir. 2007). This was the holding of the Ninth Circuit Bankruptcy Appellate Panel in In re Gurga, 176 B.R. 196, 197 (9th Cir. BAP 1994). In Gurga, the BAP determined that the Federal Arbitration Act applies in bankruptcy proceedings, and compels adherence to an agreed upon arbitration provision to determine a contract dispute. 176 B.R. at 199-2003. The Ninth Circuit Bankruptcy Appellate Panel held that the bankruptcy court erred in refusing to enforce the arbitration clause contained in the prepetition agreement. In reversing the bankruptcy court, the BAP stated that there is nothing either explicit or inherent in the Bankruptcy Code excusing the Debtor from arbitration of noncore claims. Id. at 200. While the Ninth Circuit describes the core/non-core distinction as relevant, but not alone dispositive, the Ninth Circuit recognizes that "a bankruptcy court has discretion to decline to enforce an otherwise applicable arbitration provision only if arbitration would conflict with the underlying purposes of the Bankruptcy Code." In re Thorpe Insulation Co., 671 F.3d 1011, 1021 (9th Cir. 2012) cert. denied, 133 S. Ct. 119, 184 L. Ed. 2d 26 (U.S. 2012).

Like Gurga, the issue here involves contracts signed pre-petition containing binding arbitration clauses. The contracts arise under state law, and are clearly "non-core." This is in sharp contrast to the case presented in Thorpe, involving creation of an asbestos trust pursuant to Bankruptcy Code §544(g), or In re Eber, 687 F.3d 1123 (9th Cir. 2012) in which the crux of the dispute was the dischargeability of a fraud claim under Bankruptcy Code Section 523. As stated by the Ninth Circuit:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[P]roceedings [are] "non-core" "if they do not depend on the Bankruptcy Code for their existence and they could proceed in another court." *Id.* (internal citation omitted). In another articulation, we stated a core proceeding is one that "invokes a substantive right provided by title 11 or ... a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Gruntz v. County of L.A. (In re Gruntz),* 202 F.3d 1074, 1081 (9th Cir.2000) (internal quotation marks omitted).

In re Ray, 624 F.3d 1124, 1131 (9th Cir. 2010), quoting Dunmore v. United States, 358 F.3d 1107, 1114 (9th Cir.2004).  Clearly, the rights of the Movants under their employment contracts, governed by California law, fall squarely within the Ninth Circuit's definition of non-core claims.  Using the same test, the Third Circuit held that claims under a pre-petition employment contract were "non-core", and triggered the mandatory abstention provisions of 28 U.S.C. §1334.  The fact that the bankruptcy filing triggered the default was immaterial to that fact. "The fact that federal bankruptcy law is implicated as a defense to Stoe's claim, does not change the fact that Stoe's claim itself does not "arise under" title 11. The Bankruptcy Code did not create Stoe's cause of action." Stoe v. Flaherty, 436 F.3d 209, 217 (3d Cir. 2006).  Given the fact that this is a dispute as to state law claims arising under pre-petition employment contracts, it is submitted that the alternative dispute resolution provisions should be enforced.

**C.   *Even if This Court has Discretion, the Court Should Lift the Stay to Permit Arbitration.***

In a core proceeding, the Bankruptcy Court is generally vested with discretion as to whether to enforce an arbitration clause. See, e.g., In re Edgerton, 98 B.R. 392, 194 (Bankr. N.D. Ill. 1989).  In lifting the stay to permit arbitration, Judge DeWitt discussed several facts which led to her decision.  First, Judge DeWitt looked to the provisions of the Federal Arbitration Act, noting that an exception to the mandatory provisions of that Act were present

only if the policy behind the Arbitration Act is in direct conflict with another federal statute. Id. at 394. The court also noted the strong federal policy, enunciated by both Congress and the Supreme Court, in favor of enforcing arbitration agreements. Id. See also Southland Corp. v. Keating, 465 U.S. 1, 104 S. Ct. 852, 79 L. Ed. 2d 1 (1984) (Federal policy favors arbitration where the parties have agreed to it). In Edgerton, Judge DeWitt did not reach the issue of whether she had discretion to disregard the arbitration proceeding, holding that, even if she had such discretion, she would stay the bankruptcy adversary proceeding and lift the stay to permit the arbitration to go forward. 98 B.R. at 394.

Another case involving facts quite similar to the instant dispute is In re Statewide Realty Co., 159 B.R. 719 (Bankr. D.N.J. 1993). That case involved claims for rejection damages under a management contract which had been rejected by the Debtor under Section 365. The court found that, so long as there was no conflict with the Bankruptcy Code, the court had no discretion to refuse to send the matter to arbitration. See also In Re Beckemeyer, 206 B.R. 466, 467 (Bankr. W.D. Tenn. 1997)(court enforced the arbitration agreement, noting that the parties had freely agreed to arbitrate).

Here, several factors favor enforcement of the arbitration clauses. First is the Federal policy favoring enforcement of arbitration agreements. The court would be following the spirit of the Federal Arbitration Act if it enforced the pre-petition privately made arbitration agreement. See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, (1983). See Enron v. Public Utility Dist. No. 1 (In Re Enron), 364 B.R. 489, 511 ("'Federal policy favors arbitration as an alternate means of dispute resolution.' PPG Industr. Inc. v. Webster Auto Parts, Inc., 128 F.3d 103, 107 (2d Cir.1997). 'As a result of the strong presumption in favor of arbitration, its waiver is not readily inferred.' Cotton v. Slone, 4 F.3d 176, 179 (2d Cir.1993). 'Indeed, any uncertainty concerning its waiver is resolved in favor of

proceeding with arbitration.' Crysen/Montenay Energy Co. v. Shell Oil Co. (In re Crysen/Montenay Energy Co.), 226 F.3d 160, 163 (2d Cir.2000).

In addition, alternative dispute resolution would provide a speedy and efficient means of settling the claims of the parties. See Mitsubishi Motors Corp. v. Siler Chrystler-Plymoth, Inc., 814 F.2d 844, 847 (5th Cir. 1987), where the bankruptcy court exercised discretion to lift the stay to permit an arbitration proceeding to go forward in Japan, holding that the arbitration "would afford the most expeditions method" of resolving the commercial disputes.

It is submitted that arbitration provides a favorable alternative in terms of judicial economy as well as time and expense to be dedicated by all parties.

Further, "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration…" Moses v. Core Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 25 (1983), quoted with approval in Quackenbush v. Allstate Ins. Co. 121 F.3d 1372, 1380 (9th Cir. 1997).

Finally, it should be remembered that the Debtor has the burden of proof. In re Pate, 198 B.R. 841, 846 (Bankr. S.D. Ga 1996) (Debtor has the burden of demonstrate the adverse effect on administration of the bankruptcy case, and in the absence of such showing the court will refer the case to arbitration); Siler Chrystler-Plymonth, 814 F.2d at 847 (Debtor gave no viable reason for staying arbitration, therefore failing to sustain its burden of proof under 11 U.S.C. Section 362(g)).

**D.**    ***Alternative Dispute Resolution Can be compelled Under LR 9019(a)1)).***

LR 9019(a)(1) provides that:  "On its own initiative or at the request of any party in interest, the Court may at any time order that a contested matter or adversary proceeding be

set for settlement conference or other alternative method of dispute resolution." It is submitted that LR 9019(a)(1) not only provides an independent basis for mediation and arbitration of this controversy, but reinforces the policy of our courts to encourage such alternative forms of dispute resolution.

## III.

## CONCLUSION

For the reasons stated above, Movants respectfully request that this Court grant relief from the automatic stay to pursue resolution of their disputes with the Debtor pursuant to their contractual provisions for alternative dispute resolution.

DATED this _____ day of May, 2014.

CARLYON LAW GROUP, PLLC


_____
CANDACE CARLYON, ESQ.
Nevada Bar No. 2666
ADAM P. BOWLER, ESQ.
Nevada Bar No. 8383
3333 E. Serene Avenue, Suite 110
Las Vegas, Nevada 89074

*Counsel for Roland Kiser and Klaus Bernhart*

# EXHIBIT 1

# EXHIBIT 1



SOLAR

November 4, 2012

**Roland Kiser**
**10 Pound Hollow Ct.**
**Old Brookville, NY 11545**

Dear   Roland:

Martifer Solar USA, Inc. ("**Martifer**" or the "**Company**") is pleased to present to you material terms for the position of Chief Financial Officer ("**Employee**"). In this position you will be reporting to the CEO. Your proposed start date with Martifer Solar ("**Company**") will be November 5th, 2012 ("**Effective Date**"), pending the successful completion of the company's pre-screening criteria. Your initial compensation will be $185,000 per year, paid bi- weekly plus participation in the Company's "C-level" bonus program, to be pro-rated in 2012 based on your start date.

*Employment Term / Services*

Employee's initial employment term shall be six (6) months from the Effective Date, to be extended automatically for consecutive 6-months terms unless terminated in writing thirty days prior to the end of any term by the Company or Employee.

Until December 31st, Employee shall dedicate 75% of his time to the Company activities, and shall be allowed to otherwise commit 25% of his time to continued development of a fund in support of solar energy asset investments (the "**Fund**").

Employee will receive 1.5 weeks (7.5) days paid personal time off (PTO) per employment term.

Employee shall have all Company expenses paid for or reimbursed per Company policies as relate to C-Level executives. Both parties agree that the Employee will spend a significant portion of his time in the Head Office located in Los Angeles, CA and that all related travel expenses incurred will be reimbursed by the Company pursuant to the Company's policies.

Should Employee's employment with the company be terminated without cause, Employee will receive a severance package of two months base salary, and prorated bonus for time served in the applicable year of termination.

Employee may resign for and receive severance provisions as described above for good reason under limited circumstances as provided to other C-level executives (material reduction in salary or material change of authority of the role assigned, etc.).

*Fund Participation / Affiliate Transactions*

It is understood by Employee that the purpose of the Company allowing Employee's continued involvement in the Fund is in furtherance of the Company's goal of a contemplated investment as a limited anchor investor in the general partner of the Fund. Employee agrees to work in good faith with the Company to structure and procure this opportunity to the extent feasible by the end of Employee's initial term of employment. At this point all parties involved understand that the fund opportunity is a concept, and the decision to create the fund is not in the Employee's discretion.

# MARTIFER
SOLAR

Employee hereby agrees that no agreements, investments or other transaction between (i) the Employee or the Fund and (ii) any affiliate of the Company (i.e. Martifer Solar, Inc.; Silverado; Martifer Solar S.A. or any other Martifer affiliate) may be discussed or consummated without the explicit written approval of the Company's CEO. This provision shall survive any termination of Employee for one (1) year from the date of termination.

## *Medical and Dental Benefits*

Medical and dental benefits have been declined by the Employee and the monthly allowance included in the salary offer above.

## *Confidentiality / Inventions*

Employee shall execute concurrently herewith a Confidentiality and Inventions Agreement with the Company.

This position is subject to the provisions set forth in the Employee Handbook and both State and Federal employment laws.

On your first day of employment, you will be provided with additional information about the objectives and policies, benefit programs and general employment conditions. To fulfill federal identification requirements, you are required to provide proper documentation to support your identity and eligibility to work in the United States.

If you have any questions, please don't hesitate to contact me at 310-820-7080

Very Truly Yours,

Martifer Solar USA, Inc.

ACCEPTED AND AGREED:

By: _____     Date: 11/6/12
Raffi Agopian
CEO

By: _____     Date: 11/5/2012
Roland Kiser

**Martifer Solar**
2040 Armacost Avenue
Los Angeles, CA 90025

www.martifersolarusa.com

Office 310.820.7080 | Fax 310.820.7090

2

1-877-SOLAR LA

# EXHIBIT 2

# EXHIBIT 2

## EXECUTIVE EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is made and entered into as of July 25, 2013, by and between Martifer Solar USA, Inc., a California corporation (the "Company"), with its principal place of business at 2040 Armacost Avenue, Los Angeles, California 90025, and Roland Kiser (the "Executive"). This Agreement replaces and supersedes that certain Offer Letter dated November 4, 2012 by and between the Company and the Executive.

### 1.    Commencement of Employment; Term

This Agreement is effective as of March 10, 2013 (the "Commencement Date") and shall continue for a period of one year, until March 10, 2014, after which time continued employment shall be on an at-will basis, unless:

a.    Executive's employment is terminated by either party in accordance with the terms of Section 6 of this Agreement; or

b.    Executive's term of employment is extended by a subsequent agreement duly executed by each of the parties to the Agreement, in which case such employment shall be subject to the terms and conditions contained in the subsequent written agreement.

c.    In the event that Executive's employment with the Company is not extended pursuant to a subsequent agreement, Company shall pay to Executive in a single lump sum payment on or before April 1, 2014, an amount equal to four (4) months' salary.

### 2.    Duties and Obligations of Executive

a.    Executive shall serve as the Company's Chief Executive Officer. In that capacity, Executive shall be responsible for the day-to-day operations of the Company, and shall do and perform all services, acts, and things necessary or advisable to fulfill the duties of a Chief Executive Officer.

b.    Executive shall report directly to Pedro Gomes Pereira on matters relating to strategy and direction of the Company, and shall at all times be subject to the policies established by the Board of Directors of the Company. Executive shall comply with the Company's policies and procedures as in effect from time to time during his employment with the Company, including, without limitation, the Company's Policy and Procedures Manual, Inventions Agreement, and any other policies with respect to conflicts of interest, equal employment opportunity, sexual harassment, and drug or alcohol abuse.

c.    Executive agrees that to the best of his ability and experience he will at all times loyally and conscientiously perform all of the duties and obligations required of him either expressly or implicitly by the terms of this Agreement and that may be assigned to him from time to time in accordance with this Agreement.

1

Document Integrity Verified    EchoSign Transaction Number: W4HKHDV334XE5S

d.      Executive shall devote his entire productive time, ability and attention to the business of the Company so long as Executive is an employee of the Company.

e.      This Agreement shall not be interpreted to prohibit Executive from making passive personal investments or conducting private business affairs if those activities do not materially interfere with the services required under this Agreement. However, Executive shall not, directly or indirectly, acquire, hold or retain any interest in any business competing with or similar in nature to the Company. Furthermore, Executive shall not, while employed by the Company, directly or indirectly, either as an Executive, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of the Company.

3.    **Confidentiality**

a.      As a condition of employment, Executive will be required to sign and abide by the Company's Inventions Agreement.

b.      During Executive's employment at the Company, he shall not utilize any confidential, proprietary and/or trade secret information belonging to any former employers or other third parties. Executive agrees to advise the Company of any confidentiality obligations he has with prior employers or other third parties, and to fully abide by those obligations.

4.    **Compensation of Executive; Benefits**

a.      **Base Salary.** As compensation for the services to be rendered by Executive hereunder, the Company shall pay Executive an annual salary of Two Hundred Thousand Dollars ($200,000) (the "Base Salary"), payable in accordance with the Company's payroll schedule, prorated for any partial employment period. Executive will receive such annual increases to the Base Salary, if any, as may be determined by the Board of Directors in its sole discretion from time to time.

b.      **Restructuring Bonus.** For his services during the term of this Agreement, Executive shall receive a restructuring bonus in the amount of Seventy-Five Thousand Dollars ($75,000), which shall be paid on or before March 10, 2014.

c.      **Car Allowance.** Executive shall be paid a car allowance in the amount of Five Hundred Dollars ($500) per month. Company shall also pay for Executive's car insurance, gas, and reasonable automobile maintenance expenses.

d.      **Paid Time Off.** Executive shall be provided with paid time off each calendar year for vacation, sick time, family illness, or other personal time off in accordance with the Company's policies for all employees ("Paid Time Off"). Executive shall accrue such Paid Time Off beginning on the Commencement Date, and it shall accrue pro rata throughout the calendar year. If Executive is unable for any reason to take the total amount of accrued Paid Time Off during any calendar year, the Company shall pay out any remaining accrued but unused Paid

Document Integrity Verified                                                                                    EchoSign Transaction Number: W4HKHDV334XE5S

Time Off on or before December 31st of each calendar year. Paid Time Off shall begin to accrue again pro rata on January 1st of each calendar year. To the extent that Paid Time Off includes planned vacations of one week or more, Executive shall coordinate such vacation time off with the Board of Directors. Upon approval of the Board of Directors in its sole discretion, Executive may take Paid Time Off before it is accrued.

      e.    <u>Housing</u>.  The Company will provide Executive with accommodations in an apartment located at 13836 Bora Bora Way, Unit No. B114, Marina Del Rey, California 0292. Executive will share the apartment with the Company's Chief Financial Officer, Klaus Bernhart. The Company will pay all costs associated with the apartment, including rent, utilities, internet and cable television. The Company shall pay any increases in rent that may occur during the term of this Agreement. In the event that this Agreement is terminated by the Company for any reason other than for cause (as set forth in Section 6(e)), the Company shall pay the remainder of any lease term on housing leased by Executive.

      f.    <u>Benefits</u>.  Other than the specific benefits provided in this Paragraph 4, the benefits for which Executive will be eligible are described in the Policy and Procedures Manual, and the Summary Plan Descriptions for each benefit plan, which have been provided to Executive. Executive will be covered by these benefits as per his coverage elections and the plan terms. In the event that changes are made to any of the benefit plans, at the Company's sole discretion, the changes will apply to Executive as they do other employees of the Company.

      g.    <u>Taxes</u>.  Executive shall be solely responsible for income taxes imposed on the Executive by reason of any compensation and benefits provided under this Agreement, and all such compensation and benefits shall be subject to applicable withholding by the Company.

**5.**    **Business Expenses**

    The Company will promptly reimburse Executive for all reasonable business expenses incurred by Executive in performing his duties as described in Paragraph 2 above, including expenditures for entertainment and travel (the "<u>Expenditures</u>"). Each Expenditure will be reimbursable only if it is of a nature qualifying it as a proper deduction on the Company's federal and state income tax returns. Each Expenditure will be reimbursable only if Executive furnishes to the Company adequate records and other documentary evidence required by federal and state statutes and regulations issued by the appropriate taxing authorities for the substantiation of that expenditure as an income tax deduction.

**6.**    **Termination of Employment**

      a.    <u>By Death</u>.  Executive's employment shall terminate upon the death of the Executive. The Company shall pay Executive's beneficiaries or estate, as appropriate, any Base Salary and benefits then due and owing, including payment for accrued and unused Paid Time Off, if any, as well as any other applicable benefits set forth in this Agreement. No other payments or benefits shall be made to Executive's beneficiaries or estate, except that nothing in this Paragraph shall affect any entitlement of Executive to the benefits of any applicable benefit plans.

Document Integrity Verified                        EchoSign Transaction Number: W4HKHDV334XE6S

b.    <u>By Disability.</u> If by reason of any physical or mental incapacity, Executive has been or will be prevented from properly performing his duties under this Agreement for more than ninety (90) consecutive days in any 365 day period, and Executive is not on an approved leave of absence, including, without limitation leave under the Family Medical Leave Act or the California Family Rights Act, disability leave, or workers' compensation leave, then to the extent permitted by law, the Company may replace Executive's position and terminate Executive's employment upon reasonable advance written notice to Executive. The Company shall pay Executive all compensation and benefits set forth in this Agreement to which he is entitled; thereafter, all obligations of the Company under this Agreement shall cease, unless otherwise stated or reserved. Nothing in this Paragraph 6 shall affect the Executive's rights under any applicable Company disability and/or benefit plans.

c.    <u>By Sale or Closure of Business.</u> Company may terminate this Agreement upon thirty (30) days' written notice upon the happening of any of the following events:

(i)    The sale by Company of substantially all of its assets to a single purchaser or a group of associated purchasers;

(ii)    The sale, exchange or other disposition, in one transaction, of at least fifty percent (50%) of the outstanding common shares of the Company;

(iii).    A decision by Company to terminate its business and liquidate its assets; or the merger or consolidation of Company in a transaction in which the shareholders of Company receive at least fifty percent (50%) of the outstanding voting shares of the new or continuing corporation.

In the event that Company terminates this Agreement pursuant to this Section 6(c), Company shall pay to Executive four (4) months' salary in a single lump sum payment.

d.    <u>By Company Without Cause.</u> Company may terminate Executive without cause upon thirty (30) days written notice. Upon termination without cause, Company shall pay to Executive four (4) months' salary in a single ("Severance Payment").

e.    <u>By Company With Cause.</u> At any time during Executive's Employment, the Company may terminate his employment With Cause under this Paragraph 6(d). "With Cause" shall be limited to the following acts after the Board of Directors has given Executive written notice of such acts, if such acts may be cured, if Executive fails to cure such act within fifteen (15) days after such written notice: (a) the failure by Executive to substantially perform his material duties (other than such failure resulting from his incapacity due to physical or mental impairment); (b) the gross misconduct by Executive with regard to the Company that is injurious to the Company; or (c) Executive's conviction for a felony or for any other serious crime involving fraud, embezzlement, dishonesty, misappropriation, theft or moral turpitude (excluding traffic offenses). For the avoidance of doubt, if any such act may not by its nature be cured, the Board of Directors shall not be required to provide said fifteen (15) days' notice. Any termination of employment of Executive by the Company which does not meet the definition of

Document Integrity Verified                                                                 EchoSign Transaction Number: W4HKHDV334XE5S

With Cause in this Paragraph 6(d), and does not involve the Executive's death or disability as described in Paragraphs 6(a) and 6(b) shall be treated as a termination "Without Cause" under Paragraph 6(c) herein.

       f.    <u>By Executive For Any Reason Other Than Death or Disability</u>. Executive may terminate his employment with the Company at any time by providing thirty (30) days written notice to the Board of Directors. The Company may, in its sole discretion, pay Executive in lieu of the notice period. Under no circumstances shall Executive's decision to terminate his employment entitle him to the Severance Payment described in Paragraph 6(d).

7.    <u>Indemnification of Executive</u>

       Substantially concurrently with the execution of this Agreement, the Company and Executive will enter into an indemnification agreement in the form attached hereto as <u>Exhibit A</u>.

8.    <u>Representations, Warranties and Covenants of Executive</u>

       a.    <u>Restrictions</u>. Executive represents and warrants to the Company that:

          (i)    There are no restrictions, agreements or understandings whatsoever to which Executive is a party that would prevent or make unlawful Executive's execution of this Agreement or Executive's employment hereunder, that is or would be inconsistent or in conflict with this Agreement or Executive's employment hereunder, or that would prevent, limit or impair in any way the performance by the Executive of the obligations hereunder; and

          (ii)    Executive has disclosed to the Company all restraints, confidentiality commitments or other employment restrictions that he has with any other employer, person or entity.

       b.    <u>Obligations to Former Employers</u>. Executive covenants that in connection with his provision of services to the Company, he will not breach any obligation (legal, statutory, contractual or otherwise) to any former employer or other person, including, but not limited to, obligations relating to confidentiality and proprietary rights.

9.    <u>Non-Disparagement</u>

       Executive will not at any time during or after the term of his employment with the Company make any public statements, whether orally or in writing, which are intended to be derogatory or damaging to the Company or any of its officers, Executives, directors, partners, agents or shareholders.

10.    <u>Successors and Assigns; Assignability</u>

       a.    This Agreement shall be binding upon and inure to the benefit of both the Company and the Executive, and their respective heirs, successors and assigns; provided,

ACTIVE 21894387v1 07/26/2013 11:26 AM

Document Integrity Verified          EchoSign Transaction Number: W4HKHDV334XE5S

however, that neither Party shall transfer, assign or delegate this Agreement or any rights or obligations hereunder.

      b.      Notwithstanding the provisions of Paragraph 10(a) above, the Company may assign or delegate its rights, duties and obligations hereunder to any successor to the Company (whether direct or indirect, by purchase, merger, consolidation or otherwise). The Company shall require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it such succession had not taken place.

## 11.    Non-Solicitation of Company Employees

      Effective on the Commencement Date, and for one year after his employment with the Company ends, Executive may not solicit any of the Company's current employees. For purposes of this Agreement, the term "solicit" includes, but is not limited to, any communication or contact, whether direct or indirect, on the Executive's behalf or on behalf of any other party, for the purpose of or with the intended effect of inducing a change in their employment status with the Company.

## 12.    Mediation and Arbitration

      Executive and the Company agree that any and all disputes regarding this Agreement or Executive's employment with the Company will first be addressed in mediation before a mutually agreeable mediator, paid for by the Company. If the matter cannot be resolved in mediation, then the dispute will be resolved in binding arbitration administered by JAMS pursuant to its Employment Arbitration Rules then in effect. The arbitration shall take place before an experienced JAMS employment arbitrator licensed to practice law in Los Angeles County mutually selected by the parties. The arbitrator may not modify or change this Agreement in any way. All out-of-pocket costs of the arbitration, including the fees of the arbitrator, the costs of any record or transcript of the arbitration, administrative fees, and other fees and costs shall be paid for by the Company. Each party shall initially be responsible for its own attorneys' fees, except that the arbitrator may award such fees and costs, exclusive of the arbitrator's fees, to the prevailing Party as set forth in Paragraph 13(b). All procedural and substantive rights that the Executive and the Company would have in a court of law, will be extended to the parties in arbitration, including full discovery and all forms of relief. The parties expressly acknowledge that they are waiving any right they may have to a jury trial for any and all claims covered by this Agreement.

## 13.    General Provisions

      (a)    Notices. Any notice required or permitted to be given hereunder shall be in writing and may be given by personal delivery (including delivery by messenger or by overnight

Document Integrity Verified          EchoSign Transaction Number: W4HKHDV334XE5S

courier service), by facsimile or by certified mail, return receipt requested, addressed to the parties at the addresses set forth in the introductory paragraph of this Agreement.

(b)    Attorneys' Fees. In any action undertaken to enforce the terms of this Agreement, including arbitral proceedings, the prevailing party shall be reimbursed by the non-prevailing party for such prevailing party's reasonable attorneys' fees and expenses, including the costs of enforcing an arbitral award or a judgment.

(c)    Governing Law. This Agreement shall be governed by and construed according to the laws of the State of California, without reference to principles of choice of law thereof.

(d)    Counterparts. This Agreement may be executed in one or more counterparts, both of which taken together shall be deemed one original.

(e)    Entire Agreement. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof. This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter. This Agreement may be modified only by written agreement signed by both parties.

(f)    Severability. The parties hereto desire and intend that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations of any party under this Agreement will not be materially and adversely affected thereby, (i) such provision will be fully severable, (ii) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (iii) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom and (iv) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

*Remainder of page intentionally left blank.*

ACTIVE 21894387v1 07/26/2013 11:26 AM

Document Integrity Verified                                                        EchoSign Transaction Number: W4HKHDV334XE58

The parties hereto execute this Agreement:

**EXECUTIVE**

*Roland Kiser*
<small>Roland Kiser (Jul 29, 2013)</small>                                    Jul 29, 2013

Roland Kiser                                    Date

**COMPANY**
**Martifer Solar USA, Inc.**

By: *[signature]*                              04/01/2013
Pedro Gomes Pereira                Date
Its: Authorized Representative

Document Integrity Verified                    EchoSign Transaction Number: W4HKHDV354XE5S



# PROPRIETARY INFORMATION AND
# INVENTIONS AGREEMENT

As a condition of my becoming employed by Martifer Solar USA, Inc., a California corporation, or by any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "*Company*"), and in consideration of my employment relationship with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I, Roland Kiser, agree to the following:

1.  **Employment.** I understand and acknowledge that this Agreement does not alter, amend or expand upon any rights I may have to continue in the employ of, or the duration of my employment with, the Company under any existing agreements between the Company and me or under applicable law. Any employment relationship between the Company and me, whether commenced prior to or upon the date of this Agreement, is referred to herein as the "*Relationship*."

2.  **At-Will Relationship.** I understand and acknowledge that the Relationship is and will continue to be at-will, as defined under applicable law, meaning that either I or the Company may terminate the Relationship at any time for any reason or no reason, without further obligation or liability.

3.  **Confidential Information.**

    (a)   Company Information. I agree at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, or to disclose to any person, firm, corporation or other entity without written authorization of the Board of Directors of the Company, any Confidential Information of the Company that I obtain or create. I further agree not to make copies of such Confidential Information except as authorized by the Company. I understand that "*Confidential Information*" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, suppliers, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), prices and costs, markets, developments, inventions, processes, formulas, technology, designs, drawings, engineering, regulatory information, marketing, licenses, finances, budgets or other business information disclosed to me by the Company either directly or indirectly in writing, orally or by drawings or observation of parts or equipment or created by me during the period of the Relationship, whether or not during working hours. I understand that Confidential Information includes, but is not limited to, information pertaining to any aspects of the Company's business that is either information not known by actual or potential competitors of the Company or other third parties not under confidentiality obligations to the Company, or is otherwise proprietary information of the Company or its customers or suppliers, whether of a technical nature or otherwise. I further understand that

1



Confidential Information does not include any of the foregoing items that has become publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.

(b)    Prior Obligations.  I represent that my performance of all terms of this Agreement as an employee of the Company has not breached and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me prior or subsequent to the commencement of the Relationship, and I will not disclose to the Company or use any inventions, confidential or non-public proprietary information or material belonging to any previous client, employer or any other party.  I will not induce the Company to use any inventions, confidential or non-public proprietary information, or material belonging to any previous client, employer or any other party.  I represent that I am not a party to any agreements (e.g., non-competition agreements, non-solicitation of customers agreements, non-solicitation of employees agreements, confidentiality agreements, inventions agreements, etc.) with a current or former employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability as an employee to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties as an employee of the Company or any obligation I may have to the Company.

(c)    Third Party Information.  I recognize that the Company has received and in the future will receive confidential or proprietary information from third parties subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes.  I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

4.    **Inventions.**

(a)    Inventions Retained and Licensed.  I have attached hereto, as Exhibit A, a list describing with particularity all inventions, original works of authorship, developments, improvements, and trade secrets that were made by me prior to the commencement of the Relationship (collectively referred to as *"Prior Inventions"*), that belong solely to me or belong to me jointly with another, that relate in any way to any of the Company's proposed businesses, products or research and development, and that are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Prior Inventions.  If, in the course of the Relationship, I incorporate into a Company product, process or machine a Prior Invention owned by me or in which I have an interest, the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, perpetual, worldwide license (with the right to sublicense) to make, have made, copy, modify, make derivative works of, use, sell and otherwise distribute such Prior Invention as part of or in connection with such product, process or machine.

2

**MARTIFER**
SOLAR

(b)    Assignment of Inventions. I agree that I will promptly make full written disclosure to Martifer Solar USA, Inc., will hold in trust for the sole right and benefit of Martifer Solar USA, Inc., and hereby assign to Martifer Solar USA, Inc., or its designee, all my right, title and interest throughout the world in and to any and all inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws, that I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time in which I am employed by or a consultant of the Company (collectively referred to as "*Inventions*"), except as provided in Section 4(e) below. I further acknowledge that all inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets that are made by me (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary, unless regulated otherwise by the mandatory law of the state of California.

(c)    Maintenance of Records. I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of the Relationship. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, and any other format. The records will be available to and remain the sole property of the Company at all times. I agree not to remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business. I agree to return all such records (including any copies thereof) to Martifer Solar USA, Inc., or its designee, at the time of termination of the Relationship as provided for in Section 5.

(d)    Patent and Copyright Rights. I agree to assist Martifer Solar USA, Inc., or its designee, at its expense, in every proper way to secure Martifer Solar USA, Inc.'s, or its designee's, rights in the Inventions and any copyrights, patents, trademarks, mask work rights, moral rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to Martifer Solar USA, Inc. or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments that Martifer Solar USA, Inc. or its designee deems necessary in order to apply for, obtain, maintain and transfer such rights and in order to assign and convey to Martifer Solar USA, Inc. or its designee, and any successors, assigns and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers will continue after the termination of this Agreement until the expiration of the last such intellectual property right to expire in any country of the world. If Martifer Solar USA, Inc. or its designee is unable because of my mental or physical incapacity or unavailability or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents, copyright, mask works or other

3

**MARTIFER**
SOLAR

registrations covering Inventions or original works of authorship assigned to Martifer Solar USA, Inc. or its designee as above, then I hereby irrevocably designate and appoint Martifer Solar USA, Inc. and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent, copyright or other registrations thereon with the same legal force and effect as if originally executed by me. I hereby waive and irrevocably quitclaim to Martifer Solar USA, Inc. or its designee any and all claims, of any nature whatsoever, that I now or hereafter have for infringement of any and all proprietary rights assigned to Martifer Solar USA, Inc. or such designee.

5.    **Company Property; Returning Company Documents.**  I acknowledge and agree that I have no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, stored company files, e-mail messages and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored at any time without notice.  I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice.  I agree that, at the time of termination of the Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.  In the event of the termination of the Relationship, I agree to sign and deliver the "Termination Certification" attached hereto as <u>Exhibit B</u>.

6.    **Notification to Other Parties.**

(a)    <u>Employees</u>.  If I leave the employ of the Company, I hereby consent to notification by the Company to my new employer about my rights and obligations under this Agreement.

(b)    <u>Consultants</u>.  I hereby grant consent to notification by the Company to any other parties besides the Company with whom I maintain a consulting relationship, including parties with whom such relationship commences after the effective date of this Agreement, about my rights and obligations under this Agreement.

7.    **Representations and Covenants.**

(a)    <u>Facilitation of Agreement</u>.  I agree to execute promptly any proper oath or verify any proper document required to carry out the terms of this Agreement upon the Company's written request to do so.

4

**MARTIFER**
SOLAR

(b)  Conflicts.  I represent that my performance of all the terms of this Agreement does not and will not breach any agreement I have entered into, or will enter into with any third party, including without limitation any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to commencement of the Relationship.

(c)  Voluntary Execution.  I certify and acknowledge that I have carefully read all of the provisions of this Agreement and that I understand and will fully and faithfully comply with such provisions.

8.  **General Provisions.**

(a)  Governing Law.  The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of California, without giving effect to the principles of conflict of laws.

(b)  Entire Agreement.  This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us.  No modification or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by both parties.  Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.

(c)  Severability.  If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

(d)  Successors and Assigns.  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives, and my successors and assigns, and will be for the benefit of the Company, its successors, and its assigns.

(e)  Survival.  The provisions of this Agreement will survive the termination of the Relationship and the assignment of this Agreement by the Company to any successor in interest or other assignee.

(f)  Remedies.  I acknowledge and agree that violation of this Agreement by me may cause the Company irreparable harm, and therefore agree that the Company will be entitled to seek extraordinary relief in court, including but not limited to temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security and in addition to and without prejudice to any other right and remedies that the Company may have for a breach of this Agreement.

(g)  ADVICE OF COUNSEL.  I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND

5

**MARTIFER**
SOLAR

UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT WILL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

[Signature Page Follows]

6

**MARTIFER**
SOLAR

The parties have executed this Agreement as of the date first set forth above:

**EMPLOYEE:**                                    **COMPANY:**

*Roland Kiser*
Roland Kiser (Nov 6, 2012)                        **Martifer Solar USA, Inc.**

**Roland Kiser**

By: _____
Raffi Agopian
Its: Chief Executive Officer

7

Document Integrity Verified                          EchoSign Transaction Number: PLCMJAXC444D69



## EXHIBIT A

## MUTUAL CONFIDENTIALITY AND NON-CIRCUMVENTION AGREEMENT

This **MUTUAL CONFIDENTIALITY AND NON-CIRCUMVENTION AGREEMENT** is made and entered into as of December 7, 2012, (the "***Agreement***") by and between Klaus Bernhart, an individual residing at Strandstrasse 9, 24159 Kiel-Holtenau, Germany and Martifer Solar USA, Inc., a California corporation, with its principal office at 2040 Armacost Avenue, Los Angeles, CA, 90025, each in connection with Confidential Information (as defined below) provided by it or on its behalf, a "***Discloser***" and, in connection with the Confidential Information received by it or on its behalf, a "***Recipient***," and, collectively, the "***Parties***."

**WHEREAS**, each Party to this Agreement may be receiving from the other Party or its officers, directors, agents, employees, affiliates or representatives, including advisers and legal counsel (collectively, "***Representatives***") information of a confidential and non-public nature for use by it and its Representatives in connection with certain financial, marketing and technical information regarding the design and construction of renewable energy projects (collectively, the "***Transaction***"), and the Parties desire to protect the confidentiality of such information in accordance with the terms of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants contained in this Agreement, the Parties hereby agree as follows:

1.      **Confidential Information Defined.** "***Confidential Information***" means, with respect to each Discloser respectively, the content of negotiations and discussions between the Parties regarding the Transaction, any and all technical and non-technical information, whether in oral, written, graphic, machine-readable, tangible or intangible form, relating to the Discloser's business plan and model, and/or to current, future, or proposed products, services or other business activities of the Discloser including, but not limited to, trade secrets, knowledge, formulas, supply sources, computer code (source code and object code), hardware configurations, know-how, products, equipment, computer programs, customer lists, agreements with third parties, forms, price lists, financial statements, business forecasts and projections, marketing and business plans, information relating to customers, potential customers, employees, suppliers, vendors and professionals involved in the Transaction ("Contact Persons") and other information regarding the financial or business affairs of the Discloser. Confidential Information shall also include all information related to the Transaction provided by the Discloser to the Recipient prior to the signing of this Agreement. Confidential Information does not include information that (i) becomes generally available to the public other than as a result of unauthorized disclosure or use by the Recipient, (ii) was already in possession of the Recipient on a non-confidential basis prior to its disclosure by the Discloser, (iii) becomes available to the Recipient on a non-confidential basis from a source other than the Discloser, provided that the disclosing person is lawfully in possession of such Confidential Information and under no obligation of confidentiality to the Discloser or any third party or (iv) is approved in writing by the Discloser for the Recipient to use or disseminate free of any ongoing obligations hereunder.

2.      **Nondisclosure Obligation.** The Recipient shall:

2.1      not disclose Confidential Information to any person or entity other than the Recipient;

2.2      not use Confidential Information for any purpose other than for evaluating the Transaction;

2.3      not make copies, including, without limitation, photocopies, photographs, drawings, or electronic copies, or otherwise duplicate any documents or other materials provided by the Discloser that comprise or contain Confidential Information;

2.4      treat confidentially all documents and materials containing or referring to any Confidential Information and confirm that all such documents and materials in its possession or control is marked in a manner that discloses that it contains Confidential Information and is subject to confidentiality obligations;

2.5      promptly notify the Discloser in writing of any actual or suspected misuse, misappropriation or unauthorized disclosure of Confidential Information that may come to the attention of the Recipient; and

2.6      notify the Discloser in writing at least fifteen (15) days prior to using, disclosing or copying information that would be considered Confidential Information but for the provisions of clauses (i) through (iii) in the definition of Confidential Information, and allow the Discloser a reasonable opportunity prior to any use or disclosure by the Recipient to seek a protective order or other legal protection should the Discloser notify the Recipient within such fifteen (15) day notice period that the Discloser considers the information to be Confidential Information and subject to the terms of this Agreement.

CONFIDENTIAL
CA LICENSE#813701

**MARTIFER**
SOLAR

If the Recipient or any of its Representatives receives a subpoena or court or governmental order to produce any Confidential Information or if the Recipient otherwise determines that the Recipient is legally required to disclose or produce any Confidential Information in its possession or control, the Recipient will (i) promptly notify the Discloser in writing of such required disclosure, (ii) allow the Discloser a reasonable opportunity to seek a protective order or other relief to prevent, restrict and/or limit such disclosure and cooperate with the Discloser in seeking any such relief, and (iii) disclose only that portion of the Confidential Information that is legally required to comply with the subpoena, order or other disclosure requirement.

Promptly following the Discloser's written request, the Recipient will (i) promptly return, or cause to be returned, to the Discloser all materials that the Discloser has provided pursuant to this Agreement, including (but not limited to) all materials containing or referring to Confidential Information and all copies of such materials in its possession or control, and (ii) if any Confidential Information is integrated with the Recipient's documents or media (e.g. computer drives), destroy or erase such documents and media and the Recipient will certify in writing to the Discloser within twenty (20) days after termination of this Agreement that all required destruction or erasure of documents and media have been carried out. Notwithstanding the foregoing, one copy of any Confidential Information may be retained in the files of the Recipient's legal counsel, and the Recipient will have no obligation to return or destroy internal materials containing Confidential Information such as, for example, credit requests, approval papers and analyses that were prepared in connection with the Transaction by the Recipient or its Representatives.

For the purpose of complying with the obligations set forth in this Agreement, the Recipient shall use efforts commensurate with those it employs for the protection of comparable sensitive information of its own, but in no case less than a reasonable degree of care.

3.    **Non-Circumvention.**  The Recipient shall not at any time prior to the expiration of three (3) years from the date of this Agreement, without the prior written consent of the Discloser, which consent the Discloser may withhold in its sole discretion, (a) attempt in any manner to deal directly or indirectly in any manner with any of the Contact Persons or other individuals or companies related to the Transaction including by having any part of or deriving any benefit from the Transaction or any aspect thereof, or (b) by-pass, compete, avoid, circumvent, or attempt to circumvent the Discloser relative to the Transaction or the Contact Persons, including by utilizing any of the Confidential Information or by otherwise exploiting or deriving any benefit from the Confidential Information.

4.    **No Representations or Further Obligations.**  Each Discloser warrants that it has the right to make the disclosures to be made by it or on its behalf under this Agreement. All disclosures made hereunder are at the sole discretion of the Discloser. It is understood that this Agreement does not obligate the Recipient to enter into any further agreements or to proceed with the Transaction or any other possible relationship or other transaction with the Discloser. The Parties will act as, and at all times be, independent contractors, and nothing contained in this Agreement will be construed to create or imply a joint venture, partnership, principal, agent or employment relationship between or among the Parties. The Discloser does not make any covenants, warranties or representations with respect to the accuracy or completeness of any Confidential Information disclosed hereunder, and the Discloser shall have no liability to the Recipient arising out of the use of Confidential Information supplied under this Agreement except to the extent set forth in a definitive agreement duly executed by the Parties with respect to the Transaction.

5.    **Injunctive Relief.**  Each Recipient agrees that, in view of the unique nature of the Confidential Information and the irreparable loss that could be sustained by the Discloser in the event of the unauthorized disclosure, copying or use of Confidential Information, the Discloser will be irreparably damaged and will not have an adequate remedy at law if the terms of this Agreement are violated, and therefore agree that the Discloser will be entitled to injunctive relief, including specific enforcement, to enforce the provisions of this Agreement, in addition to any other remedy to which the Discloser may be entitled at law. Each Recipient agrees that if any action should be brought by the Discloser in equity to enforce any of the provisions of this letter, the Recipient may not raise the defense that there is an adequate remedy at law.

6.    **Indemnity.**  The Recipient agrees to indemnify and hold harmless the Discloser from and against all liabilities, claims, damages, costs and expenses (including reasonable legal fees and expenses) arising out of or in connection with any breach by the Recipient or any of its Representatives of any obligation hereunder.

7.    **Publicity.**  Neither Party may disclose to any third party or parties the existence of discussions between the Parties regarding the Transaction, except with the prior written consent of the other Party.

8.    **Termination.**  This Agreement covers only Confidential Information that is disclosed on or after the date hereof. The Recipient's obligations with respect to the Confidential Information received under this Agreement expire on the earlier of (a) the second anniversary of the date hereof and (b) the execution of a definitive agreement containing confidentiality provisions between the parties in connection with the Transaction. In addition, the Parties may terminate their obligations hereunder upon a date mutually agreed in writing.

12/10/2012

CONFIDENTIAL
CA LICENSE#813701

**MARTIFER**
SOLAR

9.    **Non-Interference.** Each Party agrees that it will not (i) interfere with the other Party's project development activities, (ii) visit the site or sites that are the subject of the Transaction, or (iii) contact site personnel, local representatives, or investors without the prior written consent of the Party developing that project as of the date of this Agreement.

10.    **Miscellaneous.**

10.1    Assignment.    Neither Party will voluntarily or by operation of law assign, hypothecate, transfer, license, or otherwise transfer or encumber all or any part of its rights, duties, or other interests in this Agreement or the proceeds thereof (collectively, an "*Assignment*"), without the other Party's prior written consent, which consent will not be unreasonably withheld or delayed; provided, however, that no such consent will be required for any assignment by a Party to such party's successor in interest in connection with a merger, acquisition, reorganization or transfer of all or substantially all of a Party's stock, assets or business. Any attempt to make an Assignment in violation of this provision will be a material default under this Agreement and any Assignment in violation of this provision will be null and void

10.2    Waiver of Breach.    Any waiver by a Party of the other Party's breach of the terms and conditions of this Agreement will not be considered as a waiver of any subsequent breach of the same or any other term or condition hereof.

10.3    Attorneys' Fees.    In the event of a breach of this Agreement by the Recipient, the Discloser may obtain from a court of competent jurisdiction injunctive, other equitable relief or any other relief at law. The prevailing party in any action under this Agreement will be entitled to recover from the other party all of its attorneys' fees and costs including, without limitation, costs of any experts.

10.4    Counterparts.    This Agreement may be executed in counterparts, with all counterpart signatures constituting the final Agreement. Facsimile signatures are accepted as originals for all purposes.

10.5    Entire Agreement.    This writing constitutes the entire agreement of the Parties with respect to the subject matter hereof. This Agreement supersedes all prior agreements and understandings between the Parties with respect to such subject matter. This Agreement may be modified only by written agreement signed by both Parties.

10.6    Severability.    In the event that any provision or any part of any provision of this Agreement is held to be illegal, invalid or unenforceable, such illegality, invalidity or unenforceability will not affect the validity or enforceability of any other provision or part hereof.

10.7    Notices.    Any notice required or permitted to be given hereunder will be in writing and may be given by personal delivery (including delivery by messenger or by overnight courier service), by facsimile or by certified mail, return receipt requested, addressed as follows:

KLAUS BERNHART                                    MARTIFER SOLAR USA, INC.
Strandstrasse 9                                   2040 Armacost Avenue
24159 Kiel-Holtenau                               Second Floor
GERMANY                                           Los Angeles, CA 90025
                                                  Attention: Raffi Agopian
                                                  Phone: 310.820.7080
                                                  Facsimile: 310.820.7090
                                                  Email: raffi@martifersolarusa.com

Notice will be effective upon receipt or refusal of delivery by the intended recipient, as evidenced by the records of the messenger or delivery service or the U.S. Postal Service or by mechanical confirmation of successful facsimile transmission, provided that if such transmission is confirmed on a non-business day or later than 5:00 p.m. local time at the Recipient's location, receipt will be deemed to have been given at 9 a.m. on the following business day. Either Party may, by notice to the other, specify a different address or facsimile number for notice purposes.

10.8    Governing Law.    This Agreement will be governed by and construed according to the laws of the State of California, without reference to principles of choice of law thereof.

**[Signature Page Follows]**

CONFIDENTIAL
CA LICENSE#813701



**IN WITNESS WHEREOF,** a duly authorized representative of each Party hereto has executed this Agreement.

_____          _____
Signature                                12/10/12
                                         Date

**Klaus Bernhart**


**CONTRACTOR:**


_____          _____
Signature                                Date

**Raffi Agopian**
**CEO**
**Martifer Solar USA, Inc.**


12/10/2012

CONFIDENTIAL
CA LICENSE#813701

# EXHIBIT 3

# EXHIBIT 3



## CONSULTING AGREEMENT

This CONSULTING AGREEMENT ("Agreement") is made and entered into as of December 4, 2012, by and between Klaus Bernhart ("Consultant") and MARTIFER SOLAR USA, INC. ("Martifer").

### RECITALS

**WHEREAS,** Martifer desires to retain and engage Consultant to provide specific services, as described in the Scope of Services attached hereto, in furtherance of Martifer's business;

**WHEREAS,** Consultant represents that it is fully qualified to provide such services by virtue of its experience and the training, education, certifications and expertise of its principals and employees.

**NOW, THEREFORE,** in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of where are hereby acknowledged, the Parties hereto hereby agree as follows:

### AGREEMENT:

1.  **CONSULTANT OBLIGATIONS.**

    Summary.  Consultant shall, on behalf of Martifer, assist Martifer CFO with working through all the issues in establishing a comprehensive short, medium and longer-term strategy for Martifer (the "Services").

2.  **PERFORMANCE REQUIREMENTS.**

    2.1  **Standard for Performance**

    Consultant shall perform its obligations under this Agreement in compliance with applicable law and in a diligent and competent manner consistent with the professional standards, practices and procedures generally applicable to the performance of comparable services.  Consultant shall be responsible for the professional quality, technical accuracy, completeness and coordination of the services.  Martifer's inspection, acceptance of, or payment for any of the services shall not (i) be construed to relieve Consultant of any of its liabilities or obligations under this Agreement; or (ii) operate as a waiver of any of Martifer's rights and remedies under this Agreement with respect to any Consultant errors, omissions, default, breach or failure to perform this Agreement.

    2.2  **Subconsultants**

    Consultant shall not subcontract any of the Services without the express written consent of Martifer.

    2.3  **Relationship of the Parties**

    Consultant shall perform this Agreement as an Independent Contractor of Martifer.  This Agreement shall not be construed as constituting or creating any sort of agency, partnership or employer-employee relationship, between Consultant and Martifer, nor as creating any other form of legal association between Consultant and Martifer that would impose liability upon Consultant or Martifer for the act or omission of the other party.  Consultant shall not, without prior written consent of Martifer, make any contractual commitments on behalf of Martifer nor partake in any activities outside the scope of the Consultant's services.  Consultant agrees that it shall not make against Martifer any demand or claim for any right or privilege applicable to an employee of Martifer including, but not limited to, worker's compensation coverage, unemployment insurance benefits, social security coverage, or retirement benefits.

    2.4  **Records**

    Consultant shall maintain orderly files of correspondence, reports, work product and all other documents related to the services performed under this agreement.  Consultant shall keep a record of days and expenses with corresponding receipts relative to the efforts undertaken pursuant to this Agreement on a daily basis.  Consultant shall maintain all of its books, records, contracts, computer database information, computer disks and tapes, and other data and information relating to this Agreement at all times during the Term and for a minimum period of six (6) years following the Term.  All of the foregoing data and records shall be made available to Martifer or its representatives promptly upon request.

3.  **COMPENSATION**

    Consultant's compensation shall be based upon a daily fee of            ($        ).  All expenses occurred while on assignment (e.g. air-fares from and to Hamburg as approved by the CFO, Hotel expenses while in LA, as well as meals will

12/10/2012

CONFIDENTIAL
CA LICENSE#813701



be reimbursed by Martifer in accordance to its existing Travel & Expense Policy. Payment by Martifer will occur on a monthly basis and total amount of payment shall be conditioned upon approval of Martifer CFO.

## 4.    INDEMNITY

### 4.1    General

Contractor shall indemnify and hold harmless Martifer and its officers, members, managers, employees, agents, contractors, sublicensees, affiliates, subsidiaries, successors and assigns from and against any and all damages, liabilities, costs, expenses, claims and/or judgments, including, without limitation, reasonable attorneys' fees and disbursements (collectively the "Claims") which any of them may suffer from or incur and which arise or result from (i) any gross negligence or willful misconduct of Contractor arising from or connected with Contractor's carrying out of its duties under this Agreement, or (ii) the breach by Contractor of any of its obligations, agreements or duties under this Agreement.

### 4.2    Survival

Consultant's obligations under this Section shall survive Termination or Expiration of this Agreement, and shall apply regardless of whether or not any insurance policy is determined to be applicable to the Claim.

## 5.    TERM

### 5.1    Completion Date

This Agreement shall be deemed to have commenced on the Date of this Agreement and shall end upon January 31, 2012 (the "Initial Term"). Following the Initial Term, this Agreement can be renewed as agreed upon between the CFO & Consultant and either party shall have the right to terminate the duties and responsibilities, with or without justifiable cause, upon thirty (10) days' prior written notice to the other party. All other provisions and obligations set forth herein will survive any termination of this Agreement.

### 5.2    Early Termination

In the event either party fails or refuses to perform any of the provisions of this Agreement at the time and in the manner required, the non-defaulting party shall give the defaulting party written notice of the default, the nature of the default, and the steps necessary to cure the default. In addition to any other available legal or equitable rights or remedies, if the default is not promptly cured, the non-defaulting party may terminate this Agreement by giving written notice to the defaulting party.

## 6.    DISPUTE RESOLUTION

### 6.1    Good Faith Negotiations

In the event that any question, dispute, difference or claim arises out of or in connection with this Agreement, including any question regarding its existence, validity, performance or termination (a "Dispute"), which either Party has notified to the other, senior management personnel from both Consultant and Martifer shall meet and diligently attempt in good faith to resolve the Dispute for a period of thirty (30) days following one Party's written request to the other Party for such a meeting. If, however, either Party refuses or fails to so meet, or the Dispute is not resolved by negotiation, the provisions of Section 6.2 shall apply.

### 6.2    Submission to Jurisdiction

Each Party hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Superior Court of the State of California, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the Parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such State or, to the extent permitted by law, in such Federal court.

### 6.3    Waiver of Jury Trial

EACH PARTY HEREBY IRREVOCABLY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION IN ANY COURT IN ANY JURISDICTION BASED UPON OR ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER TRANSACTION OR DOCUMENT RELATED TO THIS AGREEMENT.

## 7.    MISCELLANEOUS

CONFIDENTIAL
CA LICENSE#813701



### 7.1 Notices

Notices required or desired to be served by either party upon the other party shall be deemed received on: (i) the day of delivery, if delivered by hand during the receiving party's regular business hours or by facsimile or e-mail before or during the receiving party's regular business hours; or (ii) on the second business day following deposit in the mail, if delivered by United States mail postage prepaid. Notices shall be sent to the address set forth below for the receiving party unless such party has previously given notice of a different address:

To Consultant:
Klaus Bernhart
Strandstrasse 9
24159 Kiel-Holtenau
Germany

To Martifer:
MARTIFER SOLAR USA, INC.
2040 Armacost Avenue
Second Floor
Los Angeles, CA  90025
Attention: Roland Kiser
Phone: 310.820.7080
Facsimile: 310.820.7090
Email: rkiser@martifersolarusa.com

### 7.2 Governing Law

This Agreement shall be governed by and construed pursuant to the law of the State of California.

### 7.3 Goodwill and Publicity

Consultant shall not use the name, trade name, service mark, or trademark Martifer in any promotional or advertising material without the prior written consent of Martifer. Martifer reserves all rights in making public announcements related to the execution and existence of this Agreement and the installation and operation of the Project, and Martifer shall have the right to promptly review, comment upon, and approve any publicity materials, press releases, or other public statements by the other Party that refer to, or that describe any aspect of, this Agreement or the Project and no such publicity releases or other public statements (except for filings or other statements or releases as may be required by, or cannot be proscribed by Applicable Law), shall be made by Consultant without the prior written consent of Martifer. At no time shall Consultant acquire any rights whatsoever to any trademark, trade name, service mark, logo or other intellectual property right belonging to the Martifer without an express written agreement with respect thereto.

### 7.4 Inventions

Any and all inventions, discoveries, developments and innovations conceived by the Consultant during this engagement relative to the duties under this Agreement shall be the exclusive property of Martifer; and Consultant hereby assigns all right, title, and interest in the same to Martifer. Any and all inventions, discoveries, developments and innovations conceived by Consultant prior to the term of this Agreement and utilized by Consultant in rendering duties to Martifer are hereby licensed to Martifer for use in its operations and for an infinite duration. This license is non-exclusive, and may be assigned without the Consultant's prior written approval by Martifer to a wholly-owned subsidiary of Martifer.

### 7.5 Non-Disclosure

Consultant and Martifer, by executing this agreement, signify that each party agrees to the terms of the attached Mutual Non-Disclosure Agreement (Exhibit A).

### 7.6 Assignment

Consultant shall not assign, transfer, delegate or encumber any interest or obligations in this Agreement without the prior written consent of Martifer, which consent will not be unreasonably withheld. Any attempt by Consultant to assign, transfer, delegate or encumber any rights, duties or obligations shall be void.

### 7.7 Severability

If any provision of this Agreement is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

### 7.8 Integration

The attached Exhibits are incorporated by reference. This Agreement (including the attached Exhibits) constitutes the entire contract of the parties and supersedes all prior and contemporaneous negotiations, proposals, understandings and agreements of the parties with respect to this subject matter. This Agreement is intended by the

CONFIDENTIAL
CA LICENSE#813701



parties as the final, complete and exclusive statement of the terms of their contract. No amendment of this Agreement shall be deemed valid unless in writing and signed by both parties.

**IN WITNESS WHEREOF**, the Parties have executed this Consultant Agreement as of the date set forth above.

**CONSULTANT:**

_____          _____
Signature                                                       Date
                                                                       12/10/12

Klaus Bernhart

**MARTIFER:**

_____          _____
Signature                                                       Date
                                                                       12/19/12

Raffi Agopian

CEO

Martifer Solar USA, Inc.

12/10/2012

CONFIDENTIAL
CA LICENSE#813701



**EXHIBIT A**

## MUTUAL CONFIDENTIALITY AND NON-CIRCUMVENTION AGREEMENT

This **MUTUAL CONFIDENTIALITY AND NON-CIRCUMVENTION AGREEMENT** is made and entered into as of December 7, 2012, (the "*Agreement*") by and between Klaus Bernhart, an individual residing at Strandstrasse 9, 24159 Kiel-Holtenau, Germany and Martifer Solar USA, Inc., a California corporation, with its principal office at 2040 Armacost Avenue, Los Angeles, CA, 90025, each in connection with Confidential Information (as defined below) provided by it or on its behalf, a "*Discloser*" and, in connection with the Confidential Information received by it or on its behalf, a "*Recipient*," and, collectively, the "*Parties*."

**WHEREAS**, each Party to this Agreement may be receiving from the other Party or its officers, directors, agents, employees, affiliates or representatives, including advisers and legal counsel (collectively, "*Representatives*") information of a confidential and non-public nature for use by it and its Representatives in connection with certain financial, marketing and technical information regarding the design and construction of renewable energy projects (collectively, the "*Transaction*"), and the Parties desire to protect the confidentiality of such information in accordance with the terms of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants contained in this Agreement, the Parties hereby agree as follows:

1. **Confidential Information Defined.** "*Confidential Information*" means, with respect to each Discloser respectively, the content of negotiations and discussions between the Parties regarding the Transaction, any and all technical and non-technical information, whether in oral, written, graphic, machine-readable, tangible or intangible form, relating to the Discloser's business plan and model, and/or to current, future, or proposed products, services or other business activities of the Discloser including, but not limited to, trade secrets, knowledge, formulas, supply sources, computer code (source code and object code), hardware configurations, know-how, products, equipment, computer programs, customer lists, agreements with third parties, forms, price lists, financial statements, business forecasts and projections, marketing and business plans, information relating to customers, potential customers, employees, suppliers, vendors and professionals involved in the Transaction ("Contact Persons") and other information regarding the financial or business affairs of the Discloser. Confidential Information shall also include all information related to the Transaction provided by the Discloser to the Recipient prior to the signing of this Agreement. Confidential Information does not include information that (i) becomes generally available to the public other than as a result of unauthorized disclosure or use by the Recipient, (ii) was already in possession of the Recipient on a non-confidential basis prior to its disclosure by the Discloser, (iii) becomes available to the Recipient on a non-confidential basis from a source other than the Discloser, provided that the disclosing person is lawfully in possession of such Confidential Information and under no obligation of confidentiality to the Discloser or any third party or (iv) is approved in writing by the Discloser for the Recipient to use or disseminate free of any ongoing obligations hereunder.

2. **Nondisclosure Obligation.** The Recipient shall:

    2.1    not disclose Confidential Information to any person or entity other than the Recipient;

    2.2    not use Confidential Information for any purpose other than for evaluating the Transaction;

    2.3    not make copies, including, without limitation, photocopies, photographs, drawings, or electronic copies, or otherwise duplicate any documents or other materials provided by the Discloser that comprise or contain Confidential Information;

    2.4    treat confidentially all documents and materials containing or referring to any Confidential Information and confirm that all such documents and materials in its possession or control is marked in a manner that discloses that it contains Confidential Information and is subject to confidentiality obligations;

    2.5    promptly notify the Discloser in writing of any actual or suspected misuse, misappropriation or unauthorized disclosure of Confidential Information that may come to the attention of the Recipient; and

    2.6    notify the Discloser in writing at least fifteen (15) days prior to using, disclosing or copying information that would be considered Confidential Information but for the provisions of clauses (i) through (iii) in the definition of Confidential Information, and allow the Discloser a reasonable opportunity prior to any use or disclosure by the Recipient to seek a protective order or other legal protection should the Discloser notify the Recipient within such fifteen (15) day notice period that the Discloser considers the information to be Confidential Information and subject to the terms of this Agreement.

12/10/2012

# MARTIFER
## SOLAR

If the Recipient or any of its Representatives receives a subpoena or court or governmental order to produce any Confidential Information or if the Recipient otherwise determines that the Recipient is legally required to disclose or produce any Confidential Information in its possession or control, the Recipient will (i) promptly notify the Discloser in writing of such required disclosure, (ii) allow the Discloser a reasonable opportunity to seek a protective order or other relief to prevent, restrict and/or limit such disclosure and cooperate with the Discloser in seeking any such relief, and (iii) disclose only that portion of the Confidential Information that is legally required to comply with the subpoena, order or other disclosure requirement.

Promptly following the Discloser's written request, the Recipient will (i) promptly return, or cause to be returned, to the Discloser all materials that the Discloser has provided pursuant to this Agreement, including (but not limited to) all materials containing or referring to Confidential Information and all copies of such materials in its possession or control, and (ii) if any Confidential Information is integrated with the Recipient's documents or media (e.g. computer drives), destroy or erase such documents and media and the Recipient will certify in writing to the Discloser within twenty (20) days after termination of this Agreement that all required destruction or erasure of documents and media have been carried out. Notwithstanding the foregoing, one copy of any Confidential Information may be retained in the files of the Recipient's legal counsel, and the Recipient will have no obligation to return or destroy internal materials containing Confidential Information such as, for example, credit requests, approval papers and analyses that were prepared in connection with the Transaction by the Recipient or its Representatives.

For the purpose of complying with the obligations set forth in this Agreement, the Recipient shall use efforts commensurate with those it employs for the protection of comparable sensitive information of its own, but in no case less than a reasonable degree of care.

**3.      Non-Circumvention.** The Recipient shall not at any time prior to the expiration of three (3) years from the date of this Agreement, without the prior written consent of the Discloser, which consent the Discloser may withhold in its sole discretion, (a) attempt in any manner to deal directly or indirectly in any manner with any of the Contact Persons or other individuals or companies related to the Transaction including by having any part of or deriving any benefit from the Transaction or any aspect thereof, or (b) by-pass, compete, avoid, circumvent, or attempt to circumvent the Discloser relative to the Transaction or the Contact Persons, including by utilizing any of the Confidential Information or by otherwise exploiting or deriving any benefit from the Confidential Information.

**4.      No Representations or Further Obligations.** Each Discloser warrants that it has the right to make the disclosures to be made by it or on its behalf under this Agreement. All disclosures made hereunder are at the sole discretion of the Discloser. It is understood that this Agreement does not obligate the Recipient to enter into any further agreements or to proceed with the Transaction or any other possible relationship or other transaction with the Discloser. The Parties will act as, and at all times be, independent contractors, and nothing contained in this Agreement will be construed to create or imply a joint venture, partnership, principal, agent or employment relationship between or among the Parties. The Discloser does not make any covenants, warranties or representations with respect to the accuracy or completeness of any Confidential Information disclosed hereunder, and the Discloser shall have no liability to the Recipient arising out of the use of Confidential Information supplied under this Agreement except to the extent set forth in a definitive agreement duly executed by the Parties with respect to the Transaction.

**5.      Injunctive Relief.** Each Recipient agrees that, in view of the unique nature of the Confidential Information and the irreparable loss that could be sustained by the Discloser in the event of the unauthorized disclosure, copying or use of Confidential Information, the Discloser will be irreparably damaged and will not have an adequate remedy at law if the terms of this Agreement are violated, and therefore agree that the Discloser will be entitled to injunctive relief, including specific enforcement, to enforce the provisions of this Agreement, in addition to any other remedy to which the Discloser may be entitled at law. Each Recipient agrees that if any action should be brought by the Discloser in equity to enforce any of the provisions of this letter, the Recipient may not raise the defense that there is an adequate remedy at law.

**6.      Indemnity.** The Recipient agrees to indemnify and hold harmless the Discloser from and against all liabilities, claims, damages, costs and expenses (including reasonable legal fees and expenses) arising out of or in connection with any breach by the Recipient or any of its Representatives of any obligation hereunder.

**7.      Publicity.** Neither Party may disclose to any third party or parties the existence of discussions between the Parties regarding the Transaction, except with the prior written consent of the other Party.

**8.      Termination.** This Agreement covers only Confidential Information that is disclosed on or after the date hereof. The Recipient's obligations with respect to the Confidential Information received under this Agreement expire on the earlier of (a) the second anniversary of the date hereof and (b) the execution of a definitive agreement containing confidentiality provisions between the parties in connection with the Transaction. In addition, the Parties may terminate their obligations hereunder upon a date mutually agreed in writing.

12/10/2012

**MARTIFER**
SOLAR

9.     **Non-Interference.** Each Party agrees that it will not (i) interfere with the other Party's project development activities, (ii) visit the site or sites that are the subject of the Transaction, or (iii) contact site personnel, local representatives, or investors without the prior written consent of the Party developing that project as of the date of this Agreement.

10.     **Miscellaneous.**

     10.1     Assignment.   Neither Party will voluntarily or by operation of law assign, hypothecate, transfer, license, or otherwise transfer or encumber all or any part of its rights, duties, or other interests in this Agreement or the proceeds thereof (collectively, an "*Assignment*"), without the other Party's prior written consent, which consent will not be unreasonably withheld or delayed; provided, however, that no such consent will be required for any assignment by a Party to such party's successor in interest in connection with a merger, acquisition, reorganization or transfer of all or substantially all of a Party's stock, assets or business.  Any attempt to make an Assignment in violation of this provision will be a material default under this Agreement and any Assignment in violation of this provision will be null and void

     10.2     Waiver of Breach.   Any waiver by a Party of the other Party's breach of the terms and conditions of this Agreement will not be considered as a waiver of any subsequent breach of the same or any other term or condition hereof.

     10.3     Attorneys' Fees.   In the event of a breach of this Agreement by the Recipient, the Discloser may obtain from a court of competent jurisdiction injunctive, other equitable relief or any other relief at law.  The prevailing party in any action under this Agreement will be entitled to recover from the other party all of its attorneys' fees and costs including, without limitation, costs of any experts.

     10.4     Counterparts.   This Agreement may be executed in counterparts, with all counterpart signatures constituting the final Agreement.  Facsimile signatures are accepted as originals for all purposes.

     10.5     Entire Agreement.   This writing constitutes the entire agreement of the Parties with respect to the subject matter hereof.  This Agreement supersedes all prior agreements and understandings between the Parties with respect to such subject matter.  This Agreement may be modified only by written agreement signed by both Parties.

     10.6     Severability.   In the event that any provision or any part of any provision of this Agreement is held to be illegal, invalid or unenforceable, such illegality, invalidity or unenforceability will not affect the validity or enforceability of any other provision or part hereof.

     10.7     Notices.   Any notice required or permitted to be given hereunder will be in writing and may be given by personal delivery (including delivery by messenger or by overnight courier service), by facsimile or by certified mail, return receipt requested, addressed as follows:

KLAUS BERNHART                          MARTIFER SOLAR USA, INC.
Strandstrasse 9                         2040 Armacost Avenue
24159 Kiel-Holtenau                     Second Floor
GERMANY                                 Los Angeles, CA  90025
                                        Attention: Raffi Agopian
                                        Phone: 310.820.7080
                                        Facsimile: 310.820.7090
                                        Email: raffi@martifersolarusa.com

Notice will be effective upon receipt or refusal of delivery by the intended recipient, as evidenced by the records of the messenger or delivery service or the U.S. Postal Service or by mechanical confirmation of successful facsimile transmission, provided that if such transmission is confirmed on a non-business day or later than 5:00 p.m. local time at the Recipient's location, receipt will be deemed to have been given at 9 a.m. on the following business day.  Either Party may, by notice to the other, specify a different address or facsimile number for notice purposes.

     10.8     Governing Law.   This Agreement will be governed by and construed according to the laws of the State of California, without reference to principles of choice of law thereof.

**[Signature Page Follows]**

CONFIDENTIAL
CA LICENSE#813701

**MARTIFER**
SOLAR

**IN WITNESS WHEREOF**, a duly authorized representative of each Party hereto has executed this Agreement.

_____          _____
Signature                                                   Date

Klaus Bernhart

**CONTRACTOR:**

_____          _____
Signature                                                   Date

Raffi Agopian
**CEO**
**Martifer Solar USA, Inc.**

12/10/2012

CONFIDENTIAL
CA LICENSE#813701

## ACTION BY UNANIMOUS WRITTEN CONSENT
## OF THE BOARD OF DIRECTORS OF
## MARTIFER SOLAR USA, INC.,
### a California corporation

In accordance with Section 307(b) of the California Corporations Code and the Bylaws of Martifer Solar USA, Inc. (the "*Corporation*"), the undersigned, constituting all the members of the board of directors of the Corporation (the "*Board*"), hereby take the following actions and adopt the following resolution by written consent without a meeting:

### Resolution:

### Executive Employment Agreements

WHEREAS, the Board has been presented with forms of employment agreements for Roland Kiser, the Corporation's CEO, and Klaus Bernhart, the Corporation's CFO, copies of which are attached hereto (the "*Executive Employment Agreements*"); and

WHEREAS, after reviewing the Executive Employment Agreements, the Board has determined that it is appropriate and in the best interests of the Corporation for the Corporation to enter into the Executive Employment Agreements.

NOW, THEREFORE, BE IT RESOLVED, that the Executive Employment Agreements are hereby approved;

RESOLVED FURTHER, that Pedro Gomes Pereira is authorized to sign Mr. Kiser's and Mr. Bernhart's Executive Employment Agreement on behalf of the Corporation.

This Action by Written Consent may be signed in counterparts, each of which will be considered an original, but all of which, taken together, will constitute one and the same instrument. This Action by Written Consent may be executed by facsimile or electronic transmission.

This Action by Written Consent must be filed in the Minute Book of the Corporation and become a part of the records of the Corporation.

*[Signatures on the following page]*

ACTIVE 21916076v1 07/29/2013 9:05 AM

Document Integrity Verified     EchoSign Transaction Number: W6AXD6663X2R7D

IN WITNESS WHEREOF, the undersigned have executed this Action by Unanimous Written Consent of the Board dated effective as of the latest date set forth below.

Date:  04 / 01 / 2013

_Klaus Bernhart_
Klaus Bernhart (Aug 1, 2013)

Pedro Gomes Pereira

Date:  04 / 01 / 2013

Gustavo Fernandes

Date:  04 / 01 / 2013

Filipe Santos

Date:  04 / 01 / 2013

Roland Kiser

ACTIVE 21916076v1 07/29/2013 9:05 AM

# EXHIBIT 4

# EXHIBIT 4

## EXECUTIVE EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is made and entered into as of July 25, 2013, by and between Martifer Solar USA, Inc., a California corporation (the "Company"), with its principal place of business at 2040 Armacost Avenue, Los Angeles, California 90025, and Klaus Bernhart (the "Executive"). This Agreement replaces and supersedes any prior agreements, oral or written, between the Company and the Executive pertaining to the subject matter hereof.

### 1.    Commencement of Employment; Term

This Agreement is effective as of March 10, 2013 (the "Commencement Date") and shall continue for a period of one year, until March 10, 2014, after which time continued employment shall be on an at-will basis, unless:

a.    Executive's employment is terminated by either party in accordance with the terms of Section 6 of this Agreement; or

b.    Executive's term of employment is extended by a subsequent agreement duly executed by each of the parties to the Agreement, in which case such employment shall be subject to the terms and conditions contained in the subsequent written agreement.

c.    In the event that Executive's employment with the Company is not extended pursuant to a subsequent agreement, Company shall pay to Executive four (4) months' salary in a single lump sum payment on or before April 1, 2014,

### 2.    Duties and Obligations of Executive

a.    Executive shall serve as the Company's Chief Financial Officer. In that capacity, Executive shall be responsible for the Company's financial matters, including without limitation internal and external reporting, controls, purchasing and payroll, banking activities, budget management, and shall supervise the Company's finance team, and shall do and perform all other services, acts, and things necessary or advisable to fulfill the duties of a Chief Financial Officer.

b.    Executive shall report directly to the Company's Chief Executive Officer and shall at all times be subject to the policies established by the Board of Directors of the Company. Executive shall comply with the Company's policies and procedures as in effect from time to time during his employment with the Company, including, without limitation, the Company's Policy and Procedures Manual, Inventions Agreement, and any other policies with respect to conflicts of interest, equal employment opportunity, sexual harassment, and drug or alcohol abuse.

c.    Executive agrees that to the best of his ability and experience he will at all times loyally and conscientiously perform all of the duties and obligations required of him either expressly or implicitly by the terms of this Agreement and that may be assigned to him from time to time in accordance with this Agreement.

1

Document Integrity Verified                                                     EchoSign Transaction Number: W4HKIZ576G2G4Y

d.      So long as Executive is an employee of the Company, Executive shall devote his entire productive time, ability and attention to the business of the Company and its affiliates including, but not limited to, Martifer Silverado Fund 1, LLC, and Silverado Power, LLC.

e.      This Agreement shall not be interpreted to prohibit Executive from making passive personal investments or conducting private business affairs if those activities do not materially interfere with the services required under this Agreement. However, Executive shall not, directly or indirectly, acquire, hold or retain any interest in any business competing with or similar in nature to the Company. Furthermore, Executive shall not, while employed by the Company, directly or indirectly, either as an Executive, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of the Company.

3.   **Confidentiality**

a.      As a condition of employment, Executive will be required to sign and abide by the Company's Inventions Agreement.

b.      During Executive's employment at the Company, he shall not utilize any confidential, proprietary and/or trade secret information belonging to any former employers or other third parties. Executive agrees to advise the Company of any confidentiality obligations he has with prior employers or other third parties, and to fully abide by those obligations.

4.   **Compensation of Executive; Benefits**

a.      <u>Base Salary</u>.  As compensation for the services to be rendered by Executive hereunder, the Company shall pay Executive an annual salary of One Hundred Eighty-Five Thousand Dollars ($185,000) (the "<u>Base Salary</u>"), payable in accordance with the Company's payroll schedule, prorated for any partial employment period. Executive will receive such annual increases to the Base Salary, if any, as may be determined by the Board of Directors in its sole discretion from time to time. [Increase in salary?]

b.      <u>Restructuring Bonus</u>.  For his services during the term of this Agreement, Executive shall receive a restructuring bonus in the amount Fifty Thousand Dollars ($50,000), which shall be paid on or before March 10, 2014.

c.      <u>Car Allowance</u>.  Executive shall be paid a car allowance in the amount of Five Hundred Dollars ($500) per month. Company shall also pay for Executive's car insurance, gas, and reasonable automobile maintenance expenses.

d.      <u>Paid Time Off</u>.  Executive shall be provided with paid time off each calendar year for vacation, sick time, family illness, or other personal time off in accordance with the Company's policies for all employees ("<u>Paid Time Off</u>"). Executive shall accrue such Paid Time

Document Integrity Verified                                                                 EchoSign Transaction Number: W4HKIZ576G2G4Y

Off beginning on the Commencement Date, and it shall accrue pro rata throughout the calendar year. If Executive is unable for any reason to take the total amount of accrued Paid Time Off during any calendar year, the Company shall pay out any remaining accrued but unused Paid Time Off on or before December 31st of each calendar year. Paid Time Off shall begin to accrue again pro rata on January 1st of each calendar year. To the extent that Paid Time Off includes planned vacations of one week or more, Executive shall coordinate such vacation time off with the Board of Directors. Upon approval of the Board of Directors in its sole discretion, Executive may take Paid Time Off before it is accrued.

     e.    <u>Housing</u>.  The Company will provide Executive with accommodations in an apartment located at 13836 Bora Bora Way, Unit No. B114, Marina Del Rey, California 0292. Executive will share the apartment with the Company's Chief Executive Officer, Roland Kiser. The Company will pay all costs associated with the apartment, including rent, utilities, internet and cable television. The Company shall pay any increases in rent that may occur during the term of this Agreement. In the event that this Agreement is terminated by the Company for any reason other than for cause (as set forth in Section 6(e)), the Company shall pay the remainder of any lease term on housing leased by Executive.

In addition, Executive may work from Germany for no more than one week per calendar month, and shall be reimbursed in an amount up to One Thousand Dollars ($1,000.00) per month for costs incurred by Executive in connection with traveling to and from Germany, provided that Executive furnishes the Company with adequate records evidencing such costs.

     f.    <u>Benefits</u>.  Other than the specific benefits provided in this Paragraph 4, the benefits for which Executive will be eligible are described in the Policy and Procedures Manual, and the Summary Plan Descriptions for each benefit plan, which have been provided to Executive. Executive will be covered by these benefits as per his coverage elections and the plan terms. In the event that changes are made to any of the benefit plans, at the Company's sole discretion, the changes will apply to Executive as they do other employees of the Company.

     g.    <u>Taxes</u>.  Executive shall be solely responsible for income taxes imposed on the Executive by reason of any compensation and benefits provided under this Agreement, and all such compensation and benefits shall be subject to applicable withholding by the Company.

## 5.  Business Expenses

    The Company will promptly reimburse Executive for all reasonable business expenses incurred by Executive in performing his duties as described in Paragraph 2 above, including expenditures for entertainment and travel (the "<u>Expenditures</u>"). Each Expenditure will be reimbursable only if it is of a nature qualifying it as a proper deduction on the Company's federal and state income tax returns. Each Expenditure will be reimbursable only if Executive furnishes to the Company adequate records and other documentary evidence required by federal and state statutes and regulations issued by the appropriate taxing authorities for the substantiation of that expenditure as an income tax deduction.

3

Document Integrity Verified        EchoSign Transaction Number: W4HKIZ576G2G4Y

6.    **Termination of Employment**

a.    <u>By Death</u>. Executive's employment shall terminate upon the death of the Executive. The Company shall pay Executive's beneficiaries or estate, as appropriate, any Base Salary and benefits then due and owing, including payment for accrued and unused Paid Time Off, if any, as well as any other applicable benefits set forth in this Agreement. No other payments or benefits shall be made to Executive's beneficiaries or estate, except that nothing in this Paragraph shall affect any entitlement of Executive to the benefits of any applicable benefit plans.

b.    <u>By Disability</u>. If by reason of any physical or mental incapacity, Executive has been or will be prevented from properly performing his duties under this Agreement for more than ninety (90) consecutive days in any 365 day period, and Executive is not on an approved leave of absence, including, without limitation leave under the Family Medical Leave Act or the California Family Rights Act, disability leave, or workers' compensation leave, then to the extent permitted by law, the Company may replace Executive's position and terminate Executive's employment upon reasonable advance written notice to Executive. The Company shall pay Executive all compensation and benefits set forth in this Agreement to which he is entitled; thereafter, all obligations of the Company under this Agreement shall cease, unless otherwise stated or reserved. Nothing in this Paragraph 6 shall affect the Executive's rights under any applicable Company disability and/or benefit plans.

c.    <u>By Sale or Closure of Business</u>. Company may terminate this Agreement upon thirty (30) days' written notice upon the happening of any of the following events:

(i)    The sale by Company of substantially all of its assets to a single purchaser or a group of associated purchasers;

(ii)    The sale, exchange or other disposition, in one transaction, of at least fifty percent (50%) of the outstanding common shares of the Company;

(iii).    A decision by Company to terminate its business and liquidate its assets; or the merger or consolidation of Company in a transaction in which the shareholders of Company receive at least fifty percent (50%) of the outstanding voting shares of the new or continuing corporation.

In the event that Company terminates this Agreement pursuant to this Section 6(c), Company shall pay to Executive four (4) months' salary in a single lump sum payment.

d.    <u>By Company Without Cause</u>. Company may terminate Executive without cause upon thirty (30) days written notice. Upon termination without cause, Company shall pay to Executive four (4) months' salary in a single lump sum payment ("Severance Payment").

e.    <u>By Company With Cause</u>. At any time during Executive's Employment, the Company may terminate his employment With Cause under this Paragraph 6(d). "<u>With Cause</u>" shall be limited to the following acts after the Board of Directors has given Executive written

4

Document Integrity Verified

notice of such acts and, if such acts may be cured, if Executive fails to cure such act within fifteen (15) days after such written notice: (a) the failure by Executive to substantially perform his material duties (other than such failure resulting from his incapacity due to physical or mental impairment); (b) the gross misconduct by Executive with regard to the Company that is injurious to the Company; or (c) Executive's conviction for a felony or for any other serious crime involving fraud, embezzlement, dishonesty, misappropriation, theft or moral turpitude (excluding traffic offenses). For the avoidance of doubt, if any such act may not by its nature be cured, the Board of Directors shall not be required to provide said fifteen (15) days notice. Any termination of employment of Executive by the Company which does not meet the definition of With Cause in this Paragraph 6(d), and does not involve the Executive's death or disability as described in Paragraphs 6(a) and 6(b) shall be treated as a termination "Without Cause" under Paragraph 6(c) herein.

    f.    By Executive For Any Reason Other Than Death or Disability.  Executive may terminate his employment with the Company at any time by providing thirty (30) days written notice to the Board of Directors. The Company may, in its sole discretion, pay Executive in lieu of the notice period. Under no circumstances shall Executive's decision to terminate his employment entitle him to the Severance Payment described in Paragraph 6(d).

7.    **Indemnification of Executive**

    Substantially concurrently with the execution of this Agreement, the Company and Executive will enter into an indemnification agreement in the form attached hereto as Exhibit A.

8.    **Representations, Warranties and Covenants of Executive**

    a.    Restrictions.  Executive represents and warrants to the Company that:

        (i)    There are no restrictions, agreements or understandings whatsoever to which Executive is a party that would prevent or make unlawful Executive's execution of this Agreement or Executive's employment hereunder, that is or would be inconsistent or in conflict with this Agreement or Executive's employment hereunder, or that would prevent, limit or impair in any way the performance by the Executive of the obligations hereunder; and

        (ii)    Executive has disclosed to the Company all restraints, confidentiality commitments or other employment restrictions that he has with any other employer, person or entity.

    b.    Obligations to Former Employers.  Executive covenants that in connection with his provision of services to the Company, he will not breach any obligation (legal, statutory, contractual or otherwise) to any former employer or other person, including, but not limited to, obligations relating to confidentiality and proprietary rights.

9.    **Non-Disparagement**

Document Integrity Verified                    EchoSign Transaction Number: W4HKIZ576G2G4Y

Executive will not at any time during or after the term of his employment with the Company make any public statements, whether orally or in writing, which are intended to be derogatory or damaging to the Company or any of its officers, Executives, directors, partners, agents or shareholders.

## 10.    Successors and Assigns; Assignability

a.      This Agreement shall be binding upon and inure to the benefit of both the Company and the Executive, and their respective heirs, successors and assigns; provided, however, that neither Party shall transfer, assign or delegate this Agreement or any rights or obligations hereunder.

b.      Notwithstanding the provisions of Paragraph 10(a) above, the Company may assign or delegate its rights, duties and obligations hereunder to any successor to the Company (whether direct or indirect, by purchase, merger, consolidation or otherwise). The Company shall require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if such succession had not taken place.

## 11.    Non-Solicitation of Company Employees

Effective on the Commencement Date, and for one year after his employment with the Company ends, Executive may not solicit any of the Company's current employees, except that Executive may, with the agreement of the Company, solicit Employees to work for RAMCO. For purposes of this Agreement, the term "solicit" includes, but is not limited to, any communication or contact, whether direct or indirect, on the Executive's behalf or on behalf of any other party, for the purpose of or with the intended effect of inducing a change in their employment status with the Company.

## 12.    Mediation and Arbitration

Executive and the Company agree that any and all disputes regarding this Agreement or Executive's employment with the Company will first be addressed in mediation before a mutually agreeable mediator, paid for by the Company. If the matter cannot be resolved in mediation, then the dispute will be resolved in binding arbitration administered by JAMS pursuant to its Employment Arbitration Rules then in effect. The arbitration shall take place before an experienced JAMS employment arbitrator licensed to practice law in Los Angeles County mutually selected by the parties. The arbitrator may not modify or change this Agreement in any way. All out-of-pocket costs of the arbitration, including the fees of the arbitrator, the costs of any record or transcript of the arbitration, administrative fees, and other fees and costs shall be paid for by the Company. Each party shall initially be responsible for its own attorneys' fees, except that the arbitrator may award such fees and costs, exclusive of the arbitrator's fees, to the prevailing Party as set forth in Paragraph 13(b). All procedural and substantive rights that the Executive and the Company would have in a court of law, will be extended to the parties in arbitration, including full discovery and all forms of relief. The parties

ACTIVE 21894459v1 07/26/2013 11:26 AM

Document Integrity Verified                                                                    EchoSign Transaction Number: W4HKIZ576G2G4Y

expressly acknowledge that they are waiving any right they may have to a jury trial for any and all claims covered by this Agreement.

13.    **General Provisions**

(a)    Notices. Any notice required or permitted to be given hereunder shall be in writing and may be given by personal delivery (including delivery by messenger or by overnight courier service), by facsimile or by certified mail, return receipt requested, addressed to the parties at the addresses set forth in the introductory paragraph of this Agreement.

(b)    Attorneys' Fees. In any action undertaken to enforce the terms of this Agreement, including arbitral proceedings, the prevailing party shall be reimbursed by the non-prevailing party for such prevailing party's reasonable attorneys' fees and expenses, including the costs of enforcing an arbitral award or a judgment.

(c)    Governing Law. This Agreement shall be governed by and construed according to the laws of the State of California, without reference to principles of choice of law thereof.

(d)    Counterparts. This Agreement may be executed in one or more counterparts, both of which taken together shall be deemed one original.

(e)    Entire Agreement. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof. This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter. This Agreement may be modified only by written agreement signed by both parties.

(f)    Severability. The parties hereto desire and intend that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations of any party under this Agreement will not be materially and adversely affected thereby, (i) such provision will be fully severable, (ii) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (iii) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom and (iv) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

*Remainder of page intentionally left blank.*

7

Document Integrity Verified

The parties hereto execute this Agreement:

**EXECUTIVE**

*Klaus Bernhart*
Klaus Bernhart (Aug 1, 2013)

Klaus Bernhart

Aug 1, 2013

Date

**COMPANY**
**Martifer Solar USA, Inc.**

By: _____

Pedro Gomes Pereira

Its: Authorized Representative

04/01/2013

Date

ACTIVE 21894459v1 07/26/2013 11:26 AM

Document Integrity Verified

# EXHIBIT 5

# EXHIBIT 5

## ACTION BY UNANIMOUS WRITTEN CONSENT
## OF THE BOARD OF DIRECTORS OF
## MARTIFER SOLAR USA, INC.,
### a California corporation

In accordance with Section 307(b) of the California Corporations Code and the Bylaws of Martifer Solar USA, Inc. (the "*Corporation*"), the undersigned, constituting all the members of the board of directors of the Corporation (the "*Board*"), hereby take the following actions and adopt the following resolution by written consent without a meeting:

Resolution:

Executive Employment Agreements

WHEREAS, the Board has been presented with forms of employment agreements for Roland Kiser, the Corporation's CEO, and Klaus Bernhart, the Corporation's CFO, copies of which are attached hereto (the "*Executive Employment Agreements*"); and

WHEREAS, after reviewing the Executive Employment Agreements, the Board has determined that it is appropriate and in the best interests of the Corporation for the Corporation to enter into the Executive Employment Agreements.

NOW, THEREFORE, BE IT RESOLVED, that the Executive Employment Agreements are hereby approved;

RESOLVED FURTHER, that Pedro Gomes Pereira is authorized to sign Mr. Kiser's and Mr. Bernhart's Executive Employment Agreement on behalf of the Corporation.

This Action by Written Consent may be signed in counterparts, each of which will be considered an original, but all of which, taken together, will constitute one and the same instrument. This Action by Written Consent may be executed by facsimile or electronic transmission.

This Action by Written Consent must be filed in the Minute Book of the Corporation and become a part of the records of the Corporation.

*[Signatures on the following page]*

ACTIVE 21916076v1 07/29/2013 9:05 AM

IN WITNESS WHEREOF, the undersigned have executed this Action by Unanimous Written Consent of the Board dated effective as of the latest date set forth below.

Date:  04 / 01 / 2013

*Klaus Bernhart*
Klaus Bernhart (Aug 1, 2013)

Pedro Gomes Pereira

Date:  04 / 01 / 2013

Gustavo Fernandez

Date:  04 / 01 / 2013

Filipe Santos

Date:  04 / 01 / 2013

Roland Kiser

ACTIVE 21916076v1 07/29/2013 9:05 AM

# EXHIBIT 6

# EXHIBIT 6

MARTIFER SOLAR USA

INDEMNIFICATION AGREEMENT

This Indemnification Agreement ("**Agreement**"), effective as of December 4, 2012, is by and between Martifer Solar USA, Inc. (the "**Company**") and Klaus Bernhart, an individual (the "**Indemnitee**").

WHEREAS, Indemnitee is employed as the Chief Financial Officer, Treasurer and Secretary of the Company.;

WHEREAS, the Company's Board of Directors ("**Board**") has determined that it is in the best interests of the Company to enhance the ability of the Company to retain and attract the most capable persons as directors and officers and that the Company therefore should seek to assure such persons that indemnification and insurance coverage is available; and

WHEREAS, in recognition of the need to provide Indemnitee with substantial protection against personal liability, in order to procure Indemnitee's continued service as an officer as well as his service as a director of the Company, and to enhance Indemnitee's ability to serve the Company in an effective manner, and in order to provide such protection pursuant to express contract rights (intended to be enforceable irrespective of, among other things, any amendment to the Company's certificate of incorporation or bylaws (collectively, the "**Constituent Documents**"), any change in the composition of the Board or any change in control or business combination transaction relating to the Company), the Company wishes to provide in this Agreement for the indemnification of, and the advancement of Expenses (as defined below) to, Indemnitee as set forth in this Agreement and for the continued coverage of Indemnitee under the Company's directors' and officers' and errors and omissions liability insurance policies.

NOW, THEREFORE, in consideration of the foregoing and the Indemnitee's agreement to provide services to the Company, the parties agree as follows:

1.    Definitions. For purposes of this Agreement, the following terms shall have the following meanings:

(a)    "Beneficial Owner" has the meaning given to the term "beneficial owner" in Rule 13d-3 under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

(b)    "Change in Control" means the occurrence after the date of this Agreement of any of the following events:

1



(i)    the consummation of a reorganization, merger or consolidation, unless immediately following such reorganization, merger or consolidation, all of the Beneficial Owners of the Voting Securities of the Company immediately prior to such transaction beneficially own, directly or indirectly, more than sixty percent (60%) of the combined voting power of the outstanding Voting Securities of the entity resulting from such transaction; or

(ii)    the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets.

(c)    "Claim" means:

(i)    any threatened, pending or completed action, suit, proceeding or alternative dispute resolution mechanism, whether civil, criminal, administrative, arbitrative, investigative or other, and whether made pursuant to federal, state or other law; or

(ii)    any inquiry, hearing or investigation that the Indemnitee determines might lead to the institution of any such action, suit, proceeding or alternative dispute resolution mechanism, even if such does not result in an action, suit, proceeding or alternative dispute resolution mechanism.

(d)    "Disinterested Director" means a director of the Company who is not and was not a party to the Claim in respect of which indemnification is sought by Indemnitee.

(e)    "Expenses" means any and all expenses, including attorneys' and experts' fees, court costs, transcript costs, travel expenses, duplicating, printing and binding costs, telephone charges, and all other costs and expenses incurred in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness or participate in, any Claim. Expenses also shall include (i) Expenses incurred in connection with any appeal resulting from any Claim, including without limitation the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent, and (ii) for purposes of Section 4 only, Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, by litigation or otherwise. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(f)    "Expense Advance" means any payment of Expenses advanced to Indemnitee by the Company pursuant to Section 3 or Section 4 hereof.

(g)    "Indemnifiable Event" means any event or occurrence, whether occurring before, on or after the date of this Agreement, related to the fact that Indemnitee is or was a director, officer, employee or agent of the Company or any subsidiary of the Company, or is or was serving at the request of the Company as a director, officer, employee, member, manager, trustee or agent of any other corporation, limited liability company, partnership, joint venture,

2

trust or other entity or enterprise (collectively with the Company, "**Enterprise**") or by reason of an action or inaction by Indemnitee in any such capacity (whether or not serving in such capacity at the time any Loss is incurred for which indemnification can be provided under this Agreement).

(h)      "**Independent Counsel**" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently performs, nor in the past ten (10) years has performed, services for either: (i) the Company or Indemnitee (other than in connection with matters concerning Indemnitee under this Agreement or of other indemnitees under similar agreements) or (ii) any other party to the Claim giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(i)      "**Losses**" means any and all Expenses, damages, losses, liabilities, judgments, fines, penalties (whether civil, criminal or other), ERISA excise taxes, amounts paid or payable in settlement, including any interest, assessments, any federal, state, local or foreign taxes imposed as a result of the actual or deemed receipt of any payments under this Agreement and all other charges paid or payable in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness or participate in, any Claim.

(j)      "**Person**" means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity and includes the meaning set forth in Sections 13(d) and 14(d) of the Exchange Act.

(k)      "**Voting Securities**" means any securities of the Company that vote generally in the election of directors.

2.      Indemnification. Subject to **Section 8 and Section 9** of this Agreement, the Company shall indemnify Indemnitee, to the fullest extent permitted by the laws of the State of California in effect on the date hereof, or as such laws may from time to time hereafter be amended to increase the scope of such permitted indemnification, against any and all Losses if Indemnitee was or is or becomes a party to or participant in, or is threatened to be made a party to or participant in, any Claim by reason of or arising in part out of an Indemnifiable Event, including, without limitation, Claims brought by or in the right of the Company, Claims brought by third parties, and Claims in which the Indemnitee is solely a witness.

3.      Advancement of Expenses. Company shall pay, prior to the final disposition of any Claim by final adjudication, any and all Expenses actually and reasonably paid or incurred by Indemnitee in connection with any Claim arising out of an Indemnifiable Event. Indemnitee's right to such advancement is not subject to the satisfaction of any standard of conduct. Without limiting the generality or effect of the foregoing, within thirty (30) days after any request by

3

Indemnitee, the Company shall, in accordance with such request, (a) pay such Expenses on behalf of Indemnitee, (b) advance to Indemnitee funds in an amount sufficient to pay such Expenses, or (c) reimburse Indemnitee for such Expenses. In connection with any request for Expense Advances, Indemnitee shall not be required to provide any documentation or information to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Indemnitee shall reimburse the Company for any Expenses paid, advanced or reimbursed to the extent that it is ultimately determined, following the final disposition of such Claim, that Indemnitee is not entitled to indemnification hereunder. Indemnitee's obligation to reimburse the Company for Expense Advances shall be unsecured and no interest shall be charged thereon.

4    Indemnification for Expenses in Enforcing Rights. To the fullest extent allowable under applicable law, the Company shall also indemnify against, and, if requested by Indemnitee, shall advance to Indemnitee subject to and in accordance with **Section 3**, any Expenses actually and reasonably paid or incurred by Indemnitee in connection with any action or proceeding by Indemnitee for (a) indemnification or reimbursement or advance payment of Expenses by the Company under any provision of this Agreement, or under any other agreement or provision of the Constituent Documents now or hereafter in effect relating to Claims relating to Indemnifiable Events, and/or (b) recovery under any directors' and officers' or errors and omissions liability insurance policies maintained by the Company. Indemnitee shall only be required to reimburse the Company for Expenses advanced under this Section 4 if a final judicial determination is made that such action brought by Indemnitee was frivolous or not made in good faith.

5.    Partial Indemnity. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for a portion of any Losses in respect of a Claim related to an Indemnifiable Event but not for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

6.    Notification and Defense of Claims.

(a)    Notification of Claims. Indemnitee shall notify the Company in writing as soon as practicable of any Claim which could relate to an Indemnifiable Event or for which Indemnitee could seek Expense Advances, including a brief description (based upon information then available to Indemnitee) of the nature of, and the facts underlying, such Claim. The failure by Indemnitee to timely notify the Company hereunder shall not relieve the Company from any liability hereunder except that the Company shall not be liable to indemnify Indemnitee under this Agreement with respect to any judicial award in a Claim related to an Indemnifiable Event if the Company was not given a reasonable and timely opportunity to participate at its expense in the defense of such action.

(b)    Defense of Claims. The Company shall be entitled to participate in the defense of any Claim relating to an Indemnifiable Event at its own expense and, except as otherwise provided below, to the extent the Company so wishes, Company may assume the defense thereof with counsel reasonably satisfactory to Indemnitee. After notice from the Company to

Indemnitee of its election to assume the defense of any such Claim, the Company shall not be liable to Indemnitee under this Agreement or otherwise, for any Expenses subsequently directly incurred by Indemnitee in connection with Indemnitee's defense of such Claim other than reasonable costs of investigation or as otherwise provided below. Indemnitee shall have the right to employ its own legal counsel in such Claim, but all Expenses related to such counsel incurred after notice from the Company of its assumption of the defense shall be at Indemnitee's own expense: provided, however, that if (i) Indemnitee's employment of his own legal counsel has been authorized by the Company, (ii) Indemnitee has reasonably determined that there may be a conflict of interest between Indemnitee and the Company in the defense of such Claim, or (iii) the Company shall not in fact have employed counsel to assume the defense of such Claim, then Indemnitee shall be entitled to retain his own separate counsel (but he shall retain not more than one law firm plus, if applicable, local counsel in respect of any such Claim), and all Expenses related to such separate counsel shall be borne by the Company. In addition, if there exists a potential, but not an actual conflict of interest between the Company and Indemnitee, the legal fees and expenses incurred by Indemnitee for separate counsel retained by Indemnitee to monitor the Proceeding (so that such counsel may assume Indemnitee's defense if the conflict of interest between the Company and Indemnitee becomes an actual conflict of interest) shall be indemnified by the Company. The Company shall not be required to obtain the consent of Indemnitee for the settlement of any Proceeding the Company has undertaken to defend if the Company assumes full and sole responsibility for each such settlement; provided, however, that the Company shall be required to obtain Indemnitee's prior written approval, which shall not be unreasonably withheld, before entering into any settlement which (1) does not grant Indemnitee's complete release of liability, (2) would impose any penalty or limitation on Indemnitee, or (3) would admit any liability or misconduct by Indemnitee.

7.    Procedure upon Application for Indemnification. In order to obtain indemnification pursuant to this Agreement, Indemnitee shall submit to the Company a written request therefor, including in such request such documentation and information as is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Claim.

8.    Determination of Right To Indemnification. Promptly after receipt of a request for indemnification, to the extent required by applicable law, the Company shall take the steps necessary to authorize such payment in the manner set forth in California Corporations Code Section 317, or in any successor statute. The Company shall pay any claims for indemnification made under this Agreement, under any statute, or under any provision of the Company's Certificate of Incorporation or Bylaws providing for indemnifications, within thirty (30) days after a written request for payment thereof has been received by the Company, except that no determination as to entitlement to indemnification under this Agreement shall be required to be made prior to the final disposition of any Claim.

(a)    Presumptions and Defenses.

(i)    Presumption of Entitlement to Indemnification.  In making a determination of Indemnitee's entitlement to indemnification hereunder, the person or persons or entity making such determination on behalf of the Company shall presume that Indemnitee is entitled to indemnification under this Agreement and the Company shall have the burden of proof to overcome that presumption with clear and convincing evidence to the contrary. The termination of any Claim by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that Indemnitee did not act in good faith and in a manner which Indemnitee reasonably believed to be in the best interests of the Company, or, in the case of a criminal proceeding, that Indemnitee had reasonable cause to believe that Indemnitee's conduct was unlawful. In addition, it is the parties' intention that if the Company contests Indemnitee's right to indemnification, the question of Indemnitee's right to indemnification shall be for a court of competent jurisdiction to decide, and no determination by the Company (including its Board of Directors, any committee or subgroup of the Board of Directors, independent legal counsel, or its stockholders) that Indemnitee has not met the applicable standard of conduct may be used as a defense to any legal proceeding brought by Indemnitee to secure indemnification or reimbursement or advance payment of Expenses by the Company hereunder or create a presumption that Indemnitee has not met any applicable standard of conduct

(ii)    Reliance as a Safe Harbor. For purposes of this Agreement, and without creating any presumption as to a lack of good faith if the following circumstances do not exist, Indemnitee shall be deemed to have acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company if Indemnitee's actions or omissions to act are taken in good faith reliance upon the records of the Company, including its financial statements, or upon information, opinions, reports or statements furnished to Indemnitee by the officers or employees of the Company or any of its subsidiaries in the course of their duties, or by committees of the Board or by any other Person (including legal counsel, accountants and financial advisors) as to matters Indemnitee reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. In addition, the knowledge and/or actions, or failures to act, of any director, officer, agent or employee of the Company shall not be imputed to Indemnitee for purposes of determining the right to indemnity hereunder.

9.    Exclusions from Indemnification. Notwithstanding anything in this Agreement to the contrary, the Company shall not be obligated to:

(a)    indemnify or advance funds to Indemnitee for Expenses or Losses with respect to proceedings initiated by Indemnitee, including any proceedings against the Company or its directors, officers, employees or other indemnitees and not by way of defense, except:

(i)        proceedings referenced in **Section** 4 above (unless a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous); or

(ii)        where the Company has joined in or the Board has consented to the initiation of such proceedings.

(b)        indemnify Indemnitee if a final decision by a court of competent jurisdiction determines that such indemnification is prohibited by applicable law.

(c)        indemnify Indemnitee for the disgorgement of profits arising from the purchase or sale by Indemnitee of securities of the Company in violation of Section 16(b) of the Exchange Act, or any similar successor statute.

10.    Settlement of Claims. The Company shall not be liable to Indemnitee under this Agreement for any amounts paid in settlement of any threatened or pending Claim related to an Indemnifiable Event effected without the Company's prior written consent, which shall not be unreasonably withheld; provided, however, that if a Change in Control has occurred, the Company shall be liable for indemnification of the Indemnitee for amounts paid in settlement if an Independent Counsel has approved the settlement. The Company shall not settle any Claim related to an Indemnifiable Event in any manner that would impose any Losses on the Indemnitee without the Indemnitee's prior written consent.

11.    Duration. All agreements and obligations of the Company contained herein shall continue during the period that Indemnitee is a director or officer of the Company (or is serving at the request of the Company as a director, officer, employee, member, trustee or agent of another Enterprise) and shall continue thereafter (i) so long as Indemnitee may be subject to any possible Claim relating to an Indemnifiable Event (including any rights of appeal thereto) and (ii) throughout the pendency of any proceeding (including any rights of appeal thereto) commenced by Indemnitee to enforce or interpret his or her rights under this Agreement, even if, in either case, he or she may have ceased to serve in such capacity at the time of any such Claim or proceeding.

12.    Non-Exclusivity. The rights of Indemnitee hereunder will be in addition to any other rights Indemnitee may have under the Constituent Documents, the California Corporations Code, any other contract or otherwise (collectively, "**Other Indemnity Provisions**"); provided, however, that (a) to the extent that Indemnitee otherwise would have any greater right to indemnification under any Other Indemnity Provision, Indemnitee will be deemed to have such greater right hereunder and (b) to the extent that any change is made to any Other Indemnity Provision which permits any greater right to indemnification than that provided under this Agreement as of the date hereof, Indemnitee will be deemed to have such greater right hereunder. The Company will not adopt any amendment to any of the Constituent Documents the effect of which would be to deny, diminish or encumber Indemnitee's right to indemnification under this Agreement or any Other Indemnity Provision.

13.    Liability Insurance. For the duration of Indemnitee's service as a director or officer of the Company, and thereafter for so long as Indemnitee shall be subject to any pending Claim relating to an Indemnifiable Event, the Company shall use its best commercially reasonable efforts (taking into account the scope and amount of coverage available relative to the cost thereof) to continue to maintain in effect policies of directors' and officers' liability insurance and errors and omissions insurance providing coverage that is at least substantially comparable in scope and amount to that provided by the Company's current policies of directors' and officers' and errors and omissions liability insurance. In all policies of directors' and officers' liability insurance maintained by the Company, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights and benefits as are provided to the most favorably insured of the Company's directors, if Indemnitee is a director, or of the Company's officers, if Indemnitee is an officer (and not a director) by such policy. Upon request, the Company will provide to Indemnitee copies of all directors' and officers' liability insurance applications, binders, policies, declarations, endorsements and other related materials.

14.    No Duplication of Payments. The Company shall not be liable under this Agreement to make any payment to Indemnitee in respect of any Losses to the extent Indemnitee has otherwise received payment under any insurance policy, the Constituent Documents, Other Indemnity Provisions or otherwise of the amounts otherwise indemnifiable by the Company hereunder.

15.    Subrogation. In the event of payment to Indemnitee under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, Indemnitee shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

16.    Amendments. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be binding unless in the form of a writing signed by the party against whom enforcement of the waiver is sought, and no such waiver shall operate as a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver. Except as specifically provided herein, no failure to exercise or any delay in exercising any right or remedy hereunder shall constitute a waiver thereof.

17.    Binding Effect. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company), assigns, spouses, heirs and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part of the business and/or assets of the Company, by written agreement in form and substances satisfactory to Indemnitee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

8

18.     Severability. The provisions of this Agreement shall be severable in the event that any of the provisions hereof (including any portion thereof) are held by a court of competent jurisdiction to be invalid, illegal, void or otherwise unenforceable, and the remaining provisions shall remain enforceable to the fullest extent permitted by law. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

19.     Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand, against receipt, or mailed, by postage prepaid, certified or registered mail:

     (a)     if to Indemnitee, to the address set forth on the signature page hereto.

     (b)     if to the Company, to: Martifer Solar USA, Inc.

         Attn: Pedro Gomes Pereira

         2040 Armacost Avenue

         Los Angeles, California 90025

         With a copy to:

         Fox Rothschild LLP

         1800 Century Park East, 3rd Floor

         Los Angeles, California 90067

         Attention: Emily Yukich, Esq.

    Notice of change of address shall be effective only when given in accordance with this Section. All notices complying with this Section shall be deemed to have been received on the date of hand delivery or on the third business day after mailing.

20.     Governing Law and Forum. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California applicable to contracts made and to be performed in such state without giving effect to its principles of conflicts of laws. The Company and Indemnitee hereby irrevocably and unconditionally: (a) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the state or federal courts of California, County of Los Angeles and not in any other state or federal court in the United States, (b) consent to submit to the exclusive jurisdiction of the state or federal courts of California for purposes of any action or proceeding arising out of or in connection with this Agreement and (c) waive, and agree not to plead or make, any claim that the federal or state

9

courts of California lack venue or that any such action or proceeding brought in such courts has been brought in an improper or inconvenient forum.

21.    Headings. The headings of the sections and paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction or interpretation thereof.

22.    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original, but all of which together shall constitute one and the same Agreement.

[SIGNATURE PAGE FOLLOWS]

10



IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

MARTIFER SOLAR USA, INC.

By: _Roland Kiser_

Its: _CEO  Martifer Solar USA_

INDEMNITEE

Name:  Klaus Bernhart
Address: 13836 Beach Board WAY
MARINA DEL REY, CA, 90292

11

MARTIFER SOLAR USA

INDEMNIFICATION AGREEMENT

This Indemnification Agreement ("**Agreement**"), effective as of November 5, 2012, is by and between Martifer Solar USA, Inc. (the "**Company**") and Roland Kiser, an individual (the "**Indemnitee**").

WHEREAS, Indemnitee is employed as the Chief Executive Officer and President of the Company and the Company expects Indemnitee to serve on the Company's Board of Directors (the "**Board**");

WHEREAS, the Board has determined that it is in the best interests of the Company to enhance the ability of the Company to retain and attract the most capable persons as directors and officers and that the Company therefore should seek to assure such persons that indemnification and insurance coverage is available; and

WHEREAS, in recognition of the need to provide Indemnitee with substantial protection against personal liability, in order to procure Indemnitee's continued service as an officer as well as his service as a director of the Company, and to enhance Indemnitee's ability to serve the Company in an effective manner, and in order to provide such protection pursuant to express contract rights (intended to be enforceable irrespective of, among other things, any amendment to the Company's certificate of incorporation or bylaws (collectively, the "**Constituent Documents**"), any change in the composition of the Board or any change in control or business combination transaction relating to the Company), the Company wishes to provide in this Agreement for the indemnification of, and the advancement of Expenses (as defined below) to, Indemnitee as set forth in this Agreement and for the continued coverage of Indemnitee under the Company's directors' and officers' liability and errors and omissions insurance policies.

NOW, THEREFORE, in consideration of the foregoing and the Indemnitee's agreement to provide services to the Company, the parties agree as follows:

1.    Definitions. For purposes of this Agreement, the following terms shall have the following meanings:

(a)    "**Beneficial Owner**" has the meaning given to the term "beneficial owner" in Rule 13d-3 under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**").

1

(b)    "**Change in Control**" means the occurrence after the date of this Agreement of any of the following events:

(i)    the consummation of a reorganization, merger or consolidation, unless immediately following such reorganization, merger or consolidation, all of the Beneficial Owners of the Voting Securities of the Company immediately prior to such transaction beneficially own, directly or indirectly, more than sixty percent (60%) of the combined voting power of the outstanding Voting Securities of the entity resulting from such transaction; or

(ii)    the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets.

(c)    "**Claim**" means:

(i)    any threatened, pending or completed action, suit, proceeding or alternative dispute resolution mechanism, whether civil, criminal, administrative, arbitrative, investigative or other, and whether made pursuant to federal, state or other law; or

(ii)    any inquiry, hearing or investigation that the Indemnitee determines might lead to the institution of any such action, suit, proceeding or alternative dispute resolution mechanism, even if such does not result in an action, suit, proceeding or alternative dispute resolution mechanism.

(d)    "**Disinterested Director**" means a director of the Company who is not and was not a party to the Claim in respect of which indemnification is sought by Indemnitee.

(e)    "**Expenses**" means any and all expenses, including attorneys' and experts' fees, court costs, transcript costs, travel expenses, duplicating, printing and binding costs, telephone charges, and all other costs and expenses incurred in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness or participate in, any Claim. Expenses also shall include (i) Expenses incurred in connection with any appeal resulting from any Claim, including without limitation the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent, and (ii) for purposes of **Section 4** only, Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, by litigation or otherwise. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(f)    "**Expense Advance**" means any payment of Expenses advanced to Indemnitee by the Company pursuant to **Section 3** or **Section 4** hereof.

(g)    "**Indemnifiable Event**" means any event or occurrence, whether occurring before, on or after the date of this Agreement, related to the fact that Indemnitee is or was a director, officer, employee or agent of the Company or any subsidiary of the Company, or is or

2

was serving at the request of the Company as a director, officer, employee, member, manager, trustee or agent of any other corporation, limited liability company, partnership, joint venture, trust or other entity or enterprise (collectively with the Company, **"Enterprise"**) or by reason of an action or inaction by Indemnitee in any such capacity (whether or not serving in such capacity at the time any Loss is incurred for which indemnification can be provided under this Agreement).

(h)     **"Independent Counsel"** means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently performs, nor in the past ten (10) years has performed, services for either: (i) the Company or Indemnitee (other than in connection with matters concerning Indemnitee under this Agreement or of other indemnitees under similar agreements) or (ii) any other party to the Claim giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(i)     **"Losses"** means any and all Expenses, damages, losses, liabilities, judgments, fines, penalties (whether civil, criminal or other), ERISA excise taxes, amounts paid or payable in settlement, including any interest, assessments, any federal, state, local or foreign taxes imposed as a result of the actual or deemed receipt of any payments under this Agreement and all other charges paid or payable in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness or participate in, any Claim.

(j)     **"Person"** means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity and includes the meaning set forth in Sections 13(d) and 14(d) of the Exchange Act.

(k)     **"Voting Securities"** means any securities of the Company that vote generally in the election of directors.

2.     Indemnification . Subject to **Section 8 and Section 9** of this Agreement, the Company shall indemnify Indemnitee, to the fullest extent permitted by the laws of the State of California in effect on the date hereof, or as such laws may from time to time hereafter be amended to increase the scope of such permitted indemnification, against any and all Losses if Indemnitee was or is or becomes a party to or participant in, or is threatened to be made a party to or participant in, any Claim by reason of or arising in part out of an Indemnifiable Event, including, without limitation, Claims brought by or in the right of the Company, Claims brought by third parties, and Claims in which the Indemnitee is solely a witness.

3.     Advancement of Expenses. Company shall pay, prior to the final disposition of any Claim by final adjudication, any and all Expenses actually and reasonably paid or incurred by Indemnitee in connection with any Claim arising out of an Indemnifiable Event. Indemnitee's





3

right to such advancement is not subject to the satisfaction of any standard of conduct. Without limiting the generality or effect of the foregoing, within thirty (30) days after any request by Indemnitee, the Company shall, in accordance with such request, (a) pay such Expenses on behalf of Indemnitee, (b) advance to Indemnitee funds in an amount sufficient to pay such Expenses, or (c) reimburse Indemnitee for such Expenses. In connection with any request for Expense Advances, Indemnitee shall not be required to provide any documentation or information to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Indemnitee shall reimburse the Company for any Expenses paid, advanced or reimbursed to the extent that it is ultimately determined, following the final disposition of such Claim, that Indemnitee is not entitled to indemnification hereunder. Indemnitee's obligation to reimburse the Company for Expense Advances shall be unsecured and no interest shall be charged thereon.

4.    <u>Indemnification for Expenses in Enforcing Rights</u>. To the fullest extent allowable under applicable law, the Company shall also indemnify against, and, if requested by Indemnitee, shall advance to Indemnitee subject to and in accordance with **Section 3**, any Expenses actually and reasonably paid or incurred by Indemnitee in connection with any action or proceeding by Indemnitee for (a) indemnification or reimbursement or advance payment of Expenses by the Company under any provision of this Agreement, or under any other agreement or provision of the Constituent Documents now or hereafter in effect relating to Claims relating to Indemnifiable Events, and/or (b) recovery under any directors' and officers' or errors and omissions liability insurance policies maintained by the Company. Indemnitee shall only be required to reimburse the Company for Expenses advanced under this Section 4 if a final judicial determination is made that such action brought by Indemnitee was frivolous or not made in good faith.

5.    <u>Partial Indemnity</u>. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for a portion of any Losses in respect of a Claim related to an Indemnifiable Event but not for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

6.    <u>Notification and Defense of Claims</u>.

(a)    <u>Notification of Claims</u>. Indemnitee shall notify the Company in writing as soon as practicable of any Claim which could relate to an Indemnifiable Event or for which Indemnitee could seek Expense Advances, including a brief description (based upon information then available to Indemnitee) of the nature of, and the facts underlying, such Claim. The failure by Indemnitee to timely notify the Company hereunder shall not relieve the Company from any liability hereunder except that the Company shall not be liable to indemnify Indemnitee under this Agreement with respect to any judicial award in a Claim related to an Indemnifiable Event if the Company was not given a reasonable and timely opportunity to participate at its expense in the defense of such action.

(b)    <u>Defense of Claims</u>. The Company shall be entitled to participate in the defense of any Claim relating to an Indemnifiable Event at its own expense and, except as otherwise

4

provided below, to the extent the Company so wishes, Company may assume the defense thereof with counsel reasonably satisfactory to Indemnitee. After notice from the Company to Indemnitee of its election to assume the defense of any such Claim, the Company shall not be liable to Indemnitee under this Agreement or otherwise, for any Expenses subsequently directly incurred by Indemnitee in connection with Indemnitee's defense of such Claim other than reasonable costs of investigation or as otherwise provided below. Indemnitee shall have the right to employ its own legal counsel in such Claim, but all Expenses related to such counsel incurred after notice from the Company of its assumption of the defense shall be at Indemnitee's own expense; provided, however, that if (i) Indemnitee's employment of his own legal counsel has been authorized by the Company, (ii) Indemnitee has reasonably determined that there may be a conflict of interest between Indemnitee and the Company in the defense of such Claim, or (iii) the Company shall not in fact have employed counsel to assume the defense of such Claim, then Indemnitee shall be entitled to retain his own separate counsel (but he shall retain not more than one law firm plus, if applicable, local counsel in respect of any such Claim), and all Expenses related to such separate counsel shall be borne by the Company. In addition, if there exists a potential, but not an actual conflict of interest between the Company and Indemnitee, the legal fees and expenses incurred by Indemnitee for separate counsel retained by Indemnitee to monitor the Proceeding (so that such counsel may assume Indemnitee's defense if the conflict of interest between the Company and Indemnitee becomes an actual conflict of interest) shall be indemnified by the Company. The Company shall not be required to obtain the consent of Indemnitee for the settlement of any Proceeding the Company has undertaken to defend if the Company assumes full and sole responsibility for each such settlement; provided, however, that the Company shall be required to obtain Indemnitee's prior written approval, which shall not be unreasonably withheld, before entering into any settlement which (1) does not grant Indemnitee a complete release of liability, (2) would impose any penalty or limitation on Indemnitee, or (3) would admit any liability or misconduct by Indemnitee.

7.    Procedure upon Application for Indemnification. In order to obtain indemnification pursuant to this Agreement, Indemnitee shall submit to the Company a written request therefor, including in such request such documentation and information as is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Claim.

8.    Determination of Right To Indemnification. Promptly after receipt of a request for indemnification, to the extent required by applicable law, the Company shall take the steps necessary to authorize such payment in the manner set forth in California Corporations Code Section 317, or in any successor statute. The Company shall pay any claims for indemnification made under this Agreement, under any statute, or under any provision of the Company's Certificate of Incorporation or Bylaws providing for indemnifications, within thirty (30) days after a written request for payment thereof has been received by the Company, except that no determination as to entitlement to indemnification under this Agreement shall be required to be made prior to the final disposition of any Claim.

5



(a)     Presumptions and Defenses.

(i)     Presumption of Entitlement to Indemnification.  In making a determination of Indemnitee's entitlement to indemnification hereunder, the person or persons or entity making such determination on behalf of the Company shall presume that Indemnitee is entitled to indemnification under this Agreement and the Company shall have the burden of proof to overcome that presumption with clear and convincing evidence to the contrary.  The termination of any Claim by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that Indemnitee did not act in good faith and in a manner which Indemnitee reasonably believed to be in the best interests of the Company, or, in the case of a criminal proceeding, that Indemnitee had reasonable cause to believe that Indemnitee's conduct was unlawful.  In addition, it is the parties' intention that if the Company contests Indemnitee's right to indemnification, the question of Indemnitee's right to indemnification shall be for a court of competent jurisdiction to decide, and no determination by the Company (including its Board of Directors, any committee or subgroup of the Board of Directors, independent legal counsel, or its stockholders) that Indemnitee has not met the applicable standard of conduct may be used as a defense to any legal proceeding brought by Indemnitee to secure indemnification or reimbursement or advance payment of Expenses by the Company hereunder or create a presumption that Indemnitee has not met any applicable standard of conduct.

(ii)     Reliance as a Safe Harbor. For purposes of this Agreement, and without creating any presumption as to a lack of good faith if the following circumstances do not exist, Indemnitee shall be deemed to have acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company if Indemnitee's actions or omissions to act are taken in good faith reliance upon the records of the Company, including its financial statements, or upon information, opinions, reports or statements furnished to Indemnitee by the officers or employees of the Company or any of its subsidiaries in the course of their duties, or by committees of the Board or by any other Person (including legal counsel, accountants and financial advisors) as to matters Indemnitee reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. In addition, the knowledge and/or actions, or failures to act, of any director, officer, agent or employee of the Company shall not be imputed to Indemnitee for purposes of determining the right to indemnity hereunder.

9.     Exclusions from Indemnification. Notwithstanding anything in this Agreement to the contrary, the Company shall not be obligated to:

(a)     indemnify or advance funds to Indemnitee for Expenses or Losses with respect to proceedings initiated by Indemnitee, including any proceedings against the Company or its directors, officers, employees or other indemnitees and not by way of defense, except:

6



(i)      proceedings referenced in **Section 4** above (unless a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous); or

(ii)     where the Company has joined in or the Board has consented to the initiation of such proceedings.

(b)      indemnify Indemnitee if a final decision by a court of competent jurisdiction determines that such indemnification is prohibited by applicable law.

(c)      indemnify Indemnitee for the disgorgement of profits arising from the purchase or sale by Indemnitee of securities of the Company in violation of Section 16(b) of the Exchange Act, or any similar successor statute.

10.    Settlement of Claims. The Company shall not be liable to Indemnitee under this Agreement for any amounts paid in settlement of any threatened or pending Claim related to an Indemnifiable Event effected without the Company's prior written consent, which shall not be unreasonably withheld; provided, however, that if a Change in Control has occurred, the Company shall be liable for indemnification of the Indemnitee for amounts paid in settlement if an Independent Counsel has approved the settlement. The Company shall not settle any Claim related to an Indemnifiable Event in any manner that would impose any Losses on the Indemnitee without the Indemnitee's prior written consent.

11.    Duration. All agreements and obligations of the Company contained herein shall continue during the period that Indemnitee is a director or officer of the Company (or is serving at the request of the Company as a director, officer, employee, member, trustee or agent of another Enterprise) and shall continue thereafter (i) so long as Indemnitee may be subject to any possible Claim relating to an Indemnifiable Event (including any rights of appeal thereto) and (ii) throughout the pendency of any proceeding (including any rights of appeal thereto) commenced by Indemnitee to enforce or interpret his or her rights under this Agreement, even if, in either case, he or she may have ceased to serve in such capacity at the time of any such Claim or proceeding.

12.    Non-Exclusivity. The rights of Indemnitee hereunder will be in addition to any other rights Indemnitee may have under the Constituent Documents, the California Corporations Code, any other contract or otherwise (collectively, **"Other Indemnity Provisions"**); provided, however, that (a) to the extent that Indemnitee otherwise would have any greater right to indemnification under any Other Indemnity Provision, Indemnitee will be deemed to have such greater right hereunder and (b) to the extent that any change is made to any Other Indemnity Provision which permits any greater right to indemnification than that provided under this Agreement as of the date hereof, Indemnitee will be deemed to have such greater right hereunder. The Company will not adopt any amendment to any of the Constituent Documents the effect of which would be to deny, diminish or encumber Indemnitee's right to indemnification under this Agreement or any Other Indemnity Provision.

7

13.    <u>Liability Insurance</u>. For the duration of Indemnitee's service as a director or officer of the Company, and thereafter for so long as Indemnitee shall be subject to any pending Claim relating to an Indemnifiable Event, the Company shall use its best commercially reasonable efforts (taking into account the scope and amount of coverage available relative to the cost thereof) to continue to maintain in effect policies of directors' and officers' liability insurance and errors and omissions insurance providing coverage that is at least substantially comparable in scope and amount to that provided by the Company's current policies of directors' and officers' and errors and omissions liability insurance. In all policies of directors' and officers' liability insurance maintained by the Company, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights and benefits as are provided to the most favorably insured of the Company's directors, if Indemnitee is a director, or of the Company's officers, if Indemnitee is an officer (and not a director) by such policy. Upon request, the Company will provide to Indemnitee copies of all directors' and officers' liability insurance applications, binders, policies, declarations, endorsements and other related materials.

14.    <u>No Duplication of Payments</u>. The Company shall not be liable under this Agreement to make any payment to Indemnitee in respect of any Losses to the extent Indemnitee has otherwise received payment under any insurance policy, the Constituent Documents, Other Indemnity Provisions or otherwise of the amounts otherwise indemnifiable by the Company hereunder.

15.    <u>Subrogation</u>. In the event of payment to Indemnitee under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee. Indemnitee shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

16.    <u>Amendments</u>. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be binding unless in the form of a writing signed by the party against whom enforcement of the waiver is sought, and no such waiver shall operate as a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver. Except as specifically provided herein, no failure to exercise or any delay in exercising any right or remedy hereunder shall constitute a waiver thereof.

17.    <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company), assigns, spouses, heirs and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part of the business and/or assets of the Company, by written agreement in form and substances satisfactory to Indemnitee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

8



18.     <u>Severability</u>. The provisions of this Agreement shall be severable in the event that any of the provisions hereof (including any portion thereof) are held by a court of competent jurisdiction to be invalid, illegal, void or otherwise unenforceable, and the remaining provisions shall remain enforceable to the fullest extent permitted by law. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

19.     <u>Notices</u>. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand, against receipt, or mailed, by postage prepaid, certified or registered mail:

     (a)    if to Indemnitee, to the address set forth on the signature page hereto.

     (b)    if to the Company, to: Martifer Solar USA, Inc.

               Attn: Pedro Gomes Pereira

               2040 Armacost Avenue

               Los Angeles, California 90025

               With a copy to:

               Fox Rothschild LLP

               1800 Century Park East, 3rd Floor

               Los Angeles, California 90067

               Attention:  Emily Yukich, Esq.

     Notice of change of address shall be effective only when given in accordance with this Section. All notices complying with this Section shall be deemed to have been received on the date of hand delivery or on the third business day after mailing.

20.     <u>Governing Law and Forum</u>. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California applicable to contracts made and to be performed in such state without giving effect to its principles of conflicts of laws. The Company and Indemnitee hereby irrevocably and unconditionally: (a) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the state or federal courts of California, County of Los Angeles and not in any other state or federal court in the United States, (b) consent to submit to the exclusive jurisdiction of the state or federal courts of California for purposes of any action or proceeding arising out of or in connection with this Agreement and (c) waive, and agree not to plead or make, any claim that the federal or state

courts of California lack venue or that any such action or proceeding brought in such courts has been brought in an improper or inconvenient forum.

21.    Headings. The headings of the sections and paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction or interpretation thereof.

22.    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original, but all of which together shall constitute one and the same Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

MARTIFER SOLAR USA, INC.

By: _____

KLAUS BERNHART CFO
MARTIFER SOLAR USA

INDEMNITEE

6/17/2013

_____

Name:  Roland Kiser
Address:  10 Round Hollow Ct
Old Brookville, NY 11545

11

# EXHIBIT 7

# EXHIBIT 7



3333 E. Serene Ave., Ste. 110
Henderson, NV 89074
Phone: 702.685.4444
www.carlyonlawgroup.com

Candace C. Carlyon
Adam P. Bowler

April 15, 2014

<u>VIA ELECTRONIC CORRESPONDENCE</u>
Michael A. Tucker
Senior Managing Director
Two North Central Avenue, # 1200
One Renaissance Square
Phoenix, AZ 85004-4563
michael.tucker@fticonsulting.com

**Re: Martifer Solar USA, Inc. and Martifer Aurora Solar, LLC ("Debtors"), BK-S-14-10355 and BK-S-14-10357; Claims of Roland Kiser and Klaus Bernhart**

Dear Michael:

As you know, this office represents Mr. Kiser and Mr. Bernhart relative to their claims in the above-referenced cases. My clients' service pursuant to the attached employment agreements (each, the "Employment Agreement") was completed, but they have not yet received final payment of sums due to them. The following amounts are currently due:

<u>**Roland Kiser**</u>:

<u>Four Month Salary</u>. Pursuant to Section 1(c) of his Employment Agreement, following the initial one year employment term ending on March 10, 2014, "[i]n the event that Executive's employment with the Company is not extended pursuant to a subsequent agreement, Company shall pay to Executive four (4) months' salary in a single lump sum payment on or before April 1, 2014". As you know, no consensual agreement for Mr. Kiser's continued employment was reached. His Employment Agreement further calls for Mr. Kiser to receive a base salary of $200,000 per year, resulting in a four month salary calculation of **$66,666.67**.

Martifer Aurora Solar, LLC
April 15, 2014
Page 2 of 4

Restructuring Bonus. Pursuant to Section 4(b) of his Employment Agreement, "[f]or his services during the term of this Agreement, [Mr. Kiser] shall receive a restructuring bonus in the amount Seventy-Five Thousand Dollars ($75,000),which shall be paid on or before March 10, 2014."

**Klaus Bernhart**:

Four Month Salary. Pursuant to Section 1(c) of his Employment Agreement, following the initial one year employment term ending on March 10, 2014, "[i]n the event that Executive's employment with the Company is not extended pursuant to a subsequent agreement, Company shall pay to Executive four ( 4) months' salary in a single lump sum payment on or before April 1, 2014". As you know, no consensual agreement for Mr. Bernhart's continued employment was reached. His Employment Agreement further calls for Mr. Bernhart to receive a base salary of $185,000 per year, resulting in a four month salary calculation of **$61,666.67**.

Restructuring Bonus. Pursuant to Section 4(b) of his Employment Agreement, "[f]or his services during the term of this Agreement, [Mr. Bernhart] shall receive a restructuring bonus in the amount Fifty Thousand Dollars ($50,000),which shall be paid on or before March 10, 2014."

**Both Mr. Kiser and Mr. Bernhart**:

My clients have also incurred attorneys' fees and costs to date totaling $32,740.04, and my clients continue to incur fees and costs associated with the company's failure to make the above payments when and as due. Such are payable both pursuant to the attorneys' fees clauses of the respective Employment Agreement, and pursuant to the separate Indemnity Agreements in favor of each of my clients.

It should be noted that none of these payments are based on "length of employment" and thus the amounts due post-petition are fully entitled to administrative priority status. See, e.g., Matter of Pac. Far E. Line, Inc., 713 F.2d 476, 479 (9th Cir. 1983)("the payments here were due

Martifer Aurora Solar, LLC
April 15, 2014
Page 3 of 4

regardless of employees' eligibility or length of service. These payments could therefore be likened to the type of severance pay which is calculated without regard to length of employment, and which both *HMO* and *Mammoth Mart* allow as administrative expense"). My clients continued to work post-petition, through very difficult circumstances, with the expectation that the March and April payments would be made. Compare Matter of Tucson Yellow Cab Co., Inc., 789 F.2d 701, 704-05 (9th Cir. 1986)("We are satisfied that the work done by the employees after April 5, 1982 was necessary to the preservation of the estate. Although they knew that their discharge was inevitable, they did not know the date it would take effect. They continued to work in the reasonable belief that their wages had been unchanged. Payment for that work has statutory priority which destroys the equality [claimant] seeks. The work's fair value includes severance pay").

My clients respectfully request that the company remit the sum of $141,666.66 to Mr. Kiser; $111,666.67 to Mr. Bernhart; and $32,740.34 to Carlyon Law Group, PLLC, by April 21, 2014. Otherwise, my clients respectfully elect to submit the matter to arbitration pursuant to Section 12 of the Employment Agreements. Since these sums were due post-petition, such a proceeding does not constitute the commencement or continuation of an act against the debtor "that was or could have been commenced before the commencement of the case," and thus that the automatic stay is not implicated by such a proceeding. However, in an abundance of caution, please advise whether you agree and, if not, whether you will stipulate to relief from the stay in

Martifer Aurora Solar, LLC
April 15, 2014
Page 4 of 4

order to pursue such claims.

Sincerely,

CARLYON LAW GROUP, PLLC

Candace C. Carlyon, Esq.

cc: Brett Axelrod, Esq., baxelrod@foxrothschild.com
Dawn Cica, Esq., dcica@foxrothschild.com
Samuel Schwartz, Esq., sam@schwartzlawyers.com
Shirley Cho, Esq., scho@pszjlaw.com